# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

RUTHELLE FRANK, et al., on behalf of
themselves and all others similarly situated,

               Plaintiffs,

v.

SCOTT WALKER, in his official capacity as
Governor of the State of Wisconsin, et al.,

               Defendants.

Civil Action No. 2:11-cv-01128 (LA)

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION
## AS TO ELEVEN NAMED PLAINTIFFS

# INTRODUCTION

The Wisconsin photo ID law, 2011 Wisconsin Act 23 ("the photo ID law" or "Act 23"), the most restrictive such law currently in force anywhere in the country, imposes severe and unjustifiable burdens on Wisconsin voters. The photo ID law arbitrarily excludes photo IDs that are in all material respects indistinguishable from accepted IDs, charges voters a fee to exercise a constitutional right, and refuses to allow any reasonable alternative to presenting an accepted photo ID. Defendants concede that alternatives such as accepting an affidavit of identity at the polls in lieu of the photo ID would be as effective at combating the purported harm the photo ID law supposedly was enacted to prevent while imposing a substantially lower administrative burden and expense on the state. And the "harm" itself is truly illusory: In the past *three decades*, not a single individual has been found to have committed voter impersonation fraud in Wisconsin, and only a handful of voters have been found to have unlawfully voted at all.

Defendant Kevin Kennedy, Executive Director of the Wisconsin agency in charge of elections, acknowledges that the photo ID law is expected to have the greatest impact on groups "such as the elderly or people with disabilities or racial minorities where there may be a higher concentration of people without the traditional forms of identification."[1] In fact, Plaintiff Ruthelle Frank – a longtime elected member of her local village board who is on the ballot for the April 3, 2012 election – will be unable to vote for herself because she lacks a birth certificate and cannot obtain an acceptable form of photo ID. Such absurd results mandate that Wisconsin's unreasonably strict photo ID law be declared unconstitutional as applied to the named Plaintiffs.

---

[1] Deposition of Kevin Kennedy, Page 49, lines 8-14 (hereafter "KK 49:8-14") (Deposition excerpts and documents not previously marked as exhibits in depositions are included as alphabetic Attachments to the Declaration of Karyn Rotker.)

The Supreme Court expressly recognized in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) that, although Indiana's less restrictive photo ID law was not unconstitutional on its face, a law that imposed "excessively burdensome requirements" would be subject to constitutional challenge by those individuals and groups of voters who are particularly burdened by such law. *Id*. at 189 ("[T]he evidence in the record is not sufficient to support a facial attack on the validity of the entire statute . . . ."); *id*. at 202 ("[O]n the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters."). This action makes precisely such a factual, as-applied challenge to the constitutionality of Wisconsin's photo ID law. Plaintiffs are experiencing severe burdens in the pursuit of an accepted photo ID for voting. The process is not as easy as walking into a single office and walking out with an ID card. Defendants have made the right to vote contingent upon a voter's ability to navigate a series of application procedures and identification requirements at multiple local, state, and federal agencies. Once, voters were forced to pass literacy tests in order to cast a ballot. Now Wisconsin voters must pass a bureaucracy navigation test – one that is particularly difficult for those citizens with limited education, literacy, resources, and access to information.

Worse yet, that bureaucracy navigation test is administered by the Wisconsin Department of Transportation Division of Motor Vehicles ("DMV") Defendants and their subordinates, an agency with no prior experience handling residents' fundamental right to vote. Now, the many employees of that agency serve as gatekeepers to the exercise of our constitutional rights by controlling who is able to obtain a Wisconsin driver's license or photo ID. DMV's scheme for issuing driver's licenses and state ID cards mandates that those who have never before had a Wisconsin driver's license or ID card must: (1) access one of 92 DMV offices statewide during

2

weekday, daytime hours; (2) produce at least three separate documents, at least one of which bears a cost and at least two of which often cannot be obtained without secondary identification; and (3) have a residence street mailing address. Procuring a photo ID in Wisconsin is an unreasonably complicated, arbitrary and costly task that disfranchises Wisconsin voters.

Plaintiffs therefore request that this court enjoin enforcement of the photo ID law as to Plaintiffs Shirley Brown, Sam Bulmer, Pamela Dukes, Carl Ellis, Ruthelle Frank, Mariannis Ginorio, Rickie Lamont Harmon, Eddie Lee Holloway, Barbara Oden, DeWayne Smith, and Nancy Lea Wilde, and allow them to vote without providing photo ID. In the alternative, as to Plaintiffs Brown, Bulmer, Dukes, Ellis, Frank, Ginorio, Holloway, Oden, Smith, and Wilde, Plaintiffs request that they be allowed to vote by providing an affidavit of identity at the polling place or with an absentee ballot as a substitute for the photo ID requirement. Plaintiffs Bulmer, Ellis, and Harmon alternatively request that they be allowed to vote using their Veterans Identification Cards ("VICs").

## STATEMENT OF FACTS

### A. The Photo ID Law

The photo ID law was signed into law on May 25, 2011 and is now effective for all elections in Wisconsin. Under the law, Wisconsin voters must present one form of photo identification from a limited statutory list in order to cast a ballot. Wis. Stat. § 6.79(2)(a). The list of accepted photo IDs in Wisconsin is restricted to only the following: (1) a Wisconsin driver's license; (2) a Wisconsin state ID card issued by the Wisconsin DMV; (3) an identification card issued by a U.S. uniformed service; (4) a U.S. passport; (5) a certificate of U.S. naturalization that was issued not earlier than 2 years before the date of an election at which

3

it is presented; (6) an unexpired receipt issued at the time of application for a Wisconsin driver's license or state ID card; (7) an identification card issued by a federally recognized Indian tribe in Wisconsin; (8) an unexpired identification card issued by a Wisconsin university or college accredited as defined in Wis. Stat. § 39.30(1)(d), which contains the student's signature, the issuance date, and an expiration date not later than 2 years after the date of issuance, Wis. Stat. § 5.02(6m); and (9) for a voter who is required to surrender his or her operator's license or driving receipt by a law enforcement officer within 60 days of the date of an election, an original copy of the citation or notice, Wis. Stat. § 6.79(7) (collectively, "accepted photo ID"). The first four accepted photo IDs must be unexpired or have expired after the date of the most recent general election. Wis. Stat. § 5.02(6m)(a). A voter lacking accepted photo ID when attempting to vote in person on Election Day must cast a provisional ballot which will be counted only if the voter can manage to obtain and present the required ID during the local clerks' limited office hours by 4pm on the Friday after the election. Wis. Stat. §§ 6.79(3)(b), 6.97.

Each of the named Plaintiffs must present photo ID to vote. This is because for most voters – including these Plaintiffs – Wisconsin's law provides <u>no</u> exceptions to the photo ID requirement for in-person voting except for electors with proof of confidential elector status due to the existence of a protective order or other specified evidence of domestic violence, sexual assault, or stalking. Wis. Stat. § 6.79(6). All Plaintiffs would, if they chose to vote absentee, still have to submit a copy of accepted photo ID, because absentee voters who do not fall into one of a few categories – generally, overseas, confidential, and some elderly and disabled voters who are indefinitely confined or live in certain care facilities – must obtain photo ID and, at least once,[2] submit a copy of that ID. Wis. Stat. §§ 6.34(1), 6.86(2)(a), 6.87(4)(b)1,2,5; 6.875(6)(c).

_____

[2] Mail-in absentee voters who have not changed names or addresses since the prior time they

4

The financial and logistical burdens of compliance with the photo ID law fall heavily upon these Plaintiffs. These are burdens Defendants' laws and policies exacerbate. Moreover, despite Defendant Kennedy's explicit recommendations (KK 11:6-18 & Deposition Exhibit (Ex.) 1,[3] p.2, Ex. 2, p.3), the Wisconsin photo ID law does not permit VICs to be used for voting. The photo ID law also fails to include reasonable alternatives to enable eligible voters who lack photo ID to vote, such as by completing an affidavit of identity at the polling place.[4] Yet Defendant Kennedy testified that an affidavit of identity would be as effective as the photo ID law in deterring voter fraud and prosecuting any perpetrators of voter fraud, and would be far less of an administrative burden and expense than the provisional ballot procedures mandated by the photo ID law. (KK 25:8-27:20; Ex. 1, p. 6, Ex. 2, pp. 8-9, Ex. 3, p. 1).

### B. Wisconsin's Regulatory Scheme Governing the Issuance of State ID Cards

The photo ID law requires the DMV to issue ID cards free of charge if the applicant is a U.S. citizen, will be at least 18 years old by the next election, and asks that the card be provided free for voting purposes. Wis. Stat. § 343.50(5)(a), *as amended by* 2011 Wis. Act 23 § 138.

DMV's application process for Wisconsin driver's licenses and state ID cards is burdensome for first-time applicants (*i.e.*, persons who have never before held a *Wisconsin* license or ID card), and for those who have not had a Wisconsin driver's license or ID card in

---

voted absentee and who previously sent photo ID do not have to resubmit it. Wis. Stat. § 6.87(4)(b)3. But because they must provide ID at least once, these voters must obtain.

[3] Exhibits marked with sequential Exhibit numbers in depositions are attached to the Declaration of Karyn Rotker.

[4] The Legislature also rejected a procedure proposed by Defendant Kennedy to allow a voter without ID to submit a "challenge" ballot. The voter would have had to affirm eligibility, but the ballot would have been marked and could have been removed from the count if the elector were subsequently found to have been ineligible. (KK 28:8-30:5 & Ex. 3).

5

more than 8 years. (Deposition of Lynne Judd ("LJ") 63:7-64:4) (Attachment B). These applicants must produce: (1) proof of name and date of birth, (2) proof of identity, (3) proof of citizenship, (4) proof of Wisconsin residency, and (5) a Social Security Number. Wis. Admin. Code Trans. § 102.15(2). To meet DMV's requirements, an individual – including all Plaintiffs for whom relief is sought – must present at least three separate documents.[5] These stringent regulations, especially the proof of citizenship requirement, were crafted not to address or facilitate voting, but rather to implement "REAL ID" requirements. (LJ 69:10-70:10); 2005 Wis. Act 126 § 2; 2007 Wis. Act 20 §§ 3245, 3257, 3379. Nevertheless, these requirements are now routinely being imposed on voters for whom compliance is impossible or extremely burdensome.

For Plaintiffs Brown, Bulmer, Dukes, Ellis, Frank, Ginorio, Holloway, and Wilde the only document listed in the DMV rules that they could use to prove U.S. citizenship is a certified copy of a birth certificate, Wis. Admin. Code Trans. § 102.15(3m), which also qualifies as proof of name and date of birth.[6] Wis. Admin. Code Trans. § 102.15(3). However, Plaintiffs Brown and Wilde were never issued birth certificates, while Plaintiffs Frank's and Holloway's birth certificates are incorrect. (Declaration of Plaintiff Brown, paragraphs 4-5[7] (hereafter "Brown ¶¶ 4-5,") Frank ¶10, Holloway ¶ 7, Wilde ¶ 10).

Under state rules, if the applicant is unable to provide accepted proof of name and date of birth because the needed documents are "unavailable," then the applicant may petition the DMV Administrator, Defendant Judd, to consider alternative proof of name and date of birth. *Id*. §

---

[5] The Indiana photo ID law affirmed in *Crawford v. Marion County Election Board*, 553 U.S. 181, 198 n.17 (2008) required the production of just *one* primary document.

[6] In contrast, Indiana voters were allowed to use Medicaid and Medicare cards, Social Security statements, and other reasonable alternative documents *in lieu of* birth certificates, to secure photo ID. *Crawford*, 553 U.S. at 199 n.18.

[7] Plaintiffs' Declarations are attached to this Brief in alphabetical order by last name.

6

102.15(3)(b).  "Unavailable" excludes documents the applicant forgot to bring and documents that have been lost or destroyed if a replacement original or certified copy may be obtained. Wis. Admin. Code Trans. § 102.15(1).  Thus, an applicant who has never had a copy of his or her birth certificate or whose birth certificate has been lost or stolen must obtain and usually pay for a new one.[8]  Plaintiffs Bulmer, Dukes, Ellis, and Ginorio, who lack birth certificates but whose birth records exist, would therefore not qualify to use this alternative procedure.

Moreover, to the extent DMV's alternative procedure exists for persons whose birth records are "unavailable," this procedure is not publicized or routinely made available for persons who need to prove name and date of birth.  Nor is it consistently applied.  Plaintiff Brown, a 73-year-old woman who was born in Louisiana by midwife and whose birth was never registered, went to DMV twice with a copy of an affidavit from the school she attended as a child that attested to her name, date and place of birth, and parents' names, but DMV rejected it and never told her about any alternative procedure to prove name and date of birth or citizenship, so she was unable to obtain a state ID card.  (Brown ¶ 7).  Plaintiff Frank, who is 84, has never had a copy of her birth certificate, and when she went to obtain it so she could apply for a photo ID to vote, she learned it contained misspellings of her maiden name and her parents' names and that correcting it would cost hundreds of dollars.  (Frank ¶ 10).  DMV rejected the baptismal certificate she proffered instead.  (Frank ¶ 13).  Moreover, DMV staff supposedly determined Plaintiff Frank could acquire a birth certificate that would allow her to obtain a state ID card, and thus never offered her any alternative procedure to prove name and date of birth or citizenship.

---

[8] In contrast, Georgia's photo ID law allows issuance of a photo ID without documentary proof of birth. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1346 (11th Cir. 2009) (The law "requires each county to issue free of charge a 'Georgia voter identification card'…The …cards can be obtained by producing evidence that the voter is registered to vote in Georgia and by swearing an oath that the voter does not have another acceptable form of identification.").

7

(LJ 43:16-44:16).  Plaintiff Wilde, a 74-year-old disabled woman who has never had a birth certificate, also went to the DMV with her baptismal and hospital records; DMV rejected them and declined to issue her an ID.[9]  (Wilde ¶¶ 3, 8-11).  Plaintiff Holloway's birth certificate erroneously recorded "Junior" as his middle name rather than as a suffix to his name.  DMV told him his birth certificate was unacceptable and failed to inform him of any alternative procedure to prove his eligibility to obtain an ID card.  (Holloway ¶¶ 9-10).

Further, under state law, Wis. Stat. §§ 343.14(2)(er)1, 343.50(4), documentary proof of citizenship is mandatory to obtain a driver's license or photo ID card.  Although Defendant Judd suggested alternative procedures might exist for persons without birth certificates to prove U.S. citizenship, documents provided by the DMV Defendants, issued by DMV's Operations Manager, Patrick Fernan, state that there are "no exceptions" to the citizenship documentation requirement, and that U.S. citizen applicants must by statute produce a birth certificate, U.S. passport, or certificate of naturalization. (LJ 8:19-25, 34:12-35:8, 36:4-18, 38:1-39:16, 41:4-42:20, 77:11-78:23 & Exs. 27, 34). Thus it is unclear whether any alternative procedure for proof of citizenship exists at all, or when or how DMV applies it.

The burdens of DMV's process are magnified by the fact that the documents it insists voters obtain often bear their own costs and identification requirements.  Many vital records offices, including those of Illinois (where Plaintiffs Dukes, Ellis, and Holloway were born), Kansas (Bulmer), Louisiana (Brown), Puerto Rico (Ginorio) and Wisconsin (Wilde) require an official photo ID or other documents from a restrictive list to obtain a birth certificate.

---

[9] Subsequently, DMV told Plaintiff Wilde to obtain a certification from the vital records office that there is no record of her birth, but did not send her forms or other information necessary to do so.  It is unclear how long this process will take and whether DMV will in fact accept the certification, if Plaintiff is able to obtain it.  (Wilde ¶¶ 12-13).

8

(Attachment C).  Some Plaintiffs lack the documents their birth states say they need to request their birth certificates.  (*See, e.g.*, Bulmer ¶10; Ginorio ¶7).

In addition, birth certificate applications generally require the payment of a fee to search for records and provide a copy of any records that exist.  While for some voters these costs might not be significant, Defendants' lack of viable, cost-free documentary alternatives to a birth certificate forces many low-income persons to expend some of their extremely limited funds to pay for a birth certificate or lose their right to vote.   Plaintiff Dukes, who subsists on Supplemental Security Income ("SSI") disability benefits and whose income is well below the Federal Poverty Level, uses her limited income to meet basic needs and cannot afford to apply for her Illinois birth certificate.  (Dukes ¶¶ 3-5).  Plaintiffs Bulmer and Ellis, who are living in a shelter for homeless veterans in Milwaukee, cannot prove they are U.S. citizens to the DMV's satisfaction because their lack of income precludes them from obtaining birth certificates from Kansas and Illinois, respectively.  (Bulmer ¶9, Ellis ¶¶ 8-9).  Plaintiff Ginorio has limited income and many bills she must pay, including medical bills.  Even though she grew up and graduated from high school in Milwaukee, DMV will not accept her Puerto Rican birth certificate because it was issued before July 1, 2010, so to get a photo ID she must pay for a Puerto Rican birth certificate issued on or after that date.  (Ginorio ¶¶2, 6); (LJ 76:5-77:1). The birth certificate application forms for both Louisiana and Wisconsin, the birth states of Plaintiffs Brown and Wilde, respectively, charge for a "search" of birth records, regardless of whether or not the record is found, not just for copies that are in fact located, (Attachment C, pp. 5, 9[10]), requiring Plaintiffs Brown and Wilde to incur costs for records that do not exist. The cost of initiating legal

---

[10] Louisiana's application form states "If no record is found, you will be notified and fees will be retained." Wisconsin's form states "FEE IS <u>NOT REFUNDABLE</u> IF NO RECORD IS FOUND. CANCELLATION REQUESTS ARE <u>NOT</u> ACCEPTED." *Id.* (emphases in original).

9

proceedings to amend inaccurate birth certificates, such as those of Plaintiffs Frank and Holloway, put even greater financial burdens on voters. (Frank ¶10, Holloway ¶¶11-12).

The proof of identity rules that DMV has chosen to impose are similarly burdensome. For some, including Plaintiffs Oden and Smith, presenting a Social Security Card ("SSC") – not just confirmation of the Social Security number or a printout or benefits statement, but the actual card – is the only document available to prove identity under DMV's rules. Wis. Admin. Code Trans. § 102.15(4).[11]  Obtaining an SSC, however, is often a bureaucratic nightmare.  The Social Security Administration ("SSA") generally requires an individual to provide identification to obtain an SSC, and the information provided voters on exactly what kind of identification is acceptable varies depending on which office or employee is contacted.  For example, DMV staff have repeatedly told Plaintiff Smith that he cannot obtain a Wisconsin photo ID card without an SSC, but staff at the Social Security Office have repeatedly refused to issue him an SSC unless he produces a photo ID. (Smith ¶¶10-12).  Similarly, employees at the downtown DMV told Plaintiff Oden that she needed an SSC, but the downtown Milwaukee Social Security office its staff told her that the agency would not give her an SSC without a government-issued photo ID card.  (Oden ¶¶ 5-6).  While SSA rules may allow the use of other documents to obtain an SSC, voters are often not told of these options, some cost money, and many require an applicant to travel to other offices or agencies.  20 C.F.R. § 422.107.

DMV also requires applicants for a Wisconsin driver's license or state ID card to provide proof of "a current acceptable Wisconsin residence street address." DMV will not accept a

---

[11] Persons with prior licenses or photo ID cards may be able to use those to prove identity, but that option is not available for persons who have never had licenses or ID cards.  Most of the remaining documents DMV permits to meet this requirement are unavailable to the public at large or otherwise not widely held, such as military IDs and discharge papers or court orders related to adoptions or name changes. *See* Wis. Admin. Code Trans § 102.15(4).

document listing a P.O. box or commercial mail-receiving agency. Wis. Admin. Code Trans §§ 102.15(2) (c); 102.15(4m). At the time this case was originally filed, the DMV Defendants had no publicized policies for voters without a residence street address or living in shelters, such as Plaintiffs Bulmer, Ellis, and Harmon. (Bulmer ¶ 6, Ellis ¶ 4, Harmon ¶ 6). The DMV now asserts that homeless shelters and social service providers may attest to their clients' residence and accept mailed ID cards on their behalf. (LJ 14:15-15:9 & Ex. 21). However, the Legislature or governor could use the rulemaking process to block this policy, as has occurred with other aspects of photo ID law implementation.[12]

Clearly, the process of obtaining the multiple documents DMV requires before it will issue a photo ID card can be extremely complex and burdensome, particularly for individuals with lower levels of education, literacy, resources, access to information, or reliable transportation. Defendants have imposed the burden of dealing with multiple, bureaucratic hurdles on voters, and often on voters with the least ability to overcome those hurdles. Disfranchisement by bureaucracy is the inevitable result.

Finally, the problem is compounded by the difficulties of accessing DMV offices. There are only 92 DMV offices in the state. Voters who essentially by definition do not drive,[13] and

---

[12] While a state agency may implement policies, the Legislature can direct an agency to issue a rule to replace a policy. Under 2011 legislation, an agency's proposed emergency rule in final draft form is subject to review by the governor, as well as by the Legislature, at various stages in the rulemaking process, including when a statement of the scope of a rule is issued and before promulgation. Wis. Stat. §§ 227.19, 227.24(1)(e)1g, 227.26(2)(b). The concerns about legislative interference with agency policy are not hypothetical in the voter ID context, as the Legislature has already objected to certain student-ID related policies of the GAB and ordered the GAB to reduce these policies to formal rules, despite the GAB Defendants' position that the policies were appropriate and within its authority. (*See, e.g.*, KK 14:16-15:11 & Ex. 4, pp. 4-11, Ex. 5, pp. 2-6).

[13] If Plaintiffs had Wisconsin driver's licenses, they would be able to use those as accepted photo ID.

11

many of whom are low income, such as Plaintiff Oden, has walked to DMV, while Plaintiff Smith, who suffers from a leg injury, has also walked and made repeated bus trips. (Oden ¶3, Smith ¶14). Plaintiff Brown has had to repeatedly incur the expense of using paratransit for her trips to DMV. (Brown ¶ 7). Yet DMV has no plans to deploy mobile units capable of servicing voters who are distant from or have difficulty traveling to its offices. (LJ 102:18-103:4). Unlike South Carolina, DMV also has no plans to drive voters without ID to its offices. (LJ 104:15 - 105:20 & Ex. 39).

## ARGUMENT

### A.    Legal Standard for Preliminary Injunction

Plaintiffs seeking a preliminary injunction must demonstrate that: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Michigan v. U.S. Army Corps of Engineers*, No. 10-3891, 2011 WL 3836457, at *2 (7th Cir. Aug. 24, 2011). "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (internal citations omitted).

Regarding the first element, the "most significant difference between the preliminary injunction phase and the merits phase is that a plaintiff in the former position needs only to show 'a likelihood of success on the merits rather than actual success.'" *Michigan v. Army Corps*, No.

10–3891, 2011 WL 3836457, at *16 (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987), *cert. denied* 2012 WL 603147 (Feb. 27, 2012). "This is in keeping with the often-repeated rule that the threshold for establishing likelihood of success is low." *Id*. A likelihood of success only requires a "plausible claim on the merits." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).

The second element, a likelihood of irreparable harm, is presumed where, as here, the deprivation of a fundamental constitutional right cannot be remedied by monetary damages. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011) (bar on exercise of Second Amendment rights constitutes irreparable harm); *Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) ("[V]iolations of First Amendment rights are presumed to constitute irreparable injuries."); *see also Awad v. Ziriax*, No. 10-6273, 2012 WL 50636, at *14 (10th Cir. Jan. 10, 2012) (when "'an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'"). Courts routinely have found that the denial or abridgment of the right to vote to constitute an irreparable injury, *i.e.* one that cannot be redressed by post-election remedies. In *Williams v. Salerno*, 792 F.2d 323 (2d Cir. 1986), the Second Circuit found that a county election board's refusal to register university students to vote on the ground that their dormitories could not be considered fixed, personal, or principal homes constituted irreparable harm. *Id*. at 326; *see also U.S. Student Ass'n Foundation v. Land*, 585 F. Supp. 2d 925, 943-44 (E.D. Mich. 2008) (policy of rejecting voter registration applications when identification is returned as undeliverable threatened irreparable injury to voters); *Cardona v.*

13

*Oakland Unified Sch. Dist.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) (citing *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986)) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."); *cf. Johnson v. Cook County Officers Electoral Bd.*, 680 F. Supp. 1229, 1232-33 (N.D. Ill. 1988) (harm found irreparable where candidate would not secure ballot position absent injunctive relief).

The third requirement, that the balance of equities tip in the Plaintiffs' favor, simply means that the injunction "must do more good than harm." *Hoosier Energy*, 582 F.3d at 725; *Winter*, 555 U.S. at 20. In determining whether a preliminary injunction is warranted, "[h]ow strong a claim on the merits [must be] depends on the balance of harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy*, 582 F.3d at 725. The Seventh Circuit has elaborated on the considerations involved in this part of the test:

> During the balancing phase of the preliminary injunction analysis, the goal of the court is to choose the course of action that minimizes the costs of being mistaken. To do so, the court must compare the potential irreparable harms faced by both parties to the suit-the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if the preliminary injunction is granted. We evaluate these harms using a sliding scale approach. The more likely it is that [the plaintiff] will win its case on the merits, the less the balance of harms need weigh in its favor. Conversely, if it is very unlikely-albeit better than negligible, as we have already determined-that [the plaintiff] will win on the merits, the balance of harms need weigh much more in [plaintiff's] favor.

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008) (internal citations omitted).

Finally, "[w]here appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Girl Scouts of Manitou*, 549 F.3d at 1086; *see also Ferrell v.*

14

*U.S. Dept. of Housing and Urban Development*, 186 F.3d 805, 811 (7th Cir. 1999) ("The court must also consider the public interest by weighing the effect that either granting or denying the injunction will have on nonparties.").  In voting rights cases, where the risk of disfranchisement exceeds the risk of actual voter fraud, the public interest weighs in favor of preventing disfranchisement.  In *U.S. Student Ass'n Foundation v. Land*, 546 F.3d 373 (6th Cir.  2008), the Sixth Circuit concluded that:

> Because the risk of actual voter fraud is miniscule when compared with the concrete risk that Michigan's policies will disenfranchise eligible voters, we must conclude that the public interest weighs in favor of denying the stay of the preliminary injunction [that the district court had issued in favor of voters]. The preliminary injunction eliminates a risk of individual disenfranchisement without creating any new substantial threats to the integrity of the election process.

*Id*. at 388-89; *see also Phelps-Roper v. Nixon*, 509 F.3d 480, 488 (8th Cir. 2007) ("[T]he public is served by the preservation of constitutional rights.").

As demonstrated below, Plaintiffs' claims satisfy each of these four elements.

**B.  Application of *Winter* Standard**

**1.  Claims 1 and 2: The Photo ID Law Imposes Severe Burdens on the Right to Vote That Are Not Narrowly Tailored to a Compelling Government Interest**

**a.  Legal Standard: The Fourteenth Amendment Balancing Test**

The right to vote is protected under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as the First Amendment.  *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 n.7 (1983). Plaintiffs Brown, Bulmer, Dukes, Ellis, Frank, Ginorio, Holloway, Oden, Smith, and Wilde are likely to succeed on the merits of these claims.  "No right is more precious in a free country than that of having a voice in the election of those who make the laws under

15

which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964).

State restrictions on the franchise are analyzed under a balancing test that weighs the degree to which the restriction impinges on the rights of voters against both the legitimacy and strength of the state's interests, and whether "those interests make it necessary to burden plaintiff's rights." *Anderson*, 460 U.S. at 789. In *Burdick v. Takushi*, 504 U.S. 428 (1992), the Supreme Court explained that "the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id*. at 434. "[S]evere restrictions" must be "narrowly drawn to advance a state interest of compelling importance." *Id*. (internal citations and quotation marks omitted). While lesser burdens may receive less rigorous review, they still must be balanced against the proffered state interest. Thus, there is no "litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters. However slight that burden may appear . . . it must be justified by relevant and legitimate state interests '*sufficiently weighty to justify the limitation*.'" *Crawford*, 553 U.S at 191 (internal citations omitted; emphasis added).

Even where the state has a legitimate interest, a statute that imposes a significant burden on the right to vote is not "necessary" if the state's interest could be achieved in a less restrictive way. *Anderson*, 460 U.S. at 789 ("In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. . . ."). Given the fundamental nature of the right to vote, a state must use the least restrictive means to achieve its articulated purpose.

16

### b.     The Severity of the Burdens

As discussed in Section I, the photo ID law and the DMV regulatory structure it incorporates impose a severe and unjustifiable burden on voters. "Ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone, are not severe. Burdens are severe if they go beyond the merely inconvenient." *Crawford*, 553 U.S. at 205. The combined effects of the burdens imposed by the photo ID law go far beyond "merely inconvenient."

Wisconsin law, unlike the Indiana statute at issue in *Crawford*, imposes a <u>total</u> deprivation of the right to vote if Plaintiffs cannot obtain a photo ID. None of the Plaintiffs fits within the limited statutory exemptions for in-person or absentee voting.[14] Further, contrary to Defendant Kennedy's own recommendations, Wisconsin has refused to provide any affidavit-of-identity alternative to obtaining a photo ID.

At the same time, as discussed extensively above, pp. 6-13, Wisconsin has chosen to make the process for obtaining an ID far more complex and burdensome than is necessary to achieve its stated ends. Wisconsin has created a system that forces voters, including Plaintiffs Bulmer, Brown, Dukes, Ellis, Frank, Ginorio, Holloway, Oden, Smith, and Wilde to interact with other, often multiple, government agencies and private entities in order to obtain the primary documents they need to secure an ID. The severe burdens DMV's restrictive documentary proof requirements impose on Plaintiffs are systemic, foreseeable, and unreasonable. These requirements were not crafted as voting regulations, but now they serve to impede the exercise of the franchise. The common thread in Plaintiffs' situations is that DMV's documentary proof requirements, which are normally inflexible and often incomprehensible, are being applied to

---

[14] Unlike Wisconsin's photo ID law, the law upheld in *Crawford* did not apply to mail-in absentee voting. 553 U.S. at 185-86.

voters in a context for which they were never intended and not designed, and are stripping citizens of their right to vote. In addition, the additional burdens imposed on voters by DMV's inaccessibility are unreasonable and unnecessary. These systemic barriers are the direct and foreseeable consequences of inserting the burdensome and convoluted process of acquiring a state ID card between a voter and his or her vote.

### c. The Lack of a Compelling Government Interest

These severe burdens must be weighed against the state's rationales for requiring photo identification of all Plaintiffs. According to Defendant Kennedy, the justification for the photo ID law was to deter voter fraud and increase public confidence. (KK 67:21-25). In a pending state court action challenging the photo ID law, the state echoed those assertions. (Defs.' Br. in Opp'n to Mot. for Temp. Inj., *Milwaukee Branch of the NAACP, et al. v. Scott Walker, et al.*, Case No. 11-CV-5492, at *31 (Dane County, Wisconsin Circuit Court, filed Feb. 3, 2012)) (Attachment D). In that case, asserting the law is needed to prevent fraud, Defendants identified the following specific state interests: (1) safeguarding elections from voter impersonation fraud; (2) "provid[ing] protections against unlawful voting under invalid voter registrations[,]" including unlawful voting by felons and non-citizens; (3) deterring and preventing "unlawful voting by registered Wisconsin voters who no longer maintain residency in this state but have not yet been removed from the registration rolls;" and (4) deterring and preventing "unlawful double voting by individuals who register to vote in more than one state." *Id.*

Despite the arguments of photo ID proponents, instances of any kind of voter fraud in Wisconsin are virtually non-existent.[15] As Defendant Kennedy acknowledged, the problem is

---

[15] The evidence confirms that allegations of widespread voter fraud in Wisconsin are only that – allegations, not facts. Federal and state authorities prosecuted only 16 persons from 2004 elections, all for double voting or voting as felons, and obtained only seven convictions.

18

not any systemic actual fraud, but "rhetoric … based on perception, but not really based on any actual facts." (KK 37:17-38:15 & Ex. 7). He is also aware that the process of obtaining photo ID is complicated and confusing, even for highly educated persons. (KK 43:8-44:8, 111:5-9, & Exs. 8, 9). Further, Defendant Kennedy agreed that the best method to deter actual fraud is to prosecute those who commit it (KK 38:16-39:1), not to disfranchise thousands of eligible elderly, disabled, homeless, impoverished, and minority voters who lack traditional forms of identification and are frequently unable to navigate the system to obtain accepted photo ID.

With respect to the specific kinds of fraud that Defendants allege photo ID would prevent, Defendant Kennedy was not aware of a single case of voter impersonation fraud having been prosecuted in Wisconsin in the more than 30 years he has been the head election official. (KK 40:10-25). Kennedy also acknowledged that impersonation fraud would have been difficult to accomplish, even before improvements that began in 2006 made such efforts more difficult, by, *inter alia*, requiring voters to provide a drivers' license number or the last four digits of a social security number when registering and flagging data that does not match. (KK 84:21-

---

Moreover, both the U.S. Attorney's Office and the Milwaukee County District Attorney later confirmed that their extensive investigations had found no evidence of widespread or systemic fraud, or any evidence at all of impersonation fraud. Instead, most of the complaints were attributable to administrative, record-keeping, and poll worker errors. *See, e.g.*, Steven F. Huefner, Daniel P. Tokaji, & Edward B. Foley, *From Registration to Recounts: The Election Ecosystems of Five Midwestern States* (2007) at 120-21 ("*Moritz Report*")(Attachment E). Neither is there evidence of significant or systemic fraud in subsequent elections. *See, e.g.*, *id.* at 121 (after 2006 elections, 28 cases of potential unlawful voting were investigated, leading to prosecution of one individual for double voting caught by SVRS, and two other potential double voting cases); Pltfs.' Br. in Supt. of Mot. for Temporary Injunction, Ex. 41 at p. 11, Kenneth R. Mayer, Report on the Effects of Wisconsin Act 23, *NAACP v. Walker*, Case No. 11-CV-5492 (Dane County, Wisconsin Circuit Court, filed Jan. 17, 2012) (Attachment F) (investigation by Wisconsin Attorney General's Task Force on Electoral Integrity led to the charges against 20 individuals for election-related violations in the 2008 election: one case involving alleged double voting by two individuals who were ultimately acquitted, and the rest concerning felons or other ineligible persons voting (11 persons), false registrations (6 persons), and absentee ballot fraud (1 person).

86:12, 132:16-133:9).  Kennedy further confirmed that allegations of impersonation fraud are rare and have turned out to be greatly exaggerated, and that most result from administrative errors that the photo ID law will not resolve, such as a poll worker erroneously noting that an individual voted on the wrong line of a poll book.  (KK 51:21-53:24 & Ex. 10).[16]

At the same time, the photo ID law itself imposes additional administrative steps on poll workers and elections officials, potentially *increasing* the risk of administrative error.  Forcing voters who lack accepted photo ID to vote a provisional ballot will impose even greater burdens on voters and strain an already-taxed administrative system.  (KK 21:6-23:24, Ex. 1 p. 6, Ex. 2 pp. 7-8).  Defendant Kennedy readily agreed that the alternative remedy Plaintiffs seek – an affidavit of identity in lieu of an accepted photo ID – would reduce the burdens on voters with difficulty obtaining ID and significantly reduce administrative burdens.  (KK 25:8-26:2, Ex. 1 p. 6, Ex. 2 p. 8).

Second, the photo ID law will not prevent voting by those with "invalid registrations," such as felons or non-citizens.  As Defendant Kennedy confirmed, the issue of felon voting is "miniscule," (KK 69:8-23), and not one of the unlawful voting prosecutions from at least the past decade has involved even an allegation of non-citizen voting.  Moreover, felons and non-citizens are able to lawfully obtain many of the accepted forms of photo ID, including driver's licenses and photo ID cards,[17] so the photo ID law would not cure this virtually non-existent problem.  At the same time, over the past several years, Defendants have implemented numerous procedures that dramatically reduce the likelihood of such occurrences, including obtaining a list of felons

---

[16] *See also Moritz Report* (Attachment E) at 121 (main problem in Milwaukee in 2004 was administrative and record-keeping).

[17] *See, e.g.*, Wis. Stat. § 343.06. "Persons not to be licensed" does not identify felons or lawfully present immigrants as persons precluded from obtaining licenses.

20

from the Wisconsin Department of Corrections and cross-matching the names on that list to names on the Statewide Voter Registration System ("SVRS") database, informing felons multiple times of their ineligibility to vote, and changing voter registration forms to require a registrant to affirm non-felon and U.S. citizenship status.[18] (KK 70:17-71:18, 72:8-21; *see also* Form GAB-131 (Attachment G). These efforts also facilitate the prosecution of ineligible voters, which Defendant Kennedy believes is the best deterrent to unlawful voting. (KK 68:13-18).

Finally, in terms of deterring unlawful voting by voters who have left Wisconsin or by voters who vote in more than one state, there is again no evidence of the former, and Defendant Kennedy is not aware of evidence of any more than a few isolated cases of double voting either within Wisconsin or across state lines, nor of any explanation as to how the photo ID law would prevent double voting by individuals who unlawfully vote in more than one state. (KK 76:15-78:15, 79:8-15). Wisconsin's voter registration form also warns voters of the risk of fines and imprisonment for voting more than once. (Attachment G). Further, it is updating voter registrations, coordinating with other states' election officials, and cross-checking voter registration lists that can guard against these concerns, to the extent they even exist. As Defendant Kennedy noted, SVRS likely could cross-match information with other state databases, were the financial resources provided to do so. (KK 75:11-76:1, 104:13-21).

These and other election reforms in Wisconsin over the past decade have addressed vulnerabilities in the system far more effectively than a photo ID requirement and without imposing unnecessary burdens on voters. In 2007, Wisconsin replaced its partisan-nominated State Elections Board with the Government Accountability Board, an explicitly non-partisan

---

[18] The form also requires a certification of other eligibility criteria, and warns voters of the risk of fine and imprisonment under state and federal law for a false certification.

entity whose Board is composed of retired judges. Wis. Stat. § 15.60. Wisconsin also extensively modernized and updated its voting rolls and voter registration system years before it passed the photo ID law.  Before 2006, most Wisconsin municipalities did not even have voter registration; that is no longer the case. (KK 81:1-19).  The implementation of SVRS dramatically reduced administrative errors, such as the ones that occurred in the 2004 election, by collecting the information of all voters registered in the state, sending confirmation mailings to verify their addresses, updating registrations when voters move and re-register, cross-matching voter lists with multiple databases, including those containing identifying information such as Social Security and DMV, and giving law enforcement tools to identify and prosecute unlawful voting. (KK 70:17-71:18, 73:4-75:10, 79:8-12, 81:1-84:2, 85:16-86:15, 89:6-90:15). Moreover, the most common error giving rise to claims of impersonation fraud – a person incorrectly identified as having already voted – is most likely to be remedied by another Act 23 provision: requiring voters to sign the poll book, which would both eliminate most clerical errors and provide forensic evidence in the "unlikely event someone would attempt to impersonate a voter."  Wis. Stat. § 6.79(2); (KK 65:7-66:9 & Ex. 11).

It is also significant that less restrictive alternatives have been shown to work well in other states.  Affidavits of identity in lieu of voter ID are used in Connecticut, Delaware, Idaho, Louisiana, Michigan, North Dakota, and South Dakota.  CONN. GEN. STAT. § 9-261; DEL. CODE ANN. tit. 15, § 4937; IDAHO STAT. §§ 34-1106(2), 34-1113, 34-1114; LA. REV. STAT. ANN. §§ 18.562, 18:565; MICH. COMP. LAWS §§ 168.523, 168:727; N.D. CENT. CODE §§ 16.1-05-07(3), 16.1-05-06, 16.1-02-05; S.D. CODIFIED LAWS §§ 12-18-6.1, 12-18-6.2. Voters in these states cast regular ballots, notwithstanding the lack of identification, though they may be challenged and/or

referred to law enforcement if eligibility is not later verified. Alaska and Oklahoma designate the ballot as provisional or questioned, require the voter without ID to sign an affirmation on the envelope, and set it aside for further eligibility and valid registration review. ALASKA STAT. §§ 15.15.215, 15.15.225; OKLA. STAT. ANN. tit. 26, § 7-114. Affidavits of eligibility and valid registration on provisional ballots with a signature-match requirement are used in Florida, Montana, and (as of January 1, 2012) Rhode Island for voters without the requested ID. FLA. STAT. ANN. § 101.048(2); MONT. CODE ANN. §§ 13-13-114, 13-15-107(2); R.I. GEN. LAWS §§ 17-19-24.2, 17-19-24.3. One state requires poll workers to mark which voters do not provide identification, facilitating referrals to prosecuting attorneys. ARK. CODE ANN. § 7-5-305(a)(8).

Finally, while the state has an interest in maintaining public confidence in elections, disenfranchising *eligible* voters undermines also public confidence in the election process and results. Indeed, the study cited by the *Crawford* court for the proposition that photo ID laws could augment public confidence by deterring fraud specifically recommended that "[s]tates should undertake their best efforts to make voter registration and ID accessible and available to all eligible citizens."[19] National Commission on Federal Election Reform, To Assure Pride and Confidence in the Electoral Process 18 (2002) ("Carter-Baker Report") (cited in 553 U.S. at 197). Far from assisting eligible voters to obtain an accepted photo ID, Wisconsin introduced multiple bureaucratic stumbling blocks in the way of persons trying to obtain the ID. These obstacles undermine, rather than promote, public confidence in the election process. Indeed, Defendant Kennedy previously recognized that "[c]itizens should not claim their vote is diluted by fraud if they rely on measures that diminish the opportunity of others to participate. It is equally unfair to enhance the value of your vote by preventing citizens who may not share your

---

[19] Carter-Baker Report, "Recommendations on Assured Access to Elections – Sec. 4.1.1" (Attachment H).

23

ideals from voting." (KK 52:21-53:1, 54:19-55:7 & Ex. 10). Yet, by preventing Plaintiffs from voting unless and until they can surmount the hurdles to obtaining ID, that is precisely what Defendants have done: enhance some citizens' votes at the expense of others.

### d. The Other *Winter* Equitable Factors

These named Plaintiffs have all incurred severe burdens on their right to vote, which are not narrowly drawn to a compelling government interest. For preliminary injunctive relief, Plaintiffs need only make a plausible showing that they meet the standard of liability, and that – at a minimum – has been demonstrated. The injury to these voters will be irreparable. If an injunction does not issue before the April 3, 2012 election, each of these Plaintiffs will be deprived of his or her right to vote in that, and possibly subsequent, elections, and no post-election remedy can redress that loss. In fact, Plaintiff Frank, an elected member of her local village board in Brokaw, will be on the ballot for the April 3, 2012 election, but will be unable to vote in the same election absent an injunction. Restoring to these individual Plaintiffs their right to vote, regardless of their possession of photo ID, will cause no or negligible disruption to GAB's election administration plans and will *promote* electoral integrity by ensuring Wisconsin voters are not wrongfully denied the franchise. Disfranchisement of eligible voters is as certain to call into question the integrity of any election as isolated instances of fraud. Moreover, when balanced against the total and permanent deprivation of votes in this upcoming election, the ostensible justifications behind this photo ID law pale in comparison. Finally, the public interest favors the issuance of an injunction because, if class certification is ultimately granted in this action, any remedy crafted here will suggest a way to resolve this case as a whole and safeguard the voting rights of similarly situated voters throughout Wisconsin.

24

### 2. The Photo ID Law Arbitrarily and Unreasonably Burdens the Voting Rights of Veterans Bulmer, Ellis, and Harmon

Wisconsin's refusal to permit the use of Veterans Identification Cards ("VICs") for voting purposes places an unreasonable burden on veterans who lack accepted photo ID. There is no state interest, let alone an important one, that justifies this burden on Plaintiffs Bulmer, Ellis, and Harmon. Rather than impose "*evenhanded* restrictions that protect the integrity and reliability of the electoral process," the state of Wisconsin has drawn a line between VICs and other accepted forms of ID without rational justification. *Crawford*, 553 U.S. at 189-90 (quoting *Anderson*, 460 U.S. at 788 n.9) (emphasis added). This is forbidden by the Constitution. *See, e.g.*, *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 728-29 (1st Cir. 1994) (limiting voters in remedial election to those who voted in prior defective election prohibited, where defendants were "unable to articulate any meaningful interest served by its voter restriction").

Issued by the U.S. Department of Veterans Affairs ("VA"), a VIC displays the veteran's name, photo, and, if applicable, a special eligibility indicator, such as Service Connected or Purple Heart. It also includes a bar code, as well as a magnetic strip and contact and website information on the back. (Attachment I). It is a Veterans Health Administration ("VHA") "policy that all veterans applying for enrollment are processed for a VIC, which is issued to eligible veterans whose eligibility, and enrollment status has been verified, and whose identity has been uniquely verified . . . ." VHA DIRECTIVE 1610.01 (Oct. 20, 2009) (Attachment J). The system used to create them has the ability to "ensure that cards are only issued to eligible Veterans." *Id.* The lack of a rational basis for excluding VICs is compounded by the fact that Defendant Kennedy repeatedly recommended their use as accepted photo ID.

25

For all too many veterans, a VIC is their sole form of identification. Like Plaintiffs Bulmer, Ellis, and Harmon, many veterans are homeless. According to the 2010 HUD-VA point-in-time count, 609 homeless veterans were identified in Wisconsin. (Attachment K).

Whatever Defendants' interest in requiring photo ID to vote, the burden it has imposed on veterans is simply not "necessary," *Anderson*, 460 U.S. at 789, or justified by an "important regulatory interest[]," *Burdick*, 504 U.S. at 434. The state has articulated no rational basis, much less a necessary or important interest, for refusing to accept a secure photo ID issued by a federal agency, particularly when the beneficiaries of accepting such ID are homeless and disabled veterans. It is well-settled that arbitrary and therefore "'invidious' distinctions cannot be enacted without a violation of the Equal Protection Clause." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). Plaintiffs Bulmer, Ellis, and Harmon are likely to prevail on the merits of their claim.

The additional equitable factors under *Winter* also weigh in favor of granting preliminary injunctive relief. Plaintiffs Bulmer, Ellis, and Harmon, homeless veterans with no accepted photo ID, are likely to suffer irreparable harm in the upcoming elections in Wisconsin if the exclusion of their VICs is not enjoined. Since such disfranchisement is irrevocable and the state would suffer no meaningful hardship in accepting these additional IDs (save the minimal burden of updating its materials and information), the balance of equities clearly tips in Plaintiffs' favor. Finally, the public interest favors allowing these Plaintiffs to vote using their VICs. Veterans with a secure, government-issued photo ID pose no threat to electoral integrity. Rather, the legitimacy of our elections would be undermined if the law is allowed to disfranchise them.

> **3. The Wisconsin Photo ID Law Unconstitutionally Imposes a Poll Tax and Other Material Burden on Plaintiffs Brown, Bulmer, Dukes, Ellis, Frank, Ginorio, Holloway, and Wilde**

26

The Twenty-Fourth Amendment to the U.S. Constitution provides that the "right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." It prohibits the states from conditioning the right to vote in federal elections on payment of a tax or fee, or imposing an additional condition that would not apply if they paid such a tax. *Harman v. Forssenius*, 380 U.S. 528, 538-39 (1965). One of the evils the Amendment's framers sought to correct was that poll taxes "exacted a price for the privilege of exercising the franchise." *Id*. at 539. In *Harman*, the Supreme Court held Virginia's $1.50 poll tax unconstitutional under the Twenty-Fourth Amendment as applied to federal elections. The law at issue in *Harman* provided that a voter in a federal election could either pay the customary poll tax or complete a witnessed or notarized certificate of residence. *Id*. at 529. In rejecting the argument that this alternative cured the violation, the Court noted that:

> "Constitutional rights would be of little value if they could be . . . indirectly denied" or "manipulated out of existence." Significantly, the Twenty-fourth Amendment does not merely insure that the franchise shall not be "denied" by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be "denied or abridged" for that reason. Thus, like the Fifteenth Amendment, the Twenty-fourth "nullifies sophisticated as well as simple-minded modes" of impairing the right guaranteed. . . . Thus, in order to demonstrate the invalidity [of a law under the Twenty-fourth Amendment], it need only be shown that it imposes a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax.

*Id.* at 540-41 (citations omitted). The Amendment abolishes "the poll tax . . . absolutely as a prerequisite to voting and no equivalent or milder substitute may be imposed." *Id*. at 542.

In *Harper v. Virginia Board of Elections*, the Supreme Court held the same poll tax unconstitutional in state elections. 383 U.S. 663 (1966). "[A] State violates the Equal Protection

27

Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax." *Id*. at 666. The Court viewed the amount of the tax or the voter's ability to pay it as irrelevant: "The principle that denies the State the right to dilute a citizen's vote on account of his economic status or other such factors by analogy bars a system which excludes those unable to pay a fee to vote or who fail to pay." *Id*. at 668. Laws that put a price on the right to vote can never pass the strict scrutiny test because "wealth or fee paying has . . . no relation to voting qualifications, the right to vote is too precious, too fundamental to be so burdened or conditioned." *Id*. at 670. *Crawford*, while not expressly reaching the question, suggested that any charge to obtain the ID would violate the Constitution: "The fact that most voters already possess a valid driver's license, or some other form of acceptable identification, would not save the statute under our reasoning in *Harper*, if the State required voters to pay a tax or fee to obtain a new photo identification." 553 U.S. at 198.

If a photo ID is required to vote, and if obtaining an acceptable form of ID either requires payment of a fee or imposes a "material requirement" in lieu of paying the fee, the law violates the Twenty-Fourth Amendment. *See Harman*, 380 U.S. at 542; *Common Cause v. Billups*, 406 F. Supp. 2d 1326, 1366-70 (N.D. Ga. 2005). Because most voters who do not possess other forms of photo ID must obtain a photo ID card to exercise their right to vote, requiring them to purchase a photo ID card effectively places a cost on the right to vote. In that respect, the photo ID requirement runs afoul of the Twenty-Fourth Amendment for federal elections and violates the Equal Protection Clause of the Fourteenth Amendment for State and municipal elections. *Common Cause v. Billups*, 406 F. Supp. 2d at 1369 (citation omitted). As the *Common Cause*

28

Court explained in rejecting Georgia's argument that any constitutional problem was cured by the availability of a fee waiver upon completion of an indigency affidavit:

> A voter who does not have another acceptable form of Photo ID and who wishes to vote must, as a practical matter, obtain a Photo ID card . . . . The voter then must pay the $20 fee or sign the fee waiver affidavit, which may require the voter to swear or affirm to facts that simply are not true in order to avoid paying the $20 fee.  Under those circumstances, the Court cannot determine that the fee waiver affidavit is not a material requirement, as discussed in *Harman*.

*Id*. at 1370.

Here, Wisconsin is imposing an unconstitutional poll tax in the form of the costs of obtaining primary documents. Plaintiffs Brown, Bulmer, Dukes, Ellis, Frank, Ginorio, Holloway, and Wilde lack the documentation of current legal name and date of birth and citizenship that Wisconsin has required them to provide in order to obtain a "free" photo ID card. None has had any way to acquire that documentation other than to pay money for it. Without it, none has been able to obtain a state ID card.  Further, even if DMV's purported alternative process for voters who have no birth records is available, voters such as Plaintiffs Brown and Wilde must pay for a vital records search to confirm the *lack* of a birth record.

Whatever Defendants' purported interest in requiring photo ID to vote, failing to allow individuals a cost-free alternative to obtain the free photo ID card they need to vote represents a poll tax on those voters.  The additional equitable factors under *Winter* also favor granting preliminary injunctive relief.  Without the ability to vote without showing the photo ID they have barriers to obtaining, by order of this Court and/or by executing an affidavit at the polls, Plaintiffs Brown, Bulmer, Dukes, Ellis, Frank, Ginorio, Holloway, and Wilde will be unable to vote altogether or will be forced to expend money to obtain birth certificates or court records that they have been told are required to vote in upcoming elections.  Plaintiff Frank will even be

29

precluded from voting for herself on April 3. That disfranchisement is irrevocable. On the other hand, the state would suffer no meaningful hardship in implementing an affidavit of identity procedure that its own chief elections official recommends for these Plaintiffs. Thus, the balance of equities clearly tips in Plaintiffs' favor. The public interest also favors ensuring that the state does not force Plaintiffs to expend money – whether directly for the ID or indirectly for the documents mandated by the state to obtain such an ID – to exercise their rights to vote.

## CONCLUSION

Applying the equitable test for a preliminary injunction as to the Plaintiffs listed in this Motion is straightforward. On one hand, the photo ID law will cause the imminent and irrevocable loss of the right to vote for the Plaintiffs. On the other, Defendants have not identified a single case of voter fraud in Wisconsin that would have been prevented by the photo ID law, and the state's election officials have already taken reasonable and effective preventative steps. The threatened harm to these voters far outweighs any inconvenience the state will face or demonstrated risk. *See, e.g.*, *The Independence Institute v. Buescher*, 718 F.Supp.2d 1257, 1278 (D. Colo. 2010) (although state has interest in "preserving the integrity of its electoral system," its failure to produce evidence that challenged legislation serves these interests, coupled with Plaintiffs' "fundamental interest in being able to express their desire for political change and actively work toward achieving that goal," leads balance of equities to tilt heavily toward plaintiffs). Further, blocking the photo ID law's enforcement as to 11 persons with significant barriers to obtaining the ID, in the absence of any evidence of impersonation fraud, will not only protect the rights of individual voters, but also instill greater confidence in the electoral system.

30

Dated this 2nd day of March, 2012.

Respectfully submitted,

<u>/s/ Karyn L. Rotker</u>
KARYN L. ROTKER
State Bar No. 1007719
LAURENCE J. DUPUIS
State Bar No. 1029261
American Civil Liberties Union of Wisconsin Foundation
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
(414) 272-4032
(414) 272-0182 (fax)
krotker@aclu-wi.org
ldupuis@aclu-wi.org

HEATHER MARIA JOHNSON
KAREN E. CUNNINGHAM
National Law Center on Homelessness & Poverty
1411 K Street NW, Suite 1400
Washington, DC 20005
Phone: (202) 638-2535
Fax: (202) 628-2737
hjohnson@nlchp.org
kcunningham@nlchp.org

M. LAUGHLIN MCDONALD
JON SHERMAN
NANCY ABUDU
American Civil Liberties Union Foundation, Inc.
230 Peachtree Street, Suite 1440
Atlanta, GA 30303
Phone: (404) 523-2721
Fax: (404) 653-0331
lmcdonald@aclu.org
jsherman@aclu.org
nabudu@aclu.org

NEIL STEINER
DIANE PRINC
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Phone: (212) 698-3822

31

Fax: (212) 698-3599
neil.steiner@dechert.com
diane.princ@dechert.com

CRAIG FALLS
Dechert LLP
1775 I Street, NW
Washington, DC 20006-2401
Phone: (202) 261-3373
Fax: (202) 261-3333
craig.falls@dechert.com

Attorneys for Plaintiffs.