# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

RUTHELLE FRANK, et al., on behalf of
themselves and all others similarly situated,

               Plaintiffs,

v.

SCOTT WALKER, in his official capacity as
Governor of the State of Wisconsin, et al.,

               Defendants.

Civil Action No. 2:11-cv-01128 (LA)

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

**Table of Contents**

INTRODUCTION ........................................................................................................... 1

I.  STATEMENT OF FACTS .................................................................................... 3

    A.  The Photo ID Law ..................................................................................... 3

    B.  Wisconsin's Regulatory Scheme Governing Elections ........................... 5

    C.  Wisconsin's Regulatory Scheme Governing the Issuance of Driver's
        Licenses and State ID Cards .................................................................... 6

        1.  Proof of Name and Date of Birth ................................................. 7

        2.  Proof of Citizenship ..................................................................... 8

        3.  Proof of Identity ........................................................................... 8

        4.  Proof of Residency ....................................................................... 9

        5.  DMV Access .................................................................................. 9

II. ARGUMENT ...................................................................................................... 10

    A.  Legal Standard for Preliminary Injunction .......................................... 10

    B.  Application of Winter Standard ............................................................. 11

        1.  The Photo ID Law Imposes Severe Burdens on the Right to Vote
            for Members of Classes 1 and 2 and Is Not Narrowly Tailored to
            Serve a Compelling Government Interest [Counts 1 & 2] ...................... 11

            a.  Legal Standard: The Fourteenth Amendment Balancing
                Test ................................................................................... 11

            b.  The Severity of the Burdens ............................................ 12

                i.   Class 1 [Count 1] ............................................. 12

                ii.  Class 2 [Count 2] ............................................. 17

            c.  The Lack of a Compelling Government Interest .......................... 18

            d.  The Other Winter Equitable Factors ............................... 20

        2.  The Photo ID Law Arbitrarily and Unreasonably Burdens the
            Voting Rights of Veterans [Class 6, Count 6] ......................... 21

        3.  The Wisconsin Photo ID Law Unconstitutionally Imposes a Poll
            Tax or Other Material Burden on Voters in Class 5 [Count 5] ............... 22

        4.  The Photo ID Law Confers Unconstrained Discretion on DMV
            Employees Which Results In Inconsistent and Arbitrary Treatment
            of Voters in Violation of Equal Protection [Count 7] ............................. 23

i

5.    Act 23 Has Rendered Wisconsin's Electoral System
      Fundamentally Unfair In Violation of Substantive Due Process
      [Count 8] ................................................................................................. 33

6.    The Photo ID Law Violates Section 2 of the Voting Rights Act
      [Claims 9 & 10] ...................................................................................... 39

CONCLUSION ...................................................................................................................... 50

Case 2:11-cv-01128-jdp   Filed 04/23/12   Page 3 of 55   Document 50

## INTRODUCTION

Wisconsin's voter photo identification law, 2011 Wisconsin Act 23 ("the photo ID law" or "Act 23"), imposes severe and unjustifiable burdens on Wisconsin voters. This motion seeks a preliminary injunction ordering that Defendants permit several classes of voters (Classes 1, 2, 5, and 6) in Plaintiffs' First Amended Complaint ("FAC") (Doc. 31) to execute an affidavit of identity in lieu of presenting one of the limited forms of photo ID acceptable under Act 23. In the absence of such relief, voters in Classes 1 and 2 will be unlawfully deprived of the right to vote, because Act 23, as applied to them, imposes severe burdens and is not narrowly tailored to achieve a compelling government interest, in violation of the Fourteenth Amendment. Doc. 31, Counts 1 & 2. In order to obtain a Wisconsin state ID card needed to vote under Act 23, voters in Class 5 must pay for a birth certificate, marriage certificate, or other documentation that costs money, in violation of the Twenty-Fourth and Fourteenth Amendments' prohibition on poll taxes. Doc. 31, Count 5. Alternatively, the motion seeks a preliminary injunction ordering Defendants to permit voters in Class 6 to use a Veterans Identification Card ("VIC") to vote. In the absence of such relief, the military veterans in this class will be barred from using a form of identification that is in all material respects indistinguishable from acceptable forms of ID, in violation of the Equal Protection Clause. Doc. 31, Count 6.[1]

The motion further seeks to enjoin the photo ID law, because Defendants treat voters applying for accepted photo ID at a Division of Motor Vehicles ("DMV") office in an arbitrary and disparate manner – a direct consequence of the lack of standards governing the documentary

---

[1] Plaintiffs' Motion for Preliminary Injunction as to Eleven Named Plaintiffs (Doc. 32), filed on March 2, 2012, sought similar relief on Counts 1, 2, 5, and 6 of the FAC and remains pending. This memorandum assumes the Court's familiarity with that motion, memorandum (Doc. 33) and reply (Doc. 41) and other supporting documents, and will not resubmit exhibits or reiterate all of the prior arguments. Previously filed documents are referred to by their docket numbers.

1

proof requirements (and exceptions) for the issuance of driver's licenses and Wisconsin state IDs. Defendants' exercise of unfettered discretion and arbitrary treatment of voters violates the Fourteenth Amendment's guarantee of equal protection. Doc. 31, Count 7. Similarly, this motion seeks to enjoin Act 23 as a violation of substantive due process, until such time as the systemic problems created by this law are corrected. In addition to the burdensome requirements and arbitrary treatment voters face at DMV offices, failures by the DMV and Government Accountability Board ("GAB") Defendants to inform the public about the voting changes in Act 23, train election officials, and ensure the law's uniform implementation have resulted in widespread confusion among voters, election officials, and DMV employees and rendered the election system fundamentally unfair. Doc. 31, Count 8.

Finally, this motion seeks a preliminary injunction barring enforcement of the photo ID law in Milwaukee County, where it will result in the denial and abridgement of the right to vote on account of race in violation of Section 2 of the Voting Rights Act ("VRA"). Doc. 31, Counts 9 & 10. This motion is filed concurrently with a motion to certify Classes 1 through 7.

Defendants do not dispute that Plaintiffs are Wisconsin residents who are entitled to vote, or that the photo ID law will have the effect of preventing certain voters from exercising their right to vote. Defs.' Br. Opp. Prelim. Inj. (Doc. 38) at 3. Act 23 imposes the same burdens on many other voters, including the numerous Wisconsin voters, especially African-American and Latino voters, who lack photo ID. *Infra* Sec. II.B.6. Nor do Defendants dispute that Act 23 has vested significant control over the franchise in the hands of DMV employees with no voting or elections experience, making the right to vote, for those who lack photo ID, contingent upon the ability to navigate a series of bureaucratic procedures at multiple local, state, and federal

Case 2:11-cv-01128-jdp   Filed 04/23/12   Page 5 of 55   Document 50

agencies. Nevertheless, Defendants insist that no "special treatment" can be provided: regardless of hardship, no one should be allowed to vote without ID. Doc. 38 at 29.

In the absence of injunctive relief,[2] named Plaintiffs and the class members they represent will be deprived of the right to vote. In contrast to this undeniable harm to voters' fundamental rights, the "harm" Act 23 purports to address is truly illusory: in the past *three decades*, not a single individual has been found to have committed voter impersonation fraud in Wisconsin, and only a handful of voters have been found to have unlawfully voted at all.

## I.      STATEMENT OF FACTS

### A.      The Photo ID Law

Act 23 imposed the most far-reaching election law changes in Wisconsin since the 1970s. Doc. 34-1 (KK 122:9-21); MH 130:20-131:8.[3] The law requires Wisconsin voters to present one

---

[2] In March 2012, two Wisconsin state courts enjoined enforcement of the photo ID law on state constitutional grounds. *See Milwaukee Branch of NAACP, et al. v. Scott Walker, et al.,* Appeal No. 2012AP000557- LV, Dane Co. Circ. Ct. No. 11-cv-5492; *League of Women Voters of Wisconsin et al. v. Scott Walker et al.,* Appeal No. 2012AP000584, Dane Co. Circ. Ct. No. 11-cv-4669. Defendants appealed and sought stays of the injunctions pending appeal. On March 28, 2012, the Courts of Appeals certified both cases to the Wisconsin Supreme Court, which, on April 16, 2012, declined to take the cases. Thus a preliminary injunction in this case is necessary only to the extent that *both* state court injunctions are stayed or reversed.

[3] Excerpts from the following depositions, listed in alphabetical order by last name, are submitted with this memorandum:

    Attach. A: Defendant Kristina Boardman, Director, DMV-Bureau of Field Services ("BFS") (hereinafter "KB");
    Attach. B: Patrick Fernan, Deputy Administrator, DMV ("PF");
    Attach. C: Michael Haas, GAB Counsel ("MH");
    Attach. D: Ross Hein, GAB Elections Supervisor ("RH");
    Attach. E: Jeremy Krueger, Driver Eligibility Unit, Lead Transportation Customer Representative, DMV ("JK");
    Attach. F: Allison Lebwohl, Section Chief, Qualifications & Issuance Section, DMV ("AL");
    Attach. G: James Miller, Chief of Technical Training Section, DMV-BFS ("JM");

3

form of photo ID from a limited statutory list in order to cast a ballot. Wis. Stat. §§ 6.79(2)(a); 5.02(6m). For most voters, Wisconsin's law provides *no* exceptions to the photo ID requirement for in-person voting. Doc. 33 at 4. Wisconsin's law also provides few exceptions for absentee voters, most of whom must still obtain and submit a copy of accepted photo ID. *Id.*

As discussed *infra* Secs. I.C., II.B.1.b, for many voters obtaining accepted photo ID in Wisconsin is a complex and burdensome process. For most Wisconsin voters, the photo ID will be a Wisconsin driver's license or state ID card, although some voters will use one of the seven other forms of accepted photo ID, such as military, tribal, and certain college ID cards. Wis. Stat. § 5.02(6m); Doc. 33 at 3-4. A voter lacking accepted photo ID when attempting to vote must cast a provisional ballot which will be counted only if the voter can manage to obtain and present one of the required forms of ID to a local clerk during the clerks' limited office hours by 4 p.m. on the Friday after the election. Wis. Stat. §§ 6.79(3)(b), 6.97; RH: 43:8-44:14.

Despite Defendant Kennedy's express recommendation, and in contrast to Indiana's practice, the Wisconsin photo ID law does not permit Veterans Identification Cards to be used for voting. Doc. 34-1 (KK 11:6-18); Doc. 34-12 at 2; Doc. 34-13 at 3. Also contrary to Kennedy's recommendations, the law fails to include reasonable alternatives to enable eligible voters who lack photo ID to vote, such as by completing an affidavit of identity at the polling place, even though an affidavit of identity would be as effective as the photo ID law in deterring voter fraud and prosecuting any perpetrators of voter fraud. Doc. 33 at 20; Doc. 34-1 (KK 25:8-27:20); Doc. 34-12 at 6, Doc. 34-13 at 8-9, Doc. 34-14 at 1.

---

Attach. H: Nathaniel Robinson, GAB Elections Division Administrator ("NR"); and
Attach. I: Janet Turja, Team Leader, Waukesha Customer Service Center, DMV ("JT").
Exhibits introduced during depositions are identified by their deposition exhibit numbers.

4

**B.     Wisconsin's Regulatory Scheme Governing Elections**

Although the GAB Defendants have general oversight of the electoral process, Wisconsin operates one of the most decentralized electoral systems in the country. MH: 46:14-17. The actual operation of elections, including registration, poll worker training, and election administration, is in the hands of 1,851 municipal clerks, 62% of whom work part-time and are not "professional" elections workers. NR 83:5-16; MH 46:18-47:9, 49:24-50:2. The clerks supervise 2700 to 5000 chief election inspectors ("chiefs") and 20,000 to 30,000 elections inspectors ("poll workers"). Wis. Stat. § 7.15(1); RH: 31:5-17; NR 73:21-25, 82:2-18; Ex. 109 at ii. This structure presents significant challenges for election administration. MH 47:5-48:1; *infra* Sec. II.B.5.

The sweeping election law changes combined with decentralized administration have led to widespread misapplication of Act 23's requirements. *See infra* Sec. II.B.5. Yet GAB has no statutory authority to mandate that current clerks or chiefs undergo specific training on the photo ID law.[4] Wis. Stat. §§ 7.15(1m), 7.31 & 7.315; RH 23:6-25, 25:17- 29:25; NR 82:8-15, 127:16-23. The poll workers, many of whom are volunteers, are trained by municipal clerks, not the GAB. NR 73:21-25, 81:11-18. As a result, local election workers are confused and ill-informed about Act 23. NR 79:25-81:23; Attach. R (D6087-89) (village clerk referring to photo ID law as "so convoluted"). GAB also has little authority to enforce election law compliance. While it can try persuasion, it has no inherent enforcement authority or direct disciplinary tools over clerks,

---

[4] New municipal clerks and chiefs are required to take three hours of "core" training, which may include topics set by GAB, but once that requirement is fulfilled, these officials take only six hours of classes of their choosing every two years.  RH 23:6-25, 25:17-27:25.

5

chiefs or poll workers, MH 141:22-143:2; NR 91:6-92:7, and some clerks ignore its orders. NR 96:5-9.

### C. Wisconsin's Regulatory Scheme Governing the Issuance of Driver's Licenses and State ID Cards

The photo ID law requires DMV to issue Wisconsin state ID cards free of charge if the applicant is a U.S. citizen, will be at least 18 years old by the next election, and asks that the card be provided free for voting purposes. Wis. Stat. § 343.50(5)(a). However, procuring a Wisconsin photo ID is an unreasonably complicated and costly task that disfranchises many voters. The process is not as easy as walking into one office and walking out with an ID. DMV's "bureaucracy navigation test" mandates that most voters lacking ID must: (1) access one of 92 DMV offices statewide during weekday, daytime hours; (2) produce at least three separate documents, at least one of which bears a cost and at least two of which often cannot be obtained without other forms of identification; and (3) have a residence street mailing address.

Original-issue applicants, *i.e.*, persons who have never before held a *Wisconsin* driver's license or state ID, and those who have not held such ID in more than 8 years, must present: (1) proof of name and date of birth, (2) proof of citizenship, (3) proof of identity, (4) proof of Wisconsin residency, and (5) a Social Security Number, Wis. Admin. Code Trans. (hereinafter "Trans.") § 102.15(2), using at least three separate documents.[5] These stringent requirements, particularly the proof of citizenship requirement, were not designed to regulate voting, but to implement "REAL ID" anti-terrorism laws. Doc. 33 at 5-6; KB 21:4-25. Applying DMV's requirements to voting will disfranchise many eligible voters. In Milwaukee County alone,

---

[5] The Indiana photo ID law upheld in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) required the production of just *one* document to obtain photo ID. *Id.* at 198 n.17.

6

approximately 21,500 eligible voters who do not have accepted ID also lack one or more of the documents that DMV requires to obtain a photo ID, including 20,000 voters who lack documentary proof of citizenship. Attach. J, Matt Barreto & Gabriel Sanchez, *Rates of Possession of Accepted Photo Identification, Among Different Subgroups in the Eligible Voter Population, Milwaukee County, Wisconsin* [hereinafter "Barreto/Sanchez"], Table 8; *see infra* Sec. II.B.6.

Further, while DMV purports to apply a set of documentary proof requirements with clearly enumerated items that satisfy each of the requirements set forth in Trans. § 102.15, it arbitrarily allows some driver's license and ID card applicants to use alternative documentation or exceptions procedures that are contradictory, not publicly disclosed, sometimes unwritten, and inconsistently applied. The determinations as to who may use these alternatives and whether or not to approve these applications are characterized by standard-less discretion that predictably yields inconsistent outcomes. *See infra* Sec. II.B.4.

### 1. Proof of Name and Date of Birth

For the majority of voters, the only document listed in the DMV rules to prove name and date of birth is a certified copy of a birth certificate. Trans. § 102.15(3m); JM 54:19-22. However, numerous Wisconsin voters were never issued birth certificates, lack accurate birth certificates, or have difficulty obtaining certified copies of the same.[6] *See infra* Secs. II.B.1.b,

---

[6] In contrast, the Indiana law at issue in *Crawford* allowed voters were allowed to use Medicaid and Medicare cards, Social Security printouts, and other reasonable alternative documents *in lieu of* birth certificates, to secure photo ID. 553 U.S. at 199 n.18. DMV's Deputy Administrator also knows of states that allow the use of documents instead of birth certificates, or that exempt persons born before 1940 from producing birth certificates. PF 11:4-5, 35:19-36:7. Although Wisconsin also used to be less stringent with documentation requirements, DMV has no plans now to liberalize its requirements for proving name, date of birth, and citizenship. PF 34:12-25.

II.B.4. When a birth certificate exists, DMV requires a voter to obtain it, regardless of legal, practical, or financial difficulties. JM 76:1-17; KB 43:20-44:23; 131:11-17; JM 180:18-24.

If the applicant is unable to provide accepted proof of name and date of birth because the needed documents are "unavailable," the applicant may petition DMV to consider alternative forms of proof. Trans. § 102.15(3)(b). "Unavailable" documents do not include those the applicant forgot to bring or that have been lost or destroyed if a replacement may be obtained. *Id.* § 102.15(1). Even persons who were never issued birth certificates must obtain documentary proof that no birth record exists, using a form known as the MV3002 with supporting documentation. KB 46:12-48:3. Information on the use of this form and the process of using alternate proof is largely hidden from the public and has not been adequately communicated to DMV staff who interact with voters or to vital records offices. *See infra* Sec. II.B.4. The alternative process does not necessarily or routinely prove successful, and does not help voters who have a birth certificate that contains errors. *See infra* Secs. II.B.1.b., II.B.4.; JM 136:18-21.

## 2. Proof of Citizenship

Wisconsin statutes and DMV's regulations require that applicants provide documentary proof of U.S. citizenship. Wis. Stat. §§ 343.14(2)(er)1, 343.50(4). For most voters, the only document listed in the DMV rules to prove U.S. citizenship is a certified copy of a birth certificate. Trans. § 102.15(3m). A recently adopted DMV policy (Ex. 47) may allow persons for whom birth certificates do not exist to use an MV3002 to prove citizenship, but that also appears to be a matter in dispute within the agency. *See infra* Sec. II.B.1.b. & n.10.

## 3. Proof of Identity

Case 2:11-cv-01128-jdp   Filed 04/23/12   Page 11 of 55   Document 50

DMV's proof-of-identity rules are also unduly burdensome. For applicants who do not have a driver's license or state ID card in their physical possession, a Social Security Card ("SSC") is often the only document available to prove identity under DMV's official rules. Trans. § 102.15(4); JM 186:9-13. However, Social Security Administration ("SSA") employees often tell voters they need photo ID to obtain SSCs. KB 145:18-20; Ex. 56; JT 80:7-17. Defendants do not assist voters in obtaining an SSC. Doc. 33 at 10; JM 35:11-13; JT 80:7-81:9. Other forms listed in the rules for proof of identity are either not widely held, such as military discharge papers, or not publicized, such as the digital image look-up procedure set forth in Trans. § 102.15(4)(c). *See infra* Sec. II.B.4.

### 4. Proof of Residency

DMV also requires applicants for a Wisconsin driver's license or state ID card to provide proof of "a current acceptable Wisconsin residence street address," not a P.O. Box or commercial mail-receiving agency. Trans. §§ 102.15(2)(c); 102.15(4m). While DMV has recently adopted policies to expand the documents an applicant can use to prove Wisconsin residency, the revised policies fail to cover all Wisconsin residents, such as unsheltered homeless individuals who are unaffiliated with any social service agency, *see* Doc. 34-22, and DMV does not provide public notice of any alternatives to this requirement. *See infra* Sec. II.B.4.

### 5. DMV Access

The burdens of obtaining photo ID are compounded by the difficulties of traveling to DMV offices. There are only 92 DMV Customer Service Centers ("CSCs") in the state. Voters without accepted photo ID, who generally do not drive and are often low-income, must often walk, ride the bus, or pay for a cab or paratransit to get to a CSC and other offices to secure

9

documents for the ID card application. Doc. 33 at 11-12; Doc. 35 at ¶ 7; Doc. 33-9 at ¶ 5; Doc. 33-10 at ¶ 14; NR 32:19-33:17; Attach. R (D11114) (GAB Help Desk call log entry reflecting voter would need to pay $125 for taxi to CSC), (D14802) (elderly couple can walk to polls, but would need a ride to CSC). Some voters simply cannot make it to a CSC. Marcella Althof, an 81-year-old woman who lives in Stoddard, has no way to access the DMV office in Onalaska, as there is no regular bus service and no taxi service. Althof Decl ¶ 10. The transportation barriers in rural communities, for seniors and persons with disabilities, and even in the inner city, are well-known to Defendants. NR 35:15-25, 50:7-18, 58:22-59:8. Yet neither DMV nor GAB has plans to deploy mobile units to serve voters with DMV access problems, or to transport voters to DMV. Doc. 33 at 11; Doc. 34-2 (LJ 102:3-105:20); RH 138:20-139:12.

## II. <u>ARGUMENT</u>

### A. Legal Standard for Preliminary Injunction

Plaintiffs seeking a preliminary injunction must demonstrate that: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal citations and quotation marks omitted). The

standards for proving each element are discussed in greater detail in Plaintiffs' prior Memorandum. Doc. 33 at 12-15. Plaintiffs' claims satisfy each of these four elements.

**B.  Application of *Winter* Standard**

    **1.  The Photo ID Law Imposes Severe Burdens on the Right to Vote for Members of Classes 1 and 2 and Is Not Narrowly Tailored to Serve a Compelling Government Interest [Counts 1 & 2]**

        **a.  Legal Standard: The Fourteenth Amendment Balancing Test**

The right to vote is protected by the Fourteenth Amendment's Equal Protection and Due Process Clauses. *Anderson v. Celebrezze*, 460 U.S. 780, 786-87 n.7 (1983). To resolve constitutional challenges to a state election procedure, a court:

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789; *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992). *Crawford* confirmed that there is no "litmus test for measuring the severity of a burden that a state law imposes on . . . an individual voter, or a discrete class of voters. However slight that burden may appear . . . it must be justified by relevant and legitimate state interests *sufficiently weighty to justify the limitation*." 553 U.S at 191 (internal citations and quotation marks omitted; emphasis added). Thus *Crawford* in fact *requires* this Court to consider the state interests and the burden as applied to discrete classes of voters and evaluate whether the state interests justify the burden imposed on those voters. Even if the state has a legitimate interest, a statute that imposes a significant burden on the right to vote is not "necessary" if the state's interest could be achieved

11

in a less restrictive way. *Anderson*, 460 U.S. at 789. Where, as here, a law imposes "severe restrictions" on the right to vote, those restrictions must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal citations and quotation marks omitted).

### b. The Severity of the Burdens

The Supreme Court expressly recognized in *Crawford* that, although Indiana's photo ID law, which was significantly less restrictive than Act 23, was not unconstitutional on its face, a law that imposed "excessively burdensome requirements" would be subject to an as-applied challenge. 553 U.S. at 199-202 (noting possibility of "heavier burden" or "special burden" on specific classes of voters, but denying facial invalidation where record lacked evidence of extent of burdens); *id.* at 202 ("[O]n the basis of the record . . .we cannot conclude that the statute imposes excessively burdensome requirements on any class of voters." (internal citations and quotation marks omitted)).

### i. Class 1 [Count 1]

The photo ID law and the DMV regulatory structure it incorporates impose a severe and unjustifiable burden on voters. "Ordinary and widespread burdens, such as those requiring nominal effort of everyone, are not severe. Burdens are severe if they go beyond the merely inconvenient." *Id.* at 205 (Scalia, J., concurring) (internal citations and quotation marks omitted). The combined effects of the burdens imposed by the photo ID law go far beyond "merely inconvenient." Further, Act 23, unlike the Indiana statute at issue in *Crawford*, imposes a *total* deprivation of the right to vote if voters cannot obtain a photo ID. None of the Plaintiffs or class members fit within the limited statutory exemptions for in-person or absentee voting, and

12

there is no fail-safe procedure for voters who are simply unable to obtain accepted photo ID.[7] Wisconsin ignored the recommendations of its own chief elections official, Defendant Kennedy, to provide an affidavit –of identity alternative. Doc. 34-1 (KK 25:8-26:24). Local election officials who met with GAB in January 2011 also wanted an affidavit of identity and argued for a broader list of accepted photo ID – they too were ignored. Attach. R (D7189) (suggestion was made that photo ID law include "ID items that were recommended by GAB" such as Veterans Identification Cards, *see infra* Sec. II.B.2., and driver's licenses or state IDs from any state; and nearly one third of clerks in attendance wanted an affidavit of identity procedure for elections).

By making a state ID card issued by DMV the photo ID of last resort, Act 23 renders the process of obtaining an ID for voting far more complex and burdensome than is necessary to achieve its purported ends. Act 23 forces voters to interact with DMV[8] and often with multiple other bureaucracies in order to obtain the documents needed to secure that ID. These systemic barriers are the direct consequence of inserting the burdensome process of acquiring a Wisconsin photo ID card between a voter and the ballot. Had Wisconsin created a separate form of voter ID rather than interposing DMV and its unreasonably stringent documentation requirements, it could have made the process much less burdensome by relaxing or eliminating some of the

---

[7] Unlike Act 23, the law in *Crawford* did not apply to mail-in absentee voting. Also unlike Act 23, the ballots of in-person Indiana voters without ID will be counted if they sign an affidavit of indigency within 10 days of the election. 553 U.S. at 185-86.

[8] DMV has become a gatekeeper to the ballot for voters who do not already possess accepted photo ID. AL 28:24-29:14 ("Like it or not, we are in the voting business."). But from central management to field offices, DMV staff do not perceive there to be any significant change in their obligations to customers. *Id.*; PF 14:24-15:16; JT 15:2-16:5.

documentary requirements that are mandatory for DMV-issued licenses and IDs. JM 30:11-32:7, 37:4-8.[9]

Some voters, especially homeless, elderly, disabled, minority and rural voters, have barriers to accessing DMV offices at all. *Supra* Sec. I.C.5. Many voters also have barriers to obtaining the documents DMV demands. For example, many voters who lack photo ID also lack certified copies of their birth certificates, Barreto/Sanchez, at 22-24, Tables 7 & 8, which can be difficult to obtain because many vital records offices require an official photo ID or other documents from a restrictive list to obtain a birth certificate, and many voters lack the documents their birth states require. *See, e.g.,* Doc. 33 at 8-9; Doc. 34-3; Doc. 33-2; Doc. 33-6. DMV provides no assistance to voters in obtaining birth certificates from their birth states, other than, occasionally, providing contact information for vital records offices. JM 58:1-16.

There also are Wisconsin voters who were never issued birth certificates. KB 72:1-12 (no birth record is exception, but not "extremely rare"); Althof Decl. ¶ 8; Doc. 35 ¶¶ 4-7; Wilde Decl. ¶¶ 9-12. DMV's alternative procedure for persons whose birth records are unavailable requires a voter to send an "MV3002" form to the birth state to certify that no birth record exists.[10] JM 58:17-59:2, 83:22-84:17. But DMV has not coordinated with vital records offices,

_____

[9] *Contrast Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1346 (11th Cir. 2009) (no birth certificate or other identification required for photo ID; "each county [must] issue free of charge a 'Georgia voter identification card' . . . obtained by producing evidence that the voter is registered to vote in Georgia and by swearing an oath that the voter does not have another acceptable form of identification").

[10] There also has been significant controversy among DMV management about whether the MV3002 procedure can be used to prove citizenship as well as name and date of birth. PF 140:9-141:15 (as of Dec. 1, 2011, did not know could be used for citizenship); Doc. 34-24 (Fernan email to DMV staff requesting public presentation stating "no exceptions" to birth certificate or passport to prove citizenship); JM 89:21-91:3, 93:13-24 (recommending use of MV3002

14

and even in Wisconsin those offices are unfamiliar with the form, JM 34:13-35:3, 140:9-141:14; KB 53:23-54:6; Attach. R (D10233-34) (Wisconsin Vital Records Program Supervisor has "never seen one"). Some – apparently including Wisconsin's – decline to complete it. Wilde Decl. ¶¶ 13-16 & Attach. A thereto (sent MV3002 and supporting documents to Wisconsin Vital Records Office, which did not complete it and instead sent letter requiring her to submit birth certificate application and fee or complete a request for delayed birth registration with fee and documentation); Althof Decl. ¶¶ 12-15 (Iowa vital records office will not complete MV3002 without Iowa birth certificate application and fee; she also lacks photo ID that Iowa requires with birth certificate application).

Further, DMV leadership has chosen not to publicize the MV3002 process. JM 87:19-88:10, 103:19-24, 119:2-120:1; *infra* Sec. II.B.4. Even if voters learn of the form and surmount the burdens of getting a vital records office to complete it, they also must present additional documents such as baptismal certificates or early medical or school records, that they may not possess or have any realistic way to obtain and that may or may not satisfy the DMV officials reviewing their applications. Ex. 47; Ex. 66 at 6-7, Driver Licensing Manual ("DLM") Ch. 215; *see infra* Sec. II.B.4. Voters who lack both records of their birth and SSCs, such as many in the

---

certification of absence of birth record with other documents to satisfy proof of citizenship, but unaware of legal authority for such use); Attach. R (D10205-10212) (emails among DMV personnel debating whether an exception can be made to legal presence requirement). *Compare id.* at D10209 ("I am not aware of any exceptions to our legal presence requirement.") *and id.* at D10210 ("I asked a TL about exceptions to the proof for Legal Presence and I was told there was none."), *with id.* at D10205-06 (head of DMV Bureau of Field Services directing acceptance of MV3002 plus baptismal certificate as proof of citizenship). Although that controversy appears to have been resolved for now, the change has not been adequately communicated to DMV field staff. The Driver's License Manual ("DLM") – the "primary resource" and "reference guide" for DMV field agents and Team Leaders ("TLs") who deal directly with applicants – still describes the MV3002 as an exception for proving *name and date of birth* where no birth certificate exists, but not as proof of *citizenship*. JT 48:20-55:1; Ex. 66; Ex. 107.

15

Amish and Mennonite communities, are unable to obtain ID cards. JM 131:8-132:22; Ex. 51 (D1981).

DMV's requirements also impose severe burdens on voters whose birth certificates do not exactly match their current names, a problem that DMV knows is relatively common. JM 64:12-16. Although DMV will at times, without public notice or uniform standards, accept birth certificates with names that vary from those on other documents, DMV often insists voters go through a birth certificate amendment or name change before it will issue an ID. DMV has said that Bridget Marion Nowak, whose birth certificate bears the name "Marion Bridget Nowak," and Plaintiff Eddie Lee Holloway, Jr., whose birth certificate bears the name "Eddie Junior Holloway" and his father's name, "Eddie Lee Holloway," must amend birth certificates to obtain ID. JM 154:13-156:12, 172:20-174:23; Nowak Decl. ¶¶ 8-9; Doc. 33-8 at ¶¶ 7-8; Doc. 40-12, No. 3; *infra* Sec. II.B.4. At the local level, the process is unforgiving even for minor errors. JT 37:3-7, 72:13-16, 75:18-76:21 (if birth certificate has errors, must either amend birth certificate or change documents like SSC to conform to birth certificate, before ID will be issued).

DMV's other documentation requirements also burden voters. DMV staff routinely tell voters they need an SSC to obtain a photo ID, while SSA staff often tell voters they need a photo ID to obtain an SSC – resulting in voters obtaining neither. Doc. 33 at 10; Doc. 33- 9 at ¶¶ 5-6; Doc. 33-10 at ¶¶ 10-12; JM 52:25-53:4; Ex. 56. DMV imposes this burden even though it could utilize the Social Security Online Verification ("SSOLV") process to electronically compare an individual's SSN to the SSN and identifying information in SSA's database. JM 59:5-13 ("[Using SSOLV], we can determine whether or not they've got a legal Social Security card . . .

16

.”). Voters who have recently moved to Wisconsin often lack proof of residency.[11] JT 87:21-88:7. DMV is also aware that some voters, such as unsheltered homeless persons without ties to a social service agency, will simply be "out of luck" and unable to obtain an ID card. JM 207:21-24. Further, DMV staff do not routinely or uniformly share information on alternative methods to prove identity or residency. *See infra* Sec. II.B.4.

### ii.    Class 2 [Count 2]

It is clear that obtaining photo ID also imposes financial hardships on many voters, especially because lower-income voters are significantly less likely to have either accepted photo ID or the birth certificates needed to obtain ID than higher-income voters. *See infra* Sec. II.B.6; Barreto/Sanchez, at 30-32, Table 19 & Fig. 11. Yet there is no indigency exception to the photo ID requirement, and there is no indigency exception to DMV's birth certificate requirement. JM 76:1-17; KB 43:20-44:23, 131:11-17; 185:2-12 (no exception for penniless homeless voters). Defendants are aware of the financial burdens that obtaining birth certificates impose on homeless, disabled and minority voters, among others. NR 26:1-27:1, 50:2-51:1, 59:3-23; Attach. R (D12487-88) (DMV noting that State Rep. Meyer raised issue that "some constituents cannot afford the fee to obtain a notarized copy of a birth certificate"). *Contrast Crawford*, 553 U.S. at 201, 202 n.20 (no evidence of "the difficulties faced by indigent voters," including how many indigent voters lacked copies of their birth certificates).

While, for some voters, the cost of obtaining required documentation may not be burdensome, for lower-income individuals subsisting on public benefits, such as Plaintiff Dukes,

---

[11] Voters who live in Wisconsin for 28 consecutive days are eligible to vote. Wis. Stat. § 6.02(1). Since it often takes new residents more than a month to obtain proof of residency needed for a Wisconsin license or ID, Act 23 could keep new residents from voting.

who receives SSI disability benefits, and Plaintiffs Holloway and Ellis, who receive only food stamps; and the working poor, such as Plaintiff Ginorio, the burden is severe. Doc. 33 at 9-10. Even applicants without birth certificates must generally pay a fee to complete the MV3002, JT 60:8-61:3, or to search for records, whether or not those records exist. Doc. 33 at 9-10; JM 55:3-5, 92:23-93:2; Althof Decl ¶ 14; Wilde Decl. ¶¶ 13-17. Defendants do not even make exceptions for voters who would have to go through a costly birth certificate amendment process to obtain the documents DMV requires to issue photo ID. JM 154:13-156:12, 172:20-174:23. And finally, transportation costs incurred in gathering documents and visiting various agency offices also impose financial burdens on many voters. *Supra* Sec. I.D.5.

### c.      The Lack of a Compelling Government Interest

These severe burdens must be weighed against the state's rationales for requiring photo identification. Defendants claim that photo ID is necessary to prevent fraud and increase voter confidence. Defendants do not claim that photo ID increases public confidence other than by preventing fraud. Doc. 38 at 19-20. Yet, instances of any kind of voter fraud in Wisconsin are exceedingly rare. Doc. 33 at 18-19 & n.15. As Defendant Kennedy acknowledged, the fraud "problem" is "rhetoric . . . based on perception, but not really based on any actual facts." Doc. 34-1 (KK 37:17-38:15); Doc. 34-17. Further, comprehensive election reforms over the past decade have addressed vulnerabilities in the system far more effectively than a photo ID requirement and without imposing unnecessary burdens on voters. Doc. 33 at 21-22.

While Defendants claim that impersonation fraud may exist but go undetected, Doc. 38 at 17-18, Kennedy was unaware of a single voter impersonation fraud prosecution in Wisconsin in the more than 30 years he has been the state's top election official. Doc. 34-1 (KK 40:10-25).

18

Allegations of impersonation fraud have turned out to be greatly exaggerated and typically caused by administrative errors, such as a poll worker erroneously noting that an individual voted on the wrong line of a poll book. Doc 33 at 22; Doc. 41 at 8-9; Doc. 34-1 (KK 51:21-53:24); NR 102:3-25 (aware of only about three cases where person incorrectly marked as having voted, likely clerical errors). Act 23's requirement that voters sign the poll book will substantially reduce such errors and facilitate prosecution of any person who tries to fraudulently sign the book, 2011 Wis. Act. 23 § 36 *amending* Wis. Stat. § 6.36(2)(a); Doc. 33 at 22; Doc. 34-1 (KK 65:17-66:9), NR 103:19-104:3, while other laws requiring those voters to provide dates of birth and driver's license, ID card or Social Security Numbers ("SSNs") when registering make any effort to vote under another's name very difficult. These verification procedures are a less restrictive means of fraud prevention than requiring photo ID from voters who experience burdens in obtaining it.

Defendants also claim that photo ID prevents and deters felons and non-citizens from voting. Doc. 38 at 19. Such forms of fraud are also nearly non-existent, but, more importantly, photo ID cannot prevent or deter them, since Wisconsin allows felons and non-citizens to obtain driver's licenses and ID cards. Doc. 41 at 9; KB 24:12-14; Trans. § 102.15(3m) (requiring "proof of citizenship, legal permanent resident status, conditional resident status or legal presence"). At the same time, in recent years the GAB Defendants have implemented numerous anti-fraud procedures, including matching SVRS against lists of felons which dramatically reduce the likelihood of felon voting. Doc. 33 at 20-21.

Defendants also assert, again without explanation or evidence, that photo ID would prevent voters who move out of Wisconsin from voting. Doc. 38 at 19. There is no evidence of this occurring and no explanation of how photo ID would prevent it.

Finally, Defendants claim photo ID would prevent or deter double voting across state lines. Doc. 38 at 19. There have been only a few isolated cases of double voting within Wisconsin, Doc. 34-1 (KK 79:13-15), and none known across borders, and Defendants cannot explain how the photo ID law would prevent either kind of double voting. Doc. 34-1 (KK 76:15-78:15, 79:8-15); NR 101:24-102:2; RH 164:14-165:6. Moreover, when a voter registers in a new state, that state is supposed to notify Wisconsin, NR 118:11-16; enforcing that requirement is a less burdensome alternative. Here as well, Wisconsin has taken other steps to investigate, deter, and prosecute any such fraud. Doc. 33 at 21; Doc. 41 at 9.

At the same time, less restrictive ID requirements, including affidavits of identity, have worked well in other states. Doc. 33 at 22-23. Defendants' failure to provide evidence to support assertions of such improper voting or to explain how Act 23 would deter such conduct, shows that the state's interest is conjectural. *See, e.g.*, *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) ("[The government] must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."); *Bernal v. Fainter*, 467 U.S. 216, 228 (1984) ("Without a factual underpinning, the State's asserted interest lacks the weight we have required of interests properly denominated as compelling.").

### d.      The Other *Winter* Equitable Factors

20

The injury voters in Classes 1 and 2 will suffer without injunctive relief is irreparable. Plaintiffs and other similarly situated voters will be deprived of their right to vote, and no post-election remedy can redress that loss. The remedy Plaintiffs seek – an affidavit of identity in lieu of photo ID at the polls – is one that Defendants themselves have recommended. Doc. 33 at 20. It will alleviate burdens on voters, while promoting electoral integrity and public confidence in elections by ensuring that eligible Wisconsin voters are not wrongfully denied the franchise.

### 2. The Photo ID Law Arbitrarily and Unreasonably Burdens the Voting Rights of Veterans [Class 6, Count 6]

Act 23's exclusion of VICs from the list of accepted photo IDs for voting places a distinct burden on veterans who lack accepted photo ID, but have this secure, cost-free photo ID card issued by the U.S. Department of Veterans Affairs. Doc. 33 at 25-26. There is no state interest, let alone an "important" one, that can justify this burden. *Burdick*, 504 U.S. at 434 (citing *Anderson*, 460 U.S. at 788); Doc. 33 at 26; Doc. 41 at 11. For the members of Class 6, a VIC is their sole form of identification, and like Plaintiffs Bulmer, Ellis, and Harmon, more than 600 veterans in Wisconsin alone are homeless. Doc. 33 at 26; Doc. 34-11. The state has articulated no interest in forcing these veterans to expend time and money obtaining a different photo ID to vote, other than hypothesizing that the lack of an expiration date on VICs might justify their exclusion. Doc. 38 at 21. But Act 23 in fact authorizes the use of other forms of photo ID that lack expiration dates, including some tribal and military ID cards. Wis. Stat. § 5.02(6m)(a)(3), (e); Doc. 41 at 10; Doc. 43, Doc. 44; MH 42:16-43:4, 44:7-13, 119:19-120:5; RH 63:21-64:13.

The other equitable factors also weigh in favor of granting relief. Veterans, especially homeless veterans, with no other accepted photo ID and limited resources, are likely to suffer irreparable harm if the exclusion of VICs is not enjoined. Since such disfranchisement is

21

irrevocable and the state would suffer no meaningful hardship in accepting these IDs, the balance of equities clearly tips in favor of the members of Class 6. Finally, the public interest favors allowing these voters to use their VICs. They pose no threat to electoral integrity and disfranchising those who served our country undermines the legitimacy of our elections.

### 3. The Wisconsin Photo ID Law Unconstitutionally Imposes a Poll Tax or Other Material Burden on Voters in Class 5 [Count 5]

The Twenty-Fourth Amendment provides that the "right of citizens of the United States to vote in any primary or other election for" federal offices "shall be denied or abridged by . . . any State by reason of failure to pay any poll tax or other tax." It prohibits states from conditioning the right to vote in federal elections on the payment of a tax or fee, or imposing any additional condition that would not apply if they paid. *Harman v. Forssenius*, 380 U.S. 528, 538-39 (1965). The Fourteenth Amendment similarly prohibits poll taxes in state and local elections. *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966); Doc. 33 at 27-29; Doc. 41 at 12-14.

Because of Act 23, voters like Ruthelle Frank, Shirley Brown, and Marcella Althof, who have gone their whole lives without birth certificates but were able to vote nonetheless, now must pay a fee in order to continue voting.[12] Wisconsin has no cost-free alternatives to paying for a birth certificate to acquire photo ID, such as allowing the use of an affidavit of citizenship or of free documents like SSA printouts. *Contrast Crawford*, 553 U.S. at 199 n.18 (Medicaid and Medicare cards, SSA statements, and other alternative documents acceptable *in lieu of* birth certificates to obtain ID); *Common Cause,* 554 F.3d at 1346 (photo ID for voting issued with evidence of voter registration and affidavit that voter has no other accepted photo ID). DMV

---

[12] For voters like Eddie Lee Holloway, Jr., and Bridget Marion Nowak, who would have to amend birth certificates by court order, the costs would be much greater. JM 172:20-174:23.

22

rules requiring documents that cost money, as applied to voting, violate the poll tax ban. At least one court has squarely held that forcing voters to pay for birth certificates to obtain photo ID is an unconstitutional fee imposed on the right to vote. *Weinschenk v. Missouri*, 203 S.W.3d 201, 213-14 (Mo. 2006); Doc. 41 at 13-14.

Voters in Class 5 are compelled to pay for documents such as birth certificates and marriage certificates, or certifications that necessary records do not exist, in order to obtain a "free" state ID card. Doc. 33 at 28; Doc. 41 at 11-12; JT 60:8-61:3; Wilde Decl. ¶¶ 14-16; Doc. 33-2 ¶ 9; Doc. 33-3, ¶ 3; Doc. 33-4 ¶ 8; Doc. 33-6 ¶ 5. As applied to them, Act 23 constitutes an unconstitutional poll tax. Defendants concede that it would be unconstitutional to charge money for the ID needed to vote, that a certified copy of a birth certificate is generally required to obtain an ID card, and that a birth certificate costs money. Doc. 38 at 10-11, 14-15, 27-28.

The other equitable factors also favor granting the relief sought. Absent an injunction, numerous voters will be unable to vote altogether or will be forced to expend money to obtain birth certificates or other records and documents so they can obtain photo ID and vote. That disfranchisement is irrevocable. Again, the state would suffer no meaningful hardship in implementing an affidavit – of identity procedure. Thus, the balance of equities clearly tips in favor of injunctive relief for Class 5. The public interest also favors this outcome.

### 4. The Photo ID Law Confers Unconstrained Discretion on DMV Employees Which Results In Inconsistent and Arbitrary Treatment of Voters in Violation of Equal Protection [Count 7]

Elections must be governed by objective and publicly disclosed rules. In contexts ranging from voter eligibility to the mechanics of casting and counting ballots, courts have insisted upon the uniform application of objective criteria. Without such objective and

23

consistently applied rules, officials who interact with voters are left to make arbitrary decisions, leading predictably to constitutionally impermissible unequal treatment of similarly situated voters. Act 23 subjects eligible voters to DMV decision-making and control over whether or not they will be able to vote. While DMV purports to apply clearly enumerated documentation requirements to applicants for its products, in practice it treats voters in an arbitrary and disparate manner.

In *Baker v. Carr*, 369 U.S. 186, 208 (1962), the Supreme Court stated: "A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution . . . ." Thus literacy, constitutional understanding, and similar "tests" were struck down on the grounds that they gave election workers unfettered discretion to judge whether a voter was qualified to vote. *See, e.g.*, *Davis v. Schnell*, 81 F. Supp. 872, 878 (S.D. Ala. 1949), *judgment aff'd*, 336 U.S. 933 (1949). In *Louisiana v. United States*, 380 U.S. 145, 153 (1965), the Court, citing *Davis*, wrote that the "cherished right of people in a country like ours to vote cannot be obliterated by the use of laws . . . which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar. Many of our cases have pointed out the invalidity of laws so completely devoid of standards and restraints." The Supreme Court's 2000 decision in *Bush v. Gore*, 531 U.S. 98 (2000), reaffirming that the Equal Protection Clause prohibits "arbitrary and disparate treatment" which "value[s] one person's vote over that of another," is a direct descendant of this line of precedent. *Id.* at 104-05. Only "specific standards" and "uniform rules" provide "sufficient guarantees of equal treatment." *Id.* at 106-07.

In *Black v. McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002), the court rejected a motion to dismiss an equal protection claim challenging the use of ballot-counting equipment that led to

24

the differential treatment of voters depending on where they live:

> [The election system] leaves the choice of voting system up to local authorities. But that choice necessarily means that some authorities will choose a system with less accuracy than others. As a result, voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office. Similarly situated persons are treated differently in an arbitrary manner.

*Id.* at 899; *see also Stewart v. Blackwell*, 444 F.3d 843, 846 (6th Cir. 2006), *vacated as moot*, 473 F.3d 692 (6th Cir. 2007) (allowing equal protection claim against error-prone punch card machines to go forward); *Hunter v. Hamilton County Board of Elections*, 635 F.3d 219, 234-36 (6th Cir. 2011) (counting certain provisional ballots cast in wrong precinct on finding of poll worker error, while failing to consider evidence of the same errors for similarly situated ballots, violates equal protection); *Pierce v. Allegheny Cnty. Bd. of Elections*, 324 F.Supp.2d 684 (W.D. Pa. 2003) (allowing voters in some counties but not others to have absentee ballots delivered by third parties violates Fourteenth Amendment and could dilute votes of voters in county where such delivery not allowed).

To obtain photo ID, voters must produce multiple, accurate documents, but those unable to do so are subjected to the ad hoc judgment calls of DMV officials. DMV sometimes allows applicants to satisfy its requirements with alternative documents or makes exceptions based on policies or practices that are concealed from the public, not reduced to writing, contradictory, and not well-known to or consistently applied by DMV staff. In fact, its Deputy Administrator believes it is not "appropriate" to publicize exceptions. PF 131:16-25. Thus determinations as to who may use alternatives and whether to approve applications often appear to be based on whether and to what extent a voter is able to appeal successfully to DMV management, GAB, or legislators. *See also Briscoe v. Kusper*, 435 F.2d 1046, 1052-56 (7th Cir. 1970) (failure to issue

Case 2:11-cv-01128-jdp   Filed 04/23/12   Page 28 of 55   Document 50

specific rules or policies setting standards for signing petition, and then applying stringent interpretation of the law to disqualify some petition signers, violates due process).

Arbitrary decision-making appears most clearly with respect to voters who either lack birth certificates or whose documents bear non-matching names. Inconsistent treatment is not only possible, but probable. Whether or not such voters will be able to obtain a photo ID is left to the discretion of DMV field agents and CSC supervisors, unconstrained by written rules, policies, standards, or procedures. JM 108:5-19, 136:5-10, 142:21-143:4, 149:6-18, 169:6-16.

As to voters for whom there is no birth record, DMV lacks any consistently disseminated or applied policy or practice to determine whether it will allow an individual to obtain an ID card with an alternative certification and documentation. A voter who has no record of birth on file may (or may not) be able to obtain a completed MV3002 from a vital records office to certify this fact. *See infra* Sec. II.B.1.b.i. And the chance of obtaining an executed MV3002 will only occur if the voter learns of this exception, which DMV refuses to publicize. It was kept out of public presentation materials, PF 136:3-140:8, Doc. 34-24, is not publicly available on DMV's website, JM 87:19-88:2, Attach. R (D10375), and is not mentioned in DMV's customer handout of acceptable documentation. JK 19:1-9; Ex. 30. DMV field offices do not keep paper copies of the form, JT 44:7-17, it is not reproduced in the DLM, JM 89:7-19; Exs. 66-68, Ex. 107, and CSC supervisory staff are largely unfamiliar with it.[13] JM 64:17-25; JT 43:14-21 (TL did not know name of the form until the day before April 2012 deposition, and could not recall if it was discussed at team meeting); *id.* at 44:3-6, 45:1-22. This nearly secret process is not offered

---

[13] At least one TL knows the form exists but has never used it, even though her office helped Hurricane Katrina victims with destroyed birth records. JT 32:17-24, 44:18-45:17.

consistently to voters, since DMV's practice is to emphasize the need for a birth certificate, not explain any exceptions, even to applicants who present documents other than a birth certificate. JT 21:14-22:10; JT 61:9-20 (if someone pulled out baptismal certificate, field agent would tell customer "You need a certified birth certificate"); KB 82:16-83:1.

DMV is also inconsistent about whether the MV3002 may be used to prove citizenship, or only to prove name and date of birth. *See supra* Sec. II.B.1.b.ii. A November 28, 2011 Technical & Training Services Update ("TTSU"), Ex. 47, extended use of the MV3002 to prove citizenship, but in the months between Act 23's effective date and the TTSU's issuance, voters who contacted or visited DMV were told there were no exceptions for proof of citizenship. JM 89:7-91:15. Moreover, DMV only sent the update directly to supervisors and TLs, not to field staff, and there has been no training on the MV3002's use since its circulation. JT 12:21-13:5; JM 113:14-23.

Unsurprisingly, DMV has applied the MV3002 process in inconsistent ways. For example, two months ago, DMV's document expert told a TL for four northwestern Wisconsin CSCs that the MV3002 "should be . . . probably reserved for those over 80," Attach. R (D10375), a policy that exists nowhere in DMV materials. Individual voters pay the price for such haphazard guidance. In January 2012, more than a month after the TTSU was issued, Plaintiff Brown, an elderly voter with no birth record, went to DMV with an affidavit from her childhood school district in Louisiana, which attested to her name, date and place of birth, and parents' names, but DMV denied her photo ID application without telling her of the MV3002 procedure. Doc. 35 ¶¶ 4-7; Doc. 40-16, Nos. 3, 5, 8. In contrast, DMV suggested that if Plaintiff Wilde and Marcella Althof could obtain no-birth-record certifications on MV3002 forms, they

27

might be able to obtain ID cards without birth certificates, although DMV did not give them the forms or any instructions on completing these, and the process has thus far not been successful. *See supra* Sec. II.B.1.b.i; Wilde Decl. ¶¶ 9-13; Doc 40-15, Nos. 3, 8; Althof Decl. ¶¶ 12-15; Exs. 25, 50, & 86; KB 78:15-82:1; JM 125:4-127:12; JK 35:18-36:1.

Even when DMV tells voters about the MV3002 process, DMV may require them to provide additional documentation. If required, this additional documentation may be restricted to those items DMV announced in the TTSU and the amended DLM,[14] JM 62:18-21, 115:2-117:5, or may be expanded, at CSC supervisor and TL discretion, to embrace additional documents, JM 115:2-117:5 (SSA printouts may be accepted); Ex. 25 (SSA history printouts communicated as option to voter); JK 40:4-8 (same), 28:1-25. Again, no rules or policies guide decisions on accepting unspecified forms or when to accept or not to accept one of the listed alternatives. JM 113:14-17, 116:22-117:5. In the absence of any policies, DMV personnel make arbitrary decisions as to whether to accept items on the list. JM 62:21-63:24 ("[I]f a 21-year-old brings in a 3002 and brings in the family Bible and says, I have no birth certificate, they're going to probably need to get some more documentation. If a 90-year-old does it, then we're looking at it a little differently."); *id.* at 124:11-22 (some baptismal certificates might not be acceptable); JK 36:11-37:11 (if individual brings in no-record letter from birth state, it can be accepted *without* an executed MV3002).

DMV also lacks policies or procedures on how to reconcile discrepancies where the name on the birth certificate varies from the name listed on other documents presented, such as an

---

[14] The list of additional documentation includes: (1) baptismal certificate; (2) hospital certificate; (3) delayed birth certificate; (4) census record; (5) early school record; (6) family bible record; and (7) doctor's record of post-natal care. Ex. 47.

28

SSC. Decisions are made on a case-by-case basis by field supervisors or officials who are not guided by formal rules, policies, or criteria. Ex. 52; Doc. 39, ¶ 1; Attach. R (D10119-34); KB 88:9-92:22, 101:19-102:6, 105:16-18, 114:5-24; JM 136:5-10, 149:12-150:4. This, too, is a recipe for the inconsistent treatment of voters. JM 136:11-17, 142:4-23. Nor is there even a consistent understanding, much less any formal policy, as to who within DMV actually has decision-making authority on these issues. *See* KB 94:12-20 (asserting she or DMV document expert could overrule CSC supervisors and TLs); Ex. 53 ¶ 1 ("final call" lies with CSC supervisor); Ex. 48 ("Exceptions may be made by the TL or supervisors . . . ."); JM 107:8-108:19, 138:24-139:18. DMV officials know that field agents might reject applications with name discrepancies without even talking to a supervisor. JM 108:20-109:10, 152:10-14.

Predictably, given the lack of policies, the treatment of applications with non-matching names varies significantly, and the outcomes are irreconcilable. DMV's Director of the Bureau of Field Services claims that voters could obtain ID in their "assumed" names despite incorrect birth certificates, KB 88:17-90:11, while a DMV TL testified that the name on the birth certificate *must* be on the license or ID card, and if there is a discrepancy, the voter must obtain a corrected birth certificate before an ID will be issued. JT 37:3-7; 72:13-17. Defendants rejected Plaintiff Holloway's birth certificate, which erroneously bears the name "Eddie Junior Holloway," because other documents, including his SSC list his name as Eddie Lee Holloway Jr., and told him that he had to amend his birth certificate by court proceeding. Doc. 33-8 at ¶¶ 9-10; JM 154:13-25, 172:20-174:23. DMV's document expert also would refuse to accept the birth certificates of Bridget Marion Nowak (first and middle names transposed, but correctly spelled) and John Krajewski (last name recorded as "Kraske"), Nowak Decl. ¶¶ 8,10; Ex. 33; JM 142:4-

23, 155:16-156:12, 161:15-164:10, while the BFS Director might accept those documents, KB 120:7-121:8, 125:14-126:17.

By contrast, Plaintiff Frank's birth certificate contains misspellings of her maiden name and her parents' names, and correcting those errors would cost hundreds of dollars. While DMV rejected the baptismal certificate she proffered instead, other DMV officials now claim they might accept her incorrect birth certificate. Doc. 33-3, ¶ 10, 13; Doc. 34-23; Ex. 53, Miller Decl. ¶¶ 6, 8. DMV also ultimately accepted birth certificates for Rose Mary Dorothea Theissen ("Marie Rose D. Schaefer" on her birth certificate), Shirley Mendel Simon ("Genevieve Shirley Mendel"), Andrew Trokan ("Andreo"), Genevieve Winslow ("Genava"), and Leo Peter Navulis ("Leo Packus Nevwulis"), but only after DMV's initial rejection of these applications led family members to complain to Wisconsin state legislators. Doc. 34-23; Doc. 39; Ex. 52; JM 136:22-142:3, 143:12-147:20, 156:24-157:24; Anderson Decl. ¶¶ 8-11; Simon Decl. ¶ 3-16; Trokan Decl. ¶¶ 7-12; Winslow Decl. ¶¶ 1-15; Attach. R (D10119-134). Notably, these voters, whose applications DMV rejected on the first trip, brought the same or almost the same documents on their subsequent, successful visits. Anderson Decl. ¶¶ 9-11; Simon Decl. ¶ 14 (same documents plus marriage certificate); Trokan Decl. ¶ 11; Winslow Decl. ¶¶ 8-15. Attach. R (D10133-34) (regarding Navulis, DMV document expert stated: "[W]e decided he has enough documentation to get the ID card issued . . . . There is no doubt that both the BC and SS card belong to him"). DMV also appears to have arbitrarily allowed some persons with changed names, including those with married names and assumed religious names to obtain ID in those names without such supplemental documentation such as marriage certificates or name change court orders. KB 98:1-99:19; Anderson Decl. ¶¶ 9-11 (issued state ID without presenting marriage certificate); Ex.

30

32; Attach. R (D10133-34) (Navulis), (D8256-58) (advocating exception for woman with no marriage certificate, due to her advanced age). DMV has made no effort to harmonize its treatment of these voters.

With respect to DMV's proof of identity requirement, there is again inconsistent treatment and inconsistent understanding of DMV policies. *See* Docs. 33-9 & 33-10 (DMV field staff told voters that SSC mandatory); Attach. R (D12490) (SSC not acceptable "because the signature was printed and not cursive"); KB 159:24-160:9, 161:19-24 (BDS 316 is exclusive list of documents to prove identity); JM 72:11-74:2, 74:25-75:14, 80:21-81:3, 100:6-14 (manager discretion on proof of identity); JK 51:1-52:11 (combination of documents *not* on list may be acceptable); JT 81:10-12 (has accepted Medicare cards); JM 190:19-191:3 (Medicare cards not acceptable alone, but possibly with other documents); JT 83:13-18 (will not accept library cards); JM 73:8-17 (library card may be acceptable); Ex. 48 (internal confusion over accepting credit cards); JT 82:16-20 (will not accept credit cards); JT 79:15-80:6 (SSA print-outs not acceptable); Attach. R (D6690-91) (SSA print-out may be acceptable); JM 189:18-190:3 (SSA print-out, plus library card or credit card, may be sufficient); JK 63:19-66:21 (Department of Corrections and Milwaukee County ID cards, though not on lists and not officially permitted, may nevertheless be accepted). The public is unaware of any flexibility that may exist, as DMV withholds that information. JM 73:24-74:7. DMV also refuses to publicize its ability to compare applicants' photos with its digital image records, Trans. § 102.15(4)(c), instead of requiring those voters to produce other forms of proof of identity, Exs. 30, 57; KB 151:16-156:15; JK 56:21-58:6; JM 104:10-105:16, 195:11-196:5. DMV specifically told one voter it could not use the digital image procedure, and DMV also, inexplicably, required him to present a birth certificate to obtain a

31

replacement for a stolen ID. [15] Young Decl. ¶¶ 6-8.

Regarding DMV's proof of residency requirement, local TLs and field supervisors have discretion to accept alternative documentation or to allow vouching by another person, but they do not apply these alternatives consistently and refuse to disclose them publicly. Exs. 49, 55, 61; JK 80:20-81:1 (ability to use other documents not made public); KB 176:9-177:6 (vouching allowed but not publicized); JM 202:16-203:13 (same); JT 97:15-98:22 (with a marriage certificate, one spouse can vouch for another, but that practice is "off list"); JK 71:21-73:3 (review mail with applicant to see if residency can be established, a judgment within supervisor's discretion). DMV rules also explicitly state that an applicant may not use a P.O. Box as an address, but DMV officials at times bend these rules, JM 206:25-209:23; KB 181:22-182:11, or make other exceptions, KB 189:19-190:14 (accepted outdated residency proof for applicant whose front door moved to different street after remodeling). Information as to the requirements and procedures for DMV's homeless residency documentation policy also varies. Doc. 34-22; JM 203:14-206:24; KB 178:12-179:1, 180:14-181:6.

The other equitable factors also weigh in favor of granting injunctive relief. Until DMV establishes clear documentation policies and procedures and ensures their uniform implementation, eligible voters will suffer the irreparable harm of disfranchisement as they are denied photo ID by the arbitrary exercise of DMV employees' discretion. Allowing eligible voters to vote without accepted ID in the interim will not harm GAB's operation of elections, especially in light of the suspension of the photo ID law during the most recent election.

---

[15] Voters getting "duplicate" ID cards to replace lost or stolen IDs need only show proof of identity, not proof of name, date of birth, or citizenship. *See, e.g.,* Ex. 30 (listing "proof of identity" as only form of proof necessary for duplicate license or ID card.)

32

Reverting now to a photo ID requirement for the approaching elections is likely to increase voter and poll-worker confusion. NR 151:19-152:7. Finally, the public interest favors the consistent and transparent administration of all aspects of the electoral process, including the issuance of accepted photo ID to eligible voters.

### 5. Act 23 Has Rendered Wisconsin's Electoral System Fundamentally Unfair In Violation of Substantive Due Process [Count 8]

An electoral system marked by fundamental unfairness violates the due process guarantees of the Fourteenth Amendment. *See, e.g., League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008) (structural electoral dysfunction based on a lack of uniform rules, standards and procedures for such election administration matters as registration lists, polling places, absentee and provisional ballots, and assistance for disabled voters, combined with inadequate poll worker training, could lead to widespread disfranchisement and state a substantive due process claim based on a "system . . . devoid of standards and procedures . . . ." *Id.* at 468-70, 477-78. Similarly, in *Griffin v. Burns*, 570 F.2d 1065, 1078-79 (1st Cir. 1978), the court held that "due process is implicated where the entire election process . . . fails on its face to afford fundamental fairness." Although isolated and inadvertent election errors may not rise to constitutional deprivations, when "an officially-sponsored election procedure" is "in its basic aspect . . . flawed" and unfair, it violates substantive due process. *Id.* at 1078. *See also Black*, 209 F. Supp. 2d at 901 ("What is challenged . . . is not an unforeseen human or mechanical irregularity which results in a diminution of someone's voting rights, but rather a statutory scheme which, depending upon the choices made by local election jurisdiction officials, will necessarily result in the dilution of an entire group of citizens' right to vote.")

The implementation of Act 23 has foreseeably rendered the state's election system

33

fundamentally unfair. In addition to the burdensome requirements and arbitrary treatment voters face under the photo ID law, *see supra* Sec. II.B.4., Act 23's underfunded and scattershot implementation will result in widespread disfranchisement. These are not garden variety or *de minimis* irregularities. Rather, Defendants' inability to ensure uniform implementation of Act 23 by local elections officials, the systemic lack of adequate training and monitoring of those officials, and systemic failures of public notice and voter assistance have already harmed, and will continue to harm, voters with and without photo ID. Voters and elections officials alike remain profoundly confused about the photo ID law's requirements, caveats, and exemptions. NR 81:20-23.

The effects of this sea change in Wisconsin election law are magnified by the structure of Wisconsin's election administration system. Wisconsin has created a statutory scheme in which DMV – an agency with no experience in voting – has been tasked with the responsibility for determining whether and how eligible voters can actually obtain the ID they need to vote, without giving the GAB – the agency responsible for administering elections – any authority over these relevant rules, policies, and procedures that impact voting. MH 117:16-25; RH 67:16-20. Wisconsin's decentralized elections system – in which GAB has little legal authority over the municipal clerks who operate elections, *see supra* Sec. Sec. I.B. – further exacerbates the problems associated with implementing a complex piece of legislation in nearly 2,000 municipalities. Voters with and without photo ID suffer the consequences.

Election officials are not prepared to uniformly and properly implement the requirements and exemptions of Act 23.[16] RH 49:19-50:12. Other than knowing that voters are supposed to

---

[16] The failure to ensure uniform standards for counting ballots may also constitute an Equal

34

show ID, many local elections officials do not understand even basic aspects of implementing the law – which will determine whether or not eligible voters, even voters *with* proper ID, are able to cast ballots. NR 73:13-19, 81:20-23; RH 19:12-21, 23:3-5. The head of GAB's Elections Division stated the problem clearly: "This is a new sweeping law with a lot of nuances, and for poll workers who do not do this as a matter of their daily jobs . . . the facts that should be known, the basic facts, in fact, are many times not known. And it does adversely affect the voter . . ." NR 74:1-8. The significance of these foreseeable errors is profound, because Act 23 provides no meaningful remedy: when clerks and poll workers get it wrong, eligible voters are likely to be denied the right to vote, or give up on voting.[17] NR 81:24-82:1; RH 50:23-51:11,124:24-125:11.

Clear examples of disfranchisement have already occurred and will continue if Act 23 is permitted to go into effect. Some polling sites, for example, incorrectly refused to allow even accepted photo ID if those IDs did not exactly match the examples on GAB handouts. Attach. R (D10328-30). Many elections officials incorrectly apply the law regarding whether a voter's name on the photo ID must be identical to the name on the voting list (it does not), which has already led to the improper denial of ballots to at least five voters in just the low-turnout February 2012 election.[18] NR 74:9-75:21, 77:11-24, 80:18-20; *see also* Attach. R (D8923)

---

Protection violation. *See, e.g., Bush v. Gore*, 531 U.S. 98.

[17] A voter without accepted photo ID can cast a "provisional ballot." Wis. Stat. §§ 6.79(3)(b) & 6.97. However, that ballot will not be counted unless the voter returns to show accepted photo ID to the municipal clerk by 4 pm on the Friday after the election. Wis. Stat. § 6.97(3)(b). Local elections officials are not always offering provisional ballots to voters who should receive them. Attach. R (D10328-30). Moreover, voters who have already been told by elections officials – even incorrectly – that their ID is unacceptable are unlikely to return to show the same ID that elections officials have already told them they cannot use.

[18] DMV emails also reveal a recently married employee stating that, after "some creative

35

(potential for name-matching problems with nicknames, especially Spanish-language nicknames). There is also a widespread misperception that an address on the photo ID presented must be the voter's current address. GAB staff know of more than 10 and as many as 50 cases in which election officials improperly ordered voters to re-register and vote using the outdated address on their licenses or ID cards. RH 141:18-25, 142:23-143:9, 144:17-145:11; Attach. R (D4508, D10328, D8343). Other voters are likely to have been denied the ability to vote due to an address mismatch. RH 142:23-143:9, 144:17-145:11; NR 87:9-22. GAB is also concerned about vote denial due to local officials' improperly requiring a photo on the ID to exactly resemble the voter. NR 79:25-80:12.

If elections officials themselves have difficulty understanding these complex election law changes, the lack of knowledge and confusion is even greater for voters. Voters who, for example, are subject to improper name, address, or photo matching by elections officials will often assume the poll workers are the experts, NR 87:6-21, and they may well become discouraged and give up on voting. RH 124:24-125:11. *See also Hoblock v. Albany Cnty. Bd. of Elections*, 487 F. Supp. 2d 90 (N.D.N.Y. 2006) (voters who should have been required to reapply to receive absentee ballots reasonably relied on election officials' erroneous issuance of absentee ballots and experienced a deprivation of their voting rights when election officials refused to count their votes).

Providing adequate public notice could, perhaps, have lessened the anticipated problems. Yet, despite having the names and addresses of all registered voters in its SVRS database, GAB has sent no individual notices to inform voters of Act 23's existence, its requirements and

---

discussion," she was allowed to vote (improperly) on February 21 with a photo ID bearing her new surname. Attach. R (D1518-19).

36

exceptions, or how to obtain the ID necessary to vote, RH 151:11-17; NR 45:11-15, nor has it required local officials to do so. NR 44:21-45:15. In enacting the photo ID law, the legislature did not provide GAB a budget for individual notice, RH 151:23-152:7, but that is no defense to a constitutional violation. *See, e.g.*, *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217-18 (1986) ("[c]osts of administration" and "administrative convenience" cannot justify infringing constitutional rights). And while GAB is making some public outreach efforts, its presentations to only approximately 100 groups are wholly inadequate to communicate complex election law changes to millions of voters statewide. NR 36:9-15, 62:10-21, 142:1-5. GAB is aware of particular and persistent difficulties in ensuring that low-income, elderly, disabled, rural, and minority voters understand Act 23. NR 39:3-40:22, 45:16-25, 54:11-56:22, 57:20-58:8.

Act 23 also contains complex, though limited, exemptions, and because GAB has omitted information on these exemptions from its public service announcements, failed to individually notify nursing homes, group homes and other residential care facilities, or homebound voters of the exemptions, otherwise-exempt voters may believe they need to obtain ID and may give up on voting due to their inability to obtain it. RH 20:13-21:5, 148:13-151:10, 151:18-22; Ex. 20 (GAB official calling exemptions "incredibly complex"); NR 40:12-22, 41:15-23, 43:12-15; Obermeyer Decl. ¶¶ 7-12.

Nor have officials adequately informed student voters of the changes wrought by Act 23. Many students rely on college administrators, some of whom do not understand the law themselves. Plaintiff Meszaros, a freshman at Carthage College, was issued a student ID her school led her to believe would be acceptable under Act 23. Meszaros Decl. ¶¶ 10-12. However, the ID card lacked an expiration date, which she – and, apparently, the college - did not realize

Act 23 required. *Id.*

The confusion surrounding Act 23 itself overlays the arbitrary and difficult process of obtaining photo ID. *See supra* Sec II.B.4. Voters may not be able to surmount the hurdles DMV imposes, RH 104:9-105:4, while DMV's inevitable errors can result in denial of the right to vote.[19] RH 131:7-17. Yet only extremely limited assistance is provided to voters trying to navigate these complicated systems. As a consequence of the arranged marriage of two agencies with different missions, GAB itself is often ill-informed about DMV's policies and procedures and thus cannot provide accurate information, RH 93:20-94:1, 97:8-16, while DMV does not even believe its staff need to know much more about Act 23 than that it involves providing free photo ID. PF 109:19-25. Voters who encounter problems obtaining photo ID and manage to contact GAB are typically just re-routed back to DMV. RH 92:8-16. Neither the GAB nor the DMV have consistent procedures or protocols to ensure that eligible voters are actually able to obtain the ID they need to vote. Exs. 81, 83; RH 90:19-24, 91:19-92:16, 102:24-103:13, 104:9-105:4, 129:5-20, 154:3-20, 156:15-157:8. As a result, voters must fend for themselves, figure out if their cases are being mishandled by DMV and/or election officials, complain, and be lucky

---

[19] For example, as recently as December 2011, some DMV staff were still wrongly telling voters that there was no free state ID card. RH 121:22-122:4, 122:23-124:23. The problem is not just that errors are made, but that Wisconsin has created a legal structure that provides no alternatives if DMV errors lead to denial of photo ID, and where the result of those errors is thus likely to be disfranchisement of voters. *See, e.g.*, Attach. R (D15006) (legally blind senior denied state ID card at DMV CSC "because neither [his] birth certificate or SS card had a photo of him on it"); RH 121:22-122:4, 122:23-124:23 (as recently as December 2011, some DMV staff still informing voters that there was no free state ID card); Young Decl. ¶ 6 (in January 2012, contrary to DMV's own rules, staff told voter he could not replace his stolen ID without showing a birth certificate that he did not have); Attach. R (D15138) (in March 2012, 92-year-old woman told by DMV staff that "they did not have a camera to take her photo"); Ex. 81 (DMV employees wrongly required 17-year-old girl who did not live with her parents to obtain parental permission in order to secure an ID card).

enough to locate an individual at GAB or DMV who can provide meaningful assistance. If an applicant does not escalate a problem to a supervisor or legislator, that voter may well be disfranchised. RH 129:24-130:4, 132:2-11.

Meanwhile, DMV engages in no significant education or outreach related specifically to Act 23. In forcing voters without accepted photo ID to pass through yet another layer of bureaucracy on their way to the ballot, Defendants have subjected them to the foreseeable risk of error, malfunction, or misconduct – and, ultimately, disfranchisement. Moreover, because DMV requires the mailing of licenses and ID cards to voters, address mistakes or a postal worker's inability to verify an address are leading to the return of as many as 100 licenses and ID cards per week. Attach. K; JM 208:20-209:2 (many products being returned because of voters who rely on P.O. Boxes). If voters do not receive those licenses and ID cards, they will be disfranchised.

Again, the other relevant equitable factors favor enjoining Act 23's photo ID requirement, at least until GAB and DMV have developed adequate policies and procedures to implement the law fairly, adequately trained those who will implement it, and adequately informed the public about the law's requirements and exceptions.

6.     **The Photo ID Law Violates Section 2 of the Voting Rights Act [Claims 9 & 10]**

Section 2 of the Voting Rights Act ("VRA") mandates that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . ." 42 U.S.C. § 1973(a). The photo ID law is unquestionably a voting standard, practice, or procedure under § 1973(a).

A violation [of Section 2] . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less

39

opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 1973(b). In 1982, "Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test'. . . ." *Thornburg v. Gingles*, 478 U.S. 30, 35-36 (1986).

Section 2 prohibits both vote denial and vote dilution. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1197-99 (11th Cir. 1999). "The right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot." *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969). "[I]n voting rights parlance, vote denial refers to practices that prevent people from voting or having their votes counted. . . . Vote denial cases challenge practices such as literacy tests, poll taxes, white primaries and English-only ballots." *Simmons v. Galvin*, 575 F.3d 24, 29 (1st Cir. 2009) (citations, quotation marks, and alterations omitted). "By contrast, vote dilution challenges involve 'practices that diminish minorities' political influence,' such as at-large elections and redistricting plans that either weaken or keep minorities' voting strength weak." *Id.*

For vote denial, the disfranchisement of individual voters on account of race or color, the question is whether, under the "totality of the circumstances," the challenged standard, practice, or procedure denies minority voters the franchise on account of race or color. *Burton*, 178 F.3d at 1197-98; *see also Farrakhan v. Gregoire*, 590 F.3d 989 (9th Cir. 2010), *rev'd on other grounds*, 623 F.3d 990 (9th Cir. 2010) (*en banc*) ("Vote denial claims . . . challenge laws . . . that directly exclude otherwise qualified voters from participating.") (internal citations and quotation marks omitted). Act 23 "denies" the voting rights of African-American and Latino voters in Milwaukee County by requiring a "license" to vote. Those who do not have the required ID are denied the

40

ability to cast a ballot, just as earlier generations who could not pass literacy tests, pay poll taxes, or speak English were prevented from voting.

For vote dilution, Plaintiffs must establish that the challenged practice or procedure disproportionately impairs minority voters' ability to participate in the political process and to elect candidates of their choice and that there is an alternative election scheme that safeguards the equal electoral opportunities of all racial groups. *Thornburg*, 478 U.S. at 50-51; *Burton*, 178 F.3d at 1198-99 & n.24. Vote dilution due to a photo ID requirement, which will lead to a substantial percentage of eligible voters failing to cast a ballot that will be counted, is analogous to the claims recognized in punch-card voting technology cases. *See, e.g.*, *Black*, 209 F. Supp. 2d at 895 ("[T]he injury here alleged, is . . . the higher probability of that vote not being counted as a result of the voting systems used, *i.e.*, vote dilution."); *Common Cause v. Jones*, 213 F. Supp. 2d 1106, 1110 (C.D. Cal. 2001); *Stewart v. Blackwell*, 444 F.3d 843, 877-79 (6th Cir. 2006), *vacated as moot*, 473 F.3d 692 (6th Cir. 2007) (*en banc*). Act 23 dilutes the voting rights of African-Americans and Latinos in Milwaukee County by creating a faulty, error-prone "practice or procedure" that will lead to uncast and uncounted ballots for minority voters.

The overarching question for each claim is whether the challenged law or practice denies minority voters "an equal measure of political and electoral opportunity." *Johnson v. De Grandy*, 512 U.S. 997, 1013 (1994). Both claims require the court to consider evidence that a particular voting standard, practice, or procedure has a disproportionate negative impact on minority voters, and that under the totality of the circumstances the electoral system is "not equally open to participation by" them. 42 U.S.C. § 1973(b); *Thornburg*, 478 U.S. at 43-44. To guide rulings on vote denial and vote dilution cases under Section 2, the Senate Report that accompanied the

1982 VRA Amendments set forth 9 factors, commonly known as the "Senate factors." S. REP. No. 97-417, 97th Cong., 2d Sess., at 28-29 (1982). Among the Senate factors are (5) the extent to which members of the minority group bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; and (9) whether the policy underlying the use of such voting law is tenuous. *Id.*[20] "The cases demonstrate, and the committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 29; *Thornburg*, 478 U.S. at 45 (noting the list is "neither comprehensive nor exclusive"); *id.* (quoting S. REP. No. 97-417, at 30 & n.120 (1982) ("[T]he Committee determined that the question whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." (internal citations and quotation marks omitted)).

As Plaintiffs' expert report establishes, black and Latino voters in Milwaukee County disproportionately lack accepted photo ID when compared to their white counterparts. The experts surveyed nearly 2,000 eligible voters in Milwaukee County and found statistically significant disparities in the possession of accepted photo ID between white, African-American

---

[20] The other Senate factors are: (1) the extent of any history of official voting discrimination; (2) the extent to which voting is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) whether minorities have been denied access to any candidate slating process; … (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; and (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. *Id.*

42

and Latino voters. Barreto/Sanchez at 12, 18-19, Table 1, Fig. 6.[21]

The expert survey showed that 14.9% of eligible Latino voters and 13.2% of eligible African-American voters, but only 7.3% of eligible white voters, lack accepted photo ID. *Id.* at 18, Table 1, Fig. 6. The correlation between race or ethnicity and the lack of accepted photo ID is "statistically significant at a very rigorous level utilized in social science research," a 99% confidence level. *Id.* at 16. Eligible Latino voters are 206 percent more likely to lack, and eligible African-American voters are 182 percent more likely to lack, accepted photo ID than eligible non-Hispanic white voters.[22] *Id.* at 16-17.

Amongst the subset of registered voters in Milwaukee County, these statistically significant disparities remain consistent. Only 6 percent of registered white voters in Milwaukee

---

[21] Survey research is often used to assess and establish the racially disparate impact of voting laws in prior VRA cases. *See, e.g., Spirit Lake Tribe v. Benson County, N.D.*, Civil No. 2:10-cv-095, 2010 WL 4226614, at *2-3, 5-6 (D.N.D. Oct. 21, 2010); *Oregon v. Mitchell*, 400 U.S. 112, 235 (1970) (Brennan, J., concurring in part, dissenting in part) ("The United States Commission on Civil Rights reported a survey of the Northern and Western States which concluded that literacy tests have a negative impact upon voter registration which falls most heavily on blacks and persons of Spanish surname." (internal citations and quotation marks omitted); *LULAC v. Clements*, 999 F.2d 831, 877 (5th Cir. 1993) (in Section 2 challenge to single-district system of electing state trial judges in Texas, "expert testimony and surveys showed that less than 2.0% of the lawyers in Dallas County [were] both eligible to serve as district judges and black"); *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 410-11 (5th Cir. 1991); *Large v. Fremont County, Wyo.*, 709 F.Supp.2d 1176, 1201, 1231 (D. Wyo. 2010) (relying on "thorough" survey-backed expert testimony concerning socioeconomic disparities on Native American voters. The U.S. Department of Justice has also used phone surveys to assess the scope of voting problems. *See, e.g., U.S. v. Wisconsin*, 771 F.2d 244, 245 (7th Cir. 1985) ("Voting Section of the Civil Rights Division . . . conducted a telephone survey of Wisconsin county and municipal election officials to determine when those officials began mailing absentee ballots to overseas voters.").

[22] By comparison, the U.S. Department of Justice recently objected to Texas's photo ID law under Section 5 of the Voting Rights Act, noting that "according to the state's own data, a Hispanic registered voter is at least 46.5 percent, and potentially 120.0 percent, more likely than a non-Hispanic registered to lack this identification." U.S. Dep't of Justice, Letter from Asst. Att'y Gen. Thomas Perez to Keith Ingram (Mar. 12, 2012), at 3. Attach. L.

County lack an accepted photo ID, compared to 15.3% of registered black voters and 11.3% of registered Hispanic voters. *Id.* at 19-20, Table 5. The disparity for registered black voters is statistically significant at the 99% confidence level, and the for registered Latino voters at the 95% confidence level. *Id.*, Table 5.

Milwaukee's African-American and Latino voters also have greater difficulty than white voters in fulfilling DMV's documentary proof requirements. For example, among all eligible voters, 18.9% of eligible Latino voters, 14.1% of eligible black voters, and 11.2% of eligible white voters lack documentary proof of citizenship.[23] *Id.* at 21, Table 3. Among eligible voters *without accepted photo ID* – a group that, as noted above, disproportionately includes African-Americans and Latinos – blacks and Latinos are *also* less likely than white voters to have all the documentary proof needed to obtain a photo ID. *Id.* at 22-23, Table 7. For example, only 28.7% of eligible white voters, but 34.3% of eligible African-American voters and 39.8% of eligible Latino voters who lack accepted photo ID *also* lack documentary proof of citizenship. *Id.*, Table 7. Thus, the expert report concludes that 2.4% of all white voters lack acceptable ID and one or more of the underlying documents necessary to obtain the "free" ID card; 4.5% of Black voters lack acceptable ID and one or more of the required underlying documents; and 5.9% of Latino voters lack acceptable ID and one or more underlying documents. *Id.* at 23-24, Fig. 7B. These disparities are statistically significant. *Id.* These documented racial disparities demonstrate that

---

[23] A significant part of the disparity is attributable to the fact that DMV does not accept Puerto Rican birth certificates issued prior to July 1, 2010 as proof of citizenship. KB 66:1-13. Milwaukee County has 10,076 residents who were born in Puerto Rico. U.S. Census Bureau, 2006-2010 American Community Survey 5-Year Estimates, Place of Birth by Citizenship Status [B05002]. Thirty-eight percent of eligible Puerto Rican voters in Milwaukee County lack birth certificates, compared to 12.9 % of eligible white voters. Barreto/Sanchez at 20-21 & Table 3.

the photo ID law will deny the franchise to tens of thousands of African-American and Latino voters, and also reduce the probability that votes cast by these minority residents of Milwaukee County will be counted.

A Section 2 violation is also supported by the disparities in socioeconomic conditions and political participation for black and Latino voters in Milwaukee County. *See Thornburg*, 478 U.S. at 47 ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives."); *id.* at 70 ("Both this Court and other federal courts have recognized that political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes."); *Rybicki v. State Bd. of Elections of State of Ill.*, 574 F. Supp. 1147, 1151-52 (D.C. Ill. 1983); S. REP. NO. 97-417, at 29 n.114 ("Where these conditions are shown, and where the level of [minority] participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.").

Thus the totality of the circumstances inquiry evaluates evidence of minority political access as well as the social, economic, and historical background for that participation.[24] As to Factor (5), census and American Community Survey (ACS) data confirms the existence of significant income and educational disparities between Latino and white residents and African-

---

[24] Plaintiffs intend to present additional expert testimony on these matters for dispositive motions and trial of this case. Because that expert report is being prepared in compliance with this Court's original scheduling order, it is not available for submission with this motion.

45

American and white residents of Milwaukee County.[25] For example, 9.5% of non-Hispanic white residents of Milwaukee County have incomes below the federal poverty level ("FPL"), a significantly lower rate than that for African Americans (36.4%) and Latinos (25.9%).[26] African-American (15.4%) and Latino (9.9%) residents also were far more likely than whites (4.2%) to be in extreme poverty, with incomes below 50% of the FPL.[27] The mean income of non-Hispanic white residents is more than double that of African-Americans and roughly 2.5 times that of Latinos.[28] These profound income and poverty disparities are linked to an official unemployment rate for African American residents more than triple (18.0%), and a Latino unemployment rate more than double (12.4%) that of non-Hispanic white residents (5.7%).[29]

Other socioeconomic indicators confirm the extensive disparities. African-American and Latino residents 25 years of age and over also have significantly lower levels of educational attainment, with 21.6% and 42.9%, respectively, having less than a high school degree compared

---

[25] Courts routinely take judicial notice of Census data under Federal Rule of Evidence 201. *See General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1084 (7th Cir. 1997); *U.S. v. Bailey*, 97 F.3d 982, 985 (7th Cir. 1996).

[26] U.S. Census Bureau, 2006-2010 American Community Survey 5-Year Estimates, Poverty Status in the Past 12 Months [Dataset S1701]. Similar disparities exist regarding white, black and Latino families. [Dataset S1702]. This and Tables of other ACS data cited are included as Attach. M.

[27] U.S. Census Bureau, 2006-2010 American Community Survey 5-Year Estimates, Selected Characteristics of People at Specified Levels of Poverty in the Past 12 Months [S1703].

[28] U.S. Census Bureau, 2006-2010 American Community Survey 5-Year Estimates, Mean Income in the Past 12 Months (In 2010 Inflation-Adjusted Dollars) [S1902].

[29] U.S. Census Bureau, 2006-2010 American Community Survey 5-Year Estimates, Employment Status [S2301].

to 8.37% of their non-Hispanic whites.[30] African-American residents comprise only 17.9% of those driving alone to travel to work, but nearly half of those relying on public transportation, while Latinos are also more likely than whites to depend on carpooling or public transportation,[31] facts that help explain the racially disproportionate lack of driver's licenses. Barreto/Sanchez, Tables 1 & 5.

African-Americans also make up a disproportionate share of Milwaukee County's homeless population. The 2011 point in time survey for Milwaukee City and County identified 63% of the homeless persons as African-American. Attach. N.[32] Similarly, data reported to HUD in 2009 showed that blacks comprised 68% of individuals staying in emergency shelters, and 64% of individuals staying in transitional housing. Among homeless families, the racial disparity is even more stark: Blacks made up 91% of persons in families staying in emergency shelters, and 85% of persons in families staying in transitional housing. Attach. O.[33] Moreover, the U.S. Census Bureau has determined that the Milwaukee-Waukesha Primary Metropolitan Statistical Region is overall the most racially segregated region in the United States for African Americans, and in the top third of large metropolitan areas for residential segregation of

---

[30] U.S. Census Bureau, 2006-2010 American Community Survey 5-Year Estimates, Sex by Educational Attainment for the Population 25 Years and Over (Black or African American Alone) [C15002B]; (White Alone, Not Hispanic or Latino) [C15002H]; (Hispanic or Latino) [C15002I].

[31] U.S. Census Bureau, 2006-2010 American Community Survey 5-Year Estimates, Means of Transportation to Work by Selected Characteristics [Dataset S0802].

[32] Milwaukee Continuum of Care, 2011 Annual Point in Time Survey of Milwaukee's Homeless Citizens 11 (Dec. 2011).

[33] U.S. Dep't of Housing and Urban Development, 2009 Annual Homeless Assessment Report, Demographic Characteristics of Sheltered Homeless Persons in Milwaukee County [Exhibit 3.1].

Latinos.[34]    Twenty-eight percent of Latinos and 14.2% of African-Americans lack health insurance, compared to 7.9% of non-Hispanic whites.[35]

These disparities are related to longstanding and ongoing systemic discrimination against African-Americans and Latinos in the Milwaukee area. Governmental entities frequently engage in discriminatory conduct. *See, e.g.*, *Baldus v. Members of Wisconsin Government Accountability Bd.*, 2012 WL 983685 (E.D. Wis. 2012) (legislative redistricting plan violated VRA by failing to create majority-minority district for Latinos; also finding racially polarized voting); *United States v. City of New Berlin,* No. 11-CV-608 (E.D. Wis. filed April 11, 2012) (proposed consent decree settling allegations of intentional race discrimination, as well as racially discriminatory effect, in housing by Milwaukee suburb) (Attach. Q);  *Kimble v. Wis. Dep't of Workforce Development*, 690 F. Supp. 2d 765 (E.D. Wis. 2010) (state agency discriminated against supervisor on basis of race and gender); *Davis v. Wis. Dep't of Corrections*, 445 F.3d 971 (7th Cir. 2006) (evidence sufficient to support jury verdict of intentional racial discrimination by state agency against employee); *Sch. Dist. of Shorewood v. Wausau Ins. Companies*, 170 Wis.2d 347 (Wis. 1992), *overruled on other grounds by Johnson Controls, Inc. v. Emp'rs Ins. of Wausau*, 264 Wis.2d 60 (Wis. 2003) (insurance coverage dispute noting settlement in underlying action alleging "racial segregation and the resulting inequality of educational opportunity and metropolitan-wide racially dual structure of education created and maintained by defendants in the Milwaukee metropolitan area"); *U.S. v. City of Milwaukee*, 441 F. Supp. 1377 (E.D. Wis. 1977) (denying

---

[34] U.S. Census Bureau, "Racial and Ethnic Residential Segregation in the United States: 1980-2000" (Dec. 2004), Chs. 5 & 6 (excerpts), *available at*:
 http://www.census.gov/hhes/www/housing/housing_patterns/pdftoc.html. Attach. P.

[35] U.S. Census Bureau, 2008-2010 American Community Survey 3-Year Estimates, Health Insurance Coverage Status [S2701].

motions to vacate consent decrees integrating Milwaukee police force); *Armstrong v. O'Connell*, 451 F. Supp. 817 (E.D.Wis. 1978) (record established that defendants intentionally segregated black students); *Amos v. Bd. of Sch. Directors*, 408 F. Supp. 765, 818 (E.D. Wis. 1976) ("[S]chool authorities engaged in practices with the intent and for the purpose of creating and maintaining a segregated school system, and that such practices had the effect of causing current conditions of segregation in the Milwaukee public schools.").

There is also a long history of race discrimination in the region by private business. *See E.E.O.C. v. Target Corp.*, 460 F.3d 946 (7th Cir. 2006) (evidence could support finding of race discrimination in refusal to hire African-American applicants for managerial jobs); *U.S. v. Security Management Co., Inc.*, 96 F.3d 260 (7th Cir. 1996) (insurance coverage dispute arising out of Fair Housing Act (FHA) race discrimination claims in various Wisconsin location, including Milwaukee county, which had been resolved by a consent order); *U.S. v. Balistrieri*, 981 F.2d 916 (7th Cir. 1992) (evidence sufficient to support finding of pattern of race discrimination by owners of Milwaukee apartment complex); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992), *cert. denied*, 508 U.S. 907 (1993) (FHA claim of racially discriminatory insurance redlining in Milwaukee area); *Sherman Park Cmty. Ass'n v. Wauwatosa Realty Co.*, 486 F. Supp. 838 (E.D. Wis. 1980) (racial housing segregation related to steering and other actions by real estate agents).

Senate Factor (6) invites the Court to consider whether the jurisdiction's political campaigns have been characterized by overt or subtle racial appeals. The most notable, and recent, Wisconsin example was the 2008 Supreme Court campaign of African-American Justice Louis Butler, who ran for reelection against Judge Michael Gabelman. Gabelman's campaign

approved and paid for a television ad that juxtaposed Justice Butler's face with that of an African-American convicted rapist in an overt racial appeal to voters. Marcus Decl. ¶ 7 & Ex. A. Ms. Marcus, Justice Butler's then-law clerk, vividly recalls the "hostile" and "hateful" phone calls that flowed from that ad and third-party ads listing the chambers' phone number, including one stating "I didn't know we had a black on the Court. That's so disgusting." Marcus Decl. ¶¶ 5-10. This Court also previously noted that a 1996 Milwaukee County Circuit Court election, in which white candidate Robert Crawford defeated African-American Judge Russell Stamper, "appear[ed] to have involved racial appeals." *Milwaukee Branch of the NAACP v. Thompson*, 935 F. Supp. 1419, 1433 (E.D. Wis. 1996).

As to Senate Factor (9), the policies and justifications proffered in defense of the photo ID law are tenuous and not supported by the evidence. *See supra* Sec. II.B.1.c.

The expert survey evidence of statistical disparate impact of Act 23's photo ID requirement on Milwaukee County's African American and Latino voters, along with the evidence of current and historical discrimination in employment, education, housing and health and of racial appeals in elections, demonstrate that Plaintiffs are likely to succeed on the merits of their claims that Act 23 "results in" a "denial or abridgement of the right . . . to vote on account of race or color," in violation of Section 2 of the VRA. The other equitable factors also weigh in favor of granting the relief sought. The harm of disfranchisement of African American and Latino voters is, of course, irreparable. An injunction will not harm GAB's election administration operations, especially in light of the suspension of the photo ID law during the most recent election.

## CONCLUSION

For the reasons set forth above, Plaintiffs request that this Court grant the preliminary injunctive relief sought in the motion.

Dated this 23rd day of April, 2012.

Respectfully submitted,

/s Karyn L. Rotker
KARYN L. ROTKER
State Bar No. 1007719
LAURENCE J. DUPUIS
State Bar No. 1029261
American Civil Liberties Union of Wisconsin
Foundation
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
(414) 272-4032
(414) 272-0182 (fax)
krotker@aclu-wi.org
ldupuis@aclu-wi.org

M. LAUGHLIN MCDONALD
JON SHERMAN
NANCY ABUDU
American Civil Liberties Union Foundation, Inc.
230 Peachtree Street, Suite 1440
Atlanta, GA 30303
Phone: (404) 523-2721
Fax: (404) 653-0331
lmcdonald@aclu.org
jsherman@aclu.org
nabudu@aclu.org

HEATHER MARIA JOHNSON
KAREN E. CUNNINGHAM
National Law Center on Homelessness & Poverty
1411 K Street NW, Suite 1400
Washington, DC 20005
Phone: (202) 638-2535
Fax: (202) 628-2737
hjohnson@nlchp.org
kcunningham@nlchp.org

NEIL STEINER
DIANE PRINC
Dechert LLP
1095 Avenue of the Americas

51

New York, NY 10036-6797
Phone: (212) 698-3822
Fax: (212) 698-3599
neil.steiner@dechert.com
diane.princ@dechert.com

CRAIG FALLS
Dechert LLP
1775 I Street, NW
Washington, DC 20006-2401
Phone: (202) 261-3373
Fax: (202) 261-3333
craig.falls@dechert.com

Attorneys for Plaintiffs.