UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

RUTHELLE FRANK, et al., on behalf of
themselves and all others similarly situated,

               Plaintiffs,

v.

SCOTT WALKER, in his official capacity as
Governor of the State of Wisconsin, et al.,

               Defendants.

Civil Action No. 2:11-cv-01128 (LA)

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

## The Photo ID Law Violates Section 2 of the Voting Rights Act

As discussed in Plaintiffs' Memorandum in Support of their Motion for Preliminary Injunction (Doc. 50), Section 2 of the Voting Rights Act ("VRA") prohibits the use of any "voting qualification or prerequisite to voting or standard, practice, or procedure" by "any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 42 U.S.C. § 1973(a).

VRA claims are evaluated using a totality of the circumstances test. 42 U.S.C. § 1973(b). In evaluating the totality of the circumstances, the VRA contemplates consideration of 9 "Senate factors," S. REP. NO. 97-417, 97th Cong., 2d Sess., at 28-29 (1982), including (1) the extent to which members of the minority group bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process ("Factor (5)") and (2) whether political campaigns have been characterized by overt or subtle racial appeals ("Factor (6)"). Doc. 50 at 41-42.

Statistically significant racial disparities exist between whites and Latinos and whites and blacks in the possession of photo ID and in possession of the underlying documents needed to obtain photo ID by those who lack it. Doc. 50 at 42-5; Doc. 62-10. The expert report of Prof. Marc Levine, filed concurrently with this supplemental brief, clearly establishes that Wisconsin's African-American and Latino voters also exhibit significant disparities across numerous socioeconomic measures within the meaning of Factor (5).

> Along a daunting array of dimensions . . . the state and its largest metropolitan center display overwhelming patterns of racial inequality, racial disparities, and racially-based socioeconomic distress: most segregated metropolitan area in the nation, widest racial income gap, highest black poverty rate, among highest levels of concentrated poverty in neighborhoods and schools, lowest rate of black male employment, second widest racial gap in school test scores, lowest rate of minority business ownership, second worst racial disparities in incarceration rates. Minority communities in Wisconsin and metro Milwaukee (where 80 percent of the state's black population lives and 45 percent of the

1

state's Latino population resides) clearly bear the socioeconomic effects of racial inequities, which hinder their ability to participate in the political process on an equal basis with other members of the electorate.

*Id.* at 20; *see generally id.,* at 5-21. These socioeconomic barriers are the product of "the historical and contemporary legacy of discrimination and entrenched inequality," "a long-standing historical pattern of extreme segregation," "the historical legacy of housing discrimination and resistance to desegregation," and "the legacy of historical labor market discrimination" in Wisconsin and Milwaukee County in particular. *Id.* at 5, 10, 17, 25.

The barriers to electoral participation are exacerbated because African-American and Latino voters are also more likely to drop out of the voting process when confronted with government-imposed burdens on voting. *Id*. at 22-26. As Prof. Levine states:

> [M]etro Milwaukee and the state of Wisconsin are rife, in the extreme, with the racially based socioeconomic distress and daunting litany of racial and ethnic disparities targeted in Senate Factor Five of the VRA. These racial socioeconomic factors represent resource deficiencies that political scientists agree impede full participation of low-income minorities in the electoral process. Moreover, disadvantaged groups are particularly likely to have their participation depressed when the "costs" of voting are high, or are increased. Voter ID laws, such as Act 23, impose such costs. Act 23 makes requirements (photo ID) that a disproportionate number of otherwise eligible minority voters cannot meet.

*Id*. at 25.

With respect to Factor (6), racial appeals in campaigns, Prof. Levine establishes that such appeals to Wisconsin voters stretch as far back as the 1950s with explicitly racist attacks and claims that then-mayor Zeidler was building public housing to attract "Negroes" to Milwaukee, continued through the 1960s with significant Wisconsin support for George Wallace's segregationist policies, and into the 1970s with support for a Nazi candidate for mayor of Milwaukee and even greater public support for the attitudes that candidate espoused. *Id*. at 28-30.

As overt expressions of racism became disfavored, more explicit racial references were

2

replaced by racially coded attacks, especially those referencing welfare recipients and criminals.[1] *Id*. at 27. By the 1970s, those coded attacks were evident as Wallace, still receiving significant support in Milwaukee, replaced explicit racist arguments with hostility to taxes and, especially, paying taxes for "welfare loafers." *Id.* at 29. In the mid-1980s, such racially coded attacks appeared in Wisconsin state electoral campaigns, with challenger Tommy Thompson attacking incumbent governor Tony Earl for welfare policies that "attract[] all the people from Mississippi up here . . . ," a clear racial reference. *Id.* at 30-31. In the 1990s, similar claims were made against Latinos, as, for example, people "who can't speak English" who had "their hands out for welfare." *Id.* at 33. Others raised racially-charged fears of criminals, such as claims by suburban politicians and candidates arguing that building light rail would allow urban criminals to prey on suburban residents. *Id.* at 32-33. The advertisements created by then-Judge Gablemen for the April 2008 state Supreme Court election, in which he juxtaposed the image of the Court's only African-American justice with the image of a black criminal, also evidences the continuing (and apparently successful) use of racial appeals to Wisconsin voters. *Id.* at 33; Doc. 50 at 49-50; Doc. 53.[2]

---

[1] "Code words" can evidence discrimination. *See, e.g., McGinest v. GTE Service Corp.*, 360 F.3d 1103,1116-7 (9th Cir. 2004) (use of term "drug dealers" can be coded reference to African-Americans); *EEOC v. Board of Regents of University of Wisconsin System*, 288 F.3d 296, 303 (7th Cir. 2002) (saying employee had skills suited to "pre-electronic" era can be code for age discrimination). *See also, e.g.*, *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (direct admissions of discrimination are rare); *Kimble v. Wisconsin Dept. of Workforce Development,* 690 F.Supp.2d 765, 776 (E.D.Wis. 2010) ("Individuals draw lines and create categories based in part on race, gender and ethnicity, and the stereotypes they create can bias how they process and interpret information and how they judge other people," and citing numerous studies regarding such implicit bias.)

[2] *See also, id.* at 12 (in 2010, New Berlin residents opposed to affordable housing raised fears of, *inter alia,* "'niggers,' 'white flight,' 'crime,' 'drugs,' 'gangs,' 'families with 10 or 15 kids,' of 'slums,' of not wanting New Berlin to turn into 'Milwaukee,' of moving to New Berlin 'to get away from the poor people . . .'") (internal citations omitted).

3

The campaign to enact voter ID in Wisconsin, which began in the early 2000s, is similarly replete with racially coded references. The state itself has asserted that the primary, if not the sole, purpose of the photo ID law to stop voter fraud. Doc. 38 at 18-19, Doc. 34-1 at 67:21-25. In that context, it is crucial to recognize the racial references and racial subtext implicit in many of the voter fraud allegations. *Id.* at 34. This is particularly evident when combined with actions and statements implying that Milwaukee – home of a significant majority of Wisconsin's entire African-American population and a substantial plurality of its Latino population – was the locus of such fraud. As early as 2001, claims were made of fraud in "urban areas," including a Milwaukee public housing complex – clear, albeit coded, racial references. *Id.* at 34-35. Not coded were claims that "wetbacks" would vote on Milwaukee's (heavily Latino) south side. *Id.* at 35. Throughout the 2000s the near-exclusive focus of investigative and prosecutorial efforts to combat alleged voter fraud were minority voters and urban polling places. *Id*. at 35-36. Similarly, those accused of committing, or being likely to commit, voter fraud, were the same urban residents. *Id.*

## CONCLUSION

For the reasons set forth above and in Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction (Doc. 50), Plaintiffs request that this Court grant the preliminary injunctive relief sought in the motion.

Dated this 21st day of May, 2012.

Respectfully submitted,

/s Karyn L. Rotker
KARYN L. ROTKER
State Bar No. 1007719
LAURENCE J. DUPUIS
State Bar No. 1029261
American Civil Liberties Union of Wisconsin Foundation
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
(414) 272-4032
(414) 272-0182 (fax)
krotker@aclu-wi.org
ldupuis@aclu-wi.org

M. LAUGHLIN MCDONALD
JON SHERMAN
NANCY ABUDU
American Civil Liberties Union Foundation, Inc.
230 Peachtree Street, Suite 1440
Atlanta, GA 30303
Phone: (404) 523-2721
Fax: (404) 653-0331
lmcdonald@aclu.org
jsherman@aclu.org
nabudu@aclu.org

HEATHER MARIA JOHNSON
KAREN E. CUNNINGHAM
National Law Center on Homelessness & Poverty
1411 K Street NW, Suite 1400
Washington, DC 20005
Phone: (202) 638-2535
Fax: (202) 628-2737
hjohnson@nlchp.org
kcunningham@nlchp.org

NEIL STEINER
DIANE PRINC
Dechert LLP
1095 Avenue of the Americas

5

New York, NY 10036-6797
Phone: (212) 698-3822
Fax: (212) 698-3599
neil.steiner@dechert.com
diane.princ@dechert.com

CRAIG FALLS
Dechert LLP
1775 I Street, NW
Washington, DC 20006-2401
Phone: (202) 261-3373
Fax: (202) 261-3333
craig.falls@dechert.com

Attorneys for Plaintiffs.