# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

RUTHELLE FRANK, et al., on behalf of
themselves and all others similarly situated,

                Plaintiffs,

v.

SCOTT WALKER, in his official capacity as
Governor of the State of Wisconsin, et al.,

                Defendants.

Civil Action No. 2:11-cv-01128 (LA)

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiffs submit this reply memorandum in further support of their motion for a preliminary injunction. In opposing Plaintiffs' Motion, Defendants (and *amici*) focus their arguments on the first factor for granting a preliminary injunction – likelihood of success on the merits – mentioning the other factors only in passing. *See* Defs.' Mem. Opp. Prelim Inj. [Doc. 85] at 43-44. Because Defendants do not seriously dispute the other factors, Plaintiffs do not address them further in this Reply.[1] For the reasons set forth below, the other arguments of Defendants and *amici* opposing a preliminary injunction on the merits of Plaintiffs' claims should be rejected and, if the state court injunctions are no longer in force, this Court should grant the preliminary relief requested.

## ARGUMENT

### A. Act 23 Violates the Fourteenth Amendment as to Classes 1 and 2 [Counts 1 & 2]

Throughout their Opposition, Defendants repeatedly cite *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), in an attempt to foreclose evaluation of the Plaintiffs' individual burdens and the state's purported justifications for Act 23. Defendants' reliance on *Crawford*, which involved a facial challenge to Indiana's voter ID law, is misplaced in this case,

---

[1] Defendants also contend that a preliminary injunction is unnecessary because two state courts have already enjoined enforcement of the photo ID law. Doc. 85 at 2-3, 9. Plaintiffs do not dispute that a decision on the instant Motion is necessary only to the extent that both state court injunctions are stayed or overturned, but dispute Defendants' further suggestion that no such relief will be necessary even if the injunctions are dissolved in the coming months. Defendants suggest that any Plaintiff who now requests that absentee ballots be sent for future elections will not be subject to the photo ID requirement until after the 2012 elections. However, Defendants previously refused to guarantee that a stay or reversal of the state court injunctions would not result in imposition of the photo ID requirement upon Plaintiffs, even if they requested and voted absentee ballots while the law was suspended. Doc. 41 at 1-2. Moreover, should Plaintiffs move within Wisconsin, they would be required to submit a photo ID with their request for an absentee ballot at their new location. Wis. Stat. § 6.87(4)(b)3. Finally, Defendants' suggested self-help remedy is impractical as applied to absent class members.

1

which seeks as-applied remedies for the special harms these Plaintiffs, and the classes they represent, experience as a result of Act 23. Indeed, *Crawford* requires this Court to consider the precise interests put forward by the state and the burden on individual voters or discrete classes of voters, and evaluate whether the state interests justify the burden. 553 U.S. at 189-91 (discussing the balancing test developed in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). The Supreme Court noted that there is no "litmus test for measuring the severity of a burden that a state law imposes on . . . *an individual voter, or a discrete class of voters.* However slight that burden may appear . . . it must be justified by relevant and legitimate state interests '*sufficiently weighty to justify the limitation.*'" *Id.* (internal citations omitted; emphases added).[2]

Thus, the state's purported interests in this case must be balanced, and the balancing must be made, not against the law's application to the majority of voters who are not burdened by the photo ID law, as was the case in a facial challenge such as *Crawford*,[3] but to Plaintiffs and the members of Classes 1 and 2 they represent, whose voting rights are severely burdened by the systemic barriers and financial hardships imposed by Act 23. Defendants' reliance on *Crawford* is further misplaced because the character and magnitude of the injury to Class 1 and Class 2 Plaintiffs – many of whom, unlike their counterparts in Indiana, will be completely

---

[2] For a more thorough discussion of the relevant balancing test, see Plaintiffs' Memorandum in support of this motion, Doc. 50 at 11-12, as well as Plaintiffs' briefs relating to their earlier preliminary injunction motion, Doc. 33 at 15-16; Doc. 41 at 3-5.

[3] Generally, a "facial challenge must fail where the statute has a 'plainly legitimate sweep.'" *Crawford*, 553 U.S. at 202 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008)). "When we consider only the statute's broad application *to all Indiana voters* we conclude that it 'imposes only a limited burden on voters' rights.' . . . The 'precise interests' advanced by the State are therefore sufficient to defeat petitioners' *facial* challenge . . . ." *Crawford*, 553 U.S. at 202-03 (emphasis added, internal citations omitted).

2

disenfranchised by the requirements of Act 23 – is profound and unquestionably more severe than the burden and injury evaluated by the Supreme Court in *Crawford*.

Finally, as discussed *infra* in Section A.2, the fact that the interests articulated by the state – preventing voter fraud and thereby increasing voter confidence – are almost entirely speculative and are not advanced by the photo ID law undermines the "legitimacy and strength" of the state interests, *Anderson*, 460 U.S. at 789, especially when balanced against the total denial of Plaintiffs' and class members' right to vote. The "legitimacy and strength" of the state interests are further undermined by the fact that extensive and more effective alternative anti-fraud measures have been and are being implemented, making it clear that there exist far less restrictive alternatives to depriving Plaintiffs of their Constitutional rights.

### 1. Act 23 Imposes Severe Burdens on the Right to Vote for Members of Classes 1 and 2

In *Crawford*, which involved a facial challenge to a photo ID law significantly less restrictive than Act 23, the Supreme Court expressly recognized that a law imposing "excessively burdensome requirements" would be subject to an as-applied challenge and noted the possibility that specific classes of voters could face "heavier burden[s]." 553 U.S. at 199-202. Yet despite acknowledging the burdens faced by both specific, named Plaintiffs[4] and members of the proposed Classes 1 and 2 they represent, Defendants rely almost exclusively on the facial analysis conducted in *Crawford* to contest the severity of these burdens.

### a. Systemic Barriers Faced by Class 1 [Count 1] Plaintiffs

Defendants' contention that "Act 23 did not change anything about the process for securing an ID card from the DMV, other than that the DMV now issues ID cards free of

---

[4] Doc. 38 at 3, 11-16 (conceding that Plaintiffs' burdens to obtaining a Wisconsin driver's license or state ID card were "undeniable," and only disputing the severity of burdens with respect to two of the eleven named Plaintiffs for whom relief was being sought).

3

charge," misses the point. Doc. 85 at 10. By making a state ID card issued by DMV the photo ID of last resort, Act 23 forces Wisconsin voters to meet DMV's stringent requirements and navigate its complex and burdensome procedures simply to exercise their right to vote. While the burdens imposed by these procedures may have been acceptable in the context of driver licensing, they are not acceptable when they act as a barrier to exercising the fundamental right to vote. Many eligible Wisconsin voters who lack an acceptable form of photo ID will be unable to meet DMV's requirements, *see* Doc. 50 at 6-10, and will consequently be disfranchised.

Defendants acknowledge these hurdles and concede that not having accurate, certified copies of their birth certificates, "the most common document that a person may use to prove their citizenship to DMV," "presents problems for some Plaintiffs and members o[f] Plaintiffs' proposed class 1" and that "[a]nother common problem for members of Plaintiffs' proposed class 1 is the lack of a Social Security card, another document that might be used to prove one's identity for the purposes of obtaining a driver's license for state photo identification card from DMV." Doc. 85 at 11. Yet Defendants fail to address in any meaningful way most of the systemic barriers experienced by Plaintiffs in this as-applied challenge and instead rely on *Crawford*'s denial of facial invalidation to argue that Act 23 does not impose severe burdens.

For example, in addressing the burdens placed on voters who do not possess certified copies of their birth certificates or their Social Security Cards, Defendants only cite the observation in *Crawford* that "[b]urdens . . . arising from life's vagaries . . . are neither so serious nor so frequent as to raise any question about the constitutionality" of the law. Doc. 85 at 11 (citing *Crawford* at 197). However, this passage referred to the relatively minor burdens placed on voters who "may have [their] wallets stolen on the way to the polls, or may not resemble the photo in the identification." 553 U.S. at 197. The Court went on to explain that the relevant

4

burdens for purposes of constitutional analysis are "those imposed on persons who are eligible to vote but do not possess a current photo identification that complies with the requirements of [the law]." *Id*. at 198. Further, the Court acknowledged that a "heavier burden" may apply, for instance, to "elderly persons born out of state, who may have difficulty obtaining a birth certificate[,] persons who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification[, and] homeless persons." *Id.* at 198-99. Despite the as-applied nature of this challenge, Plaintiffs' experiences, and the undisputed evidence of voters who face exactly these barriers to obtaining ID, Doc. 50 at 12-16, Defendants fail to offer any explanation for their contention that Act 23 does not severely burden such persons' voting rights.

With respect to the burdens faced by voters whose birth certificates contain inaccuracies, Defendants' only response is that in some instances some voters with some inaccurate documents have been able to obtain accepted photo ID. Doc. 85 at 12-13. This is little consolation for those Plaintiffs and class members who have not been able to overcome inaccurate birth certificates. As explained below, *see infra* Sec. D, there is substantial evidence of DMV's inconsistent treatment of such voters.

### b. Financial Hardships Faced by Class 2 [Count 2] Plaintiffs

Again, Defendants rely almost exclusively on *Crawford* to argue that the financial hardships Class 2 Plaintiffs would experience in securing a Wisconsin state ID card, including the costs of obtaining documentation DMV requires and related transportation costs, do not constitute a severe burden on the right to vote. However, in contrast to *Crawford*, where no evidence of the "difficulties faced by indigent voters" was presented, 553 U.S. at 201, 202 n.20, the record in the present case provides ample evidence of the heavy burden Act 23 imposes on

5

low-income Plaintiffs and other voters in this class. *See* Doc. 33 at 8-12, Doc. 50 at 9-10, 17-18; Sherman Decl. In Supp. of Pltfs.' Mot. for Prelim. Inj. ["Sherman Decl."], Attach. A (D32068) (elderly voter in wheelchair would need to spend $80 minimum for transport service). Lower-income voters are significantly less likely to have either accepted photo ID or the birth certificates needed to obtain ID than higher-income voters. Doc. 50 at 17, Sec. II.B.6; Doc. 62-10 at 30-32, Table 19 & Fig. 11. The burden on these voters, particularly those who are homeless, subsisting on public benefits, and the working poor, is severe and amounts to a total deprivation of the right to vote. Doc. 33 at 5-12; Doc. 50 at 6-10, 17-18. Despite acknowledging that "obtaining identification required under Act 23 may come at a cost to certain Plaintiffs," Doc. 85 at 23, and the "trouble or expense" voters may face to secure certified copies of their birth certificates, Doc. 85 at 12, Defendants argue that the state's provision of "free" IDs renders Act 23 constitutionally permissible under *Crawford*.

While Act 23 does require DMV to provide free state ID cards for the purpose of voting, Defendants are well aware that many voters lack, and will be required to pay for, the underlying documents DMV requires them to present in order to obtain this "free" ID. Although *amici* claim that voters can ask DMV to waive birth certificate fees, Doc. 91 at 16, that assertion is simply incorrect. The regulation *amici* references, Wis. Admin. Code Trans § 102.15(3)(b), addresses "unavailable" documents, *i.e.* documents that do not exist. *Id*. § 102.15(1) (defining "unavailable" to exclude the situation where "a replacement original or a certified copy of the document is available to those persons upon proper request"). Neither Act 23 nor any other state law or rule provides any exception to the documentation requirements for those who cannot afford the necessary, underlying documents needed to obtain an ID, *see* Doc. 62-7 at 76:1-17; Doc. 62-1 at 43:20-44:23, 131:11-17, 185:2-12, and Defendants, including Defendant Boardman,

6

explicitly confirmed that DMV does "not have an exceptions process for indigency standards for what you need to show to get a product." Doc. 62-1 at 44:5-23; *see also* Doc. 62-7 at 76:1-10. In contrast, the Indiana law considered in *Crawford* allowed the use of certain free documents in lieu of a birth certificate to obtain an ID (including Social Security benefit statements and Medicare and Medicaid cards), permitted voters to return absentee ballots by mail without sending proof of identification, and allowed affidavits from indigent voters "unable to obtain proof of identification without payment of a fee." 553 U.S. at 199 n.18, 185-86.

## 2. Defendants' Interests are Conjectural and Not Supported by the Record

The state's only rationales for Act 23 – that requiring photo IDs for voting is necessary to prevent or deter fraud and that voter confidence will increase due to this effort, Doc. 85 at 15-18, are conjecture that cannot justify the burden on Plaintiffs and voters in Classes 1 and 2.

It is indisputable that voter fraud, and particularly voter impersonation fraud, the only type of fraud that the photo ID requirement could conceivably address, is exceedingly rare. Doc. 33 at 18-19 & n.15. Despite Defendant Kennedy's admission that fraud concerns are a matter of "rhetoric . . . [and] not really based on any facts," Doc. 34-1 at 37:17-38:15, Doc. 34-17, Defendants now claim that impersonation fraud may exist but go undetected. Doc. 85 at 15-18. Yet not only have allegations of impersonation fraud turned out to be greatly exaggerated and often the result of administrative errors, Doc. 41 at 8-9, Doc. 50 at 18-19, but numerous changes in federal and state election laws and practices make such fraud extremely difficult and facilitate prosecution. Doc. 33 at 19-23; Doc. 41 at 9. These alternative anti-fraud measures also demonstrate that the state's interest can be achieved in a less restrictive manner than requiring ID from persons for whom it is a burden to obtain it. *Anderson,* 460 U.S. at 789; Doc. 41 at 5.

7

Defendants also claim that photo ID deters voting by felons and non-citizens and those who move out of Wisconsin or double-vote across state lines. Doc. 85 at 17. However, Defendants rely solely on these bare assertions, failing to articulate any way in which photo ID would prevent or deter these types of fraud. *See also* Doc. 33 at 20-21, Doc. 41 at 9; Doc. 62-1 at 24:12-14. Defendants fail to respond to Plaintiffs' demonstration that existing state measures taken by the state already prevent and deter these types of fraud and that existing alternatives are significantly less burdensome. Doc. 50 at 19-20; Sherman Decl., Attach. A (D34279-80) (GAB official writes "Only once have we had a voter vote twice (this was prior to our central count)"). These omissions show the conjectural nature of Defendants' purported interests. *See, e.g.*, *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) ("[The government] must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."); *Bernal v. Fainter*, 467 U.S. 216, 228 (1984) ("Without a factual underpinning, the State's asserted interest lacks the weight we have required of interests properly denominated as compelling.").

## B. Act 23 Arbitrarily Excludes VICs, Unreasonably Burdening the Voting Rights of Veterans [Class 6, Count 6]

Wisconsin's exclusion of Veteran Identification Cards ("VICs") from the list of acceptable photo IDs for voting places an unreasonable burden on veterans for whom this cost-free, federally-issued photo ID is their sole form of identification – a burden not justified by any state interest, let alone an "important" one. *Burdick*, 504 U.S. at 434 (citing *Anderson*, 460 U.S. at 788). Rather than impose "*evenhanded* restrictions that protect the integrity and reliability of the electoral process," Defendants' decision to distinguish VICs from other accepted forms of ID

8

and exclude them is without rational justification and severely burdens members of Class 6. *Crawford*, 553 U.S. at 189-90 (quoting *Anderson*, 460 U.S. at 788 n.9) (emphasis added).

Defendants also misstate the appropriate legal standard by contending that they need only show any conceivable state of facts that could justify the exclusion of VICs. Doc. 85 at 19-20 (citing *McGowan v. Maryland*, 366 U.S. 420 (1961); *Eby-Brown Co., LLC v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 295 F.3d 749 (7th Cir. 2002); *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677 (7th Cir. 2005)). The balancing test of *Anderson* and *Burdick*, not mere rational basis scrutiny, applies in voting cases, and there is a difference between the balancing test invoked for the right to vote and a mere "conceivable" purpose test. *See Crawford*, 553 U.S. at 190 n.8 ("Contrary to Justice Scalia's suggestion . . . our approach remains faithful to *Anderson* and *Burdick*. . . . To be sure, *Burdick* rejected the argument that strict scrutiny applies to all laws imposing a burden on the right to vote; but in its place, the Court applied the 'flexible standard' set forth in *Anderson*. . . . *Burdick* surely *did not create a novel 'deferential "important regulatory interests" standard*.'") (emphasis added).

Defendants speculate that the decision to exclude VICs is supported by the cards' lack of expiration and issuance dates and that without these "it is not possible . . . to determine whether the photograph on it is current as to provide an accurate, current visual depiction of the cardholder." Doc. 85 at 20. Thus, according to Defendants, VICs "do not serve as a good proxy to confirm a voter's identity at the polls." *Id.* However, Act 23 authorizes the use of other forms of photo ID that lack expiration dates, including some tribal and military IDs. Wis. Stat. § 5.02(6m)(a)(3), (e); Doc. 41 at 10; Doc. 43; Doc. 44; Doc. 62-3 at 42:16-43:4, 44:7-13, 119:19-120:5; Doc. 62-4 at 63:21-64:13. Moreover, Act 23 requires mail-in absentee voters to provide photo ID despite the complete inability to compare the appearance of the absent voter to the

9

photo on the card, further undermining the state's justification. In addition, because Wisconsin driver's licenses and ID cards are valid for eight years and may be renewed by mail or electronically for an additional eight years, Wis. Stat. § 343.20(1)(a); Wis. Admin. Code § Trans 102.16(3); 2011 Wis. Act 32 § 3181, these *accepted* forms of ID will routinely include photographs that are up to 16 years old, some of which may no longer resemble the cardholder. Accordingly, the purported, hypothetical difficulty in verifying the voter's resemblance to a photo on a VIC is no basis to categorically exclude the federally-issued VICs. The state can simply do what it does with every photo ID under Act 23: ensure that it has an "accurate, current visual depiction of the cardholder."[5] Doc. 85 at 20.

Defendants further speculate that the U.S. Department of Veterans Affairs, which issues the VICs, may not have appropriate "mechanisms [] in place to determine that the person who shows up at the VA Medical Facility to have his picture taken actually is the eligible veteran he claims to be." Doc. 85 at 20. Defendants provide no evidence to support this allegation. Further, the federal government only issues VICs to veterans "whose eligibility, and enrollment status has been verified, and whose identity has been uniquely verified . . . ." VHA Directive 1610.01 (Oct. 20, 2009) (Doc. 33 at 25 & Doc. 34-10). In fact, the Department issues VICs to veterans eligible for health benefits only after they have provided required identifying information (including SSN, mother's maiden name, VA claim number, date and place of birth, and address), insurance information, employment status, and military service information (including branch of service, entry and discharge dates, and military service number) and only after their identity has been

---

[5] Election officials must "verify that any photograph appearing on . . . [any proof of identification] document reasonably resembles the elector." Wis. Stat. § 6.79(2)(a).

10

uniquely verified through the VA's Master Patient Index (the MPI system).[6] *Id.*; Sherman Decl.,

Attach. B, U.S. Dep't of Veterans Affairs, Application for Health Benefits, VA Form 10-10EZ

Feb. 2011 [VA Form 10-10EZ], *available at* https://www.1010ez.med.va.gov/. Even *amici*

express concern regarding Defendants' position and note that it "puts the State of Wisconsin in

the uncomfortable position of maintaining that a U.S.-government approved photo identification

card provide[s] insufficient assurance of a person's identity." Doc. 91 at 28. Plaintiffs agree.

## C. <u>Act 23 Unconstitutionally Imposes a Poll Tax or Other Material Burden on Voters in Class 5 [Count 5]</u>

Citing no evidence and relying almost exclusively on an untenable interpretation of

*Crawford*, Defendants fail to refute the essential point that Act 23, *as applied to voters in Class

5*, imposes a specific financial cost on these voters, who undisputedly are compelled to expend

money they would otherwise not pay for documents such as birth certificates and marriage

certificates that are necessary to obtain a "free" state ID card.[7] *See Weinschenk v. Missouri*, 203

S.W.3d 201, 213-14 (Mo. 2006) (evidence "of specific Missouri voters who will have to incur

the costs associated with birth certificates and other documentation to acquire a photo ID and

vote . . ." sufficient to support claim that photo ID law imposed poll tax); *see also* Doc. 33 at 28;

Doc. 41 at 11-12; Doc. 62-9 at 60:8-61:3; Doc. 33-2 ¶ 9; Doc. 33-3, ¶ 3; Doc. 33-4 ¶ 8; Doc. 33-

6 ¶ 5; Doc. 33-11 ¶¶ 14-16.[8] Indeed, Defendants concede that "obtaining identification required

---

[6] Making a materially false statement or concealing a material fact in connection with completing
the application is a federal crime punishable by a fine and/or up to five years imprisonment.
Sherman Decl., Attach. B, VA Form 10-10EZ; 18 U.S.C. § 1001.

[7] *Amici*'s reliance on *Gonzalez v. Arizona*, Nos. 08-17094 & 08-17114, 2012 WL 1293149 (9th
Cir. Apr. 17, 2012) (*en banc*), Doc. 91 at 3-6, is similarly misplaced, as the plaintiffs in
*Gonzalez*, just like the plaintiffs in *Crawford*, presented a *facial* challenge to Arizona's voter ID
law. *See Gonzalez*, 2012 WL 1293149, at *15-18.

[8] The Twenty-Fourth Amendment prohibits states from abridging an individual's right to vote in

under Act 23 may come at some cost to certain Plaintiffs." Doc. 85 at 23. Notwithstanding the undisputed facts and this concession, Defendants argue, in wholly conclusory fashion, that the Act is "neither a poll tax itself . . . , nor is it a burden imposed on voters who refuse to pay a poll tax." *Id.* Defendants are incorrect.

### 1. *Crawford* Does Not Foreclose Plaintiffs' Poll Tax Claim.

First, contrary to Defendants' arguments, *Crawford* does not foreclose Plaintiffs' challenge to Act 23 as an unconstitutional poll tax, because it is distinguishable in several key respects ignored by Defendants. The plaintiffs in *Crawford* – in stark contrast to the Plaintiffs in this case – presented no evidence of the "difficulties faced by indigent voters," including whether and how many voters lacked certified copies of their birth certificates. *See Crawford*, 553 U.S. at 201, 202 n.20. The *Crawford* Court also only evaluated the legitimacy of Indiana's law in the context of "the statute's broad application to *all* Indiana voters." *Id.* at 202-03. Here, by contrast, Plaintiffs challenge the requirements imposed by Act 23 as applied to voters who lack birth certificates or other DMV-mandated documents, like marriage certificates, that invariably carry a cost. And unlike the *Crawford* plaintiffs, Plaintiffs have presented evidence of thousands of voters who lack both accepted photo ID and birth certificates and who therefore must pay fees to obtain documents they need to secure a photo ID to vote. Doc. 62-10 at 22-24, Tables 7 & 8.

The Indiana law in effect at the time *Crawford* was decided – unlike Act 23 or DMV rules – also allowed individuals to obtain ID (or otherwise to vote) without paying any money for underlying documents by using free documents such as Social Security benefit statements and Medicare and Medicaid cards in lieu of birth certificates, by voting a mail-in absentee ballot, or

---

a federal election "by reason of failure to pay any poll tax or other tax." U.S. Const. Amend. XXIV; *see also Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 666 (1966) ("[A] State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard.").

12

by submitting an affidavit of indigency. 553 U.S. at 185-86 & n.2, 199 & n.18. Here, voters such as Plaintiffs Dukes, Ellis, and Ginorio must all pay money to obtain copies of their birth certificates in order to obtain the so-called "free" photo ID. Doc. 33-3 ¶ 3; Doc. 33-4 ¶ 8; Doc. 33-6 ¶ 5. Voters such as Bridget Nowak and Plaintiff Holloway will have to pay for court proceedings to amend their birth certificates to obtain the "free" ID. Doc. 55 ¶¶ 8-10; Doc. 33-8 ¶¶ 9-12. Plaintiff Frank, who Defendants claim would "likely" be issued an ID with her inaccurate birth certificate, Doc. 39 ¶ 6, would still have to pay to obtain that flawed document. Doc. 33-5 ¶¶ 12, 15. And voters such as Marcella Althof and Plaintiffs Brown and Wilde must pay money to obtain proof that no records of their births exist. Doc. 51 ¶¶ 12-14; Doc. 35 ¶¶ 4-7; Doc. 59 ¶¶ 13-16. Thus, Defendants' oft-repeated assertion that Act 23 imposes no poll tax because these voters can obtain a "free" ID finds no support in the record.

### 2. Act 23 Constitutes a Poll Tax Under the Twenty-Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment.

Contrary to Defendants' assertions, Doc. 85 at 3-8, Act 23 amounts to an unconstitutional poll tax under the Supreme Court's *Harman* and *Harper* decisions, for federal and state elections. The Twenty-Fourth Amendment prohibits not only poll taxes as such, but also "nullifies sophisticated as well as simple-minded modes of impairing the right guaranteed." *Harman v. Forssenius*, 380 U.S. 528, 540-41 (1965) (citation omitted). As stated in *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966), which invoked equal protection to prohibit poll taxes in state and local elections, "a State violates the Equal Protection clause of the Fourteenth Amendment *whenever* it makes the affluence of the voter or *payment of any fee* an electoral standard." *Id.* at 666 (emphasis added). Thus, the Constitution defends against fees for voting as well as "onerous procedural requirements which effectively handicap exercise of the

13

franchise by those claiming the constitutional immunity." *Harman*, 380 U.S. at 541. By requiring Wisconsin voters without photo ID who also lack DMV-required documents to pay money to obtain copies of their birth certificates or other documents to obtain the "free" ID, Act 23 makes the "payment of *any* fee an electoral standard" as applied to those voters. *See Harper*, 383 U.S. at 666 (emphasis added); *Harman*, 380 U.S. at 541; *Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1370 (N.D. Ga. 2005) (enjoining Georgia's voter ID law as "fee waiver affidavit" constituted "material requirement" to avoid paying poll tax); *Gray v. Johnson*, 234 F. Supp. 743, 746 (S.D. Miss. 1964) (requiring voters to obtain document from "the sheriff who is not an election official or the custodian of registration records or data" is an action that "circumscribe[s] or burden[s] or impair[s] or impede[s] the right of a voter to the free and effective exercise and enjoyment of his franchise.").

*Amici* read the legal definition of "poll tax" too narrowly and contrary to the way the Supreme Court has construed it. "[A] 'requirement of fee paying' as a condition of obtaining a ballot" embraces fees that are not expressly stated in a voting restriction, but are necessary to comply with it and cast a ballot, as well as fees that must be paid prior to arriving at the polling place and obtaining a ballot. Doc. 91 at 3-4 (quoting *Harper*, 383 U.S. at 666). Act 23 makes the payment of a fee an "electoral standard," *Harper*, 383 U.S. at 666, by requiring voters in Class 5 to pay fees for underlying documentation as a condition of obtaining the photo ID they must present to vote. The only difference between this scenario and what Defendants and *amici* concede would be unconstitutional – charging money for the state ID card itself – is that the payment occurs in a prior, but necessary, step. Doc. 38 at10-11, 14-15, 27-28. Act 23 is no less a "direct prerequisite for voting," Doc. 91 at 5, because a person who fails to pay a fee for the

14

required underlying document will be denied a ballot that will be counted.[9]  *See Weinschenk*, 203

S.W.3d at 213 ("The fact that Missouri has waived collection of costs normally charged to

persons seeking a non-driver's license does not make that license 'free' if Missourians without

certified copies of birth certificates or passports must still expend sums of money to obtain the

license.").  Further, this fee is imposed on voters directly and individually, not on candidates as

in the ballot access restrictions in *Gould v. Richardson*, No. Civ. 08-505, 2009 WL 1300941, at

*11 (D. N. Mex. Mar. 28, 2009), and *O'Connor v. Nevada*, 27 F.3d 357, 361 (9th Cir. 1994), and

not diffusely through a tax on municipalities as in *Lynwood v. Snohomish County*, 738 P.2d 699,

700 (Wash. Ct. App. 1987).[10]

The language *amici* cite from *Stewart v. Marion County*, No. 1:08-CV-586-LJM-TAB,

2010 WL 1579672, at *3 (S.D. Ind. Apr. 16, 2010) cannot rescue Act 23 either, because Claim 5

does not concern voters who already possess accepted photo ID.  *As applied to Class 5 members*

(who lack accepted photo ID and underlying documents that cost money), Act 23 requires these

voters to pay for documents required to obtain photo ID, without which they cannot vote.

Finally, *amici* assert that Act 23 does not impose a poll tax because some of the fees are

not necessarily paid *to the state*, as other forms of ID, including federal IDs, are accepted.  Doc.

91 at 8.  *Amici* contend that a state must "charge or collect" fees for a voting law to constitute a

poll tax.  *Id.* (citing *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 827 (S.D. Ind.

2006) (denying poll tax claim in part on basis that Indiana voter ID law also included "valid

federal identification, e.g. passport, whose requirements to obtain . . . are beyond the control of

---

[9] Furthermore, books have "inherent or independent value," Doc. 91 at 5, but no law could
constitutionally require their purchase as a condition to voting.

[10] *Johnson v. City & County of Philadelphia*, 665 F.3d 486 (3d Cir. 2011), is also inapt, because
that case concerned a city ordinance imposing fines for posting signs on city property such as
utility poles, which obviously "does not make any voter pay any fees to vote."  *Id.* at 496.

the State.")).  Other cases have rejected *Rokita*'s reasoning.  *See Weinschenk*, 203 S.W.3d at 213

(finding voter ID law imposes poll tax, notwithstanding inclusion of U.S. passports as well as

nominally free state ID that requires expenditure for underlying documents).  The recipient of the

proceeds from a poll tax is irrelevant: what matters is that the state is imposing the requirement

that the voter pay a fee.  A state could mandate that all poll tax revenue be given to another state,

a private charity, or to veterans, but that would not cure the violation.  Additionally, that an

entity other than the state is charging the fees – e.g., the federal government for passports – is

immaterial.  The Twenty-Fourth and Fourteenth Amendments prohibit states from making "the

affluence of the voter or payment of any fee an electoral standard," *Harper*, 383 U.S. at 666, not

the payment of a fee *to the state*, as *amici* would have it.  The Legislature made possession of a

photo ID a requirement for voting, designated the types of ID that would be accepted, and

required voters without ID to follow DMV laws, rules, and policies to obtain it.  Accordingly, the

fees charged by any entities issuing the accepted IDs, or by any entities issuing required

underlying documents at a cost, are not "beyond the control of the State," because the State could

have chosen to issue or allow IDs that do not require such underlying documents.  *Rokita*, 458 F.

Supp. 2d at 827.  An original copy of the ID of last resort, a Wisconsin state ID card, does cost

money for members of Class 5.[11]  For these reasons, Act 23 is an unconstitutional poll tax.

>    **D.  <u>Act 23 Confers Unconstrained Discretion on DMV Employees Which Results in
>    Inconsistent and Arbitrary Treatment of Voters in Violation of Equal Protection
>    [Count 7]</u>**

Claim 7 is a facial challenge to Act 23.  As noted in Plaintiffs' opening brief, cases such

---

[11] Even if Defendants' novel proposed requirement found support in the law, primary document
fees are routinely paid to the State of Wisconsin.  Notably, *amici's* proposed alternative remedy,
Doc. 91 at 9, is to enjoin the State of Wisconsin from collecting fees for birth certificates –
confirming that, in fact, such fees often *are* paid to the state.  Of course, this remedy is
inadequate, as it would not protect class members who are required by Act 23 to pay money to
obtain documents from other states or the federal government in order to obtain an ID to vote.

16

as *Bush v. Gore*, 531 U.S. 98 (2000), have found equal protection violations when a policy or legal standard will lead predictably to arbitrary and disparate treatment of voters.  *See also Black v. McGuffage*, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002) (rejecting motion to dismiss equal protection claim challenging voting technology that caused the differential treatment of voters).  DMV's lack of uniform and consistently applied rules, policies, and procedures concerning the documentation required to obtain an ID card necessarily leads to the arbitrary and disparate treatment of similarly situated voters.  In addition, gaps in DMV's rules effectively consign determinations that directly impact the right to vote to the discretion of local field staff, making inconsistency not only likely, but inevitable, as the numerous examples cited in Plaintiffs' opening brief demonstrate.  These are not simply "minor differences" in treatment.  Doc. 85 at 28.  Disparate treatment that enfranchises one voter and leaves a similarly situated voter disfranchised "rise[s] to the level of a constitutional violation."  *Id.*

Defendants do not rebut Plaintiffs' assertion that DMV employees' exercise of discretion in processing voters' ID applications has resulted in the treatment of applicants in an inconsistent and arbitrary manner.  Nor do they contest any of the evidence supporting this claim.  Doc. 50 at 23-33.  Rather, Defendants argue that Plaintiffs have not shown that these inconsistently treated voters are "similarly situated."  Doc. 85 at 28-29.  This argument is premised on a flawed understanding of the phrase "similarly situated."

"[S]imilarly situated means only that members of the comparison group are comparable to the plaintiff in all *material* respects."  *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (internal quotation marks omitted; emphasis in original).  Voters are similarly situated "in all *material* respects" if they are eligible to exercise the franchise.  Voters who are eligible to vote, but do not possess accepted photo ID, must run the gauntlet of DMV rules to obtain ID to vote.

17

No further similarities are required, because every vote must be valued equally, regardless of race, age, gender, wealth, or any other arbitrary criterion.[12] "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). This guarantee of equal treatment extends beyond "the initial allocation of the franchise" to embrace "the manner of its exercise." *Id.* at 104. Whatever part of the electoral machinery is at issue and whatever state agency plays a role in eligible voters' ability to vote, the federal right to equal protection ensures that all eligible voters are "similarly situated."

Defendants contend that a 90-year-old eligible voter without accepted photo ID is not similarly situated to a 20-year-old eligible voter without accepted photo ID. Doc. 85 at 29-30. Surely, Defendants would not say that a voting process that allowed poll workers in their discretion to turn away the 20-year-old, but not the 90-year-old, would satisfy equal protection. But that is precisely what DMV's lack of concrete policies and standardless discretion do, albeit at the DMV Customer Service Center, rather than at the polling place. Differences in age do not eliminate the "similarity" of eligible voters' situations, because age is not material to voting. Bureaucratic errors can cause birth records to be unidentifiable and effectively lost, and natural disasters, such as Hurricane Katrina, can destroy vital records for the young and old alike. Doc. 62-9 at 32:17-24, 44:18-45:17. Thus, if there is a legal requirement to present a birth certificate or an alternative, it must be applied to both voters equally.

---

[12] Defendants cite *Marin-Garcia v. Holder*, 647 F.3d 666, 673 (7th Cir. 2011), for the unremarkable proposition that the Constitution does not require different things to be treated as if they were the same. Doc. 85 at 28-29. Unlike *Marin-Garcia*, this case does not involve citizen children of undocumented immigrants (as compared to citizen children of citizens), where the citizenship of the parents is indisputably "material" to whether the parents are deportable, and the incidental "de facto" removal of the children with the parents is explained by this material factor. Instead, this case involves citizens, all of whom are eligible to vote.

The disparate treatment of equally eligible voters is not a theoretical problem, as Defendants suggest. Doc. 85 at 28-31. Table 1 below lists just some examples of this disparate treatment.

**Table 1. Similarly Situated Wisconsin Voters and Unequal Treatment Post-Act 23[13]**

| SIMILAR SITUATION | FAVORABLE TREATMENT | UNFAVORABLE TREATMENT |
|---|---|---|
| Eligible voter with no accepted photo ID and no record of birth on file with vital records office | DMV offered Nancy Lea Wilde and Marcella Althoff the MV3002 procedure.[14]<br><br>*Jones v. Deininger* Plaintiff Bettye Jones was issued a state ID card without presenting a birth certificate, submitting an MV3002 form, or providing any other documentation of birth. (Case No. 2:12-cv-00185-LA, Doc. 20, Pltfs.' Mot. for Prelim. Inj., at 11-12). | DMV did not offer Shirley Brown the MV3002 procedure or issue her a state ID card, even though she has no birth certificate and presented alternative documentation of her birth.<br><br>Other DMV staff asserted MV 3002 procedure is restricted to use by those over a certain age. (Doc. 62-18 (D10375)). |
| Eligible voter with no accepted photo ID who has all necessary documents to obtain a state ID card, but the names on the underlying documents do not match | DMV accepted birth certificates for and issued ID cards to the following individuals, notwithstanding name discrepancies: Rose Mary Dorothea Theissen ("Marie Rose D. Schaefer" on her birth certificate), Shirley Mendel Simon ("Genevieve Shirley Mendel"), Andrew Trokan ("Andreo"), Genevieve Winslow ("Genava"), and Leo Peter Navulis ("Leo Packus Nevwulis"). | DMV denied ID cards to Eddie Lee Holloway Jr., whose birth certificate recorded name as "Eddie Junior Holloway" and his father's name as "Eddie Lee Holloway" and other documents, such as Social Security Card and expired Illinois state ID card, had actual name "Eddie Lee Holloway Jr." "Bridget Marion Nowak" because her birth certificate records her name incorrectly as "Marion |

---

[13] These examples have previously been recounted in detail. *See* Doc. 50 at 23-33.

[14] Defendants also assert, based on the unsubstantiated statements of Jim Miller, that only "a miniscule number of voters" will need an MV3002. Doc. 85 at 29. But even Defendants anticipate a rise in the number of MV3002 submissions. Doc. 62-18 (D10328).

19

| | | |
|---|---|---|
| | DMV *might* do the same for Ruthelle Frank, whose birth certificate contains errors. | Bridget Nowak," despite presentation of other documents reflecting her correct name. John Krajewski because his name appears on birth certificate as "John Kraske" despite other documents reflecting "Krajewski" as surname. |
| Eligible voter with name change but no documentation of name change | DMV issued Rose Mary Dorothea Theissen (maiden name "Schaefer") and another elderly woman ID cards without marriage certificates. (Doc. 62-18 (D8256-58)).<br><br>DMV issued IDs to nuns in their Sister names without proof of legal name change. (Doc. 62-1 at 98:7-99:4). | DMV denied John Krajewski ID card because his name, changed during early childhood, appears on birth certificate as "John Kraske." |
| Eligible voter who previously possessed a Wisconsin driver's license or state ID card and has no proof of citizenship | DMV used digital image lookup and offered to process Jennifer Platt's application as a renewal, not an original application, and to excuse her failure to provide proof of citizenship even though she last held a Wisconsin driver's license in 1998 and DMV rules and policies treat only persons whose licenses expired 8 or fewer years ago as renewal applicants. (Sherman Decl., Attach. A (D27883-85))[15]; Ex. 31; (Sherman Decl., Attach. C, Fernan Tr. 124:16-125:2). | DMV told Mark Young that he could not get replacement for unexpired, stolen ID without providing birth certificate and that it could not use digital image lookup to verify his identity. Doc. 61. |

Contrary to Defendants' assertion that DMV excuses only "minor" name variations, Doc.

85 at 30, DMV has no policies or procedures for consistently determining which variations are

---

[15] *See also* Sherman Decl., Attach. A (D15865-66) (informing voter that holders of ID cards that expired more than one year previously must present their birth certificates).

excusable and which are not. Although Defendants claim, Doc. 85 at 30-31, that the disparate treatment is explained by a purported DMV practice of issuing IDs in cases of minor spelling errors or Americanizations, the examples above show that Defendants' assertion is belied by the facts. Defendants have not articulated any reasoned basis for why Theissen's, Simon's, Navulis's, and Winslow's variations are "more minor" than Krajewski's, Holloway's, or Nowak's. It also seems more likely that Defendants' issuance of ID cards to certain voters with document errors was due to the ability of these voters or their family members to complain to officials, rather than any policy of disregarding minimal errors, since Theissen, Simon, Trokan, Winslow, and Navulis were initially denied ID cards and would never have obtained ID cards but for their complaints. Doc. 34-23; Doc. 39; Ex. 52; Doc. 62-7 at 136:22-142:3.

Amici's reliance on *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), Doc. 91 at 24-25, is misplaced. *Engquist* involved a government employee, and its holding was based on the "significantly greater leeway" the government enjoys as an employer than when it deals with "citizens at large." *Id*. at 598-99. *Engquist* implicated no fundamental right and concerned inherently discretionary activities, such as firing employees or ticketing speeding drivers, not the ministerial act of processing an ID card application. *Id*. at 603-04. Further, the Supreme Court merely held that a public employee cannot assert a "class-of-one" arbitrary treatment claim under the 14th Amendment. *Id*. at 594, 607-09. Claim 7 is not premised on a "class-of-one" theory but rather is concerned with the unequal treatment of groups of similarly situated voters under a purportedly uniform legal scheme. *See Bush*, 531 U.S. at 104-08 (condemning election rules or processes, or absence thereof, when there are insufficient "guarantees of equal treatment" of similarly situated voters); *Hunter v. Hamilton County Bd. of Elections*, 635 F.3d 219, 234-36 (6th Cir. 2011) (citing *Bush* in enjoining disparate treatment of

21

classes of provisional voters).

In claiming intentional or purposeful discrimination must be proven to establish this claim, Doc. 91 at 25, *amici* misconstrue the *Bush v. Gore* line of cases. *Bush* prohibits the official and deliberate adoption of standards that result in arbitrary and disparate treatment, or the failure to apply specific rules that lead to such inconsistencies. Election officials need not *intend* inconsistency or arbitrariness. As the Sixth Circuit has explained, "[t]he Supreme Court has held in cases since *Snowden* [*v. Hughes*, 321 U.S. 1, 8 (1944)] that the Equal Protection Clause protects the right to vote from invidious and arbitrary discrimination" and "a showing of intentional discrimination has not been required in these cases." *Hunter*, 635 F.3d at 234 n.13 (citing *Bush*, 531 U.S. at 104-05; *Williams v. Rhodes*, 393 U.S. 23, 30, 34 (1968)).

Finally, both Defendants and *amici* present a false choice between unduly burdensome requirements and unfettered discretion, suggesting Plaintiffs may complain about one of these, but not both. Doc. 85 at 31-32; Doc. 91 at 24. But the Constitution condemns both, and had the Legislature not conscripted DMV into the electoral system as the supplier of the photo ID of last resort, it would have created neither problem.

### E. Act 23 Has Rendered Wisconsin's Electoral System Fundamentally Unfair in Violation of Substantive Due Process [Count 8]

Act 23 violates the requirement of substantive due process by creating an electoral scheme that is fundamentally unfair. *Briscoe v. Kusper*, 435 F.2d 1046, 1055 (7th Cir. 1970); *Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978). The Legislature's decision to impose on the state's extremely decentralized and largely volunteer-driven election administration system the complex set of rules and exceptions embodied in Act 23 and to make the DMV the issuer of the voter ID of last resort, inevitably and predictably disfranchises voters due to deficiencies in both agencies' structures of training and supervision, and the GAB's lack of oversight and

22

control over DMV's and elections officials' implementation of the law.

Defendants argue that Plaintiffs have not identified enough people who have been prevented from voting by Act 23 for the law to violate the Due Process Clause. Doc. 85 at 32-33. Yet, "an election is more than just a sum total of votes. It is also about the act of voting – an individual's ability to express his or her political preferences at the ballot box." *Kozuszek v. Brewer*, 546 F.3d 485, 490 (7th Cir. 2008); *see also Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 894 (1992) ("Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant."). Thus, Act 23's constitutionality must be determined by looking at the people affected by the state's decision to radically change the election laws without addressing or rectifying the bureaucratic limitations of the agencies that implement it.

Wisconsin's highly decentralized electoral structure, when combined with the complexity of Act 23 and DMV's requirements for those wishing to obtain ID, inevitably leads to the disfranchisement of eligible and registered voters. Act 23 is an incredibly complex piece of legislation, which even the civil servants at the GAB found confusing. Doc. 62-4 at 21:3-20. Despite its overall responsibility for the state's electoral process, the GAB has little power to monitor those charged with front-line implementation of the law – the 1,851 municipal clerks scattered throughout the state who administer the election laws. Doc. 50 at 5. Short of going to court to compel a clerk to follow the law, the GAB has no power to discipline a clerk that fails to comply with Act 23. Doc. 62-8 at 91:6-13. Moreover, unless a disgruntled voter lodges a complaint, the GAB has no way of even discovering when a clerk fails to follow the law. *Id.* at 96:15-22. Likewise, the GAB has no authority over the DMV; it cannot mandate that the DMV

23

follow any specific procedure in issuing the voter ID. Doc. 62-4 at 67:16-20. Additionally, the GAB is not well-informed of the DMV's policies and procedures. Doc. 62-4 at 93:20-94:1, 97:12-18; Sherman Decl., Attach. A (D36031) (Defendant Kennedy erroneously told voters that only a Social Security Number, not the physical card, was necessary to obtain an original state ID card).

Defendants claim that the problems identified by Plaintiffs are "isolated." Doc. 85 at 32. However, in the one, very low-turnout election in which photo ID was in effect, even voters with acceptable forms of photo ID were excluded from voting, either because their ID did not match the examples provided by GAB, Doc. 62-18 (D103280-30), or because the poll workers did not understand that names on photo ID do not have to exactly match the name on the voter list. Doc. 62-8 at 74:9-75:21, 77:11-24. Had Act 23's ID requirement been in full effect for a high-turnout election, the number of voters experiencing problems undoubtedly would have been significantly larger. "Injunctions issue to curtail palpable risks of future injury; it is not essential to establish that the worst has come to pass." *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006).

Moreover, far from being "isolated and inadvertent errors" as Defendants claim, Doc. 85 at 32, this pattern of failure is the logical result of trying to implement Act 23 without altering a profoundly decentralized system and without proper education and oversight. While some of Wisconsin's municipal clerks have sought training on the new law, GAB is aware of approximately 300 clerks who likely did not undergo any photo ID training. Sherman Decl., Attach. D, Robinson Tr. 132:24-133:12.

Likewise, the haphazard implementation of Act 23 in DMV offices is unsurprising. The DMV and its employees have no experience implementing election law and even career DMV

24

employees have had difficulty understanding and implementing Act 23's complicated requirements. Doc. 50 at 38-39 & n.19. Despite this, the Legislature made the photo ID of last resort one issued by the DMV that requires compliance with stringent REAL ID requirements not intended to regulate voting. Doc. 50 at 5-10, 34. Further, GAB was not given authority over the DMV to ensure its appropriate implementation and compliance with the law. *Id.* The inevitable result is the arbitrary burdens and barriers that have permeated the process of obtaining IDs at DMV offices. Depending on which DMV office a voter visits or which field agent she interacts with, she may be able to receive a photo ID and vote or not be able to obtain a photo ID and therefore be prevented from voting.[16] Doc. 62-4 at 91:13-18.

Although a plaintiff must show more than isolated, negligent, or incompetent actions by election officials to prevail on a substantive due process claim, "lack of intent to violate the plaintiffs' constitutional rights would 'not necessarily be a defense if the defendants should have known that their conduct would have that effect.'" *Hennings v. Grafton*, 523 F.2d 861, 863 (7th Cir. 1975) (*quoting Wood v. Strickland*, 420 U.S. 308, 322 (1975)).[17] Here, the Legislature should have known that this convoluted law – which drastically alters Wisconsin's election administration, puts an agency with no expertise or jurisdiction over elections in charge of issuing a document needed by many people to vote, and requires little if any training and/or oversight of the elections and motor vehicle officials implementing the law – would inevitably lead to the

---

[16] Again, *amici* seem to confuse the limitations on "class of one" suits under the Equal Protection Clause with the much broader protections against arbitrary treatment afforded the public in interacting with civil servants at arm's length. Doc. 91 at 31-32; *Engquist*, 553 U.S. at 604 (*citing Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (*per curiam*)).

[17] *Amici* cite cases in which actions by individual election officials or groups of officials was challenged under the due process clause. Doc. 91 at 26. In such individual defendant cases, a requirement of "willful conduct" makes sense. Here, the Legislature intentionally adopted a complex law that it knew or should have known would sow chaos at the DMV and among municipal election officials and poll workers around the state.

25

disfranchisement of countless voters.  Doc. 62-18 (D103280-30); Doc. 62-8 at 74:9-75:21, 77:11-24.

Unless and until the DMV and GAB adopt policies to ensure adequate education and supervision of front-line DMV and elections personnel and consistent, fair implementation of Act 23, the law's photo ID requirement should be enjoined.

### F.  Act 23 Violates Section 2 of the Voting Rights Act [Counts 9 & 10]

Plaintiffs assert both vote denial and vote dilution claims under Section 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973.  Doc. 31, FAC ¶¶ 182-95; Doc. 50 ¶¶ 39-41.  Plaintiffs are moving for a preliminary injunction blocking enforcement of the photo ID law because it is a "standard, practice, or procedure" that dilutes the votes of Latino and African-American voters in Milwaukee County.  Doc. 50 at 39-43; 42 U.S.C. § 1973.  Act 23 "disproportionately impairs minority voters' ability to participate in the political process and to elect candidates of their choice" and "has a disproportionate negative impact on minority voters [such] that under the totality of the circumstances the electoral system is 'not equally open to participation by' them." *Id*. at 41 (quoting 42 U.S.C. § 1973(b)).

#### 1.  Plaintiffs Are Likely to Succeed on their Vote Denial Claim [Count 9]

"[V]ote denial refers to practices that prevent people from voting or having their votes counted. . . . Vote denial cases challenge practices such as literacy tests, poll taxes, white primaries and English-only ballots."  *Simmons v. Galvin*, 575 F.3d 24, 29 (1st Cir. 2009); *Farrakhan v. Gregoire*, 590 F.3d 989, 1006 (9th Cir. 2010), *rev'd on other grounds*, 623 F.3d 990 (9th Cir. 2010) (*en banc*) ("Vote denial claims . . . challenge laws . . . that directly exclude otherwise qualified voters from participating.") (internal citations and quotation marks omitted).

26

Defendants argue that the Barreto/Sanchez Report[18] does not show that Act 23 has caused any *denial* of the right to vote because the survey focused on whether or not respondents currently possess photo ID and the underlying documents needed to acquire an ID card, but not whether they "*could obtain*" the documents they need to vote. Doc. 85 at 39. This argument is based on a flawed understanding of the requirements of a vote denial claim.

Defendants argue that a vote denial claim lies only where a practice renders voting absolutely impossible, and where minority voters uniquely face that insurmountable barrier. Doc. 85 at 40-41. This is incorrect. The VRA precludes the use of literacy tests and poll taxes as forbidden forms of vote denial, regardless of whether or not some minority voters could satisfy those requirements and despite evidence that some segment of the white voting-age population was also disfranchised by these mechanisms. *See, e.g.*, *Oregon v. Mitchell*, 400 U.S. 112, 235 (1970) (Brennan, J., concurring in part, dissenting in part) (upholding 1970 VRA Amendment imposing nationwide ban on literacy tests in part based on survey demonstrating "that literacy tests have a negative impact upon voter registration which '*falls most heavily* on blacks and persons of Spanish surname'") (emphasis added); *Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1253-54 & n.3 (N.D. Miss. 1987) (even though poor rural whites were likely also negatively affected by registration requirements and restrictions, evidence of 25 percent racial disparity in registration rates supported determination that requirements and failure to make satellite voter registration available statewide constituted vote denial in violation of Section 2); *U.S. v. State of La.*, 225 F. Supp. 353, 373 & n.50 (D.C. La. 1963) ("some twenty to thirty thousand white voters" were disfranchised by virtue of literacy and

---

[18] Plaintiffs' argument against excluding the Barreto/Sanchez Report is included in the Reply Memorandum In Support of Plaintiffs' Motion for Class Certification submitted concurrently with this brief. Pltfs.' Reply In Support of Mot. for Class Cert. Br. at 7-9.

property qualifications for voting under 1898 Constitution); *U.S. v. Atkins*, 323 F.2d 733 (5th Cir. 1963) (under Alabama's literacy and constitutional understanding test, between June 1961 and May 1962, 92% of white applicants and about 62% of black applicants had been accepted).

Although in these situations whites also were disfranchised, each of these tests or devices nevertheless erected a significant barrier that *disproportionately* excluded minority voters from the polls. *U.S. v. State of La.*, 225 F. Supp. at 385 ("The State of Louisiana accomplished its purpose in the parishes where the constitutional interpretation test was used. In those twenty-one parishes, registration of white persons between 1956 and December 31, 1960, increased from 161,069 to 162,427; registration of Negroes decreased from 25,361 to 10,256."). The same is true of Act 23's requirement that voters obtain a "license" in order to vote. Regardless of whether some blacks and Latinos pass Act 23's bureaucracy navigation test and ultimately obtain the required license to vote, a disproportionate number cannot, and will therefore be barred from voting. That denies them the right to vote. *See infra* Sec. F.3.

### 2. Plaintiffs Are Likely to Succeed on their Vote Dilution Claim [Count 10]

As to Claim 10, vote dilution is distinct from vote denial. It requires evidence of a disparate negative impact on a covered minority and evidence under the totality of the circumstances, including the relevant Senate factors, that the challenged law is depriving the minority group of an equal opportunity to participate in the electoral system and elect representatives of choice. *LULAC v. Perry*, 548 U.S. 399, 425-26 (2006).

In cherry-picking a single sentence in Plaintiffs' brief and misconstruing a single phrase in a First Circuit case to argue that Plaintiffs are not asserting a vote dilution claim, Defendants have ignored Plaintiffs' assertions regarding vote dilution and failed to rebut the argument and expert testimony in support of this claim. Doc. 85 at 37 ("[A]lthough Plaintiffs couch their

28

arguments in terms of both vote denial and vote denial [*sic*], it is clear that they are only arguing a claim of vote denial, and Defendants will not further respond to Plaintiffs' vote dilution argument.").  Defendants' argument appears to be based on a myopic view of vote dilution, contending any claim that is in part premised on uncast and/or uncounted ballots *per se* cannot be dilutive.  *Id*.  While it is true that courts have struck down schemes that "'dilute' the force of minority votes that were duly cast and counted," *Holder v. Hall*, 512 U.S. 874, 896 (1994), vote dilution attacks the aggregate power of minority voters, *Farrakhan*, 590 F.3d at 1006, and thus any scheme that disproportionately results in minority votes being uncast and uncounted dilutes the minority votes that *were* cast and counted.

 *Amici* acknowledge Plaintiffs have asserted a claim for vote dilution, but argue that vote dilution is "properly confined to the redistricting context."  Doc. 91 at 9 n.8.  This argument also fails.  VRA cases under Section 2, including some cases Defendants cite, have involved vote dilution claims against a "standard, practice, or procedure" (42 U.S.C. § 1973(a)), other than a redistricting plan or at-large election system.  *See, e.g.*, *Gonzalez v. Arizona*, Nos. 08–17094, 08–17115, 2012 WL 1293149, at *13-15 (9th Cir. Apr. 17, 2012) (*en banc*) (vote dilution challenge to voter ID law cognizable, but rejected due to insufficient proof of discriminatory effect); *Simmons*, 575 F.3d at 31 (characterizing challenge to felon disfranchisement law in *Wesley v. Collins*, 791 F.2d 1255 (6th Cir. 1986), as a vote dilution claim); *Black*, 209 F. Supp. 2d at 895 (in Section 2 challenge to punch-card voting technology, "the injury here alleged, is . . . the higher probability of that vote not being counted as a result of the voting systems used, *i.e.*, vote dilution").

 In contexts analogous to this case, such as challenges to the use of punch-card voting machines, courts have acknowledged that vote dilution may be proven where minority voters

29

face a "higher probability of [their] vote[s] not being counted as a result of the voting systems used, i.e., vote dilution." *Black*, 209 F. Supp. 2d at 895. Act 23 similarly increases the probability that minority votes will not be counted and that duly counted minority votes will have less force. Accordingly, the photo ID scheme renders Wisconsin's elections "not equally open to participation" by minority voters and severely reduces their collective opportunity "to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).[19]

### 3. Plaintiffs Meet the Other Requirements for Vote Denial and Vote Dilution

However the claim is characterized under Section 2, Plaintiffs have adduced sufficient evidence of a disproportionate impact to establish both vote denial and vote dilution and the requisite causation. *Compare Common Cause v. Jones*, 213 F. Supp. 2d 1106, 1110 (C.D. Cal. 2001) (punch-card voting technology's disproportionate impact on minority voters cognizable as vote denial), *with Black*, 209 F. Supp. 2d at 895 (characterizing same as vote dilution).

### a. Act 23 Has a Disproportionate Impact on Minority Voters

Plaintiffs' expert evidence confirms that eligible African-American and Latino voters are much more likely to lack accepted photo ID than eligible white voters, and that this difference is statistically significant at the most rigorous 99% confidence level. Doc. 62-10, at 18, Table 1, Fig. 6. The survey data also demonstrate that Latino and black voters in Milwaukee County are more likely to lack both accepted photo ID and one or more of the required documents necessary

---

[19] *Amici* argue that because the Supreme Court in *Crawford* rejected the contention that Indiana's photo ID law, as a facial matter, constituted a "substantial burden," that there can be no denial or abridgement of the right to vote under Section 2 of the Voting Rights Act for those who lack accepted photo ID and/or one or more of the documents necessary to acquire ID. Doc. 91 at 11-12. As Plaintiffs have assembled significant evidence of both severe burdens on voters generally, *see supra* Sec. A.1, as well as evidence of disproportionate difficulties confronting minority voters under Act 23, *see infra* Sec. F.3, this argument is unavailing.

to obtain one.  *Id*. at 23-24, Fig. 7B.  Contrary to *amici*'s argument, Doc. 91 at 15, these disparities are statistically significant.  Doc. 62-10 at 23.  Further, in measuring the rates at which voters by racial subgroup lack the necessary *underlying* documents, the survey results demonstrate a disproportionate negative impact on minority voters' *ability* to obtain an ID and the *ability* to vote.  This conclusion is buttressed by, *inter alia*, the finding that African-Americans and Latinos are also far more likely than white voters to have been born outside of Wisconsin, making the birth certificate application process even more burdensome.[20]

### b.  The Totality of the Circumstances Supports Plaintiffs' Claims

Plaintiffs have introduced evidence on the relevant Senate factors to establish a violation of Section 2 under the "totality of the circumstances"[21] for Claims 9 and 10. While *amici* argue that Plaintiffs did not submit evidence for each factor, Doc. 91 at 18, the VRA does not require that each factor be proven.  *See* Doc. 50 at 42.  Plaintiffs' expert evidence from Dr. Marc Levine demonstrates that decades of historical discrimination across a variety of sectors, from employment to housing to education, have caused blacks and Latinos in Milwaukee County to rank at or close to the bottom for socioeconomic indicators across metropolitan areas nationwide:

> Along a daunting array of dimensions . . . , the state and its largest metropolitan center display overwhelming patterns of racial inequality, racial disparities, and racially-based socioeconomic distress: most segregated metropolitan area in the nation, widest racial income gap, highest black poverty rate, among the highest levels of concentrated poverty in neighborhoods and schools, lowest rate of black male employment, second widest

---

[20] Eighty-one percent of whites were born in the state of Wisconsin, compared to 51 percent of blacks and 28 percent of Latinos.  Doc. 62-10 at 25 & Fig. 8.

[21] Contrary to Defendants' assertions, the Senate factors apply to both vote denial and vote dilution claims, though their application may differ in different contexts. *Smith v. Salt River Project Agric. Improvement and Power District*, 109 F.3d 586, 596 n.8 (9th Cir. 1997). Similarly, *amici* are incorrect when they imply evidence must be introduced for each Senate factor, as "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."  Doc. 91 at 18-20; S. Rep. No. 97-417, 97th Cong., 2d Sess., at 28-29 (1982).

31

racial gap in school test scores, lowest rate of minority business ownership, second worst racial disparities in incarceration rates.

Doc. 81-1 at 20.

This racial divide is the product of "the legacy of historical labor market discrimination," "a long-standing historical pattern of extreme segregation," and "the historical legacy of housing discrimination and resistance to desegregation," in Wisconsin and Milwaukee County in particular. *Id*. at 5, 10, 17; *see also* Doc. 50 at 48-49 (enumerating judicial findings of public and private discrimination in Wisconsin and Milwaukee or consent decrees entered to address same). Although, contrary to *amici*'s argument (Doc. 91 at 19), the VRA does not require that Plaintiffs establish a "causal nexus" between socioeconomic distress and depressed minority turnout, S. REP. NO. 97-417, at 29 n.114, socioeconomic distress negatively affected the ability of minorities to participate in the political process:

> These racial socioeconomic factors represent resource deficiencies that political scientists agree impede full participation of low-income minorities in the electoral process. . . . Act 23 makes requirements (photo ID) that a disproportionate number of otherwise eligible minority voters cannot meet. Moreover, given the challenges that resource-disadvantaged minorities without photo IDs face in securing the documentation necessary to obtain an ID, Act 23 imposes a double roadblock on voting for substantial numbers of eligible voters from communities that have borne the historical and contemporary legacy of discrimination and entrenched inequality.

Doc. 81-1 at 25.

Dr. Levine's expert report also addresses Senate Factor Six with significant evidence that Wisconsin and Milwaukee elections have been marked by racial appeals and that political rhetoric about combating voter fraud, the purported interest behind the photo ID law, has been deployed as a racially coded rallying cry and political issue.[22] *Id*. at 27-36; *see also* Doc. 53. In addition, Plaintiffs proffer evidence on Senate factor 8, the lack of responsiveness on the part of

---

[22] Defendants and *amici* have failed to respond in any way to the Levine Report and have thus made no effort to rebut Plaintiffs' expert evidence on Senate factors 5 and 6.

32

elected officials to the needs and concerns of minority communities. S. REP. NO. 97-417, at 29. In her declaration, Congresswoman Gwendolynne Moore recounts a number of policy battles from law enforcement to welfare reform, in which the Wisconsin State Legislature or the Governor ignored and acted contrary to minority needs and concerns and/or rejected proposals advocated by the minority community. Moore Decl. ¶¶ 5-15.

The Levine Report provides the socioeconomic context for the Barreto/Sanchez Report's finding of a racially disparate impact on the ability to participate in the political process and elect representatives of choice, and explains how socioeconomic variables have contributed to and will perpetuate that disparity. *Id*. at 22-25. In turn, the Barreto/Sanchez Report complements the Levine Report's findings by demonstrating that individuals with lower levels of income and education lack accepted photo ID at significantly higher rates. Doc. 62-10 at 29-32, Figs. 10 & 11. As explained in the next section, the two expert reports establish a causal link between racial discrimination and racial disparities across a host of socioeconomic indicia on the one hand, and disparate possession of accepted photo ID and underlying documents and the consequent diminishment of minority electoral opportunity on the other.

### c. The Disparate Impact and Totality of the Circumstances Evidence Satisfy the Causation Requirement of the VRA

Defendants and *amici* assert that Plaintiffs have provided insufficient proof that Act 23 "results in" the observed racial disparities. The Supreme Court has held that causation in Section 2 cases is established when the challenged law causally interacts with contributing factors to produce a disparate impact: "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."

*Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).[23]  Moreover, "under the 'results test' of § 2, only the correlation between race of voter and selection of certain candidates, *not the causes of the correlation*, matters."  *Id.* at 63-64 (emphasis added).  *See also Gonzalez v. Arizona*, 624 F.3d 1162, 1193 (9th Cir. 2010), *aff'd in part, rev'd in part*, 2012 WL 1293149, at *13-15 (9th Cir. Apr. 17, 2012) (*en banc*) ("To prove that such a causal relationship exists, a plaintiff need not show that the challenged voting practice caused the disparate impact *by itself*.") (emphasis added).  *Amici* also concede that Plaintiffs need only prove that the challenged election requirement has a discriminatory result, not that it "was adopted or maintained with the intent to discriminate against minority voters."  Doc. 91 at 10 (quoting *Gingles*, 478 U.S. at 44).

Defendants and *amici* nevertheless argue that a "bare statistical showing" of a disparate impact does not make out a Section 2 claim.  Doc. 85 at 37-38; Doc. 91 at 10.  Some of the cases Defendants and *amici* cite in support of this argument are simply inapposite.  For example, the decision in *Irby v. Virginia State Board of Elections*, 889 F.2d 1352 (4th Cir. 1989), which upheld an appointment-based school board system despite a statistical disparity between the percentage of blacks in the population and the percentage of blacks on the school board, was premised on Section 2's express disclaimer of any right to proportional representation by a protected group.  *Id*. at 1358-59; 42 U.S.C. § 1973(b).  Further, the evidence at issue in *Irby* did not even constitute an *interracial* disparity as in the instant case.  *Wesley v. Collins*, 791 F.2d 1255 (6th Cir. 1986), which rejected a Section 2 challenge to Tennessee's felon disenfranchisement law based on the statistical difference between minority and white felony-

---

[23] *Amici*'s citation to *Common Cause/GA v. Billups*, 406 F. Supp. 2d 1326 (N.D. Ga. 2005) (Doc. 91, at 17) is inapposite, as the plaintiffs did not present concrete evidence of a disparate impact on minority voting.  *Id*. at 1374-75.  Rather, the court denied the plaintiffs' request for a preliminary injunction as it had been asked to infer a disparate impact on minority voters solely on the basis of socioeconomic disparities between African Americans and whites.  *Id.*

34

conviction rates, relied on the virtually uniform conclusion of the courts that the 14th

Amendment permits the disfranchisement of convicted felons. *Id*. at 1259-61; *see also Simmons*,

575 F.3d at 30-42 (finding VRA does not override "affirmative sanction" for felon

disfranchisement laws in 14th Amendment).

Defendants and *amici* also cite a variety of cases in which the plaintiffs insufficiently

developed the record to demonstrate causation. These cases fail to support Defendants' assertion

that racial disparities cannot serve as the foundation for a finding of disproportionately reduced

electoral opportunity. In *Salt River*, the Ninth Circuit found a land ownership voting

qualification for an agricultural improvement and power district's elections did not violate

Section 2, because the plaintiffs had not demonstrated a "causal connection" and, unlike here,

had failed to make a sufficient showing under the Senate factors. 109 F.3d at 595-96. All the

VRA requires is that the challenged law caused a racial inequality in electoral opportunity. *See*

*Chisom v. Roemer*, 501 U.S. 380, 408 (1991) (Scalia, J., dissenting) ("If . . . a county permitted

voter registration for only three hours one day a week, and that made it more difficult for blacks

to register than whites, blacks would have less opportunity *to participate* in the political process

than whites, and § 2 would therefore be violated . . . .") (emphasis in original; citations and

quotation marks omitted).

A showing of causation does not require that the challenged voting law be the sole cause

of the disparate impact; the challenged law may interact with socioeconomic factors to produce

the inequitable result; and this suit, in any event, does not rest solely on turnout disparities, as in

challenges to voter purge schemes based on inactive voter status or where a Section 2

redistricting case is brought without evidence of racially polarized voting but solely turnout

disparities between minority and white voters. *See Ortiz v. City of Philadelphia Office of the*

*City Comm'rs*, 28 F.3d 306, 315 (3d Cir. 1994) (rejecting Section 2 challenge to Pennsylvania's voter-purge law that was, in Defendants' words, Doc. 85 at 37, "simply because of" a racial disparity in inactive voter status rates); *Salas v. Southwest Texas Junior College Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992) (concluding Section 2 challenge to at-large voting system again in Defendants' words, Doc. 85 at 38, "based exclusively on a statistical difference" between Hispanic and white voter turnout). *Ortiz* and *Salas* also do not stand for the proposition that statistically significant disparities cannot establish Section 2 violations under the totality of the circumstances, but rather that defendants cannot be *automatically* held responsible for disproportionately lower minority voter turnout. These cases cited the "failure to take advantage of political opportunity" and concluded that "a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote." *Salas*, 964 F.2d at 1556; *Ortiz*, 28 F.3d at 313 ("[I]t is not the State which prevents citizens from exercising their right to vote, from participating in the political process, and from electing representatives of their own choosing.").[24]

Finally, Defendants cite the 9th Circuit's *en banc* opinion in *Gonzalez* to argue Plaintiffs have not demonstrated Act 23 has *caused* a discriminatory result. Doc. 85 at 41. That case also

---

[24] Moreover, *Ortiz* and *Salas* rest on the questionable premise that diminished minority turnout cannot be attributed to the challenged scheme or practice, is purely a function of apathy, and may defeat a Section 2 claim. The Ninth Circuit has quite forcefully rejected this notion:

> [I]f low voter turnout could defeat a section 2 claim, excluded minority voters would find themselves in a vicious cycle: their exclusion from the political process would increase apathy, which in turn would undermine their ability to bring a legal challenge to the discriminatory practices, which would perpetuate low voter turnout, and so on.

*U.S. v. Blaine County, Montana*, 363 F.3d 897, 911 (9th Cir. 2004). Even if *Ortiz* and *Salas* were rightly decided, they do not control here. A photo ID requirement is "beyond the control of minority voters," *Ortiz*, 28 F.3d at 313, and causes racial disparities in individual access and electoral opportunity.

only holds that a claim of discriminatory impact must be supported by adequate evidence. 2012 WL 1293149, at *15 ("Gonzalez alleged that 'Latinos, among other ethnic groups, are less likely to possess the forms of identification required under Proposition 200 to ... cast a ballot,' but produced no evidence supporting this allegation."). Indeed, as the panel had noted, "Gonzalez adduced no evidence that Latinos' ability or inability to obtain or possess identification for voting purposes . . . resulted in Latinos having less opportunity to participate in the political process and to elect representatives of their choice." *Gonzalez*, 624 F.3d at 1194.

The *Gonzalez* plaintiffs did not proffer evidence demonstrating statistically significant racial disparities in possession of the necessary means to vote, and "the district court determined, after 'examining the facts as a whole, [that] Proposition 200 does not have a statistically significant disparate impact on Latino voters.'" 2012 WL 1293149, at *14. One of the principal differences between *Gonzalez* and the instant case is that Arizona's voter ID law is not a strict photo ID law, but rather allows "photograph-bearing documents such as driver's licenses as well as non-photograph-bearing documents such as utility bills or bank statements." *Id*. at *13. By contrast, the survey upon which the Barreto/Sanchez Report is based (1) confirmed the voting eligibility of all respondents; (2) did not rely on guesswork as to race or ethnicity, but asked voters themselves to report their race or ethnicity; and (3) by utilizing tested and reliable research methodology common in social science, revealed the existence of statistically significant racial disparities for both photo ID and primary document possession that Defendants do not dispute exist. Doc. 62-10, at 3-5, 16-26, 44 (Appendix B).

Certainly, Act 23 has a disparate impact on African-American and Latino voters, who are less likely to have ID than white voters – and who are more likely compelled to take additional steps that white voters need not take in order to vote, including collecting and paying for

documents and traveling to a DMV office to obtain ID. Plaintiffs' claim is not "based exclusively on" statistical disparities. Plaintiffs have submitted significant evidence of how Act 23 interacts with the profound social and economic barriers African-American and Latino residents face, as well as the racially charged nature of the campaign against voter fraud, to lower minorities' ability to participate in the electoral process. *See supra* Sec. F.3.c; Doc. 50 at 45-50; Doc. 80; Doc. 81-1.[25] The documented disparities, combined with the multiple and often severe burdens involved in actually obtaining ID, will result in the complete denial of some black and Latino voters' right to vote, and also in the dilution of minority voting strength.

Here, the specific provisions of Act 23 – which photo IDs are accepted and which are not, which exceptions are available or not, as well as the decision to make DMV and its REAL ID requirements the gatekeeper to the ballot box – cause the disproportionate impact on the ability to participate in the political process. The state legislature's decision to make possession of one of a very few forms photo ID the *sine qua non* of voting, combined with existing racial disparities in possession of photo ID and underlying documents, disparities that result from and are exacerbated by the socioeconomic disparities disclosed by Dr. Levine, operate together to cause the statistical disparate impact on voting observed by Dr. Barreto. None of the cases Defendants cite stand for the proposition that a statistically significant racial disparity in conjunction with Senate factors evidence considered under the totality of the circumstances cannot rise to the level of a Section 2 violation. Here, Plaintiffs have demonstrated what the *Gonzalez* plaintiffs did not – with a rigorous survey of nearly 2,000 voters in Milwaukee County and expert testimony on both the statistical disparities and the socioeconomic context and

---

[25] Moreover, Act 23 was passed after the legislature had explicitly been informed that such racial disparities were likely. *See* Canon Decl. ¶¶ 5-8 & Attach.

contributory factors behind this racially disparate impact. Therefore, Plaintiffs have established a likelihood of success on the merits of Claims 9 and 10.

**CONCLUSION**

Plaintiffs have demonstrated that they are likely to succeed on the merits of Claims 1, 2, 5, 6, 7, 8, 9 and 10. Defendants have not rebutted Plaintiffs' arguments and evidence on this first equitable factor – nor have they advanced any meaningful argument as to the other equitable factors under *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Lacking legal authority or evidence to justify the disfranchisement Plaintiffs have documented, Defendants rely heavily on the Supreme Court's decision in *Crawford*, a case that forecloses no aspect of the instant suit. Accordingly, Plaintiffs request that this Court safeguard the most fundamental right of Wisconsin residents – the right to vote – by entering a preliminary injunction.

Dated this 29th day of June, 2012.

Respectfully submitted,

/s/ Jon Sherman
JON SHERMAN
M. LAUGHLIN MCDONALD
NANCY ABUDU
American Civil Liberties Union Foundation, Inc.
230 Peachtree Street, Suite 1440
Atlanta, GA 30303
Phone: (404) 523-2721
Fax: (404) 653-0331
jsherman@aclu.org
lmcdonald@aclu.org
nabudu@aclu.org

KARYN L. ROTKER
State Bar No. 1007719
LAURENCE J. DUPUIS

39

State Bar No. 1029261
American Civil Liberties Union of Wisconsin Foundation
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
(414) 272-4032
(414) 272-0182 (fax)
krotker@aclu-wi.org
ldupuis@aclu-wi.org

HEATHER MARIA JOHNSON
KAREN E. CUNNINGHAM
National Law Center on Homelessness & Poverty
1411 K Street NW, Suite 1400
Washington, DC 20005
Phone: (202) 638-2535
Fax: (202) 628-2737
hjohnson@nlchp.org
kcunningham@nlchp.org

NEIL STEINER
DIANE PRINC
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Phone: (212) 698-3822
Fax: (212) 698-3599
neil.steiner@dechert.com
diane.princ@dechert.com

CRAIG FALLS
Dechert LLP
1775 I Street, NW
Washington, DC 20006-2401
Phone: (202) 261-3373
Fax: (202) 261-3333
craig.falls@dechert.com

Attorneys for Plaintiffs.

40