IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

RUTHELLE FRANK, et al.,

      Plaintiffs,

      v.                    Case No. 11-CV-1128

GOVERNOR SCOTT WALKER, et al.,

      Defendants.

---

LEAGUE OF UNITED LATIN AMERICAN
CITIZENS (LULAC) OF WISCONSIN, et al.,

      Plaintiffs,

      v.                   Case No. 12-CV-0185

DAVID G. DEININGER, et al.,

      Defendants.

---

## DEFENDANTS' POST-TRIAL BRIEF

---

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................. 1

BACKGROUND ............................................................................... 2

    I.     ACT 23's VOTER PHOTO IDENTIFICATION REQUIREMENT. .......................................................................... 2

    II.    STATE COURT PROCEEDINGS ENJOINING ACT 23. ............. 5

ARGUMENT ..................................................................................... 7

    I.     ARGUMENTS RELEVANT TO BOTH CASES. ............................ 7

        A.    The State of Wisconsin's interests in a voter photo identification requirement are compelling. .......................... 7

        B.    Mitigating factors in Act 23 bolster its validity. ................ 16

            1.    DMV's free Wisconsin state ID card program. ......... 17

            2.    GAB's Act 23 educational programs and the Bring It to the Ballot campaign. ............................... 19

        C.    Plaintiffs' claims under Section 2 of the Voting Rights Act fail. ............................................................................... 23

            1.    Legal standards. ........................................................ 24

            2.    Plaintiffs have not demonstrated that Act 23 causes a prohibited discriminatory result. ............... 28

                a.    Professor Matt Barreto's expert opinion. ....... 29

                b.    Leland Beatty's expert opinion. ...................... 37

            3.    A "totality of circumstances" analysis based upon the so-called "Senate Factors" does not indicate that Act 23 violates Section 2 of the Voting Rights Act. .................................................... 48

Case 2:11-cv-01128-LA   Filed 12/20/13   Page 2 of 142   Document 176

a.  Senate Factors One and Three........................ 51

b.  Senate Factors Two and Six............................ 52

c.  Senate Factor Four. ......................................... 54

d.  Senate Factor Five............................................ 55

e.  Senate Factor Seven. ...................................... 60

f.  Senate Factor Eight........................................ 61

g.  Senate Factor Nine. ........................................ 64

II.  ARGUMENTS SPECIFIC TO *LULAC v. DEININGER*.............. 64

A.  The *LULAC* Plaintiffs lack statutory standing to pursue a claim under Section 2 of the Voting Rights Act. .................................................................................... 64

1.  Statutory standing is different from Article III standing. .................................................................... 65

2.  The *LULAC* Plaintiffs lack statutory standing because they are not "aggrieved persons" under the Voting Rights Act. .............................................. 67

B.  The Court lacks jurisdiction over the *LULAC* case because the *LULAC* Plaintiffs do not have Article III standing. ............................................................................. 69

1.  Legal standards. ...................................................... 69

2.  The *LULAC* Plaintiffs cannot be injured by Act 23's voter photo identification requirement because the requirement applies only to voters....... 70

3.  Plaintiff LULAC has not demonstrated that it meets the associational standing requirements of *Hunt*.................................................................... 72

4. Plaintiff Cross Lutheran Church has not demonstrated that it meets the associational standing requirements of *Hunt*.................................. 74

5. Plaintiff Milwaukee Area Labor Council, AFL-CIO, has not demonstrated that it meets the associational standing requirements of *Hunt*.......................................................... 75

6. Plaintiff Wisconsin League of Young Voters Education Fund has not demonstrated that it meets the associational standing requirements of *Hunt*.................................................... 77

III. ARGUMENTS SPECIFIC TO *FRANK v. WALKER*. .................. 79

A. The Court should grant judgment in favor of Defendants as to certain *Frank* Plaintiffs' claims. ............ 79

B. The Court should deny the *Frank* Plaintiffs' request for class certification........................................................... 82

1. Legal standards. ...................................................... 82

a. Class certification requires parties to be so numerous so as to make joinder impracticable.................................................... 84

b. Class certification requires questions of law or fact common to the class. ..................... 85

c. Class certification requires claims or defenses of the representative parties to be typical of the claims or defenses of the class. ................................................................ 87

d. Class certification requires adequate representation of the interests of the class by representative parties. ...................... 88

2.    The *Frank* Plaintiffs' trial evidence established that only three of the 25 plaintiffs lack qualifying ID. ............................................................. 89

3.    Putative Classes 3, 4, and 6 automatically fail for lack of any adequate class representative *Frank* Plaintiffs. ......................................................... 92

4.    The putative classes do not satisfy Rule 23(a)(2)'s commonality requirement because the *Frank* Plaintiffs have not demonstrated that class members will suffer the same injury. ......................................................... 94

5.    The *Frank* Plaintiffs have not proven at trial that the class representatives' claims are typical of the claims of class members. .................... 98

6.    The *Frank* Plaintiffs have not proven at trial that the putative classes are sufficiently numerous to be certified. ........................................ 100

7.    The putative classes are unmanageable, and the *Frank* Plaintiffs have not established that any of the classes are sufficiently definite. ............. 103

C.    Act 23's photo identification requirement is not a poll tax in violation of the Fourteenth or Twenty-fourth Amendments (Counts 3 and 5 of the First Amended Complaint). ....................................................... 104

1.    Count 5 of the First Amended Complaint fails. ..... 105

2.    Count 3 and putative Class 3 of the First Amended Complaint are nonsensical and fail. ....................................................................... 112

D.    The *Frank* Plaintiffs' Equal Protection and Due Process Clause claims fail (Counts 1, 2, 4, 6, 7, and 8 of the First Amended Complaint). .......................... 114

1.      Counts 1 and 2 of the First Amended Complaint fail because any burdens imposed by Act 23's photo identification requirement do not outweigh the significant benefits and compelling State interests furthered by the law.... 114

2.      Count 4 of the First Amended Complaint fails because technical college ID cards are considered a form of qualifying ID by GAB............ 119

3.      Count 6 of the First Amended Complaint fails because the Legislature's decision to exclude Veteran Identification Cards had a rational basis. ...................................................................... 122

4.      Counts 7 and 8 of the First Amended Complaint fail because Act 23's photo identification requirement does not result in inconsistent and arbitrary treatment of voters in violation of the Equal Protection Clause and has not rendered Wisconsin's electoral system "fundamentally unfair" in violation of the Due Process Clause.................................................. 126

CONCLUSION............................................................................. 136

Case 2:11-cv-01128-LA    Filed 12/20/13    Page 6 of 142    Document 176

# INTRODUCTION

Can those that currently lack qualifying identification under 2011 Wisconsin Act 23 ("Act 23"), nonetheless, obtain qualifying identification?

That question is the crux of this case. A two-week trial, the testimony of dozens of fact witnesses and five expert witnesses, hours of attorney arguments, and tens of thousands of pages of discovery exchanged lead to one principal question.

Plaintiffs have not shown through evidence presented at trial that the answer to the question is "No" for many, if any, Wisconsin voters. Of course, some voters will need to use their common sense to make efforts to obtain an ID card. For most, the effort expended to obtain ID will be no greater than the effort expended in exercising the franchise itself. The evidence presented at trial shows that approximately 95% of registered Wisconsin voters will have no difficulty whatsoever voting under Act 23 because they already possess qualifying ID. For those that currently lack qualifying ID, Plaintiffs have not shown that these voters cannot get ID.

With regard to the Voting Rights Act claims, Plaintiffs have not proven their case. While their evidence shows that minorities are less likely than whites to currently possess qualifying ID, the evidence does not establish

that minorities cannot obtain qualifying ID or that they face different considerations than whites in obtaining qualifying ID. A mere disparity in current ID possession rates between whites and minorities is not enough to prove a Section 2 Voting Rights Act claim. Act 23, therefore, does not cause a prohibited discriminatory result that violates the Voting Rights Act.

With regard to constitutional claims, Plaintiffs have not carried their burden. The Supreme Court has repeatedly and consistently recognized the compelling State interests in detecting, deterring, and preventing voter fraud, bolstering voter confidence in the integrity of elections, and orderly election administration and recordkeeping. Act 23's voter photo ID requirement furthers these policy goals in a way that does not unnecessarily burden the rights of voters. The law is constitutional.

For all of the reasons argued in this brief, and based upon the evidence and arguments presented at trial, the Court should grant judgment to Defendants on all claims.

## BACKGROUND

I.     ACT 23's VOTER PHOTO IDENTIFICATION REQUIREMENT.

Prior to Act 23, an eligible Wisconsin elector voting in person or by absentee ballot was not required to present an identification document, other than proof of residence in certain circumstances. Instead, voters identified

2

themselves at the polls by stating their name and address. Under Act 23, an elector must present documentary proof of identification to vote in person or by absentee ballot. There are nine forms of acceptable photo identification, including a Wisconsin driver license or state identification card issued by the Wisconsin Department of Transportation ("DOT"). Wis. Stat. § 5.02(6m)(a)1., 2. The complete list of qualifying identification includes the following:

(a) One of the following documents that is unexpired or if expired has expired after the date of the most recent general election:

1. An operator's license issued under ch. 343.

2. An identification card issued under s. 343.50.

3. An identification card issued by a U.S. uniformed service.

4. A U.S. passport.

(b) A certificate of U.S. naturalization that was issued not earlier than 2 years before the date of an election at which it is presented.

(c) An unexpired driving receipt under s. 343.11.

(d) An unexpired identification card receipt issued under s. 343.50.

(e) An identification card issued by a federally recognized Indian tribe in this state.

(f) An unexpired identification card issued by a university or college in this state that is accredited, as defined in s. 39.30 (1) (d), that contains the date of issuance and signature of the individual to whom it is issued and that contains an expiration date indicating that the card expires no later than 2 years after the date of issuance if the

3

individual establishes that he or she is enrolled as a student at the university or college on the date that the card is presented.

Wis. Stat. § 5.02(6m)(a)-(f).

With certain exceptions,[1] Act 23 requires that an elector must present an acceptable form of photo identification to an election official, who must verify that the name on the identification conforms to the name on the poll list and that any photograph on the identification reasonably resembles the elector.[2] Wis. Stat. § 6.79(2)(a). If an elector does not have acceptable photo identification, the elector may vote by provisional ballot pursuant to Wis. Stat. § 6.97. Wis. Stat. § 6.79(2)(d) and (3)(b). The provisional ballot will be counted if the elector presents acceptable photo identification at the polling place before the polls close or at the office of the municipal clerk or board of election commissioners by 4 p.m. on the Friday after the election. Wis. Stat. § 6.97(3)(b). If an in-person voter presents photo identification bearing a name that does not conform to the voter's name on the poll list or a photograph that does not reasonably resemble the voter, that person may not vote. *Id.*

---

[1] *See* Wis. Stat. § 6.87(4)(a)-(b).

[2] Similar requirements apply to absentee voters. *See* Wis. Stat. § 6.86(1)(ar); Wis. Stat. § 6.87(1); Wis. Stat. § 6.87(4)(b)1.

4

To accommodate eligible electors who do not yet possess an acceptable photo identification and to ensure that no elector is charged a fee for voting, DOT is required by law to issue an identification card to such electors free of charge if the elector satisfies all other requirements for obtaining such a card, is a U.S. citizen who will be at least 18 years of age on the date of the next election, and requests that the card be provided without charge for purposes of voting. Wis. Stat. § 343.50(5)(a)3.

II.    STATE COURT PROCEEDINGS ENJOINING ACT 23.

On July 17, 2012, the photo identification requirement for voting created by Act 23 was permanently enjoined by the Dane County Circuit Court in *Milwaukee Branch of the NAACP, et al. v. Scott Walker, et al.*, Case No. 11-CV-5492 (Dane Co. Cir. Ct.) (Flanagan, J.), *hereinafter* "*NAACP.*" That decision was appealed to District II of the Wisconsin Court of Appeals, but the permanent injunction in *NAACP* remains in place.

In light of the injunction in *NAACP*, the Government Accountability Board ("GAB") has suspended all implementation of the photo identification requirement for voting and all public education and information campaigns associated with the requirement.

A related case, *League of Women Voters of Wisconsin Education Network, Inc., et al. v. Scott Walker, et al.*, Case No. 11-CV-4669

5

(Dane Co. Cir. Ct.) (Niess, J.), *hereinafter* "*League*," is also relevant. On March 12, 2012, the circuit court in *League* entered a permanent injunction enjoining Act 23's photo identification requirement. Defendants in *League* appealed to District IV of the Wisconsin Court of Appeals.

On appeal, Defendants in *League* prevailed. This resulted in reversal in their favor (with a remand to circuit court) and the *League* permanent injunction being lifted. *See League of Women Voters of Wisconsin Education Network, Inc. v. Walker*, 2013 WI App 77, ¶ 94, 348 Wis. 2d 714, 834 N.W.2d 393. Plaintiffs in *League* then appealed by filing a petition for review in the Wisconsin Supreme Court.

On November 20, 2013, the Wisconsin Supreme Court granted the petition for review in *League* and also took jurisdiction over the appeal in *NAACP*. The court has scheduled oral argument in both cases for February 25, 2014. The court set a briefing schedule in *League*, and the opening appellate brief is due on December 20, 2013. The defendants' response brief is due on January 17, 2014, and a reply brief is due 10 days after the filing of the response. The court has not ordered additional briefing in *NAACP*. The court is likely to issue decisions in *League* and *NAACP* by mid-July 2014.

6

The pending injunction in *NAACP* will impact this Court's decision making. However, if the Court intends to grant judgment to Defendants, it can do so now. A state court injunction based upon state law claims does not prevent the Court from resolving the federal law claims in *Frank* and *LULAC* in Defendants' favor. Defendants anticipate that if the Court is to rule in their favor, it will happen sooner rather than later because a federal judgment upholding Act 23 under federal law is not impacted by a pending state court injunction that is based upon only state law claims.

If the Court intends to grant judgment to the *Frank* or *LULAC* Plaintiffs—even as to only certain federal claims—it is unnecessary to do so now because the law is currently enjoined in state court under state law.

## ARGUMENT

These cases present some overlapping legal and factual issues and a few case-specific issues. Defendants are filing one brief for both cases. The overlapping issues and claims will be addressed first, followed by arguments separately relevant to *LULAC* and *Frank*.

I. **ARGUMENTS RELEVANT TO BOTH CASES.**

    A.    The State of Wisconsin's interests in a voter photo identification requirement are compelling.

The State of Wisconsin's interests in a voter photo identification requirement are compelling. The State's interests are that:

7

- a voter photo identification requirement will help detect, deter, and prevent in-person voter impersonation fraud;

- a voter photo identification requirement will deter and help detect other types of voter fraud because a voter intending to commit fraud will have to identify himself with an identification card at the poll;

- a voter photo identification requirement will promote public confidence in the integrity of the election process; and

- a voter photo identification requirement will promote orderly election administration and accurate recordkeeping.

The United States Supreme Court has recognized these compelling interests. In *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), the Court recognized the legitimacy and importance of the State's interests in preventing fraud, promoting orderly election administration and accurate recordkeeping, and safeguarding public confidence in the integrity of the election process. *Crawford*, 553 U.S. at 191-97 (opinion of Stevens, J.). The Court did not require the State to present evidence to justify those interests, but rather said:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method

8

of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

*Id.* at 196; *see also Burson v. Freeman*, 504 U.S. 191, 199 (1992) (observing that an important component of a State's compelling interest in regulating elections is "ensuring that an individual's right to vote is not undermined by fraud"). The Court has readily acknowledged the independent importance of the State's interest in promoting public confidence in the integrity of the electoral process. *Id.* at 197; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised."); *Eu v. San Francisco Cnty. Democratic Cent. Comm.,* 489 U.S. 214, 231 (1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process").

Other post-*Crawford* decisions in voter photo ID cases have recognized the same state interests with equal readiness. *See*, *e.g.*, *City of Memphis v. Hargett*, ___ S.W.3d ___, 2013 WL 5655807, *10-12 (Tenn. Oct. 17, 2013); *South Carolina v. United States*, 898 F.Supp.2d 30, 43-44 (D.D.C. 2012); *Democratic Party of Georgia, Inc. v. Perdue*, 707 S.E.2d 67, 75 (Ga. 2011);

9

*League of Women Voters of Indiana v. Rokita*, 929 N.E.2d 758, 767-69 (Ind. 2010); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1353-54 (11th Cir. 2009). After *Crawford*, the State's interests are not subject to debate.

Plaintiffs will argue that the State's interest in preventing voter fraud is not legitimate enough to justify a photo identification requirement because there is no evidence of recent instances of voter impersonation fraud in Wisconsin. That argument fails for a couple of reasons.

First, the argument has been specifically rejected in *Crawford* and *Common Cause/Georgia*. *See Crawford*, 553 U.S. at 191-97; *Common Cause/Georgia*, 554 F.3d at 1353-54. In particular, the Seventh Circuit's decision in *Crawford* pointed out that, in the absence of effective voter identification procedures, voter impersonation fraud is very difficult to detect. *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 953-54 (7th Cir. 2007), *aff'd* 553 U.S. 181 (2008).

The absence of prosecutions for voter impersonation fraud, therefore, does not compel the conclusion that such fraud does not occur. On the contrary, the alleged infrequency of prosecutions for voter impersonation fraud is equally consistent with either of two possibilities: (a) that such fraud does not occur, or (b) that such fraud occurs but goes undetected and,

10

therefore, unprosecuted. Referring to instances of so-called "stolen votes," Milwaukee County Assistant District Attorney Bruce Landgraf testified at trial that there are "normally one or two per major election that remain unexplained that no amount of inquiry seems to explain or unravel or solve." (Trial Transcript, Nov. 15, 2013, at 2057, ll. 7-25.) Thus, some potential voter impersonation fraud cases cannot be investigated and prosecuted.

In the absence of additional probative evidence, the infrequency of such prosecutions, without more, is insufficient to confirm that such fraud does not exist or that there is no legitimate and important interest in preventing potential fraud. Notably, the Supreme Court deemed such an interest valid despite the fact that the *Crawford* "record contain[ed] no evidence of any such fraud actually occurring in Indiana at any time in its history." *Crawford*, 553 U.S. at 194.

Moreover, even if voter impersonation fraud could be affirmatively shown to be rare in Wisconsin at the present time, history nonetheless shows such fraud to be a real and significant danger. The Supreme Court has expressly recognized that danger and has held that states have a legitimate and important interest in addressing it by imposing reasonable photo identification requirements that will prevent such fraud. *Crawford*, 553 U.S. at 195 (noting that "flagrant examples of such fraud in other parts of

11

the country have been documented throughout this Nation's history by respected historians and journalists" (footnote omitted)).

Constitutional principles do not require a state to wait until a particular type of voter fraud has become an unmanageable problem before it takes reasonable affirmative steps to prevent such fraud. The Supreme Court has held that legislatures may be proactive in their efforts to prevent fraud. In *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986), the Supreme Court held that legislatures "should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." As James Madison noted, men are not angels, and sound government must be structured in light of that realistic understanding. *See* The Federalist No. 51, at 322 (James Madison) (Clinton Rossiter ed., 1961). Elections provide the means to acquire political power, and history teaches that some people are willing to violate the law for such ends. States need not wait until after they have been robbed before locking the door.

Second, it is not true that photo identification requirements protect against *only* the type of fraud in which a would-be voter tries to impersonate another individual on the poll list. Photo identification requirements also

12

provide protections against unlawful voting under invalid voter registrations. For example, photo identification requirements will make it easier to identify and prevent unlawful voting by a registered voter who has subsequently been convicted of a felony or by a person who is not a United States citizen, but who has established residency in Wisconsin and has managed to register to vote in the past. Similarly, photo identification requirements will help to deter and prevent: (1) unlawful voting by registered Wisconsin voters who no longer maintain residency in this state but have not yet been removed from the poll list; and (2) unlawful double voting by individuals who register to vote in more than one state.

Voter fraud occurs in Wisconsin, and Act 23's voter photo identification requirement would help detect, deter, and prevent such fraud. Assistant District Attorney Landgraf testified about numerous recent convictions in Milwaukee County for other forms of election fraud, such as voting by a disqualified person and double voting. (Trial Transcript, Nov. 15, 2013, at 2046-56.) Copies of the criminal complaints in these cases were admitted into the trial record as Defendants' Trial Exhibits 1025, 1026, 1027, 1028, 1029, and 1030. These cases, too, would have been deterred by Act 23's voter photo identification requirement.

13

Therefore, even if it were proved that it is currently uncommon for one registered voter to impersonate another registered voter at the polls, the State would still have a legitimate and important interest in addressing the significant risk of these other forms of unlawful voting by requiring voters to provide proof of identification when they vote.

The State also has a legitimate and important interest in promoting public confidence in elections that will be furthered by a voter photo ID requirement. *Crawford*, 553 U.S. at 197. The Supreme Court noted:

> public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process. As the Carter–Baker Report observed, the "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters."

*Id.* (quoting National Commission on Federal Election Reform, *To Assure Pride and Confidence in the Electoral Process*, at 1618 (2002)); *see also Purcell*, 549 U.S. at 4 ("A State indisputably has a compelling interest in preserving the integrity of its election process").

The evidence at trial confirms that Wisconsin voters value the integrity of elections and do not want their votes stolen or threatened by fraud. (*See, e.g.*, Trial Transcripts, Nov. 5, 2013, at 436, ll. 10-25; *id.* at 528-30; Nov. 6, 2013, at 585, ll. 1-16; Nov. 7, 2013, at 861-62.) Plaintiffs' fact witnesses testified at trial and confirmed the obvious truth that, under the

14

existing procedures for obtaining a ballot in Wisconsin, it would not be difficult for someone to impersonate another registered voter, obtain a ballot, and vote in their place. For example, Raymond Ciszewski testified that "[i]f someone were really determined, there probably isn't a way to stop them." (Trial Transcript, Nov. 5, 2013, at 546, ll. 6-12.) Likewise, Sim Newcomb testified that it would not be difficult to walk up to the front desk of a polling place and say you are someone else to get a ballot: "I mean, anybody could do that. I could do that if I knew your name. So I imagine it is possible." (Trial Transcript, Nov. 7, 2013, at 850, ll. 15-17.)[3] Robert Spindell, Jr., a

---

[3]Unlike the lay voters that testified, the *LULAC* Plaintiffs' expert witness, Professor Lorraine Minnite, had difficulty understanding what the word "difficult" means in the context of stealing another person's vote:

A.    And by steal the vote you mean what, that they would – what do you mean by steal the vote?
Q.    Let me give you an example.
A.    Okay.
Q.    The person walks into the polling place, they state their name as Lynn Adelman, and they state that person's address, and they sign the poll book as Lynn Adelman, and then they get that ballot. Would that be difficult to do?
A.    I'm not sure. Again, you're asking me to respond to your definition of difficult and I'm thinking in my mind my definition of difficult. I think it would be very difficult for a lot of people to do something illegal.
Q.    But not procedurally difficult.
MR. EICHNER:    Objection. Asked and answered.
THE COURT:    Sustained.
MR. KAWSKI:    I will move on.

(Trial Transcript, Nov. 7, 2013, at 1069, ll. 8-23.)

long-time member of the City of Milwaukee Election Commission, also testified that it "would be extremely easy" to steal someone's vote if the voter photo ID law is not in place. (Trial Transcript, Nov. 15, 2013, at 2001, l. 4 through 2002, l. 9.) Having Act 23's voter photo identification requirement in place would "make it harder" for a person to commit voter fraud. (*Id. at* 2002, ll. 11-13.)

In our democratic system of governance, promoting public confidence in elections is an important good in its own right, without regard to whether the level of voter confidence can be correlated with the most recent turnout statistics or whether a change in voting procedures is made in response to actual convictions of in-person impersonation voter fraud. A state should not be required to postpone remedial action until voters have permanently given up on the voting process. Moreover, apart from any measurable increase in turnout, voter identification requirements advance the State's legitimate and important interest in promoting a healthy respect for democratic institutions, while furthering all of the policy goals already discussed.

B.     Mitigating factors in Act 23 bolster its validity.

Defendants' expert witness, University of Georgia Professor M. V. Hood III, testified that there are two important mitigating factors in Act 23. (*See* Trial Transcript, Nov. 12, 2013, at 1471-72.) Those mitigating

16

factors are DMV's free Wisconsin state ID card program and GAB's program to educate voters and election officials about Act 23. Both of these factors make adapting to Act 23's new requirements easier for voters and election officials.

       1.     DMV's free Wisconsin state ID card program.

Tens of thousands of Wisconsinites obtained free state ID cards for the purpose of voting from summer 2011 through the time of trial in late 2013. The table below illustrates the number of free state ID cards issued, based upon the evidence presented at trial:

| Number of free state IDs issued by DMV | Date of count | Evidentiary source |
|---|---|---|
| 79,170 | May 16, 2012 | Declaration of M.V. Hood III in *Frank*, Defendants' Trial Ex. 1003 at 18-19, ¶¶ 33-34 and Table 11. |
| 217,061 | October 31, 2013 | Trial Testimony of DMV's James Miller, Trial Transcript, Nov. 14, 2013, at 1814, ll. 19-25. |

In Milwaukee County alone, through September 2013 more than 74,000 voters obtained free state ID cards, and the majority of those voters were

minorities. The following table from Professor Hood's supplemental declaration illustrates:

Table 9. Racial/Ethnic Breakdown for Free State ID Cards Issued by Wisconsin DMV in Milwaukee County through September 2013

| Race/Ethnicity | Frequency | Percentage |
|---|---|---|
| White | 16,314 | 22.0% |
| Black | 47,651 | 64.4% |
| Hispanic | 8,365 | 11.3% |
| Asian | 932 | 1.3% |
| Indian | 767 | 1.0% |
| Total | 74,030 | 100% |

Source: Figures calculated by author from data provided by the Wisconsin DMV.

(Defendants' Trial Ex. 1001 at 19.)

To accommodate the increased demand for free state ID cards, in August 2011 DOT expanded both the number of DMV customer service center locations and the hours of available service. (Trial Transcript, Nov. 14, 2013, at 1806, l. 16 through 1811, l. 3.) There are 92 DMV customer service centers throughout Wisconsin offering about 32,000 hours of service to customers per year. (*Id. at* 1807, ll. 5-14.) In every county in the state there is now a DMV customer service center that is open at least 20 hours per week. (*Id. at* 1806, l. 20 through 1807, l. 2.) In Milwaukee County, there are now five permanent customer service centers, along with a driver license renewal center in downtown Milwaukee. (*Id. at* 1810, ll. 9-13.) The locations

18

of these service centers are illustrated in the maps found in Defendants' Trial Exhibits 1070 and 1071. Defendants' Trial Exhibit 1071 shows the current level of DMV customer service in Wisconsin. (*Id. at* 1810, ll. 6-8.)

DMV's free state ID card program is still in place, despite the fact that Act 23's photo identification requirement has been enjoined in state court. If the law were again in place, more voters would likely take advantage of the free ID program. Professor Hood testified "that those that didn't have an ID and needed to take advantage of the free ID program would, especially the closer we got to a general election scenario. So I think there would be more and more free IDs issued the closer one got to a general election scenario." (Trial Transcript, Nov. 12, 2013, at 1472, ll. 5-12.)

> 2. GAB's Act 23 educational programs and the Bring It to the Ballot campaign.

The second important mitigating factor in Act 23 is a requirement found in a non-statutory provision of the Act:

> (1) PUBLIC INFORMATIONAL CAMPAIGN. In conjunction with the first regularly scheduled primary and election at which the voter identification requirements of this act initially apply, the government accountability board shall conduct a public informational

19

campaign for the purpose of informing prospective voters of the voter identification requirements of this act.

2011 Wis. Act 23, § 144(1). Additionally, Wis. Stat. § 7.08(12), which was created by Act 23, requires GAB to reach out to voters that need assistance in obtaining or renewing ID:

> (12) ASSISTANCE IN OBTAINING PROOF OF IDENTIFICATION. Engage in outreach to identify and contact groups of electors who may need assistance in obtaining or renewing a document that constitutes proof of identification for voting under s. 6.79 (2) (a), 6.86 (1) (ar), or 6.87 (4) (b) 1., and provide assistance to the electors in obtaining or renewing that document.

With the assistance of a third-party contractor, GAB developed the Bring It to the Ballot public information campaign and revised its election official training materials in response to the Legislature's requirements. GAB training officer Allison Coakley testified at trial about the myriad ways in which GAB's public information campaign provided resources to prospective voters and election officials to educate them about the new voter photo identification requirement. (Trial Transcript, Nov. 14, 2013, at 1903-33.)

In her trial testimony, Ms. Coakley described and authenticated examples of some (but not all) of the training and outreach media and materials that GAB produced, such as:

- The Bring It to the Ballot website, *http://bringit.wisconsin.gov/*, (Defendants' Trial Exhibit 1053);

20

- A series of informational videos and Bring It to the Ballot public service announcements, (Defendants' Trial Exhibit 1054 (YouTube links to videos)), (Defendants' Trial Exhibit 1055 (a CD that includes a sample of the videos and a voter ID training session));

- A toll-free hotline for voters, (Defendants' Trial Exhibit 1056);

- Bring It to the Ballot posters, handbills, fliers, and pamphlets in English and Spanish, (Defendants' Trial Exhibits 1058-60);

- Bring It to the Ballot television and radio advertisements, (Defendants' Trial Exhibits 1063-64);

- Bring It to the Ballot resource guide, (Defendants' Trial Exhibit 1065);

- GAB's "Speaker's Bureau" PowerPoint slideshow, (Defendants' Trial Exhibit 1066); and

- 2011 training handouts from GAB WisLine Series educational programs for election officials, (Defendants' Trial Exhibits 1068-69).

Ms. Coakley's trial testimony and the exhibits illustrate the wide-ranging public education campaign that GAB created and implemented, but a few items warrant further discussion. The Bring It to the Ballot website assisted voters in determining whether they had a qualifying ID, explained how to get a free state ID card from DMV, helped voters locate the closest DMV location, and assisted voters in ascertaining whether there were any exceptions to the voter photo ID requirement that applied. (Trial Transcript, Nov. 14, 2013, at 1913-14.)

21

The Speaker's Bureau presentations that GAB staff gave to voters and election officials throughout Wisconsin in 2011 and 2012 were successful. Individuals and groups could make an online or telephone request to GAB to have GAB staff make an in-person presentation regarding Act 23's voter photo ID requirements. (Trial Transcript, Nov. 14, 2013, at 1921-22.) GAB completed more than 150 such presentations from September 2011 to March 2012, with over 2,000 participants attending, and this number does not include those who watched the Speaker's Bureau presentations online. (*Id. at* 1922, ll. 8-21.) GAB staff made presentations all over the state, from Alma, to Milwaukee, to Racine, to Madison, to Chippewa Falls. (*Id. at* 1923, l. 1.) Speaker's Bureau attendees could take with them a printed copy of an Act 23 resource guide, *i.e.*, Defendants' Trial Exhibit 1065, or they could access the document online. (*Id. at* 1926, l. 17 through 1927, l. 4.)

GAB also provided training to election officials throughout the state via WisLine Series telephone training sessions that were focused on the photo ID provisions of Act 23. (Trial Transcript, Nov. 14, 2013, at 1930, ll. 14-21.) Election officials called into a toll-free line for the presentations and received training materials from GAB, which are Defendants' Trial Exhibits 1068 and 1069. (*Id. at* 1930, l. 14 through 1931, l. 18.) The training sessions were well-attended, as approximately 600 participants called in for the first

22

program, and about 1,200 called in for the second. (*Id. at* 1931, ll. 22-24.) This number of participants does not include the number who may have listened to a recording of the presentation later. (*Id.*)

Finally, GAB paid for thousands of radio and television advertisements and public service announcements that were broadcast in early 2012 to inform the public about the requirements of Act 23. (Trial Transcript, Nov. 14, 2013, at 1924-26.) Defendants' Trial Exhibits 1063 and 1064 detail the number of ads that were purchased and broadcast.

GAB's outreach and education efforts were put on hold in March 2012 when Act 23's photo identification requirement was enjoined in state court. However, GAB could and would replicate and expand upon the success that its programs had already achieved in 2011 and 2012 if the law were again in effect.

<blockquote>C. Plaintiffs' claims under Section 2 of the Voting Rights Act fail.</blockquote>

Plaintiffs in *Frank* and *LULAC* both raise claims under Section 2 of the Voting Rights Act. Their claims fail. The failure is primarily due to the fact that Plaintiffs have not demonstrated that those minority voters that *currently* lack Act 23 ID can *never* get Act 23 ID. Merely demonstrating a

23

current disparity in possession rates of ID between white and minority voters is not enough to prove a Section 2 claim.

### 1. Legal standards.

Section 2 of the Voting Rights Act states, in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

42 U.S.C. § 1973(a).

A violation of Section 2 of the Voting Rights Act is established "if, based upon the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of a protected class, "in that its members have less opportunity than other members of the electorate [1] to participate in the political process and [2] to elect representatives of their choice." 42 U.S.C. § 1973(b). Thus, "a plaintiff can prevail in a section 2 claim only if, based on the totality of the circumstances, . . . the challenged voting practice results in discrimination on account of race." *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (*en banc*) (citations and internal quotation marks omitted) (*hereinafter "Gonzalez"*), *aff'd on unrelated*

*grounds*, *Arizona v. Inter Tribal Council of Arizona*, *Inc.*, 133 S. Ct. 2247 (2013).

There are two types of claims under Section 2 of the Voting Rights Act: vote denial claims and vote dilution claims. Professor Daniel Tokaji has described these distinct claims:

> [I]t is important to distinguish two analytically distinct types of Voting Rights Act cases: those involving vote denial and those involving vote dilution. "Vote denial" refers to practices that prevent people from voting or having their votes counted. Historically, examples of practices resulting in vote denial include literacy tests, poll taxes, all-white primaries, and English-only ballots. "Vote dilution," on the other hand, refers to practices that diminish minorities' political influence in places where they are allowed to vote. Chief examples of vote-dilution practices include at-large elections and redistricting plans that keep minorities' voting strength weak.

Daniel P. Tokaji, *The New Vote Denial: Where Election Reform Meets the Voting Rights Act*, 57 S.C. L. REV. 689, 691-92 (Summer 2006); *see also id.* at 718 ("Vote denial cases are different from vote dilution cases. The most obvious difference is that next-generation vote denial cases, like first-generation vote denial cases, mainly implicate the value of participation; by contrast, second-generation cases involving vote dilution mainly implicate the value of aggregation.").

The *LULAC* case involves a claim of vote denial under Section 2 of the Voting Rights Act. (*LULAC*, Dkt. #1 at 1 ("African Americans and Latinos are far more likely than other Wisconsin citizens to have their right to vote

25

denied or abridged by Act 23."); *id.* at ¶ 36 ("Act 23 is likely to disproportionately deny and abridge the rights of African American and Latino voters in Wisconsin to participate in the political process[.]").) Plaintiffs in *LULAC* assert that the practice of requiring a voter to show photo identification prior to receiving a ballot denies or abridges his or her right to vote.

The *Frank* case purports to pursue both vote denial and vote dilution claims under Section 2 of the Voting Rights Act. (*See Frank*, Dkt. #31, ¶¶ 182-94 (Counts 9 and 10 of the First Amended Complaint).) But, a vote dilution claim makes little sense when a change in voting procedures like a voter photo identification requirement is at issue. *See Simmons v. Galvin*, 575 F.3d 24, 29 (1st Cir. 2009) (distinguishing between vote denial and vote dilution claims and indicating that the former "refers to practices that prevent people from having their vote counted"). Furthermore, none of the evidence that the *Frank* Plaintiffs offered at trial establishes a vote dilution claim, and such claims are typically reserved for redistricting cases in the first place. *See, e.g.*, *Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998) (applying Section 2 of the Voting Rights Act to determine whether the City of Chicago's redistricting plan was valid). The vote denial

26

claim is the relevant claim for adjudication based upon the facts presented at trial.

Plaintiffs must establish causation to prove a vote denial claim. *Gonzalez*, 677 F.3d at 405 (citation omitted). "Although, proving a violation of § 2 does not require a showing of discriminatory intent, only discriminatory results, proof of a causal connection between the challenged voting practice and a prohibited discriminatory result is crucial." *Id.* (citations and internal quotation marks omitted). Demonstrated ID possession rate disparities between whites and minorities are not enough.

"[A] bare statistical showing of disproportionate *impact* on a racial minority does not satisfy the § 2 'results' inquiry." *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997) (emphasis in original); *see also Ortiz v. City of Philadelphia Office of the City Comm'rs*, 28 F.3d 306, 315 (3d Cir. 1994) (rejecting the contention that Pennsylvania's voter-purge statute violated Section 2 of the Voting Rights Act simply because more minority members than whites were inactive voters); *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1358-59 (4th Cir. 1989) (upholding Virginia's appointment-based school board system against a Section 2 Voting Rights Act challenge despite a statistical disparity between the percentage of blacks in the population and the percentage of

27

blacks on the school board); *Salas v. Sw. Tex. Junior College Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992) (rejecting a Section 2 Voting Rights Act challenge to an at-large voting system based exclusively on a statistical difference between Hispanic and white voter turnout); *Wesley v. Collins*, 791 F.2d 1255, 1262 (6th Cir. 1986) (rejecting a Section 2 Voting Rights Act challenge to Tennessee's felon-disenfranchisement law that rested primarily on the statistical difference between minority and white felony-conviction rates).

A Section 2 claim "based purely on a showing of some relevant statistical disparity between minorities and whites, without any evidence that the challenged voting qualification causes the disparity, will be rejected." *Gonzalez*, 677 F.3d at 405 (citation and internal quotation marks omitted). This approach applies to both vote denial and vote dilution claims. *Id.* at 405 n. 32. (citation omitted).

    2. Plaintiffs have not demonstrated that Act 23 causes a prohibited discriminatory result.

Plaintiffs' Section 2 Voting Rights Act claims in *Frank* and *LULAC* fail because Plaintiffs have not demonstrated that Act 23 causes a prohibited discriminatory result. While Plaintiffs have offered evidence through expert testimony and declarations that purports to establish that a number of

28

eligible African American and Latino voters do not *currently* possess a form of Act 23 qualifying ID, Plaintiffs have not demonstrated that these voters cannot obtain a qualifying ID. Plaintiffs have completed only one half of the analysis. They have tried to demonstrate that some voters currently lack a form of qualifying ID, but they have not demonstrated that these individuals are unable to *ever* obtain any form of qualifying ID. The trial evidence is insufficient to establish that point.

        a.      Professor Matt Barreto's expert opinion.

Consider, first, the expert opinion of the *Frank* Plaintiffs' expert witness, Professor Matt Barreto. Professor Barreto and his co-investigator, Professor Gabriel Sanchez, analyzed a telephone survey that was completed by a third-party contractor in late December 2011 through January 29, 2012, to determine possession rates of Act 23 qualifying ID only in Milwaukee County. (*Frank* Plaintiffs' Trial Ex. 600 at 14.) The survey also looked at whether Milwaukee County survey respondents possessed underlying documents necessary to obtain a free Wisconsin state ID card or Wisconsin driver license, such as a certified copy of a birth certificate or a Social Security card. (*Id.* at 20-24.)

Importantly, Professor Barreto did not study possession rates of qualifying ID for the entire State of Wisconsin. This is crucial because Act 23 applies statewide. Professor Barreto testified on cross-examination at trial:

> Q.  Is it true that you're not offering any expert opinion regarding ID possession rates outside of Milwaukee County?
>
> A.  Correct.
>
> Q.  In other words, your expert opinions are limited solely to Milwaukee County.
>
> A.  This report is only about Milwaukee County. Correct.
>
> Q.  And you did no analysis with regard to racial disparities of possession rates of ID or underlying documents outside of Milwaukee County.
>
> A.  That's correct.
>
> Q.  You don't know the racial disparities -- if you don't know if the racial disparities that you estimated for Milwaukee County would apply to places outside of Milwaukee County in the State of Wisconsin.
>
> A.  I did not analyze that, no.
>
> Q.  So is it fair to say you're not offering any expert opinion as to possession rates of either qualifying IDs or the underlying documents to obtain a qualifying ID in the State of Wisconsin?
>
> A.  I'm only offering them in Milwaukee County would be a way to say it, yes.

(Trial Transcript, Nov. 5, 2013, at 315.) Thus, while Professor Barreto offered opinions for Milwaukee County, his opinions are not helpful to resolving the Section 2 Voting Rights Act question in places outside of

30

Milwaukee County. His opinions do not provide any evidentiary basis whatsoever for this Court to enter judgment regarding Act 23 that would have statewide impact.

In addition to being geographically limited, Professor Barreto's survey data are stale. The survey was completed more than 21 months before trial. Professor Barreto could have replicated the survey in 2013 to get current estimates, but he did not. The result is an unreliable estimate.

In the intervening period between when the survey was completed in early 2012 and the time of trial, DMV's free Wisconsin state ID card program was in place. Wisconsinites took advantage of the program in droves. As addressed in Argument section I. B. 1. of this brief, many tens of thousands of voters obtained free state IDs for the purpose of voting from May 2012 to the time of trial in late 2013. By October 31, 2013, 217,061 Wisconsinites had obtained a free state ID card for voting. (Trial Transcript, Nov. 14, 2013, at 1814, ll. 19-25.) In Milwaukee County alone, through September 2013, more than 74,000 voters obtained free state ID cards from DMV, and the majority of those recipients were minorities. (Defendants' Trial Ex. 1001 at 19.) Professor Barreto's survey does not consider the reality of the continuing free state ID card program or how it impacted the accuracy and usefulness of his now-stale ID possession rate estimates.

31

Likewise, Professor Barreto's survey does not compensate for the fact of the November 2012 General Election. While Act 23's voter photo ID requirement was enjoined for that election, it is not hard to fathom that voter behavior regarding obtaining Act 23 ID was impacted because the voter photo ID requirement *could have* gone into effect for that election. Wise voters would have obtained qualifying ID in case it became required to vote.

Professor Barreto also did not update his survey estimates based upon current census data; the census data he used to "weight" his survey were from 2010, yet 2012 census data were available. (Trial Transcript, Nov. 5, 2013, at 317, l. 17 through 318, l. 1.) Again, Professor Barreto neglected to update his survey to make it a current estimate.

Most importantly, Professor Barreto's survey did not ask *any* questions regarding whether respondents could get or tried to get a qualifying ID or a certified copy of their birth certificates. (Trial Transcript, Nov. 5, 2013, at 316-17); (*Frank* Plaintiffs' Trial Ex. 600 at 44-50 (the survey instrument).) The survey covered only current possession rates of qualifying ID and the underlying documents necessary to obtain ID from DMV. It did not evaluate whether respondents had tried to get ID or underlying documents, or

32

whether they could do so. Professor Barreto confirmed the point on cross-examination:

> Q. Just because someone's currently not in possession of a birth certificate doesn't mean that they can't ever get it, correct?
>
> A. Correct.
>
> Q. And so you're not offering any opinion about the ability or not ability of survey respondents to obtain a birth certificate.
>
> A. No, we're not offering that in this report.
>
> Q. And you're not offering any expert opinion regarding not only about the respondents, but you're not offering any estimate about whether people in Milwaukee County could or could not get a birth certificate.
>
> A. That was not part of the study.
>
> Q. You're also not offering any expert opinion about whether anyone in the entire State of Wisconsin could or could not get a birth certificate.
>
> A. No.

(Trial Transcript, Nov. 5, 2013, at 317.) Thus, while Professor Barreto's survey estimated late 2011/early 2012 possession rates of Act 23 ID and some of the underlying documents needed to get ID, the survey is not a useful tool to determine whether those who lacked ID *then* cannot get an ID *now*. His survey did not ask the right questions about whether respondents were able to obtain or tried to obtain qualifying ID or underlying documents; it asked only whether respondents *currently possessed* ID or underlying documents.

33

Professor Hood pointed out at trial that Professor Barreto's survey analysis is somewhat misleading because it does not consider that survey respondents that had a qualifying ID in the past might be able to obtain such ID again. Professor Hood testified about analysis that he completed in his initial *Frank* expert report regarding the fact that a very small percentage of survey respondents have never held a form of qualifying ID *and* lack the underlying documents necessary to obtain an ID.

Professor Hood testified that, based upon Professor Barreto's own Milwaukee County survey data, 97.4% of survey respondents have Act 23 ID, have expired Act 23 ID, or previously held a state ID card or Wisconsin driver license. (Trial Transcript, Nov. 12, 2013, at 1457, l. 25 through 1458, l. 16.). Table 6 from his *Frank* expert report illustrates this point:

Table 6. Survey Respondents with Valid ID, Expired ID, or Who Have Previously Held a State ID or Driver's License

|  | Valid, Expired, or Previous ID | None |
|---|---|---|
| White | 98.5% | 1.5% |
| Black | 95.7% | 4.3% |
| Latinos | 94.5% | 5.5%[**] |
| All Respondents | 97.4% | 2.6% |

Source: Figures calculated by author from data provided from Barreto expert report. Row percentage presented with weighted frequency counts in brackets. [***]P<.001; [**]p<.01; [*]p<.05; [‡]p<.10

34

(Defendants' Trial Ex. 1003 at 14, Table 6.) Likewise, only 3.1 percent of respondents have no valid Act 23 ID and no birth certificate. (Trial Transcript, Nov. 12, 2013, at 1457, ll. 12-20). Table 8 from Professor Hood's *Frank* expert report illustrates:

Table 8. Percentage of Racial/Ethnic Groups Lacking Proof of Name/Birth or Valid Act 23 ID

|  | No Valid ID or Birth Documentation | Valid ID or Birth Documentation |
|---|---|---|
| White | 2.1% [26] | 97.9% [1,232] |
| Black | 4.6%[**] [22] | 95.4% [461] |
| Hispanic | 6.1%[**] [10] | 93.9% [154] |
| All Respondents | 3.1% [61] | 96.9% [1,925] |

Source: Figures calculated by author from data provided from Barreto expert report. Row percentage presented with weighted frequency counts in brackets. [***]P<.001; [**]p<.01; [*]p<.05; [‡]p<.10

(Defendants' Trial Ex. 1003 at 16, Table 8.) Based upon Professor Barreto's survey data, Professor Hood calculated that only .25% of all respondents had no qualifying Act 23 ID and no proof of identity documentation.

35

(Trial Transcript, Nov. 12, 2013, at 1458, l. 19 through 1459, l. 11.) Table 10 of Professor Hood's *Frank* report illustrates:

Table 10. Percentage of Racial/Ethnic Groups Lacking Proof of Identity or Valid Act 23 ID

| | No Valid ID or Identity Documentation | Valid ID or Identity Documentation |
|---|---|---|
| White | .40% [5] | 99.6% [1,254] |
| Black | 0% [0] | 100.0% [483] |
| Hispanic | 0% [0] | 100.0% [163] |
| All Respondents | .25% [5] | 99.7% [1,981] |

Source: Figures calculated by author from data provided from Barreto expert report. Row percentage presented with weighted frequency counts in brackets. ***P<.001; **p<.01; *p<.05; +p<.10

(Defendant's Trial Ex. 1003 at 18, Table 10.)

Professor Barreto did not complete any of the above analysis, although he could have based upon his own survey data for Milwaukee County. (*See* Trial Transcript, Nov. 12, 2013, at 1456, l. 15 through 1459, l. 21.)

In sum, Professor Barreto could and should have completed a statewide survey of qualifying ID possession rates. He could have replicated his survey in 2013 to demonstrate current possession rates. He could have asked questions in his survey about respondents' attempts or ability to procure qualifying ID or certified copies of birth certificates and other underlying

36

documents needed to obtain qualifying ID.  He did none of these things.  His expert opinions are of little value in resolving Section 2 Voting Rights Act claims because Professor Barreto did not answer the pertinent question: Can those eligible voters that currently lack Act 23 ID, nonetheless, obtain Act 23 ID?

### b.    Leland Beatty's expert opinion.

Next, consider the opinion of the *LULAC* Plaintiffs' expert witness, Leland Beatty.  Unlike Professor Barreto, Mr. Beatty did not complete a survey.  Instead, like Professor Hood, he matched GAB and DMV databases to determine the number of Wisconsin residents who currently possess a Wisconsin driver license or state ID card.  Unlike Professor Barreto's survey, Mr. Beatty's analysis looked at two forms of Act 23 ID alone and did not analyze the remaining forms of qualifying ID.  (Trial Transcript, Nov. 6, 2013, at 710, l. 17 through 712, l. 4.)  Also, unlike Professor Barreto's survey, Mr. Beatty's analysis did literally *no analysis* regarding possession rates of birth certificates or other underlying documents necessary to obtain qualifying ID from DMV.  (*Id. at* 712, ll. 5-9.)  Mr. Beatty simply did not study whether Wisconsinites had or will have any difficulty obtaining qualifying ID or underlying documents to get ID.

37

While Mr. Beatty's analysis was more current than Professor Barreto's and focused on statewide possession rates of some qualifying IDs, it failed to answer the basic question necessary to resolve the Section 2 claims: Can those that currently lack Act 23 ID, nonetheless, obtain Act 23 ID? Mere statistics regarding racial disparities in current possession rates of some forms of ID are not enough to prove a Section 2 claim. *Gonzalez*, 677 F.3d at 405. Plaintiffs had to close the loop and demonstrate that minorities will not be able to get ID cards to establish that Act 23 causes a prohibited discriminatory result in violation of the Voting Rights Act. They have not done so.

Mr. Beatty's expert opinions show a trend toward greater rates of possession of driver licenses and state ID cards. In April 2012, his opinion was that 11.1% of registered voters in Wisconsin (360,387 voters) lacked a Wisconsin driver license or state ID card. At trial, he offered estimates that currently 8.8% of registered Wisconsin voters (295,796 voters) lack a Wisconsin driver license or state ID card. The following tables summarize his estimates.

38

April 2012 (*LULAC* Plaintiffs' Trial Ex. 2 at ¶ 45):

| Registered Voters by Race, With Count Not Matching Driver's License or State ID, and Race Share Without Matching Driver's License or State ID | | | | | |
|---|---|---|---|---|---|
| Race | Registered Voters | Share of All Voters | Voters Without Matching Driver's License or State ID | Share of All Unmatched Voters | Share of Race Without Matching Driver's License or State ID |
| ASIAN | 37,597 | 1.2% | 5,929 | 1.6% | 15.8% |
| BLACK | 172,251 | 5.3% | 27,938 | 7.8% | 16.2% |
| HISPANIC | 51,974 | 1.6% | 12,879 | 3.6% | 24.8% |
| INDIAN | 15,519 | 0.5% | 872 | 0.2% | 5.6% |
| OTHER | 32,373 | 1.0% | 32,373 | 9.0% | 100.0% |
| WHITE | 2,945,663 | 90.5% | 280,396 | 77.8% | 9.5% |
| Total | 3,255,377 | 100.0% | 360,387 | 100.0% | 11.1% |

October 2013 (*LULAC* Plaintiffs' Trial Ex. 817 at ¶ 9):

| License and State ID Records, by Race | | | | |
|---|---|---|---|---|
| Race | Total Voters | Total Voters Matched to DL / ID Record | Total Unmatched to DL / ID Record, Race Identified | Share of Race Without Matching DL / ID |
| ASIAN | 44,310 | 38,919 | 5,391 | 12.2% |
| BLACK | 199,398 | 176,519 | 22,879 | 11.5% |
| HISPANIC | 62,490 | 50,498 | 11,992 | 19.2% |
| INDIAN | 17,934 | 16,797 | 1,137 | 6.3% |
| WHITE | 3,049,615 | 2,795,218 | 254,397 | 8.3% |
| Total | 3,373,749 | 3,077,953 | 295,796 | 8.8% |

Accepting the racial breakdowns in Mr. Beatty's analysis at face value, one can observe a trend toward greater driver license and state ID possession rates for minorities. For blacks, the share of those without one of those two

39

forms of ID dropped from 16.2% to 11.5%. For Hispanics, the number dropped from 24.8% to 19.2%.

Professor Hood also observed a trend in increased driver license and state ID card possession rates, both throughout Wisconsin and in Milwaukee County. The tables below, from his supplemental declaration, illustrate:

Table 5. Summary of ID Possession Estimates of Wisconsin Registrants

| | Previous Estimates[6] (April 2012) | Current Estimates (September 2013) | Difference |
|---|---|---|---|
| Registrants without a Driver's License or State ID–Criteria B Match | 9.43% [306,894] | 7.20% [244,560] | (-)2.23% |
| Registrants–No State ID Number in Registration Database or Criteria B Match | 6.15% [200,069] | 4.93% [167,351] | (-)1.22% |
| Total Active Registrants | 3,255,378 | 3,395,695 | (+)140,317 |

**Table Notes:**
Frequency counts in brackets. Registration figures are not estimates.
Criteria B: Includes any registrant matched by Driver's License/State ID number match or any registrant matched by name and DOB in Match B

(Defendants' Trial Ex. 1001 at 11, Table 5.) Professor Hood currently estimates that 4.93% of registered Wisconsin voters (167,351 voters) lack a state ID card or Wisconsin driver license. (*Id.*)

40

Table 8. Summary of ID Possession Estimates of Milwaukee County Registrants

| | Previous Estimates[15] (April 2012) | Current Estimates (September 2013) | Difference |
|---|---|---|---|
| Registrants without a Driver's License or State ID–Criteria B Match | 12.61% [63,527] | 9.51% [51,724] | (-)3.30% |
| Registrants–No State ID Number in Registration Database or Criteria B Match | 9.15% [46,101] | 7.11% [38,661] | (-)2.04% |
| Total Active Registrants | 503,676 | 543,648 | (+)39,972 |

**Table Notes:**
Frequency counts in brackets. Registration figures are not estimates.
Criteria B: Includes any registrant matched by Driver's License/State ID number match or any registrant matched by name and DOB in Match B

(Defendants' Trial Ex. 1001 at 18, Table 8.)

In sum, both Professor Hood and Mr. Beatty seem to agree that there is a trend toward greater rates of Wisconsin driver license and state ID card possession in Wisconsin from 2012 to the time of trial.

But, there is a hole in Mr. Beatty's work. His database matching analysis alone could not discern the racial breakdown of those in Wisconsin that lack a driver license or state ID card.[4] A Section 2 Voting Rights Act claim focuses not generically on how changes in voting procedures impact all

---

[4]In fairness, Professor Hood's analysis also did not estimate the racial breakdown of those registered voters in GAB's Statewide Voter Registration System ("SVRS") database that lack a driver license or state ID card. The database does not include the race or ethnicity of voters. (*See* Trial Transcript, Nov. 12, 2013, at 1470, l. 25 through 1471, l. 8.)

41

voters, but instead on how changes in voting procedures impact *minority* voters. *See* 42 U.S.C. § 1973(a) ("No voting . . . procedure shall be imposed or applied . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color"). Thus, since GAB's SVRS data did not include fields regarding a voter's race, Mr. Beatty's analysis could not produce an expert opinion regarding the race of the voters who he determined lacked a driver license or state ID card. Mr. Beatty needed help.

Enter Ethnic Technologies. Mr. Beatty gave his list of unmatched voters and their personal identifying information to Ethnic Technologies to have the firm apply its proprietary method to determine the voters' races. Mr. Beatty based his racial estimates on what Ethnic Technologies sent back to him. But, Ethnic Technologies' methods are not reliable.

Professor Hood testified that because Ethnic Technologies' methods are both proprietary and undeterminable that they would not pass muster in the field of social science. He testified:

A.   Well, [Mr. Beatty] took a list of nonmatched registrants that he had created and sent that list to a firm called Ethnic Technologies for them to do some matching or try to do some matching on race and ethnicity.

Q.   In the social sciences is it common to see someone not setting forth the methodology that was used to complete that kind of analysis?

42

A.  No, I don't think it's common, and it would be heavily criticized if someone attempted to do that. You know, verification and validation of data analysis is very important in the sciences period.

(Trial Transcript, Nov. 12, 2013, at 1460, ll. 15-25.)  The main point is that Ethnic Technologies' methodology cannot be tested in any meaningful way because it is a secret.  (*See id.*, 1590, l. 25 through 1591, l. 12.) Ethnic Technologies' work for the *LULAC* Plaintiffs is a mystery, a black box. Mr. Beatty gave Ethnic Technologies some data, and he got some data back. We do not know what specifically Ethnic Technologies did to process the data in 2012 and 2013.

The *LULAC* Plaintiffs' efforts to explain Ethnic Technologies' methodology for determining the races of Wisconsin voters were insufficient. The best they could do was offer the testimony of someone who last worked for Ethnic Technologies in 2007.  John Mas had no knowledge of what work Ethnic Technologies did to analyze the data that Mr. Beatty provided to Ethnic Technologies in 2012 and 2013.  The Court has no evidence before it to determine whether Ethnic Technologies' work for the *LULAC* Plaintiffs was reliable because we do not know what Ethnic Technologies did in *this* case to *these* data sets, or how they did it.  We can only guess based upon the limited description that Mr. Mas could provide of an otherwise secret method.

43

Ethnic Technologies' secret method of determining race would not be acceptable in social science, and it certainly should not be accepted as reliable in federal court. Even an article that the *LULAC* Plaintiffs offered to prop up the reliability of Ethnic Technologies' method reported that the method misclassified 52 percent of self-reported black participants as white. (*LULAC* Plaintiffs' Trial Ex. 212 at 5); (*see also* Trial Transcript, Nov. 6, 2013, at 737, l. 4 through 738, l. 10.) A coin flip would be about as reliable.

If the *LULAC* Plaintiffs wanted to establish by evidence the science behind Ethnic Technologies' work for Mr. Beatty, they should have hired an expert witness from Ethnic Technologies, timely disclosed that expert witness to Defendants, and offered expert opinions at trial regarding what Ethnic Technologies did to process Mr. Beatty's 2012 and 2013 data. Mr. Beatty himself indicated that the *LULAC* Plaintiffs were in need of expert testimony to establish the credibility of Ethnic Technologies' work. He testified at trial to an e-mail, Defendants' Trial Exhibit 1105, that he wrote in June 2012:

> Q. Is this document an e-mail string between Karen Sinisi [of Ethnic Technologies] and you from June of 2012?
>
> A. Yes, it is.
>
> Q. In the middle of the page did you write in this e-mail: *We really need an expert witness who can establish the credibility of your*

44

*analytics. We will pay. We don't expect the expert witness to take sides, only to establish the reliability of the data.*

> Did you write that?

A.     I did.

Q.     Have you found this expert witness who can establish the credibility of your analytics?

A.     I'm not really qualified to define "expert witness." I used those words. I have no idea what the qualifications of an expert witness is, and it may have been inappropriate for me to use those words. What I was looking for was something in response to the State of Wisconsin, who questioned this.

(Trial Transcript, Nov. 6, 2013, at 727, ll. 1-18 (emphasis added).)

The *LULAC* Plaintiffs did not offer expert testimony as to the science, methodology, or reliability of the proprietary process that Ethnic Technologies used in 2012 and 2013 in this case, and the Court in fact held that Mr. Mas could not offer any expert testimony. (Trial Transcript, Nov. 6, 2013, at 593, ll. 13-17 ("You know, testimony about whether what Ethnic Technologies does is scientifically valid or something like that, that's not okay. I mean, you can't go into generalized principles, you can't explain scientific principles, or he can't offer opinions based on specialized knowledge.").) If the Court considers Mr. Mas an expert in the proprietary method that Ethnic Technologies applied to Mr. Beatty's data in 2012 and 2013, that would be an error.

45

It would also be an error for the Court to consider Mr. Mas knowledgeable about the process that Ethnic Technologies applied to Mr. Beatty's 2012 and 2013 data. Mr. Mas testified at trial:

> Q. Before you testified during our argument one of the things Mr. Foster said is that Mr. Mas has no knowledge of what Ethnic did with Leland Beatty's data. Did you hear him say that?
>
> A. Yes, I did.
>
> Q. Did you agree with that?
>
> A. 100 percent.

(Trial Transcript, Nov. 6, 2013, at 614, ll. 7-12.) Mr. Mas does not know what Ethnic Technologies did to process Mr. Beatty's data in this case. He cannot verify the accuracy of Ethnic Technologies' methodology.

We do not know what Ethnic Technologies did to process Mr. Beatty's data. Mr. Beatty's expert opinions as to the racial breakdown of those voters who he determined lack a driver license or state ID card, which are based upon unsubstantiated and unverified methods, are not reliable. With no racial breakdown to rely upon, it is impossible for the *LULAC* Plaintiffs to prove their Section 2 case.

Finally, Mr. Beatty did *no analysis* regarding possession rates of birth certificates or other underlying documents necessary to obtain qualifying ID from DMV. Mr. Beatty simply did not study whether Wisconsinites have had

46

or will have any difficulty obtaining qualifying ID or the underlying documents necessary to get ID.

To summarize: Plaintiffs have offered evidence purporting to establish a statistical disparity between white and minority voters in rates of possession of Wisconsin driver licenses, state ID cards, and other qualifying IDs. But, that is not enough to prove their Section 2 claim. *Gonzalez*, 677 F.3d at 405. Plaintiffs have not demonstrated that eligible African American and Latino voters are unable to obtain qualifying ID. Without that additional showing, Plaintiffs cannot demonstrate that Act 23 causes a prohibited discriminatory result, which is necessary to prove their Section 2 claim. *Id.* There is insufficient evidence to suggest that implementation of Act 23 will produce any racially disparate impact on the ability of minorities in Wisconsin to fully participate in the electoral process. (Trial Transcript, Nov. 11, 2013, at 1470, l. 13 through 1471, l. 8.); (Defendants' Trial Ex. 1001 at 20); (Defendants' Trial Ex. 1002, ¶¶ 31, 40); (Defendants' Trial Ex. 1003, ¶¶ 18-19.) Plaintiffs' Section 2 claim fails.

47

3. A "totality of circumstances" analysis based upon the so-called "Senate Factors" does not indicate that Act 23 violates Section 2 of the Voting Rights Act.

The *LULAC* Plaintiffs state a Section 2 vote denial claim. Yet, they and the *Frank* Plaintiffs believe that the Court should weigh a set of "Senate Factors," as they are known, which are typically used to evaluate the "totality of circumstances" for a claim of vote dilution. *Thornburg v. Gingles*, 478 U.S. 30 (1986). Specifically, the Supreme Court has indicated that these "factors will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims." *Gingles*, 478 U.S. at 45.

Whether the Senate Factors play any part in the analysis of a vote denial claim is doubtful. Even the *LULAC* Plaintiffs have acknowledged that addressing the Senate Factors is "not required to prove a Section 2 vote denial claim." (*LULAC*, Dkt. #20 at 30.) Professor Daniel Tokaji distinguishes vote denial and vote dilution claims and explores the reasons why some of the factors that would be considered in a vote dilution case (such as a redistricting case) would not be pertinent to the analysis in a vote denial case:

> Whatever dangers of proportional representation exist in applying a disparate-impact standard to vote dilution cases, they do not exist at all in vote denial cases. For example, allowing a plaintiff to make a prima facie against a voter ID law by showing the law has a more severe effect on black voters than on white voters is a far cry from

48

requiring proportional representation. Thus, the concerns that led Congress to avoid a simple disparate-impact standard in vote dilution cases are not germane to vote denial claims.

Tokaji, *supra*, 57 S.C. L. Rev. at 722-23; *see also Simmons*, 575 F.3d at 29 (distinguishing vote denial and dilution claims, indicating that the former "refers to practices that prevent people from having their vote counted").

Circuit Judge Richard Posner may have best described the limited utility that the Senate Factors provide in evaluating the totality of circumstances in a Section 2 claim:

> Section 2 unfortunately provides no guidance on how to balance the factors and thus determine whether a challenged plan needlessly impairs a minority group's voting power. The statute tells the courts to consider "the totality of circumstances," and that has turned out to be, if anything, worse than useless advice, as it has discouraged the Supreme Court from trying to particularize the standard. *Johnson v. De Grandy,* 512 U.S. 997, 1017-21, 114 S.Ct. 2647, 2659-62, 129 L.Ed.2d 775 (1994).

*Barnett*, 141 F.3d at 702. Further confounding the Senate Factors analysis, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles,* 478 U.S. at 45, (quoting S.Rep. No. 97–417, at 29, *reprinted in* 1982 U.S.C.C.A.N. at 209) (internal quotation marks omitted).

This Court should not focus on the Senate Factors to analyze Plaintiffs' Section 2 vote denial claims. This is not a redistricting case centered on a claim of vote dilution like *Gingles*. Many of the Senate Factors have nothing

49

to do with a change in voting procedures to require photo identification. But, for the sake of completeness, this brief will respond to the Senate Factors.

In evaluating the totality of the circumstances in a Section 2 Voting Rights Act vote dilution claim, "a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'" *Gingles*, 478 U.S. at 44 (quoting S.Rep. No. 97-417, at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 205). In *Gingles*, the Supreme Court cited a list of nine factors (generally referred to as the "Senate Factors" because they were discussed in the Senate Report on the 1982 amendments to the Voting Rights Act) that courts should consider in making this totality of the circumstances assessment. *Id.* at 44-45. Those factors were stated by the Court:

> The Senate Report specifies factors which typically may be relevant to a § 2 claim: [1] the history of voting-related discrimination in the State or political subdivision; [2] the extent to which voting in the elections of the State or political subdivision is racially polarized; [3] the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; [4] the exclusion of members of the minority group from candidate slating processes; [5] the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; [6] the use of overt or subtle racial appeals in political campaigns; and [7] the extent to which members of the minority group have been elected to public office in the jurisdiction. *Id.,* at 28-29; see also *supra,* at ----. The Report notes also that evidence demonstrating that [8] elected officials are unresponsive to the

50

particularized needs of the members of the minority group and [9] that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value.

*Id.* at 44-45 (brackets added). The Senate Factors are each addressed below.

a.    Senate Factors One and Three.

Senate Factor One requires an analysis of "the history of voting-related discrimination in the State or political subdivision[.]" *Gingles*, 478 U.S. at 45. Senate Factor Three requires an analysis of "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting[.]" *Id.* Plaintiffs have not made a convincing showing as to these Senate Factors.

Plaintiffs highlighted two examples of allegedly discriminatory voting practices in Wisconsin. (*See LULAC* Plaintiffs' Trial Ex. 811 at 4-5, ¶¶ 14-18.) The first example is an obsolete Wisconsin registration requirement applicable only to those voters who lived in counties with over 5,000 residents. (*Id.*, ¶¶ 16-17.) This requirement is not relevant to the Court's analysis because the Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. §§ 15301-15545, now requires a SVRS. Wisconsin's compliance with the HAVA SVRS requirement occurred in 2006. Registration is now

51

required for voters throughout Wisconsin, not just for those voters who live in counties with over 5,000 residents.

The second example of an allegedly discriminatory voting practice in Wisconsin that Plaintiffs cite is that Spanish language ballots were not provided in Milwaukee County until February 2012. (*LULAC* Plaintiffs' Trial Ex. 811 at 5, ¶ 18.) This isolated example hardly establishes what the *LULAC* Plaintiffs' expert witness, Professor Barry Burden, characterized as a "long history of election practices that facilitate discrimination." (*Id.* at 4, ¶ 14.) Plaintiffs have made a weak showing as to Senate Factors One and Three.

### b.   Senate Factors Two and Six.

Senate Factor Two requires an analysis of "the extent to which voting in the elections of the State or political subdivision is racially polarized[.]" *Gingles*, 478 U.S. at 45. Senate Factor Six requires an analysis of "the use of overt or subtle racial appeals in political campaigns[.]" *Id.* In *Gingles*, the Supreme Court referred to racial polarization as "a consistent relationship between [the] race of the voter and the way in which the voter votes," or where "black voters and white voters vote differently." *Gingles*, 478 U.S. at 53 n. 21 (internal quotation marks omitted; bracket in original). The Seventh Circuit has also observed that racially polarized voting under

52

this factor of the analysis means "that members of various racial or ethnic groups have a strong preference for a candidate that belongs to their group[.]" *Barnett*, 141 F.3d at 702.

Plaintiffs relied upon examples of allegedly racially polarized voting in Wisconsin, citing primarily the voting patterns observed during the recent major presidential and statewide elections. (*LULAC* Plaintiffs' Trial Ex. 811 at 3-4, ¶¶ 10-13.) Notably, the 2008 and 2012 presidential elections included an African American candidate on the Democratic presidential ticket, with strong African American voting support in Wisconsin for that candidate. (*Id.*, ¶ 11.) Under Senate Factor Two, there is some evidence of racially polarized voting in Wisconsin.

With regard to Senate Factor Six, Plaintiffs point to the "Reuben Lee Mitchell" TV ad run against incumbent Wisconsin Supreme Court Justice Louis Butler, Jr. in 2008 and a 2006 gubernatorial campaign ad criticizing "illegal aliens" who were taking advantage of government programs providing public assistance. (*See LULAC* Plaintiffs' Trial Ex. 811 at 12-13, ¶¶ 44-48.) Plaintiffs' also relied upon the existence of billboards proclaiming that voter fraud is a felony that were displayed in the Milwaukee metropolitan area during the 2012 presidential election cycle. (*LULAC* Plaintiffs' Trial Ex. 811 at 13, ¶ 50; *Frank* Plaintiffs' Trial Ex. 578 at 38-39.) Plaintiffs' "evidence"

53

with regard to Senate Factor Six is scant, and the ads and billboards Plaintiffs addressed at trial are subject to interpretation and debate regarding their merits and whether they were even "racial appeals."

*Frank* expert Professor Marc Levine also offered evidence at trial regarding "coded" racial issues, such as Governor Tommy Thompson's push for welfare reform and the debate over the construction of light-rail in the Milwaukee region. (*Frank* Plaintiffs' Trial Ex. 578 at 34-36.) Professor Hood responded to these examples in his *Frank* expert report:

> I should note that while these types of issues can contain a race-related component, there can also be completely race-neutral reasons for supporting or opposing these types of issues. For example, someone may favor welfare reform because they are generally fiscally conservative or do not favor government spending in this area. Likewise, someone could oppose the expansion of public transportation on grounds that are race-neutral such as opposition to expanded taxation to fund such projects. It should be noted that Wisconsin's welfare reform was heavily relied on as a model for the Comprehensive Welfare Reform Act passed by Congress in 1996.

(Defendants' Trial Ex. 1003 at 9, ¶ 16.)

The isolated examples cited by Plaintiffs for Senate Factor Six cannot be viewed as typical of Wisconsin politics.

### c. Senate Factor Four.

Senate Factor Four requires an analysis of "the exclusion of members of the minority group from candidate slating processes[.]" *Gingles*,

54

478 U.S. at 45.    Plaintiffs offered no evidence at trial in support of Senate Factor Four.

> d.    Senate Factor Five.

Senate Factor Five requires an analysis of "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process[.]"  *Gingles*, 478 U.S. at 45. Relying upon the opinions of Professors Burden and Levine, Plaintiffs' position as to Senate Factor Five can be summarized as follows:

> In summary with regard to Senate Factor Five, Wisconsin displays substantial and enduring racial disparities in areas such as education, income, employment, criminal justice, and health. These disparities are frequently larger than those in the rest of the United States. These are highly relevant to Section 2 analysis because demographic markers are strongly associated with the likelihood of an individual being deterred from voting by a new and burdensome voting practice. Because they bear the effects of discrimination in these areas, Blacks and Latinos in Wisconsin are more likely than Whites to be deterred from voting by the additional burdens imposed by Act 23.

(*LULAC* Plaintiffs' Trial Ex. 811 at 11, ¶ 41.)

With regard to Senate Factor Five, Plaintiffs' trial evidence paints a misleading picture that illustrates how detached this factor is from the Section 2 Voting Rights Act "results" inquiry.  The Court's focus should be on whether Act 23's photo identification requirement causes a prohibited discriminatory result, not on whether minorities face diminished

55

socioeconomic conditions in Wisconsin or Milwaukee County generally. Senate Factor Five is not a useful proxy to determine whether Act 23 is valid under the Voting Rights Act because it has virtually nothing to do with whether minorities face differing circumstances in complying with a law that requires one to show a photo ID to obtain a ballot at the poll.

The focus should be on whether Act 23 causes a prohibited discriminatory result. Even if minority groups in Wisconsin disproportionately *lack* qualifying ID, Plaintiffs have offered no conclusive evidence to show that these groups are unable to *obtain* qualifying ID. Plaintiffs have not shown that alleged discrimination against minority groups and alleged differing socioeconomic conditions have in fact *resulted in* these groups' inability to obtain Act 23 ID. Plaintiffs must demonstrate that Act 23 causes a prohibited discriminatory result. *Gonzalez*, 677 F.3d at 405. Merely showing a racial disparity in possession rates of qualifying ID is not enough. *See id.*

Plaintiffs' trial evidence regarding Senate Factor Five does not directly address the issue of causation. Professor Burden's opinion vaguely touches upon the issues of African American and Latino voters obtaining state photo ID and lacking birth certificates, (*see LULAC* Plaintiffs' Trial Ex. 811 at 16-17, ¶¶ 60-61), but he includes no research or analysis on these points by

56

which the Court could conclude that these voters face barriers to obtaining qualifying ID. Instead, Professor Burden's supplemental declaration addresses: (1) the migration of Blacks and Latinos to Wisconsin, (*Id.*, ¶ 20); (2) the demographic breakdown of Milwaukee compared to other places in Wisconsin, (*Id.*, ¶¶ 21-23); (3) disparities in the use of public transportation, (*Id.*, ¶ 24); (4) past racial segregation in Milwaukee, (*Id.*, ¶¶ 25-27); (5) unemployment, income, and poverty disparities, (*Id.*, ¶¶ 28-32); (6) infant mortality disparities, (*Id.*, ¶ 33); (7) educational disparities, (*Id.*, ¶¶ 34-35); (8) incarceration disparities, (*Id.*, ¶ 36); and (9) traffic stop disparities. (*Id.*, ¶ 37.)

Likewise, Professor Levine's expert opinion regarding Senate Factor Five is not helpful in determining whether Act 23 causes a prohibited discriminatory result. Professor Levine's supplemental expert report addresses: (1) racial segregation in Milwaukee, (*Frank* Plaintiffs' Trial Ex. 578 at 5-9); (2) the rate of black suburbanization, (*Id.* at 9-11); (3) ethnic disparities in poverty rates, income, and educational attainment, (*Id.* at 12-15); (4) employment disparities, (*Id.* at 15-18); (5) minority business ownership, (*Id.* at 18-20); and (6) incarceration rate disparities. (*Id.* at 20-22.)

57

None of the subjects that Professors Burden and Levine addressed in their opinions even remotely addressed whether African American and Latino voters are able to procure a form of Act 23 ID. Without addressing that issue head on, Plaintiffs cannot prevail. *See Gonzalez*, 677 F.3d at 405.

Professor Burden opines that these "glaring disparities in outcomes have a direct bearing on the impact of state election laws on minority voting." (*LULAC* Plaintiffs' Trial Ex. 811 at 11, ¶ 38.) He posits that educational, income, and health disparities result in decreased voter participation. (*See id.*, ¶¶ 39-41.) Even if such disparities were shown to decrease voter participation generally, Act 23 has no direct impact whatsoever on disparities in education, income, and health for African American and Latino voters. Act 23 does not *cause* such disparities—it is a law regulating the administration of elections. Voter participation *generally* is not at issue here; Plaintiffs' Voting Rights Act case is about whether Act 23 *causes* a prohibited discriminatory result.

Professor Burden concludes that "Wisconsin displays substantial and enduring racial disparities in areas such as education, income, employment, criminal justice, and health." (*LULAC* Plaintiffs' Trial Ex. 811 at 11, ¶ 41.) Without citation to evidence, he concludes that these disparities are "frequently larger than those in the rest of the United States[]" and that

58

"[b]ecause they bear the effects of discrimination in these areas, Blacks and Latinos in Wisconsin are more likely than Whites to be deterred from voting by the additional burdens imposed by Act 23." (*Id.*) Professor Burden has done no research or analysis regarding whether Blacks and Latinos will be "deterred from voting" by Act 23. His ultimate conclusion that Act 23 will deter these groups from voting is unsupported by any research or analysis that he has done regarding minority voter turnout. In any event, the *LULAC* Plaintiffs' other expert witness, Professor Lorraine Minnite, has written that, as to the impact of voter photo identification laws, "the existing science regarding vote suppression [is] incomplete and inconclusive." (Defendants' Trial Ex. 1019 at 98.)

Professor Hood also evaluated voter turnout for minority groups and concluded that there is no evidence that a historical pattern of lower minority turnout in Wisconsin exists. (Defendants' Trial Ex. 1002 at 11-12, ¶¶ 24-25.) From 2000 to 2010, black and white voter turnout rates are statistically the same in all but one election cycle (2006). (*Id.* and accompanying Figure 2.) Likewise, in more recent comparisons using the citizen voting age population as a baseline for turnout, Hispanic turnout differed from white turnout in 2008, but not in 2010. (*Id.* and accompanying Figure 1.)

59

Plaintiffs' trial presentation with regard to Senate Factor Five is not helpful to this Court in answering the question of whether those that currently lack Act 23 ID can, nonetheless, obtain such ID. Senate Factor Five does not point to invalidating Act 23's voter photo ID requirement.

e.     Senate Factor Seven.

Senate Factor Seven requires an analysis of "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 45. In *Gingles*, the Supreme Court addressed the district court's analysis of minority representation in both statewide offices and state legislative offices. *Gingles*, 478 U.S. at 40-41. Plaintiffs have failed to address the fact that there are and have been a significant number of African American and Latino elected officials in Wisconsin history.

In Wisconsin there are currently a number of African American and Latino legislators, including: Gwen Moore (4th Congressional District), Lena Taylor (4th Senate District), Nikiya Harris (6th Senate District), JoCasta Zamarripa (8th Assembly District), Mandela Barnes (11th Assembly District), Leon Young (16th Assembly District), LaTonya Johnson (17th Assembly District), and Jessie Rodriguez (21st Assembly District). *Wisconsin     Blue     Book     2013-14*,     Biographies,     *available     at*

60

*http://legis.wisconsin.gov/lrb/bb/13bb/Biographies.pdf* (last visited Dec. 20, 2013).[5]  In terms of congressional and legislative representation, Professor Hood found than in 2011-12 blacks are descriptively represented in Wisconsin at levels comparable to, or above, their proportion of the voting age population.  (Defendants' Trial Ex. 1002 at 12-13, ¶¶ 26-27.)  Additionally, the United States Census Bureau reports that from 1970 to 2002 there were 33 black public elected officials in Wisconsin.  U.S. Census Bureau, Statistical Abstract of the United States: 2011, *http://www.census.gov/prod/2011pubs/11statab/election.pdf*, at 258 (last visited Dec. 20, 2013).  Likewise, the Census Bureau reports that there were nine Hispanic public elected officials in Wisconsin from 1985 to 2008. (*Id.* at 259.)  Senate Factor Seven points in favor of upholding Act 23's voter photo identification requirement.

### f.    Senate Factor Eight.

Senate Factor Eight requires an analysis of the extent to which "elected officials are unresponsive to the particularized needs of the members of the minority group[.]"  *Gingles*, 478 U.S. at 45.  With regard to this factor, Professor Burden asserted in his supplemental expert report that "Blacks

---

[5]State Representative Jesse Rodriguez was elected to the 21st Assembly District on November 19, 2013, in a special election.  *See http://www.jsonline.com/news/statepolitics/republican-jessie-rodriguez-elected-to-assembly-b99144203z1-232608671.html* (last visited Dec. 20, 2013).

and Hispanics suffer severe disparities in education, health, employment, income, and criminal justice in part due to state and municipal policies." (*LULAC* Plaintiffs' Trial Ex. 811 at 14, ¶ 54.)   Plaintiffs have not made a convincing showing with regard to this Senate Factor.

First, the existence of racial disparities in the areas that Plaintiffs highlighted at trial is not evidence that elected officials are "unresponsive" to the needs of minority groups.  On the contrary, such racial disparities are also equally probative of the fact that programs and laws in place with the goals of eliminating or decreasing racial disparities are ineffective. Government programs and legislation cannot categorically wipe away racial disparities in housing, education, employment, income, health, criminal justice, and other areas.  To point the finger of blame at elected officials as "unresponsive" is to seriously misjudge the power of our policymakers to fashion a wholesale remedy for alleged racial disparities in these areas.

Second, pointing to a handful of instances in which Plaintiffs allege that shortcomings have occurred at the state level does not establish that Wisconsin elected officials are "unresponsive" to the needs of minority groups. The examples that Plaintiffs relied upon at trial do not demonstrate a widespread unresponsiveness of elected officials to the needs of minority groups in Wisconsin.

62

Finally, in enacting Act 23 the Legislature considered countless competing proposals and policies. Representative JoCasta Zamarripa testified at trial regarding the various amendments that Democratic state legislators offered to alter the bill that became Act 23. (Trial Transcript, Nov. 6, 2013, at 788-96.) Representative Zamarripa testified that the Legislature ultimately amended the bill that became Act 23 to include passports, student ID cards, military ID cards, and tribal IDs. (*Id. at* 809, l. 22 through 810, l. 7.) It does not follow that because the Legislature necessarily made policy choices that did not accommodate the preferences of *every* group or person that the Legislature was "unresponsive" to those groups or people. (In any event, Representative Zamarripa testified at trial that she would never have endorsed the bill that became Act 23. (*Id. at* 787, ll. 11-15; 796, ll. 16-18.))

Plaintiffs are dissatisfied with the voter photo ID law that was enacted, but that dissatisfaction is best expressed to the Legislature, not to this Court. Plaintiffs have not demonstrated that elected officials are unresponsive to the particularized needs of minorities in Wisconsin.

63

g.      Senate Factor Nine.

Finally, Senate Factor Nine requires an analysis of whether "the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous[.]" *Gingles*, 478 U.S. at 45.

The policy underlying Act 23 is not tenuous.  The State has compelling interests in a voter photo identification requirement, as explained in Argument section I. A. of this brief.  An analysis of Senate Factor Nine does not support Plaintiffs' Section 2 Voting Rights Act claim.

## II.     **ARGUMENTS SPECIFIC TO *LULAC v. DEININGER*.**

   A.      The *LULAC* Plaintiffs lack statutory standing to pursue a claim under Section 2 of the Voting Rights Act.

The *LULAC* Plaintiffs lack statutory standing to pursue a claim under Section 2 of the Voting Rights Act.  The plain language of the Voting Rights Act limits those litigants who may pursue a claim to (1) the Attorney General of the United States, and (2) affected voters, namely, "aggrieved persons" in the words of the law.  42 U.S.C. § 1973a.

There are no individual voter plaintiffs in *LULAC*.  The organizations do not have statutory standing to assert a claim under Section 2 of the Voting Rights Act.

64

1.     Statutory standing is different from Article III standing.

The Supreme Court and the Seventh Circuit have recognized the difference between statutory standing and Article III standing. The Supreme Court in *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979), distinguished between the concepts of "standing" and "cause of action":

> s*tanding* is a question of whether a plaintiff is sufficiently adversary to a defendant to create an Art. III case or controversy, or at least to overcome prudential limitations on federal-court jurisdiction, see *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975); *cause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court[.]

The Supreme Court has since noted that "statutory standing" and the existence of a cause of action are "closely connected" and "sometimes identical" questions. *Bond v. U.S.*, ___ U.S. ___, 131 S. Ct. 2355, 2362 (2011); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 96-97 and n.2 (1998).

In *Thompson v. North American Stainless, LP*, ___ U.S. ___, 131 S. Ct. 863, 870 (2011), the Supreme Court explained that Article III standing requirements and statutory standing are different. The *Thompson* Court interpreted the language "person claiming to be aggrieved" in Title VII of the Civil Rights Act of 1964. *Id.* at 867. The Court concluded that the language should not be equated with conferring a right to sue on all who satisfy Article III standing requirements. *Id.* at 869-70. Instead, the Court

65

reiterated that statutory standing inquiries focus on whether the prospective plaintiff falls within the "zone of interests" sought to be protected by the statutory provision. *Id.* at 870; *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (noting that statutory standing "may properly be treated before Article III standing"). Thus, statutory standing must be addressed separately from Article III standing.

In *Kohen v. Pacific Investment Management Company, LLC*, 571 F.3d 672, 677 (7th Cir. 2009), Judge Posner explained statutory standing:

> The term "statutory standing" is found in many cases, e.g., *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 830, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 96–97 and n. 2, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *United States v. U.S. Currency, in Amount of $103,387.27,* 863 F.2d 555, 560-61 and n. 10 (7th Cir. 1988), but it is a confusing usage. It usually refers to a situation in which, although the plaintiff has been injured and would benefit from a favorable judgment and so has standing in the Article III sense, he is suing under a statute that was not intended to give him a right to sue; he is not within the class intended to be protected by it. *Steel Co. v. Citizens for a Better Environment, supra,* 523 U.S. at 97, 118 S.Ct. 1003; *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Harzewski v. Guidant Corp.,* 489 F.3d 799, 803–04 (7th Cir. 2007).

*See also Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 294-95 (3d Cir. 2007) ("Though all are termed 'standing,' the differences between statutory, constitutional, and prudential standing are important.").

66

2. The *LULAC* Plaintiffs lack statutory standing because they are not "aggrieved persons" under the Voting Rights Act.

The *LULAC* Plaintiffs lack statutory standing because they are not "aggrieved persons" under the Voting Rights Act. Analysis of a party's standing is "gauged by the specific common-law, statutory or constitutional claims that a party presents[] . . . [with] 'careful judicial examination . . . to ascertain whether the particular plaintiff is entitled to an adjudication *of the particular claims asserted.*'" *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991) (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)) (emphasis in original). The statute that the *LULAC* Plaintiffs rely upon does not provide standing for them to sue.

Standing under the Voting Rights Act for individual litigants—those other than the United States Attorney General—is limited to "aggrieved persons" seeking to enforce their right to vote. 42 U.S.C. § 1973a; *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989); *Assa'ad-Faltas v. S. Carolina*, 2012 WL 6103204, *4 (D. S.C. Nov. 14, 2012); *Clay v. Garth*, 2012 WL 4470289, *2 (N.D. Miss. Sept. 27, 2012) ("The Voting Rights Act authorizes a private cause of action for individuals who are 'aggrieved persons.' 42 U.S.C. § 1973a."); *McGee v. City of Warrenville Heights*, 16 F.Supp.2d 837, 845 (N.D. Ohio 1998) ("Standing under the Act is limited

67

to 'aggrieved persons,' and that category is confined to persons whose voting rights have been denied or impaired."); *Ill. Legislative Redistricting Comm'n v. LaPaille*, 782 F. Supp. 1267, 1270 (N.D. Ill. 1991). "Aggrieved persons" under the Voting Rights Act are those persons who claim that their right to vote has been infringed because of their race. *Roberts*, 883 F.2d at 621.

Statutory standing under the Voting Rights Act does not extend to non-electors like the four organization Plaintiffs that have no race and, most importantly, have no right to vote. They cannot be "aggrieved persons" under the plain language of the Voting Rights Act.[6] Furthermore, the four *LULAC* Plaintiff organizations lack standing to assert a claim under the Voting Rights Act because they are not voters; Act 23 creates no consequences for them. *See Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 805 (7th Cir. 2011) ("No one has standing to object to a statute that imposes duties on strangers.") Any action that the *LULAC* Plaintiffs took in response to Act 23 was entirely voluntary and not compelled or mandated by Act 23. The four *LULAC* Plaintiffs lack statutory standing and, with no remaining living *LULAC* voter plaintiff in the case that has statutory

---

[6] 42 U.S.C. § 1983 cannot save the *LULAC* Plaintiffs' Voting Rights Act claim because § 1983 does not create a cause of action to assert the rights of third parties. *Ray v. Maher*, 662 F.3d 770, 773 (7th Cir. 2011) ("§ 1983 claims are personal to the injured party.").

standing, the *LULAC* Plaintiffs' Section 2 Voting Rights Act claim fails as a matter of law.

This Court has already rejected the foregoing argument regarding the *LULAC* Plaintiffs' lack of statutory standing. (*LULAC*, Dkt. #84 at 3-4.) In doing so, the Court did not directly address the Eight Circuit's decision in *Roberts* and the district court opinions upon which Defendants relied. (*Id.*) Defendants respectfully request that the Court reconsider the statutory standing argument in light of the plain language of 42 U.S.C. § 1973a and the cases that Defendants have cited.

> B. The Court lacks jurisdiction over the *LULAC* case because the *LULAC* Plaintiffs do not have Article III standing.

> 1. Legal standards.

"Subject matter jurisdiction is, as we know, an issue that should be resolved early but must be considered at any stage of the litigation." *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003).

Article III of the United States Constitution confines the federal courts to adjudicating actual "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. "[T]he requirements of Article III case-or-controversy standing are threefold: (1) an injury in-fact; (2) fairly traceable to the defendant's action;

69

and (3) capable of being redressed by a favorable decision from the court." *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 516 (7th Cir. 2010) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

An organization has associational standing and may bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claims asserted, nor the relief requested, requires participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *see also Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 801-02 (7th Cir. 2008).

> 2. The *LULAC* Plaintiffs cannot be injured by Act 23's voter photo identification requirement because the requirement applies only to voters.

The *LULAC* Plaintiffs cannot be injured by Act 23's voter photo identification requirement because the requirement applies only to voters. Act 23, therefore, does not require the four organization plaintiffs to take any action. Since the organizations have no right to vote, they cannot be injured by a requirement that applies only to voters.

The *LULAC* Plaintiffs will argue an injury-in-fact theory based upon a diversion of organization resources. "Not every diversion of resources to

70

counteract the defendant's conduct, however, establishes an injury in fact."
*NAACP v. City of Kyle, Texas*, 626 F.3d 233, 238 (5th Cir. 2010). "[T]he mere
fact that an organization redirects some of its resources to litigation and legal
counseling in response to actions or inactions of another party is insufficient
to impart standing upon the organization." *Id.* (citation and internal
quotation marks omitted). The organization plaintiffs' evidence presented at
trial only suggests "simply a setback to the organization[s'] abstract social
interests," which is insufficient to establish standing. *Havens Realty Corp. v.
Coleman*, 455 U.S. 363, 379 (1982).

No organization plaintiff was compelled to act in response to Act 23.
Unilateral action where none is required by law does not result in
injury-in-fact for purposes of standing. If there is any impact on these
organizations, it is due to their unilateral choices to invest time and resources
to publicly oppose Act 23 and to reach out to voters. Act 23 certainly did not
require these organizations to do anything. Chief Judge Easterbrook's logic
from *Freedom From Religion Foundation, Inc. v. Obama* must be applied here
to conclude that the *LULAC* organization plaintiffs lack standing:

> [Act 23] imposes duties on [eligible Wisconsin voters] alone. It does not
> require any [organization] to do anything—or for that matter to take
> any action in response to whatever [law] the [Wisconsin Legislature

71

enacts]. . . . *No one has standing to object to a statute that imposes duties on strangers.*

641 F.3d 803, 805 (7th Cir. 2011) (Easterbrook, C. J.) (emphasis added).

> 3. Plaintiff LULAC has not demonstrated that it meets the associational standing requirements of *Hunt*.

In addition to lacking their own injury-in-fact, the organization plaintiffs do not satisfy the three factors identified by the Supreme Court in *Hunt* to demonstrate associational standing. First, Plaintiff LULAC has not demonstrated that it meets the associational standing requirements of *Hunt*.

*Hunt* Factor 1: LULAC did not demonstrate through evidence at trial that any LULAC member lacks an Act 23 qualifying ID and would, therefore, suffer an injury-in-fact. *See Lujan*, 504 U.S. at 560-61. Specifically, the treasurer and former state director of LULAC state board, Yolanda Adams, testified that she could not name a single LULAC member who lacked a qualifying ID. (Trial Transcript, Nov. 4, 2013, at 162.)[7] Ms. Adams further testified that, while over half of the individuals she worked with at LULAC did not have an identification card, "[m]any came from Illinois." (*Id. at* 149.)

_____

[7]Ms. Adams identified five individuals by name who she believed did not have identification. (*See* Trial Transcript, Nov. 4, 2013, at 154.) However, these individuals lacked identification mainly because they did not want to take the time from their employment to get identification, and not because they could not get the identification. (*Id. at* 160.) Ms. Adams was not able to positively identify of her own personal knowledge even a single dues-paying member of LULAC who was not able to get qualifying ID. (*Id. at* 162.)

72

She never indicated whether those individuals resided in Wisconsin or were merely here to assist with LULAC's training.

*Hunt* Factor 2:  Ms. Adams testified that LULAC was a "grassroots civil rights organization[.]"  (Trial Transcript, Nov. 4, 2013, at 140.)  Each member of LULAC is a "working member" who belongs to a council.  (*Id. at* 142.)  There are nine councils representing the southeastern part of Wisconsin.  (*Id. at* 143.)  Ms. Adams confirmed that the organizational mission of LULAC is to "advance the economic condition, educational attainment, political influence, housing, health, and civil rights of the Hispanic population of the United States."  (*Id. at* 158-59.)  She further admitted that Act 23 "did not call on LULAC to do anything[.]"  (*Id. at* 159.)

There is nothing in LULAC's mission which is germane to the voter identification law, and LULAC's own witness confirmed that Act 23 did not require LULAC to take any action in response to the law.

*Hunt* Factor 3:  LULAC cannot demonstrate *Hunt* Factor 3 because, as argued above, only individual voters can be "aggrieved persons" that may pursue a claim under Section 2 of the Voting Rights Act.

73

4. Plaintiff Cross Lutheran Church has not demonstrated that it meets the associational standing requirements of *Hunt*.

Plaintiff Cross Lutheran Church has not demonstrated that it meets the associational standing requirements of *Hunt*.

*Hunt* Factor 1: Cross Lutheran Church presented the testimony of one member, Alice Weddle, who currently does not have an Act 23 qualifying ID. (Trial Transcript, Nov. 4, 2013, at 36.) Ms. Weddle testified that she had last tried to get such an identification in 2005 and had not tried again since that time. (*Id. at* 37.) Failing to make any efforts to obtain identification over the last eight years does not support an implication that Ms. Weddle would not be able to currently obtain such identification. Furthermore, Pastor Michelle Yvette Townsend de Lopez of Cross Lutheran Church testified that it was her belief that Ms. Weddle either now had or was able to get her birth certificate. (Trial Transcript, Nov. 5, 2013, at 381-82.)

*Hunt* Factor 2: Pastor Michelle de Lopez testified that it was the primary purpose of Cross Lutheran Church to spread the gospel of Jesus Christ. (Trial Transcript, Nov. 5, 2013, at 377-78.) She further admitted that nothing in Act 23 required Cross Lutheran Church to do anything or to take any actions. (*Id. at* 378.) There is nothing in

74

Cross Lutheran Church's mission that is germane to opposing the voter photo identification law. Cross Lutheran Church cannot meet *Hunt* Factor 2.

*Hunt* Factor 3: Finally, Cross Lutheran Church cannot demonstrate *Hunt* Factor 3 because, as argued above, only individual voters can be "aggrieved persons" that may pursue a claim under Section 2 of the Voting Rights Act.

> 5. Plaintiff Milwaukee Area Labor Council, AFL-CIO, has not demonstrated that it meets the associational standing requirements of *Hunt*.

Plaintiff Milwaukee Area Labor Council, AFL-CIO has not demonstrated that it meets the associational standing requirements in *Hunt*.

*Hunt* Factor 1: Like LULAC, the Milwaukee Area Labor Council, AFL-CIO did not demonstrate through evidence at trial that any of its members lack an Act 23 qualifying ID and would, therefore, suffer an injury-in-fact. *See Lujan*, 504 U.S. at 560-61. Annie Wacker, vice-president of the Milwaukee Area Labor Council, AFL-CIO, could not provide the name of one person in the labor council—nor one member of her organization—who does not have a qualifying Act 23 identification. (Trial Transcript, Nov. 5, 2013, at 352.) She also could not name any person from her organization who was prevented from voting due to Act 23. (*Id. at* 356.)

75

Ms. Wacker further testified that she did not know if members of her labor council were more likely than other Wisconsin residents to be burdened by Act 23. (*Id. at* 353.)

*Hunt* Factor 2: Ms. Wacker testified that the mission of the Milwaukee Area Labor Council, AFL-CIO was to "organize for social and economic justice, to propose and support legislation that is beneficial to working families, and to oppose legislation that harms working people." (Trial Transcript, Nov. 5, 2013, at 342-43.) She did not testify that it was her organization's mission to promote voting rights. Ms. Wacker asserted that voting rights were important to her organization because it was important for her members to "have a voice in the voting booth." (*Id. at* 343.) But, that is not unique to this organization's mission. Moreover, if that were the requirement, *every* organization could claim that voting rights were part of their mission.

*Hunt* Factor 3: The Milwaukee Area Labor Council, AFL-CIO cannot demonstrate *Hunt* Factor 3 because, as argued above, only individual voters can be "aggrieved persons" that may pursue a claim under Section 2 of the Voting Rights Act.

6. **Plaintiff Wisconsin League of Young Voters Education Fund has not demonstrated that it meets the associational standing requirements of *Hunt*.**

Plaintiff Wisconsin League of Young Voters Education Fund has not demonstrated that it meets the associational standing requirements in *Hunt*.

*Hunt* Factor 1: Wisconsin League of Young Voters Education Fund did not demonstrate through evidence at trial that any of its members lack an Act 23 qualifying ID and would, therefore, suffer an injury-in-fact. *See Lujan*, 504 U.S. at 560-61. Both Rosalyn Wolfe, the current regional director of the Wisconsin League of Young Voters Education Fund, and Jayme Montgomery Baker,[8] the former state director, testified that they could not name one individual who either lacked Act 23 qualifying identification or was unable to vote due to Act 23. (Trial Transcript, Nov. 5, 2013, at 501, 509-10, 526.)

*Hunt* Factor 2: The Wisconsin League of Young Voters Education Fund targets constituents who are predominantly young adults between ages 18 to 35, and mostly those individuals that are not in colleges or post-high school

---

[8]Ms. Baker initially identified Jerome Pulley, a Wisconsin League of Young Voters Education Fund member who she claimed did not have Act 23 qualifying Wisconsin identification. (Trial Transcript, Nov. 5, 2013, at 501.) However, Ms. Baker then testified that her organization assisted Mr. Pulley in obtaining qualifying identification. (*Id.*) Ms. Baker could not identify any members who lack identification or were prevented from voting due to Act 23. (*Id.* at 509-10.)

77

educational institutions. (Trial Transcript, Nov. 5, 2013, at 486-87.) Of the Wisconsin League of Young Voters Education Fund's three major programs under its mission in non-election years, two have nothing whatsoever to do with Act 23 or a voter photo identification requirement.[9] And, even though the second program involves efforts to challenge voter suppression, *see id.* at 519, Ms. Wolfe admitted that there is nothing in Act 23 which requires the Wisconsin League of Young Voters Education Fund to take any action. (*Id. at* 525.)

*Hunt* Factor 3: As with the three other *LULAC* Plaintiffs, the Wisconsin League of Young Voters Education Fund cannot demonstrate *Hunt* Factor 3 because, as argued above, only individual voters can be "aggrieved persons" that may pursue a claim under Section 2 of the Voting Rights Act.

* * * *

In summary, the Court lacks subject matter jurisdiction over the *LULAC* case when none of the four *LULAC* Plaintiffs has standing, either on

---

[9]The League's first organizational goal is focused on assisting felons in obtaining voting rights immediately upon release from a correctional facility, whether or not they are on probation, parole, or are otherwise subject to a court's jurisdiction. (Trial Transcript, Nov. 5, 2013, at 524.) Ms. Wolfe testified that that goal had nothing to do with Act 23. (*Id. at* 525.) The third organizational goal concerns efforts to increase the wages of young adults; it, too, per Ms. Wolfe, has nothing to do with Act 23. (*Id.*)

78

their own merits or via associational standing. Standing is a jurisdictional requirement to establish an Article III "case" or "controversy." *See Lujan*, 504 U.S. at 560-61. *LULAC* must be dismissed for want of jurisdiction.

III. **ARGUMENTS SPECIFIC TO *FRANK v. WALKER*.**

    A.   The Court should grant judgment in favor of Defendants as to certain *Frank* Plaintiffs' claims.

At the close of Plaintiffs' evidence in *Frank*, Defendants made a Federal Rule of Civil Procedure 52(c) motion for judgment on partial findings. (*Frank*, Dkts. #167, 168, 168-1, 168-2, 168-3.) Defendants respectfully request that the Court grant their motion because 22 of the 25 Plaintiffs in *Frank* have no viable claims based upon the lack of evidence presented at trial.

16 *Frank* Plaintiffs did not testify at trial or offer any evidence at trial in support of their claims: Mariannis Ginorio, Frank Ybarra, Sam Bulmer, Pamela Dukes, Rickie Lamont Harmon, Dartric Davis, Barbara Oden, Sandra Jashinski, Justin Luft, Anna Shea, Max Kligman, Steven Kvasnicka, Sarah Lahti, Edward Hogan, Anthony Judd, and Anthony Sharp. They have

not established even a prima facie case for relief, let alone proven that relief should be granted to them.[10]

One *Frank* Plaintiff whose deposition testimony was admitted into evidence, Nancy Lea Wilde, is deceased. (*Frank*, Dkt. #160-5 (obituary).) She has no legal claims because she is no longer a real person.

Five *Frank* Plaintiffs who testified in person at trial have a form of Act 23 qualifying ID:

- Carl Ellis (Wisconsin state ID card), (Trial Transcript, Nov. 6, 2013, at 567-69);

- DeWayne Smith (Wisconsin state ID card), (Trial Transcript, Nov. 6, 2013, at 856);

- Samantha Meszaros (U.S. passport and Carthage College student ID card), (Trial Transcript, Nov. 6, 2013, at 695-96);

- Matthew Dearing (U.S. passport), (Trial Transcript, Nov. 7, 2013, at 977); and

- Domonique Whitehurst (Wisconsin state ID card and MATC student ID card), (Trial Transcript, Nov. 5, 2013, at 389-90).

These *Frank* Plaintiffs have no claim for relief because they cannot be injured by Act 23's photo identification requirement. They could vote with their IDs if Act 23 were in effect.

---

[10]With regard to *Frank* Plaintiffs Oden and Sharp, Defendants' Trial Exhibit 1089A includes certified records from the Wisconsin DMV showing that these plaintiffs currently have Wisconsin state ID cards.

80

Federal Rule of Civil Procedure 52(c) allows the district court to weigh the evidence to determine whether a plaintiff has proven his case. *See Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006); *Collins v. Ralston Purina Co.*, 147 F.3d 592, 599 (7th Cir. 1998); *see generally* 9 MOORE'S FEDERAL PRACTICE § 52.50 (3d ed. 2002).

22 of the 25 *Frank* Plaintiffs have not proven their case as to any of their claims under the U.S. Constitution or Section 2 of the Voting Rights Act. 16 *Frank* Plaintiffs submitted no evidence at trial; they have not even made a prima facie case. One *Frank* Plaintiff is deceased; she has no viable claims. Five *Frank* Plaintiffs testified that they have a qualifying ID; they cannot be injured by Act 23.

Because *Frank* Plaintiffs Nancy Lea Wilde, Mariannis Ginorio, Frank Ybarra, Sam Bulmer, Pamela Dukes, Carl Ellis, Rickie Lamont Harmon, Dartric Davis, Barbara Oden, DeWayne Smith, Sandra Jashinski, Justin Luft, Anna Shea, Matthew Dearing, Max Kligman, Samantha Meszaros, Steven Kvasnicka, Sarah Lahti, Domonique Whitehurst, Edward Hogan, Anthony Judd, and Anthony Sharp have offered no evidence at trial to prove that they will be injured by Act 23's photo identification requirement, the Court should dismiss these *Frank* Plaintiffs' claims.

81

B.    The Court should deny the *Frank* Plaintiffs' request for class certification.

The Court should deny the *Frank* Plaintiffs' request for class certification. Defendants have previously briefed this issue. (*See Frank*, Dkt. #83.) Defendants stand by their prior arguments and supplement them as follows.

1.    Legal standards.

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. ___, 131 S. Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700-01 (1979)). Because class actions present a number of "downsides," districts courts considering motions for class certification under Rule 23 must exercise "caution." *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 744-46 (7th Cir. 2008).

A district court may certify a case for class treatment only if it satisfies the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one of the conditions of Rule 23(b). *Rosario v. Livaditis*, 963 F. 2d 1013, 1017 (7th Cir. 1992); *see also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 606-07 (1997). If the party seeking class certification fails to meet any of these four requirements, class certification is precluded. *Kress v. CCA of*

82

*Tenn., LLC*, 694 F.3d 890, 893 (7th Cir. 2012).  In addition, a class must be sufficiently definite that its members are ascertainable.  *See Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 493 (7th Cir. 2012); *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006).

Plaintiffs have the burden of proof of establishing compliance with Rule 23 by a preponderance of the evidence.  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).  The Court "may not simply assume the truth of the matters as asserted by the plaintiff."  *Id.*  Class certification requires a plaintiff to "affirmatively demonstrate compliance with [Rule 23] – that is, [the plaintiff] must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart*, 131 S. Ct. at 2551.  To certify a class, a trial court must perform a "rigorous analysis" which establishes that the "prerequisites of Rule 23(a) have been satisfied."  *Id.*  Moreover, unlike the standard for a motion to dismiss, the Court is not bound to accept the plaintiffs' allegations as true for the purposes of a motion for class certification.  *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676-77 (7th Cir. 2001).

A class "defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct . . . is defined too broadly to permit certification."  *Messner*,

83

669 F.3d at 824. "A class definition that requires the Court to assess subjective criteria, like the class members' state of mind, will not be certified." *Lau v. Arrow Fin. Services, LLC*, 245 F.R.D. 620, 624 (N.D. Ill. 2007). A class action which depends on each individual plaintiff's state of mind may be made unmanageable. *See Simer*, 661 F.2d at 668-69.

> a.  Class certification requires parties to be so numerous so as to make joinder impracticable.

Federal Rule of Civil Procedure 23(a)(1) requires that "[o]ne or more members of a class may sue . . . as representative parties on behalf of all members only if . . . the class is so numerous that joinder of all members is impracticable." A "party supporting the class cannot rely on 'mere speculation' or 'conclusory allegations' as to the size of the putative class to prove that joinder is impractical for numerosity purposes." *Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008). Numerosity requires "examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw., Inc. v. Equal Emp't Opportunity Comm'n*, 446 U.S. 318, 330 (1980).

While joinder need not be impossible to be impracticable, it must be extremely difficult or inconvenient. *See Gomez v. Ill. State Bd. of Educ.*, 117 F.R.D. 394, 398-99 (N.D. Ill. 1987). Class size, geographic dispersion of

84

its members, the nature of the relief sought, and the practicality of forcing relitigation of a common core of issues are relevant considerations. *Id.* at 399.

"While there is no fixed numerosity rule, 'generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.'" *Evans v. Evans*, 818 F. Supp. 1215, 1219 (N.D. Ind. 1993) (quoting *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)). "A plaintiff will generally meet the requirement by showing that the class consists of forty or more." *Barden v. Hurd Millwork Co., Inc.*, 249 F.R.D. 316, 319 (E.D. Wis. 2008); *see also Pruitt v. City of Chicago*, 472 F.3d 925, 926 (7th Cir. 2006).

> b.  Class certification requires questions of law or fact common to the class.

For a class to be certified, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A class may satisfy the commonality requirement with a single common question of law or fact. *Rosario*, 963 F.2d at 1018. To raise common questions of law or fact, the plaintiff must demonstrate that class members have suffered the same injury. *Wal-Mart*, 131 S. Ct. at 2551. The common question raised must give cause to believe that all claims can be "productively litigated at once." *Id.* A question which asks whether all class members have suffered a violation of

85

the same provision of law does not, by itself, raise a valid common question. *Id.*

"What matters to class certification . . . [is] the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)). Plaintiffs' "claims must depend upon a common contention of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2545.

"Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart*, 131 S. Ct. at 2551 (quoting Nagareda, Class Certification, 84 N.Y.U. L. Rev. at 132). A class definition that entails individualized questions of fact and law, and which produces unique answers respective of each claimant, does not meet the requirements for commonality. *See Jamie S.*, 668 F.3d at 496-97.

86

c. Class certification requires claims or defenses of the representative parties to be typical of the claims or defenses of the class.

Fed. R. Civ. P. 23(a)(3) requires a showing that "the claims . . . of the representative parties are typical of the claims . . . of the class." To establish typicality, a plaintiff must specifically present questions of law or fact that are common to the claims of both the plaintiff and the members of the class he seeks to represent. *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 158-59 (1982). Without such a "specific presentation," it would be an error "to presume that [a] claim was typical of other claims." *Id.* The question of typicality is closely related to the question of commonality. *See Rosario*, 963 F.2d at 1018.

For a class representative's claim to be typical, she "must be part of the class and possess the same interest and suffer the same injury as the class members." *See Falcon*, 457 U.S. at 156. A representative's claim which arises "from the same event or practice or course of conduct that gives rise to the claims of other class members and [which is] based on the same legal theory" satisfies typicality. *Rosario*, 963 F.2d at 1018. Similarity of legal theory may suffice to establish typicality where factual distinctions exist between the claims of class members and those of the representative parties.

87

*See De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983).

Typicality, however, is lacking where the adjudication of claims entails a fact-specific analysis requiring a case-by-case assessment. *See Jones v. Takaki*, 38 F.3d 321, 323 (7th Cir. 1994), *abrogated on other grounds by Smith v. City of Chicago*, 524 F.3d 834 (7th Cir. 2008).

> d. Class certification requires adequate representation of the interests of the class by representative parties.

Finally, "the representative parties [must] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc.*, 521 U.S. at 625. "[A]bsent class members [must] be adequately represented in order to be bound by a court's judgment." *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977). Adequacy requires each plaintiff to have a live controversy with the defendant on the day a suit begins. *See Holmes v. Fisher*, 854 F.2d 229, 233 (7th Cir. 1988).

The "adequate representation inquiry consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the

88

adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011), *as modified* (Sept. 22, 2011); *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986).

"[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem*, 521 U.S. at 625-26. A class in which the interests of representative claimants are not aligned with those of class members fails the adequacy requirement. *See id.* at 626. The named plaintiffs must not have interests antagonistic to, or conflicting with, those of the class. *See Susman*, 561 F.2d at 90; *see also Fitzsimmons*, 805 F.2d at 697 (citing *Hansberry v. Lee*, 311 U.S. 32, 44-45 (1940)). "[C]ertification may be denied because a named plaintiff's claim is atypical of the claims of the other members of the class" and it may be atypical because it is subject to a complete defense which is not applicable to the claims of other class members. *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 821 (7th Cir. 2011).

> 2.   The *Frank* Plaintiffs' trial evidence established that only three of the 25 plaintiffs lack qualifying ID.

The *Frank* Plaintiffs' trial evidence established that only three of the 25 Plaintiffs lack qualifying ID. *See* Argument section III. A. of this brief. Only three of the 25 Plaintiffs could hypothetically be an adequate class

89

representative since all of the putative classes are based upon members lacking qualifying ID.

Below is a table that shows the putative classes and which *Frank* Plaintiffs represent the classes. Those Plaintiffs who presented no evidence at trial are designated by ~~strikethrough text~~; those who currently have a form of Act 23 ID based upon their trial testimony are designated by *~~italics and strikethrough text~~*; deceased Plaintiffs are designated by ***~~bold italics strikethrough text~~***:

| Class | Class Representatives |
|---|---|
| Class 1 | Ruthelle Frank, Shirley Brown, ***~~Nancy Lea Wilde~~***, Eddie Lee Holloway, Jr., ~~Mariannis Ginorio~~, ~~Frank Ybarra~~, ~~Sam Bulmer~~, ~~Dartric Davis~~, ~~Justin Luft~~, ~~Barbara Oden~~, *~~DeWayne Smith~~*, ~~Sandra Jashinski~~, and ~~Anthony Judd~~ (*Frank*, Dkt. #31, ¶ 108.) |
| Class 2 | ~~Pamela Dukes~~, ~~Mariannis Ginorio~~, Ruthelle Frank, Eddie Lee Holloway, Jr., *~~Carl Ellis~~*, ~~Frank Ybarra~~, ~~Sam Bulmer~~, and ~~Dartric Davis~~ (*Id.*, ¶ 113.) |
| Class 3 | ~~Anna Shea~~, *~~Matthew Dearing~~*, ~~Max Kligman~~, *~~Samantha Meszaros~~*, ~~Steve Kvasnicka~~, and ~~Sarah Lahti~~ (*Id.*, ¶ 118.) |
| Class 4 | *~~Domonique Whitehurst~~*, ~~Edward Hogan~~, and ~~Sarah Lahti~~ (*Id.*, ¶ 121.) |
| Class 5 | Ruthelle Frank, Shirley Brown, ***~~Nancy Lea Wilde~~***, Eddie Lee Holloway, Jr., ~~Mariannis Ginorio~~, ~~Frank Ybarra~~, ~~Sam Bulmer~~, *~~Carl Ellis~~*, ~~Pamela Dukes~~, and ~~Dartric Davis~~ (*Id.*, ¶ 124.) |
| Class 6 | ~~Sam Bulmer~~, *~~Carl Ellis~~*, and ~~Rickie Lamont Harmon~~ (*Id.*, ¶ 127.) |

90

| | |
|---|---|
| Class 7 and Subclass 7.1 | Shirley Brown, Eddie Lee Holloway, Jr., ~~Mariannis Ginorio~~, ~~Frank Ybarra~~, ~~Barbara Oden~~, ~~*Carl Ellis*~~, ~~Rickie Lamont Harmon~~, ~~Pamela Dukes~~, ~~Dartric Davis~~, *~~DeWayne Smith~~*, and *~~Domonique Whitehurst~~* (*Id.,* ¶ 131.) |

Ruthelle Frank, Eddie Lee Holloway, Jr., and Shirley Brown are the only potentially viable class representative Plaintiffs in *Frank*. Of these three, Ms. Frank could obtain a free state ID card from DMV if she obtained a certified copy of her birth certificate. She simply refuses to do so. *See infra*, Argument section III. D. 1. of this brief.

Eddie Lee Holloway, Junior is a most unusual and atypical case: his birth certificate reads "Eddie Junior Holloway." (Trial Transcript, Nov. 4, 2013, at 43.) Setting his unusual situation aside, he cannot represent class members that *lack* a birth certificate. He has one.

That leaves only Shirley Brown, who was unable to get her Louisiana certified birth certificate by the time of trial. Ms. Brown's son, Kenneth, attempted to obtain her birth certificate from Louisiana. (Trial Transcript, Nov. 4, 2013, at 214-15.) After mailing an application to Louisiana and paying a fee, Mr. Brown received his aunt June Rose Brown's birth certificate in the mail, not Shirley Brown's birth certificate. (*Id.* at 215-16.) On cross examination, Mr. Brown could not explain whether he made any efforts to

follow up with Louisiana to determine why the state sent him the wrong birth certificate. (*Id*. at 216-17.)

It is unclear whether Ms. Brown's birth certificate is unavailable or whether it exists and she has not made sufficient efforts to obtain it. Ms. Brown is, therefore, an inadequate representative of classes of voters who claim that they lack a birth certificate or face insurmountable legal and practical burdens to obtaining a birth certificate.

           3.     Putative Classes 3, 4, and 6 automatically fail for lack of any adequate class representative *Frank* Plaintiffs.

Putative Classes 3, 4, and 6 fail for lack of any adequate class representative *Frank* Plaintiffs. *See* Fed. R. Civ. P. 23(a)(4). The proposed class representatives either (1) did not present any evidence at trial, or (2) have Act 23 ID. *See* Argument section III. A. of this brief. They cannot adequately represent the interests of individuals that allegedly lack ID.

Below is a table showing these three putative classes and their proposed class representatives. Again, those *Frank* Plaintiffs who presented no evidence at trial are designated by ~~strikethrough text~~; those who currently

have a form of Act 23 ID based upon their trial testimony are designated by

*italics and strikethrough text*:

| Class | Class Definitions | Class Representatives |
|-------|-------------------|----------------------|
| Class 3 | "all Wisconsin voters who are residents of Wisconsin for voting purposes, who lack any accepted photo ID, and who would be forced to surrender an out-of-state driver's license in order to obtain a free Wisconsin ID card for voting purposes." (*Frank*, Dkt. #31, ¶ 115.) | ~~Anna Shea~~, *~~Matthew Dearing~~*,[11] ~~Max Kligman~~, *~~Samantha Meszaros~~*, ~~Steve Kvasnicka~~, and ~~Sarah Lahti~~ (*Id.*, ¶ 118.) |
| Class 4 | "all enrolled students at accredited Wisconsin technical colleges who lack any form of accepted photo ID other than technical college ID cards." (*Id.*, ¶ 120.) | *~~Domonique Whitehurst~~*, ~~Edward Hogan~~, and ~~Sarah Lahti~~ (*Id.*, ¶ 121.) |
| Class 6 | "all veterans of a uniformed service of the United States who are eligible Wisconsin voters, lack accepted photo ID, and possess a Veterans Identification Card ("VIC") issued by the U.S. Department of Veterans Affairs." (*Id.*, ¶ 126.) | ~~Sam Bulmer~~, *~~Carl Ellis~~*, and ~~Rickie Lamont Harmon~~ (*Id.*, ¶ 127.) |

As illustrated by the table, the proposed class representatives for Classes 3, 4, and 6 are wholly inadequate. How can a class representative be adequate if he or she has presented no evidence of his or her lack of Act 23 ID at trial or if he or she currently has a form of Act 23 ID? That class

---

[11] Mr. Dearing testified that this year he would have to vote in Indianapolis, Indiana and that he could not vote in Wisconsin, so he is no longer an adequate class representative for that reason, as well. (Trial Transcript, Nov. 7, 2013, at 980, ll. 3-13.)

93

representative would not be typical of the putative class members who, we must assume, would be injured by Act 23 *because* they lack Act 23 ID. Putative Classes 3, 4, and 6 must fail.

> 4.  The putative classes do not satisfy Rule 23(a)(2)'s commonality requirement because the *Frank* Plaintiffs have not demonstrated that class members will suffer the same injury.

The putative classes do not satisfy Rule 23(a)(2)'s commonality requirement because the *Frank* Plaintiffs have not demonstrated that class members will suffer the same injury. The class members and their circumstances are so diverse that there is no common contention, same injury, or common question of fact or law that justifies class action treatment.

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury[.]" *Wal-Mart*, 131 S. Ct. at 2551 (citation and internal quotation marks omitted). Commonality requires a "common contention—for example, the assertion of discriminatory bias on the part of the same supervisor." *Id.* While this case is not an employment discrimination suit like *Wal-Mart*, the same basic principle applies: common contentions must be present to satisfy Rule 23(a)(2).

The putative class members would not suffer the same injuries, and Plaintiffs make no common contentions that are maintainable as a class.

94

One needs to look no further than the class definitions the *Frank* Plaintiffs have asserted to confirm the point. *See Jamie S.*, 668 F.3d at 496-97 (rejecting a proposed class as indefinite).

Class 1 is defined as "all eligible Wisconsin voters who lack accepted photo ID, lack one or more of the documents DMV accepts to obtain a Wisconsin ID card for voting purposes, and face legal or systemic practical barriers to completing the process of obtaining an ID." (*Frank*, Dkt. #31, ¶ 106.) What this definition means and who it covers is very difficult to comprehend. What is a "legal or systemic practical barrier"? Would forgetting one's birth certificate at home be a "legal or systemic practical barrier" because DMV's system of issuing free state ID cards might warrant showing a certified birth certificates to prove legal presence due to the requirements of Wis. Admin. Code ch. Trans 102? It is unclear what the definition of Class 1 means.

In paragraph 107 of the First Amended Complaint, the *Frank* Plaintiffs try to provide a non-exhaustive list of the types of persons that meet Class 1's definition, and the list only further illustrates how common questions of law or fact do not apply to this putative class:

> This class of eligible Wisconsin voters who lack accepted photo ID includes—but is not limited to—individuals who are unable to obtain photo ID from DMV because they: were never issued birth certificates or lack accurate birth certificates; are unable to

95

> obtain certified copies of their birth certificates due to their birth
> states' identification requirements; lack and cannot obtain proof of
> Wisconsin residency; and lack and cannot obtain any documentary
> proof of identity accepted by the Wisconsin DMV.

(*Frank*, Dkt. #31, ¶ 107.)  As should be plain, the *Frank* Plaintiffs' "kitchen sink" approach with regard to defining their classes makes the classes essentially meaningless.  It is not clear how this Court could determine who is a member of Class 1.

Class 2 is no better.  Class 2 is defined as "all eligible Wisconsin voters who lack accepted photo ID and for whom the costs incurred in obtaining a Wisconsin state ID card, including but not limited to the cost of obtaining certified and accurate copies of birth certificates or any other documentary proof accepted by the Wisconsin DMV or the cost of traveling to the nearest Wisconsin DMV office, would constitute a financial burden."  (*Frank*, Dkt. #31, ¶ 110.)

What amounts to a "financial burden" to achieve membership in Class 2?  The *Frank* Plaintiffs indicate that the federal poverty level might be a measure, *see Frank*, Dkt. #31, ¶ 112, but even that standard would be virtually impossible to implement if the Court were to certify and grant relief to Class 2.  What happens when a voter pulls himself up out of poverty?  Apparently that would take the voter out of Class 2, resulting in the voter needing a qualifying ID to vote.  When does one determine if he is still a

96

member of Class 2?  Yearly?  Upon every general election?  At the time tax returns are filed?  Some other time?  Class 2, like Class 1, is impossible to certify.

Classes 3, 4, and 6 have no representative *Frank* Plaintiffs, as argued above.  Even if commonality could be demonstrated, these classes still fail Rule 23(a)(4).

Class 5 fails the commonality test, too.  It is defined as "all eligible Wisconsin voters who lack accepted photo ID, must obtain one or more primary documents that DMV accepts to obtain a Wisconsin state ID card, including but not limited to certified <u>and</u> accurate copies of birth, marriage, and name change certificates or records or [sic] of the non-existence thereof, and will be required to pay one or more fees to obtain these documents." (*Frank*, Dkt. #31, ¶ 123.)

This definition seems to encompass those voters who will have to obtain certain documents and those voters for which certain documents *do not exist*. How can a voter both obtain a document and the document also does not exist?  It is impossible.  Class 5's definition is a contradiction, and it would include voters who can get documents and voters for which no documents exist.  By definition, it includes those with disparate facts and claims.

97

Even if the definition was not internally inconsistent, use of the word "accurate" in the definition leaves it open to subjective interpretation. If one's name is "John Jacob Jingle*hei*mer Schmidt," would a certified copy of a birth certificate for that individual with the name "John Jacob Jingleh*i*emer Schmidt" be "accurate," despite the misspelling? Class 5, by definition, invites confusion.

"Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart*, 131 S. Ct. at 2551 (citation and internal quotation marks omitted). The *Frank* Plaintiffs' proposed class definitions identify cadres of dissimilar voters and impede the generation of common answers to legal and factual questions before the Court. They fail the commonality requirement and cannot be certified.

     5.    The *Frank* Plaintiffs have not proven at trial that the class representatives' claims are typical of the claims of class members.

The *Frank* Plaintiffs have not proven at trial that the class representatives' claims are typical of the claims of class members. Of the remaining class representatives who have potentially viable claims—which is limited to Ruthelle Frank, Eddie Lee Holloway, Jr., and Shirley Brown—the circumstances of these three voters makes their claims atypical of the claims of voters in the putative classes.

98

Ruthelle Frank purports to represent Classes 1, 2, and 5. But, her claims and circumstances are not typical of members of these classes because Ms. Frank could get an ID card if she obtained a certified copy of her birth certificate. By Class 1's definition, Ms. Frank does not face a "legal or systemic practical barrier" to obtaining an ID. She also is not typical of those members of Class 2 that face a "financial burden" to obtaining a birth certificate. She would have to expend only $20 to get the copy, while that expenditure might not be a financial burden for others. With regard to Class 5, any purported inaccuracy in the spelling of Ms. Frank's name on her certified birth certificate stands as no impediment to DMV issuing her a free state ID card. Ms. Frank's claims are not typical of those in putative Classes 1, 2, or 5.

Eddie Lee Holloway, Jr. purports to represent Classes 1, 2, 5, 7, and subclass 7.1. Mr. Holloway has a copy of his birth certificate, but it has an error on it. His claim is based upon the fact that DMV would have to create an exception for him due to his name being out of order on his birth certificate. This situation will not be typical of all class members seeking an ID card from DMV. Some proposed class members will not have any birth certificate in existence. Other voters might have a birth certificate, but they cannot prove residency or identity to DMV because they lack other

99

documentation.  (*See Frank*, Dkt. #31, ¶ 107.)  Mr. Holloway cannot represent all of these class members because his birth certificate error situation is atypical, giving rise to a unique claim for an exception from DMV. (*See* Trial Transcript, Nov. 14, 2013, at 1843-44.)

Finally, Shirley Brown purports to represent Classes 1, 5, 7, and subclass 7.1.  As discussed above, it is not clear whether Ms. Brown has even undertaken reasonable efforts to obtain her Louisiana birth certificate.  Her son Kenneth Brown tried unsuccessfully to obtain the birth certificate, but he failed to follow up with Louisiana when he was sent the wrong document. Ms. Brown's claim is not typical of members of the proposed classes because we do not know whether she can or cannot obtain her birth certificate.  We do not know whether her birth certificate exists.    Her claims are not typical of the claims of other class members because we do not know, based upon the trial evidence presented, whether Ms. Brown can obtain a birth certificate.

> 6.  The *Frank* Plaintiffs have not proven at trial that the putative classes are sufficiently numerous to be certified.

The *Frank* Plaintiffs have not proven at trial that the putative classes are sufficiently numerous to be certified.  *See* Fed. R. Civ. P. 23(a)(1).  While the trial evidence shows that there are Wisconsin registered voters that currently lack Act 23 qualifying ID and that some voters also currently lack

100

underlying documents like birth certificates, the trial evidence does not demonstrate that there are sufficient numbers of voters that meet the class definitions that the *Frank* Plaintiffs have asserted. Simply lacking ID or lacking underlying documents is *not* enough to qualify for membership in the classes that the *Frank* Plaintiffs have defined, and the *Frank* Plaintiffs have not made the additional showing at trial that their putative classes, as defined, include sufficient numbers of voters to meet Rule 23's requirement.

Class 1 does not satisfy the numerosity requirement, even based upon Professor Barreto's expert opinion. Professor Barreto opined that there are over 63,000 Wisconsin voters who lack qualifying ID and over 21,500 voters that lack underlying documents to obtain ID in Milwaukee County. (*Frank* Plaintiffs' Trial Ex. 600 at Table 2 & Table 8.) However, Class 1 focuses on those that face "legal or systemic practical barriers" to obtaining an ID card. (*Frank*, Dkt. #31, ¶ 106.) The *Frank* Plaintiffs did not establish through trial evidence that this group of voters is sufficiently numerous to constitute a certifiable class. It would be speculation to guess as to how many voters of those who currently lack ID or underlying documents meet this definition.

Class 2 also does not satisfy the numerosity requirement. The main issue with ascertaining this class's membership is that the *Frank* Plaintiffs did not demonstrate through trial evidence that there is a sufficient

population of persons who meet their definition of experiencing a "financial burden" when obtaining an ID card. (*Frank*, Dkt. #31, ¶ 110.) At trial, the *Frank* Plaintiffs did not even try to explain through evidence what this phrase means, making it impossible to determine whether the class is sufficiently numerous to be certified.

Class 5 does not satisfy the numerosity requirement. As noted above, this class's definition is contradictory and confusing. However, the ultimate focus seems to be on the requirement to pay a fee to obtain underlying documents necessary to get a free state ID card from DMV. (*See Frank*, Dkt. #31, ¶ 123.) Like with Class 1, the *Frank* Plaintiffs did not establish through trial evidence that this class is sufficiently numerous to be certified.

Currently lacking underlying documents does not automatically mean that a voter must pay a fee to obtain the documents. For example, at trial the Court heard testimony regarding the fact that Milwaukee County offered free birth certificates to those born in Milwaukee. (Trial Transcript, Nov. 5, 2013, at 401, ll. 1-6; *id.* at 535, l. 25 through 536, l. 22; Trial Transcript, Nov. 6, 2013, at 583, l. 11-14.) The Court also heard testimony about other programs in Milwaukee, such as Repairers of the Breach, which provide free birth certificates to volunteers. (Trial Transcript, Nov. 5, 2013, at 447, ll. 9-24.) The *Frank* Plaintiffs did not establish that

102

there is a sufficiently numerous population of voters to qualify for membership in Class 5.

> 7. The putative classes are unmanageable, and the *Frank* Plaintiffs have not established that any of the classes are sufficiently definite.

Finally, all of the putative classes (and sub-class) would be utterly unmanageable. The classes are not sufficiently definite to be certified, and administering this case and any relief flowing from it as a class action would be virtually impossible given the varying circumstances facing voters in Wisconsin.

"It is axiomatic that for a class action to be certified a 'class' must exist." *Simer*, 661 F.2d at 669. Here, the *Frank* Plaintiffs base part of their class definitions upon the subjective state of mind of their putative class members. Plaintiffs' class definitions rely upon "legal or systemic practical barriers," "financial burden," and the purported complexity of DMV's policies. (*Frank*, Dkt. #31, ¶¶ 106, 110, 123.) However, each of those "factors" will differ by individual and are really based upon the perceptions of the members as to what is too much of a barrier, what financial burden is truly burdensome, and what regulations are too complex. These classes are plainly too unmanageable because they are based upon the state of mind of the individual class representatives and members. *Simer*, 661 F.2d at 668

103

(unmanageability due to individual state of mind analysis was one basis upon which the court declined class certification).

These classes should not be certified because none of the classes are sufficiently definite.  *See Oshana*, 472 F.3d at 513.  Plaintiffs have so broadly defined all of the putative classes that they actually lack any meaningful definition.

In any event, class certification is an unnecessary exercise in this case.  The *LULAC* Plaintiffs did not see the need for class treatment.  Without a need for a class, without a means to define an ascertainable class, and without establishing how any class would be manageable, the *Frank* Plaintiffs have failed to meet their burden of proof under Rule 23.

> C.  Act 23's photo identification requirement is not a poll tax in violation of the Fourteenth or Twenty-fourth Amendments (Counts 3 and 5 of the First Amended Complaint).

The *Frank* Plaintiffs assert that the photo identification requirement for voting created by Act 23 constitutes a poll tax in violation of the Fourteenth and Twenty-fourth Amendments.  (*Frank*, Dkt. #31 at 63-64, 66 (Counts 3 and 5 of the First Amended Complaint).)  The *Frank* Plaintiffs are incorrect, and Counts 3 and 5 of their First Amended Complaint fail.

1.     Count 5 of the First Amended Complaint fails.

Count 5 of the First Amended Complaint fails because Act 23's voter photo identification requirement does not constitute a poll tax under either the Twenty-fourth Amendment or the Fourteenth Amendment.

The Twenty-fourth Amendment prohibits the charging of a tax in order to vote. It provides that:

> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States for or any State by reason of failure to pay any poll tax or other tax.

U.S. Const. amend. XXIV.

The Seventh Circuit has already held, in evaluating Indiana's voter photo identification law, that a requirement of photo identification for purposes of voting is not an unconstitutional poll tax.  *See Crawford*, 472 F.3d at 952.  The court explained:

> The Indiana law is not like a poll tax, where on one side is the right to vote and on the other side the state's interest in defraying the cost of elections or in limiting the franchise to people who really care about voting or in excluding poor people or in discouraging people who are black. The purpose of the Indiana law is to reduce voting fraud, and voting fraud impairs the right of legitimate voters to vote by diluting their votes-dilution being recognized to be an impairment of the right to vote.

*Id.* (citing *Purcell*, 549 U.S. at 4; *Reynolds v. Sims,* 377 U.S. 533, 555 (1964); *Siegel v. LePore,* 234 F.3d 1163, 1199 (11th Cir. 2000)).

105

Although obtaining identification required under Act 23 may come at some cost to certain *Frank* Plaintiffs or other voters, it is neither a poll tax itself (*i.e.*, it is not a fee imposed on voters as a prerequisite for voting), nor is it a burden imposed on voters who refuse to pay a poll tax. There simply is *no* poll tax created by Act 23.

This conclusion is consistent with *Harman v. Fornessius*, 380 U.S. 528 (1965), the only Supreme Court that considered the Twenty-fourth Amendment's ban on poll taxes. In *Harman*, the Supreme Court considered a state statute that required voters to either pay a $1.50 poll tax on an annual basis or go through "a plainly cumbersome procedure," *id.* at 541, for filing an annual certificate of residence. *Id.* at 530-32. There was no dispute that the $1.50 fee was a poll tax barred by the Twenty-fourth Amendment. *See id.* at 540. Accordingly, the only question before the Court was whether the state "may constitutionally confront the federal voter with a requirement that he either pay the customary poll taxes as required for state elections or file a certificate of residence." *Id.* at 538.

The Court enunciated the rule that a state may not impose "a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax." *Id.* at 542. Applying this rule, the Court determined that the state's certificate of

106

residence requirement was a material burden: among other things, the procedure for filing the certificate was unclear, the requirement that the certificate be filed six months before the election "perpetuat[ed] one of the disenfranchising characteristics of the poll tax which the Twenty-fourth Amendment was designed to eliminate," and the state had other alternatives to establish that voters were residents, including "registration, use of criminal sanction[s], purging of registration lists, [and] challenges and oaths." *Id.* at 541-43. Accordingly, the Court concluded that "[w]e are thus constrained to hold that the requirement imposed upon the voter who refuses to pay the poll tax constitutes an abridgment of his right to vote by reason of failure to pay the poll tax." *Id.* at 542.

Act 23's photo identification requirement is not analogous to the requirement in *Harman*; it is not a poll tax. Voters need only verify their eligibility by showing identification at the polls, which does not constitute a tax. Nor does Act 23's photo identification requirement place a material burden on voters "solely because of their refusal to waive the constitutional immunity" to a poll tax. *Harman,* 380 U.S. at 542. Voters are not given the choice between paying a poll tax or obtaining identification; all voters are required to present identification at the polling place. *Cf. Harman*, 380 U.S. at 541-42. Thus, Act 23's photo identification requirement does not

107

constitute an unconstitutional poll tax in violation of the Twenty-fourth Amendment.

Nor is Act 23's requirement that voters show identification at the polling place a poll tax under the Equal Protection Clause of the Fourteenth Amendment. *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966), is the leading Supreme Court case considering whether a state law is a poll tax under the Equal Protection Clause.

In *Harper,* the Supreme Court held that a state law levying an annual $1.50 poll tax on individuals exercising their right to vote in the state was unconstitutional under the Equal Protection Clause. 383 U.S. at 665-66 and n. 1. The Court held that "the interest of the State, when it comes to voting, is limited to the power to fix qualifications," *id.* at 668, and that the imposition of poll taxes fell outside this power because "[w]ealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process[.]" *Id.* Because the state's poll tax made affluence of the voter an electoral standard, and such a standard is irrelevant to permissible voter qualifications, the Court concluded that the tax was invidiously discriminatory and a per se violation of the Equal Protection Clause. *Id.* at 666-67.

108

Act 23's photo identification requirement falls outside of *Harper*'s rule that "restrictions on the right to vote are invidious if they are unrelated to voter qualifications." *Crawford,* 553 U.S. at 189-90. The requirement that individuals show documents proving their identity is not an invidious classification based on impermissible standards of wealth or affluence, even if some individuals have to pay for them. On the contrary, requiring individuals to show identification falls squarely within the State's power to administer elections. Photo identification addresses the most basic voter criterion: that individuals seeking to cast a ballot are who they purport to be and are in fact eligible to vote.

Plaintiffs' position that Act 23's voter photo identification requirement results in an unconstitutional poll tax is not consistent with *Crawford*. *Crawford* involved an Indiana state requirement that a citizen voting in person or at the office of the circuit court clerk before election day present a photo identification card issued by the government. *Crawford*, 553 U.S. at 185. The state would provide a free photo identification to "qualified voters able to establish their residence and identity." *Id.* at 186. A number of plaintiffs challenged this requirement on the ground that the "new law substantially burdens the right to vote in violation of the Fourteenth Amendment." *Id.* at 187.

Wisconsin, like Indiana, provides free photo identification cards to individuals who need them for voting. Also like Indiana, Wisconsin electors may incur a fee in securing the underlying documentation needed to obtain the free identification card. The Supreme Court's decision in *Crawford* suggests that this situation is not problematic.

Although the Supreme Court was unable to agree on the rationale for upholding Indiana's photo identification requirement, neither the lead opinion nor the concurrence held that *Harper*'s per se rule applied to Indiana's photo identification requirement. *See Crawford*, 553 U.S. at 203. The lead opinion explained that *Harper*'s "litmus test" made "even rational restrictions on the right to vote . . . invidious if they are unrelated to voter qualifications." *Id.* at 190. But, according to the lead opinion, later election cases had moved away from *Harper* to apply a balancing test to state-imposed burdens on the voting process. *Id.* Under these later cases, a court "must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." *Id.* The lead opinion then proceeded to apply this balancing test to the Indiana photo identification requirement. *Id.*

*Crawford* did not purport to overrule *Harper*, however, which remains as an example of an electoral standard for which a state would never have

110

sufficiently weighty interests to justify the requirement that a fee be paid in order to vote. *Id.* Additionally, although the *Crawford* Court noted that charging a tax or a fee in order to obtain a photo identification card for voting would be problematic under *Harper*, the Court specifically recognized that some of the *underlying* documentation necessary for obtaining the free photo identification card carries a cost. *Id.* at 198 n. 17. Because *Crawford* did not extend *Harper*'s per se rule to other burdens imposed on voters, but left it applicable only to poll tax requirements, *Crawford* does not support the *Frank* Plaintiffs' argument that Act 23's photo identification requirement is invalid under *Harper*.

In sum, because any payment associated with obtaining the primary documents required to procure Act 23 photo identification is related to the State's legitimate interest in assessing the eligibility and qualifications of voters, the photo identification requirement is not an invidious restriction under *Harper,* and the burden is not sufficiently weighty to be unconstitutional as applied to the *Frank* Plaintiffs under *Crawford*. Act 23's photo identification requirement for voting does not violate either the Twenty-fourth Amendment or the Equal Protection Clause as applied to the *Frank* Plaintiffs, and Count 5 of the First Amended Complaint fails.

111

2. Count 3 and putative Class 3 of the First Amended Complaint are nonsensical and fail.

Count 3 and related putative Class 3 of the First Amended Complaint purport to assert a poll tax claim based upon that fact that a Wisconsin resident must surrender an out-of-state driver license to obtain a Wisconsin DMV product for purposes of voting. (*Frank*, Dkt. #31, ¶¶ 115-19, 143-48.) Count 3 of the *Frank* Plaintiffs' First Amended Complaint makes no sense because it presumes that a person can be a resident of Wisconsin for purposes of voting but a resident of another state for purposes of driving. That would be illegal in Wisconsin. Class 3 is a nonsensical class, and Count 3 is a nonsensical claim. The claim and class fail as a matter of law.

An individual cannot be a resident of one state for driving (Wisconsin) and a resident of another state for voting (not Wisconsin). *Compare* Wis. Stat. § 343.01(2)(g) (defining residence for purposes of driving) *with* Wis. Stat. § 6.10(1) (defining residence for purposes of voting). If one is a resident for one of these purposes, one is a resident for the other. By state law, out-of-state individuals who intend to reside in Wisconsin and drive here must surrender their out-of-state licenses when they take up residence in Wisconsin. Wis. Stat. § 343.05(3)(a). Act 23 did not place this imposition upon Wisconsin residents; the existing motor vehicle laws have always

112

required a Wisconsin resident that drives here to have a Wisconsin driver license. *Id.*

Conversely, non-Wisconsin residents may drive in this state legally with out-of-state driver licenses. But, these individuals are *precisely that*: non-Wisconsin residents, which means that they are not eligible to vote in Wisconsin.

Plaintiffs Meszaros and Dearing apparently do not understand the law, as they testified that, while they vote in Wisconsin and are or were Wisconsin residents, they also possess out-of-state driver licenses and drive in Wisconsin. (Trial Transcript, Nov. 6, 2013, at 697-98; Trial Transcript, Nov. 7, 2013, at 980-81.) This is illegal.

To drive legally in Wisconsin, a driver must either possess a valid Wisconsin driver license or be a non-resident with a valid driver license from that person's home jurisdiction. Wis. Stat. § 343.05(3)(a) and (4)(b)1. It necessarily follows that if someone is lawfully driving a motor vehicle in Wisconsin under a driver license from another jurisdiction, they must be a resident of that other jurisdiction (or at the very least not be a Wisconsin resident). If the person is a resident of another jurisdiction, they cannot vote in Wisconsin. *See* Wis. Stat. § 6.10(1). Therefore, Class 3 is a non-existent class—or it is composed of individuals who are breaking the law with respect

113

to the legal operation of motor vehicles in Wisconsin. Either way, Class 3 and Count 3 must fail as a matter of law.

> D. The *Frank* Plaintiffs' Equal Protection and Due Process Clause claims fail (Counts 1, 2, 4, 6, 7, and 8 of the First Amended Complaint).

The *Frank* Plaintiffs' Equal Protection and Due Process Clause claims fail. The First Amended Complaint asserts a number of constitutional claims in Counts 1, 2, 4, 6, 7, and 8, which are addressed below.

> 1. Counts 1 and 2 of the First Amended Complaint fail because any burdens imposed by Act 23's photo identification requirement do not outweigh the significant benefits and compelling State interests furthered by the law.

The *Frank* Plaintiffs' Counts 1 and 2 assert claims under the Equal Protection and Due Process Clauses relating to the alleged burdens imposed by Act 23 on members of putative Classes 1 and 2. (*Frank*, Dkt. #31 at 61-63.) Counts 1 and 2 of the First Amended Complaint fail because any burdens imposed by Act 23's photo identification requirement do not outweigh the significant benefits and compelling State interests furthered by the law.

The Supreme Court "has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis

114

with other citizens in the jurisdiction," but this right "is not absolute." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). "[T]he States have the power to impose voter qualifications and to regulate access to the franchise in other ways." *Id.* When the Court considers a challenge under the Fourteenth Amendment, it thus applies "more than one test, depending upon the interest affected or the classification involved." *Id.* at 335.

Accordingly, the Supreme Court has rejected a "litmus-paper test" for "[c]onstitutional challenges to specific provisions of a State's election laws" and instead has applied a "flexible standard." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Crawford*, 553 U.S. at 190 n. 8. Under this standard, "a court must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." *Crawford*, 553 U.S. at 190. A regulation that imposes a "severe" burden must be "narrowly drawn to advance a state interest of compelling importance," *Burdick*, 504 U.S. at 434 (internal quotation marks omitted), but "reasonable, nondiscriminatory restrictions" that impose a minimal burden may be warranted by "the State's important regulatory interests." *Anderson*, 460 U.S. at 788. "However slight the burden may appear, . . . it must be justified by relevant and legitimate state

115

interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 190 (internal quotation marks omitted).

First, consider the burdens that the *Frank* Plaintiffs allege will be caused by Act 23. Act 23 applies to all Wisconsin voters, with some limited exceptions. *See* Wis. Stat. § 6.87(4)(a)-(b). It is not a facially discriminatory law that singles out some voters for particular treatment. All voters, regardless of their race or economic standing, must show an ID to obtain a ballot.

At trial, the *Frank* Plaintiffs sought to prove Counts 1 and 2 of their case by offering the anecdotal testimony of witnesses that faced difficulty either in obtaining a free state ID card from DMV or in obtaining the underlying documents necessary to get a free state ID card. Instead of attacking Act 23 facially as unconstitutional as applied to *all* voters, which would be quite difficult post-*Crawford*, the *Frank* Plaintiffs made an incremental approach through a putative class action and anecdotes.

The plural of anecdote is not data. The testimony of the fact witnesses at trial—while some had unfortunate stories—did not prove that there is a widespread or epidemic problem in Wisconsin for voters attempting to obtain Act 23 qualifying ID. Instead, the examples that the Court heard are unique, unusual, infrequent, unlikely, one-of-a-kind, uncommon, extraordinary,

116

uncharacteristic, and downright bizarre cases. For instance, the Court heard testimony about the highly unusual and unfortunate situation of a voter named Cecily Keys-Kelly who, lacking hands, had difficulty obtaining an ID card from DMV because she could not sign the application form. (Trial Transcript, Nov. 8, 2013, at 1177, l. 23 to 1178, l. 13.) This type of bizarre situation is not what the typical voter will experience.

The *Frank* Plaintiffs essentially canvassed the State, and the Milwaukee area in particular, and pored over all of the discovery documents produced in this case searching for the most sympathetic stories. Those are the stories that were told at trial. What the *Frank* Plaintiffs failed to accomplish at trial is to demonstrate, through facts and data, that the anecdotal examples that the Court heard at trial are *representative* of the experiences of any significant corresponding population of Wisconsinites that will obtain Act 23 qualifying ID.

Even considering the *Frank* Plaintiffs' anecdotal examples of voters who faced burdens in obtaining ID cards, the examples do not establish a constitutional violation. DMV's Jim Miller testified at trial that lead plaintiff Ruthelle Frank has all of the documents that she needs to get a free state ID card if she would only obtain a certified copy of her birth certificate. (Trial Transcript, Nov. 14, 2013, at 1840 through 1843, l. 10.) It is hard for

117

DMV to help Ms. Frank if she simply refuses to obtain a copy of her certified birth certificate.  If Ms. Frank was intended by Plaintiffs to be an example of the typical voter's situation, she is a poor example, indeed.

As to putative Classes 1 and 2, the "burden" on this group of voters is not categorically "severe," *see Burdick*, 504 U.S. at 434, so as to trigger heightened scrutiny.  Each voter will experience slightly different individual circumstances in obtaining qualifying ID.  Some voters will use common sense and will find out ahead of time which documents they must bring to DMV; others will not and will make multiple trips to DMV.  Some voters have birth certificates; others will have to get them.  Based upon the evidence presented at trial, the "burden" component of the *Anderson/Burdick* balancing test for the putative class members in Classes 1 and 2 does not weigh in favor of finding that Act 23's voter photo identification requirement is unconstitutional.

Next, consider the important justifications for Act 23, as evidenced by the State's interests discussed in Argument section I. A. of this brief.  The Supreme Court has repeatedly and consistently held that the State's interests at issue in this case are important and compelling.  *See Crawford*, 553 U.S. at 191-97; *Purcell*, 549 U.S. at 4; *Eu*, 489 U.S. at 231; *Burson*, 504 U.S. at 199.  The State's vital interests in detecting, deterring, and

118

preventing voter fraud, along with its independent interests in promoting public confidence in the integrity of the election process and promoting orderly election administration and recordkeeping, weigh strongly in favor of upholding Act 23.

On balance, the State's regulatory interests in this neutral and non-discriminatory law overcome any purported burden on the members of putative Classes 1 and 2 of the *Frank* case. Under the *Anderson/Burdick* analysis that this Court must apply to evaluate Counts 1 and 2 of the *Frank* Plaintiffs' First Amended Complaint, Act 23's photo identification requirement for voting is constitutional.

           2.      Count 4 of the First Amended Complaint fails because technical college ID cards are considered a form of qualifying ID by GAB.

Count 4 of the First Amended Complaint fails because technical college ID cards are considered a form of qualifying ID by GAB.

In Count 4, the *Frank* Plaintiffs assert that Act 23 violates the Fourteenth Amendment rights of members of putative Class 4 because the Legislature did not include technical college ID cards as qualifying ID. (*Frank*, Dkt. #31 at 65-66.) Class 4 consists of "all enrolled students at accredited Wisconsin technical colleges who lack any form of accepted photo

119

ID other than technical college ID cards." (*Id.*, ¶ 120.) The *Frank* Plaintiffs' claim fails for a couple of reasons.

First, the *Frank* Plaintiffs failed to establish at trial that there is any meaningful population of Wisconsin voters who lack all forms of Act 23 ID, yet have a Wisconsin technical college ID card. There are no adequate representatives of this putative class who presented evidence at trial.

Second, GAB has determined that technical college IDs are permitted by Act 23. GAB Election Division Administrator Mike Haas testified at trial that GAB's Board "determined that technical college student ID cards could be used as an acceptable form of photo ID." (Trial Transcript, Nov. 14, 2013, at 1957, ll. 5-7.) GAB was in the process of promulgating an administrative rule that would formalize the Board's position regarding technical college ID cards when Act 23 was enjoined in state court. (*Id.* at 1957, ll. 8-22.) GAB's guidance for the February 2012 primary election (when Act 23's voter photo ID requirement was in effect) was "that although no administrative rule had been promulgated, that . . . the opinion of our staff was that technical college IDs would be acceptable." (*Id.* at 1958, ll. 2-4.) GAB also cautioned "that voters who used the technical college ID might be challenged at the polls." (*Id.* at 1958, ll. 5-6.) This was the best guidance GAB could provide at that time. (*Id.* at 1958, ll. 6-7.)

120

At trial, the Court asked some follow-up questions of Mr. Haas regarding technical college IDs:

> Q.   So if the photo ID law is in effect, then what's the status of students in Wisconsin and tech students relative to the law? What would happen?
>
> A.   Well, I think a lot of it depends upon the timing. If the law becomes into effect, ideally we would complete promulgation of the our administrative rules. The administrative rules currently have not been promulgated.
>
>       We would need to confer internally. One of our options might be to again state that this is the decision of the Government Accountability Board, but voters who either use stickers or use a technical college ID might be subject to challenge at the polls.
>
>       Another, you know, possibility, of course, is that there might be some further, you know, interaction with the legislature that might resolve that issue.
>
> Q.   Okay.
>
> A.   I'm speculating on both the options.
>
>       THE COURT:      Okay.  Thank you.

(Trial Transcript, Nov. 14, 2013, at 1968, ll. 1-19.)  Thus, based upon the testimony presented at trial, GAB has taken the position that technical college ID cards are a form of Act 23 qualifying ID.  The *Frank* Plaintiffs' Count 4 must fail when GAB has determined that Wisconsin technical college ID cards are an acceptable form of Act 23 ID.

121

3.    Count 6 of the First Amended Complaint fails because the Legislature's decision to exclude Veteran Identification Cards had a rational basis.

In Count 6 of the First Amended Complaint, the *Frank* Plaintiffs asserted a violation of the Equal Protection Clause based upon the fact that the Legislature did not include Veteran Identification Cards ("VICs") as a permitted form of photo identification for voting. (*Frank*, Dkt. #31, ¶¶ 157-62.) The Legislature's decision not to include VICs in the list of qualifying IDs is subject to rational basis review, and the decision has a rational basis. Count 6 fails.

In *McGowan v. Maryland*, 366 U.S. 420 (1961), the Supreme Court described the rational basis test:

> [T]he Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*Id.* at 425-26. A court will not strike down a state policy merely because it "may be unwise, improvident, or out of harmony with a particular school of thought." *Eby-Brown Co., LLC v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 295 F.3d 749, 754 (7th Cir. 2002). Rather, the rational basis

122

inquiry requires the Court to consider only whether any state of facts reasonably may be conceived to justify the classification, and it is enough that a purpose may conceivably or may reasonably have been the purpose and policy of the relevant governmental decisionmaker even if the decisionmaker never articulated that rationale. *See Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 685 (7th Cir. 2005).

There is a rational basis for the Legislature to exclude VICs. Unlike some of the other forms of acceptable Act 23 ID for purposes of voting, VICs do not include an expiration or issuance date. *See http://www.va.gov/healthbenefits/access/veteran_identification_card.asp* (last visited Dec. 20, 2013). Without an expiration or issuance date, it is not possible to judge when the VIC was created or issued to determine whether the photograph on it is current as to provide an accurate, current visual depiction of the cardholder. Without a relatively current photograph to identify an individual cardholder, VICs do not serve as a good proxy to confirm a voter's identity at the polls.

Furthermore, based on information available from the Department of Veterans Affairs, it is unclear what, if any, forms of identification or

123

verification are needed for an individual to secure a VIC.  The Department of

Veterans Affairs' website merely states:

> How do I receive a VIC
>
> To receive a VIC, the Veteran must have his/her picture taken for the card at the VA Medical Facility. The card will be mailed to the Veteran within 7-10 days after the Veteran's eligibility has been verified. To ensure the VIC is received at the appropriate address, it is important that the Veteran's address is verified and the correct address is entered in the VistA computer system. If the U.S. Postal Service cannot deliver the card, it will be returned to the facility where the Veteran requested the card.

*http://www.va.gov/healthbenefits/access/veteran_identification_card.asp*

(last visited Dec. 20, 2013).  It is not clear what, if any, mechanisms are in

place to determine that the person who shows up at the VA Medical Facility

to have his picture taken actually is the eligible veteran he claims to be.

Therefore, unlike some of the other forms of acceptable Act 23 ID for

purposes of voting, VICs may not serve as a reliable method of verifying

identity.

Of course, the Legislature could have included VICs in Act 23.

However, the Legislature has wide latitude in determining the problems it

wishes to address and the manner in which it desires to address them.  The

124

Supreme Court could not be clearer than it was in *Williamson v. Lee Optical of Oklahoma*:

> Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. We cannot say that that point has been reached here.

348 U.S. 483, 489 (1955) (internal citations omitted).

The *Frank* Plaintiffs have made it clear that voter impersonation fraud is not a problem they would have chosen to address had they been in position to substitute their judgment for that of the Legislature, and, in fact, had they chosen to address this problem at all, they would not have resolved it by requiring the presentation of photo identification at the polls. This is a policy determination that the Legislature is empowered to make, and the *Frank* Plaintiffs' strong desire for a different result does not translate into a constitutional violation. *See Indiana Democratic Party v. Rokita*, 458 F.Supp.2d 775, 829 (S.D. Ind. 2006). Thus, the Legislature's choice to exclude VICs passes rational basis scrutiny, and the *Frank* Plaintiffs' Count 6 must fail.

125

4. Counts 7 and 8 of the First Amended Complaint fail because Act 23's photo identification requirement does not result in inconsistent and arbitrary treatment of voters in violation of the Equal Protection Clause and has not rendered Wisconsin's electoral system "fundamentally unfair" in violation of the Due Process Clause.

Counts 7 and 8 of the First Amended Complaint fail because Act 23's photo identification requirement does not result in inconsistent and arbitrary treatment of voters in violation of the Equal Protection Clause and has not rendered Wisconsin's electoral system "fundamentally unfair" in violation of the Due Process Clause. (*See Frank*, Dkt. #31, ¶¶ 163-71, 172-81.)

In Counts 7 and 8, the *Frank* Plaintiffs essentially complain that DMV is being too helpful when it provides exceptions for DMV customers that are trying to obtain a free state ID card for voting. The *Frank* Plaintiffs would like to have it both ways: they want a process for obtaining a free state ID card that is not too stringent or bureaucratic, yet they also apparently do not want any room for DMV employee discretion in issuing ID cards because discretion necessarily leads to some degree of inconsistency. Rather than allow for some flexibility in DMV's ID issuance procedures to accommodate the needs of voters, the *Frank* Plaintiffs would prefer to have the entire ID requirement for voting invalidated. Neither the Equal Protection Clause nor

126

the Due Process Clause are offended by DMV employees exercising reasonable discretion in their efforts to help customers get free state ID cards for voting based upon the statutory and administrative rule requirements found in Wis. Stat. ch. 343 and Wis. Admin. Code ch. Trans 102.

First, DMV's procedures for issuing state ID cards did not change when Act 23 was enacted. DMV's Jim Miller testified that there is no such thing as a "voter ID card" and that DOT has been issuing the same state ID card since the 1980s that can now be used for voting under Act 23. (Trial Transcript, Nov. 14, 2013, at 1814, ll. 1-13.) The only change that Act 23 created was that state ID cards can now be obtained for free for purposes of voting. (*Id.* at 1814, ll. 13-14.) Act 23 made no changes to the procedures for obtaining a state ID card from DMV. (*Id.* at 1814, ll. 14-18.) If the *Frank* Plaintiffs are dissatisfied with DMV's procedures for issuing state ID cards, they should have asserted legal challenges to those procedures.

Second, Mr. Miller testified that since January 14, 2013, DMV has more flexibility to issue state ID cards than before that time. This is because DMV can now issue either REAL ID-compliant state ID cards or non-compliant state ID cards. (Trial Transcript, Nov. 14, 2013, at 1901, l. 5 through 1902, l. 14; *see also id.* at 1858, ll. 11-22.) This distinction allows DMV to relax, to some extent, the requirements to obtain a free state ID card,

127

which is what caused some customers problems because their birth certificates contained errors. REAL ID non-compliant ID cards are the same as any other state ID cards issued by DMV and are an acceptable form of Act 23 qualifying ID. (*Id.* at 1902, ll. 8-14.) DMV now has more leeway to provide exceptions for customers that are trying to obtain REAL ID non-compliant DMV products for voting.

Third, the number of people seeking ID from DMV who have problems with their birth certificates is quite small. For example, DMV's MV3002 form, which is an alternative for those for whom an out-of-state birth certificate exists or is unavailable, is used infrequently. Mr. Miller testified that, in his experience of 19 years as a customer service center team leader and his more than 25 years of total experience with DMV, he has only seen the form used five times. (Trial Transcript, Nov. 14, 2013, at 1826, ll. 6-8.) Janet Turja, a team leader in DMV's Waukesha customer service center, testified that she has *never* seen a customer need the MV3002 form in 13 years of service, with hundreds of thousands of DMV customers served in Waukesha during that time. (Trial Transcript, Nov. 5, 2013, at 478, l. 15 through 479, l. 13.) The MV3002 form is "hardly ever used" because "there's hardly ever a reason to use it[.]" (*Id.* at 480, ll. 18-22.)

Ms. Turja also testified that her customer service center sees instances of customers with missing or lost birth certificates only about once per week. (Trial Transcript, Nov. 5, 2013, at 479, l. 11-24.) It has been years since she has seen a customer with an unavailable birth certificate because it was destroyed. (*Id.* at 479, l. 25 through 480, l. 6.) Likewise, she has only seen instances of customers whose names on their birth certificates do not match their Social Security cards once or twice per week. (*Id.* at 480, ll. 7-17.) The evidence at trial confirms that problems with unavailable or erroneous birth certificates are rare.

Plaintiffs' Equal Protection Clause claim in Count 7 must fail because DMV's reasonable efforts to accommodate customers' needs when obtaining state ID cards are not arbitrary or inconsistent as to different groups of voters. "It is well settled that equal protection does not require absolute equality or precisely equal advantages." *French v. Heyne*, 547 F.2d 994, 997 (7th Cir. 1976) (citing *Ross v. Moffit,* 417 U.S. 600, 612 (1974)). The Equal Protection Clause "'does not require the government to give everyone identical treatment;' rather, the clause provides for 'the right to be free from invidious discrimination in statutory classifications and other governmental activity.'" *Cooper v. City of Chicago Heights,* 2011 WL 5104478, * 8 (N.D. Ill. Oct. 27, 2011) (quoting *Nabozny v. Podlesny*, 92 F.3d 446, 453

129

(7th Cir. 1996)).  The types of inconsistent treatment of which the *Frank* Plaintiffs complain—inconsistency in DMV offering the MV3002 birth certificate exception procedure or leniency in the types of underlying documents that are required by DMV to obtain a state ID card—are of the types of minor differences in treatment that do not rise to the level of a constitutional violation.

Additionally, the *Frank* Plaintiffs have altogether failed to establish that certain voters are treated less favorably than other "similarly situated" persons or groups.  Without first establishing that other similarly situated individuals or groups were treated more favorably, it is unnecessary to even discuss whether there is a compelling state interest that justifies the allegedly disparate treatment.  And even if the *Frank* Plaintiffs could establish that certain voters were treated less favorably than other similarly situated voters, there is a compelling state interest that justifies any unequal treatment.  *See* Argument section I. A., above.

The "similarly situated" requirement has been part of equal protection jurisprudence for well over a century.  *See, e.g., Moore v. State of Missouri,* 159 U.S. 673 (1895); *Tigner v. Texas*, 310 U.S. 141, 147 (1940).  The Seventh Circuit has emphasized this point in explaining that "although equal protection requires that all persons similarly circumstanced shall be treated

130

alike, the constitution does not require things which are different in fact to be treated in law as though they were the same." *Marin-Garcia v. Holder*, 647 F.3d 666, 673 (7th Cir. 2011). In *Marin-Garcia*, for example, the court rejected an equal protection challenge to an immigration law that resulted in the de facto deportation of citizen children of illegal alien parents, because citizen children of illegal alien parents are not "similarly situated" to citizen children of citizen parents. Here, the *Frank* Plaintiffs have failed to prove through trial evidence that certain voters were treated less favorably at DMV offices and that those individuals were similarly situated to other voters who they assert were treated more favorably. Count 7 must fail.

Like their Equal Protection Clause claim in Count 7, the *Frank* Plaintiffs' Due Process Clause claim in Count 8 also fails. Wisconsin's electoral system would not be rendered "fundamentally unfair" because of a voter photo identification requirement.

The *Frank* Plaintiffs again point the finger of blame at DMV. Count 8 of the First Amended Complaint asserted that "[t]he photo ID law has forced DMV officials and employees to serve as gatekeepers to the ballot box." (*Frank*, Dkt. #31, ¶ 175.) The *Frank* Plaintiffs alleged that "Wisconsin DMV has failed to adequately implement a uniform, consistently applied scheme for providing free photo ID to voters." (*Id.*, ¶ 177.) "Wisconsin DMV has

131

treated similarly situated voters in an arbitrary and disparate manner due to its failure to establish and implement uniform and definite rules, standards, and procedures to process voter ID card applications." (*Id.*, ¶ 178.)

The *Frank* Plaintiffs failed to prove their claims at trial. First, DMV is a not the "gatekeepers to the ballot box" under Act 23. DMV has no role whatsoever in determining whether a voter is denied a ballot at the polling place because he or she does not have qualifying ID. No trial evidence established this allegation.

Second, DMV has implemented a uniform and consistently applied scheme to issue Wisconsin driver licenses and state ID cards. DMV's Jim Miller testified at some length regarding the process and laws relevant to obtaining a free state ID card for someone that has never held a DMV product. (Trial Transcript, Nov. 14. 2013, at 1818-36.) DMV has promulgated administrative rules in Wisconsin Administrative Code Chapter Trans 102 that govern the standards for DMV customer service centers issuing IDs to customers. (Defendants' Trial Ex. 1083.)

When the administrative rules do not specifically address a scenario presented by a customer who either lacks an underlying document or presents a document that has an error on it, DMV has developed procedures internally to ensure that the customer will be treated fairly, consistent with

132

the law.  (*See, e.g.*, Trial Transcript, Nov. 14, 2013, at 1830, l. 22 through 1835, l. 1.)  The MV3002 form is an example of an exception procedure that DMV developed and implemented to ensure that the small number of customers who face problems with unavailable or out-of-state birth certificates are given an alternative to prove their name and date of birth and legal presence to DMV.  (*Id.* at 1835, l. 2 through 1837, l. 8.)

Third, DMV does not treat similarly situated DMV customers differently.  Every customer is treated fairly, and the existing laws and administrative rules are applied consistently.  Naturally, some ID card issuance decisions will require DMV employees to exercise discretion to determine whether the customer has presented acceptable documentation to be issued a DMV product.  (*See* Trial Transcript, Nov. 14, 2013, at 1830, ll. 11-21.)  The *Frank* Plaintiffs' own trial evidence illustrated over and over that the circumstances of DMV customers vary.  DMV staff does the best they can to assist customers in a way that is consistent with the law regarding driver license and ID card issuance in Wis. Stat. ch. 343 and Wis. Admin. Code ch. Trans 102.  To claim that DMV's ID card issuance procedures would result in a "fundamentally unfair" electoral system in Wisconsin is unsupported by the trial evidence.

133

Finally, the evidence that the *Frank* Plaintiffs relied upon at trial in support of their due process argument is a far cry from that presented in other cases addressing whether election procedures were fundamentally unfair in violation of due process. For example, in *League of Women Voters of Ohio v. Brunner* (which is cited in paragraph 174 of the First Amended Complaint), the court denied a motion to dismiss when the plaintiffs made specific factual allegations that registered voters were denied the right to vote because their names were missing from the rolls, inadequate provision of voting machines caused 10,000 Columbus, Ohio voters not to vote, poll workers refused assistance to disabled voters, and provisional ballots were not distributed to some voters, causing voters to be denied the right to vote, while provisional ballots were provided to other voters without proper instructions, causing 22% of provisional ballots cast to be discounted. 548 F.3d 463, 478 (6th Cir. 2008). In effect, the plaintiffs specifically alleged that tens of thousands of voters were denied the right to vote or had their votes not counted, which the court found supported a claim of "a system so devoid of standards and procedures" as to violate substantive due process. *Id.*

This case is nothing like *Brunner*, and the trial evidence does not establish that Act 23 would make Wisconsin's voting system fundamentally

134

unfair.  Act 23 does not result in a voting system devoid of standards and procedures.  It creates another step in the existing voting procedures that is intended to improve election integrity and deter and prevent voter fraud.  That step—showing a photo ID to an election official—will require a population of Wisconsin voters to first obtain a qualifying ID card.  When they do so, DMV staff will provide procedurally consistent service to those obtaining a free Wisconsin state ID card for purposes of voting.  There is no "fundamental unfairness" in the process; therefore, Count 8 fails.

135

## CONCLUSION

For the reasons argued in this post-trial brief, the Court should grant judgment to Defendants in the *Frank* and *LULAC* cases as to all claims.

Dated this 20th day of December, 2013.

Respectfully submitted,

J.B. VAN HOLLEN
Attorney General

MARIA S. LAZAR
Assistant Attorney General
State Bar # 1017150

s/Clayton P. Kawski
CLAYTON P. KAWSKI
Assistant Attorney General
State Bar # 1066228

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin  53707-7857
(608) 267-3519 (Lazar)
(608) 266-7477 (Kawski)
(608) 267-2223 (fax)
*lazarms@doj.state.wi.us*
*kawskicp@doj.state.wi.us*

kawskicp\cases\jones - voter id, gab\pleadings\defendants' post-trial brief final.docx

136