# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

RUTHELLE FRANK, et al., on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

SCOTT WALKER, in his official capacity as
Governor of the State of Wisconsin, et al.,

      Defendants.

Civil Action no. 2:11-cv-01128(LA)

## FRANK PLAINTIFFS' AMENDED POST-TRIAL BRIEF

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

I.   FACTS ..................................................................................................................... 3

    A.   Wisconsin Voters are Affected by Act 23 ..................................................... 3

    B.   Act 23 .......................................................................................................... 5

        1.   Accepted Photo IDs ......................................................................... 6

            a.   Wisconsin drivers licenses and state ID cards ................................. 6

            b.   Passports ............................................................................................ 7

            c.   Naturalization certificates ................................................................. 7

            d.   Military ID cards ............................................................................... 7

            e.   Tribal ID cards .................................................................................. 7

            f.   Student ID cards ................................................................................ 7

        2.   Identification Recommendations Not Accepted ............................. 9

    C.   Facts Regarding DMV Requirements .......................................................... 10

        1.   DMV Access .................................................................................. 10

        2.   DMV Documentation Requirements .............................................. 12

            a.   Proof of name and date of birth, and citizenship .......................... 13

                i.    Voters with erroneous birth certificates ............................. 16

                ii.   Voters without birth records ............................................... 18

            b.   Proof of identity .............................................................................. 20

            c.   Proof of residency ........................................................................... 21

        3.   Multiple Trips to Agencies ........................................................... 21

        4.   Surrender of Out-of-State License ................................................. 22

    D.   Facts Relating to Election Administration .................................................. 23

        1.   GAB Has Limited Authority Over Election Administration ................... 23

i

2. GAB Does Not Meaningfully Assist Voters Who Lack Act 23 Compliant ID ....................................................... 24

3. Registration and Voting Process ..................................... 27

4. Act 23 Implementation Issues ........................................ 28

E. Facts Relating to Eligible Wisconsin Voters Without Acceptable Forms of ID and Racial Disparities in ID Possession Rates ...................................... 31

1. More than 150,000 Registered Voters Lack Accepted Photo ID ............. 31

2. There are Significant Racial Disparities in ID Possession ...................... 34

F. Facts Relating to Social and Historical Factors that Affect Minorities' Ability to Participate in the Political Process ..................................... 39

1. Blacks and Latinos Bear the Effects of Discrimination, Which Hinders Their Ability to Participate Effectively in the Political Process (Senate Factor 5) ...................................................... 39

2. The Political Process is Tainted by Other Factors Hindering Blacks' and Latinos' Ability to Participate Effectively ......................................... 43

a. Racial appeals (Senate Factor 6) .................................. 43

b. Non-responsiveness to minority communities (Senate Factor 8) ........................................ 45

c. Other Senate Factors ........................................ 46

3. Given the Presence of These Factors, the Burdens Associated with Act 23 Weigh More Heavily on African-Americans and Latinos ........... 47

G. There is No Evidence of Voter Fraud that Act 23 Would Deter and No Evidence It Would Improve Voter Confidence ................................... 48

II. ARGUMENT ................................................................. 51

A. Act 23 Violates Section 2 of the Voting Rights Act (Claims 9 & 10) ................. 51

1. The Section 2 Legal Standard ................................ 51

2. Act 23's Burdens Fall Disproportionately on Black and Latino Voters ... 54

3. Act 23 Interacts with Historical and Social Conditions (Senate Factors) to Cause Inequality in Minorities' Ability to Participate in Political Process ....................................... 57

4.     The Policy Justifications for Act 23 Are "Tenuous" at Best (Senate Factor 9) ....................................................................................... 62

B.    Act 23 Violates the Constitution by Imposing Excessive Burdens on Many Eligible Voters without Accepted ID (Claims/Classes 1 and 2) .......................... 64

1.     The Severity of the Burdens ................................................. 67

a.     Act 23 imposes severe burdens on voters without ID who face legal or practical systemic barriers to obtaining ID (Claim 1/ Class 1).......................................................................... 67

b.     Act 23 imposes severe burdens on eligible voters who lack ID and lack the financial resources needed to obtain it (Claim 2/ Class 2) ........................................................................ 70

2.     The Asserted Government Interests Are Conjectural .............................. 71

3.     Balancing Interests: The State's Interests Do Not Justify the Burdens on these Plaintiffs and Class Members .................................... 71

C.    Act 23 Arbitrarily and Unreasonably Burdens Voting Rights of Veterans and Technical College Students (Claims/Classes 4 and 6)........................................ 74

1.     Act 23 Arbitrarily Excludes the Use of VA ID for Voting (Claim/ Class 6)............................................................................ 74

2.     Act 23 Arbitrarily Obstructs Use of Technical College IDs (Claim/ Class 4)............................................................................ 75

D.    Act 23 Unconstitutionally Imposes a Poll Tax or other Material Burden on Voters (Claims/Classes 3 and 5) .......................................................... 76

1.     Requiring Voters to Pay for Documents to Get ID is a Poll Tax (Claim/Class 5) ....................................................................... 77

2.     Requiring Voters to Surrender Out-of-State Licenses to Obtain "Free" ID is a Poll Tax or "Material Requirement" (Claim/Class 3)................... 79

E.    Act 23 Confers Unconstrained Discretion Which Results In Inconsistent and Arbitrary Treatment of Voters in Violation of Equal Protection (Claim/ Class 7)........................................................................................... 81

F.    Act 23 Has Rendered the Electoral System Fundamentally Unfair (Claim 8) ..... 84

G.    Remedy .................................................................................. 88

1.     Plaintiffs Are Entitled to a Permanent Injunction..................................... 88

iii

2.    Enjoining the Photo ID Provisions is Necessary Because They Violate Section 2 of the Voting Rights Act (Claims 9 and 10) ............................ 89

3.    Enjoining the Photo ID Provisions is Necessary Because They Cannot Be Implemented in a Constitutionally Fair or Consistent Manner (Claims 7 and 8) .................................................................................... 90

4.    Act 23's Unconstitutional Applications Should be Remedied by Allowing Voting Without ID or by a Simple Affidavit Option (Claims 1-6) ...................................................................................... 90

H.    The Court Should Certify the Proposed Classes ...................................................... 92

1.    Class-Wide Treatment of Claims and Remedies in this Case is Far Superior to the Alternative of *Ad Seriatim* Litigation of Individual Claims ..................................................................................................... 93

2.    Each of Plaintiffs' Proposed Classes Satisfies the Requirements for Certification under Rule 23 and is Ascertainable ..................................... 95

    a.    All classes satisfy the requirements of Rule 23(b)(1)-(2) ............. 95

    b.    All classes satisfy the requirements of Rule 23(a)(1)-(3) ............. 96

        i.    Class 1 satisfies the requirements of Rule 23(a) ............... 96

        ii.    Class 2 satisfies the requirements of Rule 23(a) ............... 99

        iii.    Class 3 satisfies the requirements of Rule 23(a) ............. 101

        iv.    Class 4 satisfies the requirements of Rule 23(a) ............. 102

        v.    Class 5 satisfies the requirements of Rule 23(a) ............. 102

        vi.    Class 6 satisfies the requirements of Rule 23(a) ............. 103

        vii.    Class 7 satisfies the requirements of Rule 23(a) ............. 104

    c.    All Classes Satisfy the Requirements of Rule 23(a)(4) ............. 105

    d.    Each of Plaintiffs' Classes is Ascertainable ................................ 106

I.    Defendants' Rule 52(c) Motion Should Be Denied ............................................ 108

1.    The Claims of Plaintiffs Who Did Not Testify At Trial Were Represented by the Plaintiffs Who Did Testify ...................................... 108

2.    Obtaining Accepted Photo ID Does Not Moot a Plaintiff's Claims ....... 109

3.   There is a Live Controversy for Every Claim in this Case ..................... 110

CONCLUSION ......................................................................................................... 111

# INTRODUCTION

The right to vote is the most precious right in our democracy. It may not be conditioned on the race or wealth of the voter or on the arbitrary whims of state officials. The overwhelming evidence adduced during the two-week trial established that Wisconsin's voter photo identification law, 2011 Wisconsin Act 23 (the "photo ID law" or "Act 23"), imposes unjustifiable and discriminatory burdens on that fundamental right.

The credible evidence convincingly proved that Act 23 will impose harsh and widespread burdens on voters. Virtually all the factual testimony – of Plaintiffs, other voters, non-parties who provide assistance to voters, as well as Defendants and state employees called adversely by Plaintiffs – went essentially unchallenged by Defendants. All this evidence compels one conclusion: Act 23 violates Section 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973, and the Fourteenth and Twenty-Fourth Amendments to the U.S. Constitution, and must be enjoined.

Act 23 requires voters to present one of a limited number of forms of ID to vote. It permits no exceptions for indigent or other voters facing substantial barriers to obtaining ID. Defendants' own expert admitted that more than 167,000 registered voters lack the most common forms of ID, a driver's license or a state ID card. Plaintiffs' experts convincingly established that these burdens fall disproportionately upon Black and Latino voters. These are not merely abstract statistics. Many actual voters, including Plaintiffs Shirley Brown, Eddie Lee Holloway, and Ruthelle Frank, and voters Alice Weddle, Rickey Davis, Sim Newcomb, Melvin Robertson and Rose Thompson lack ID and would be disfranchised by Act 23.

Moreover, Act 23's implementation has been marked by the lack of meaningful efforts to mitigate the burdens of the bureaucracy navigation test given by the Wisconsin Department of

Transportation Division of Motor Vehicles ("DMV"), or by any meaningful individual voter assistance from the Government Accountability Board ("GAB") or any other State agency.

In contrast to the undeniable and racially disparate burdens that Act 23 imposes on voters, there is no evidence that any of the harms that purportedly justify those burdens is real. Over the past three decades, not a single individual has been found to have committed in-person voter impersonation fraud in Wisconsin, the only type of fraud that Act 23 could even conceivably prevent. And Defendants presented no evidence that Act 23 would enhance public confidence or election integrity.

Act 23 therefore violates federal law and the Constitution in several independent respects:

*First*, Act 23 violates Section 2 of the Voting Rights Act. Operating against a backdrop of severe racial disparities in every socioeconomic area of Wisconsin life that impede equal political participation, Act 23 disproportionately denies the vote of Blacks and Latinos (Claim 9), and dilutes the voting power of their communities (Claim 10). Act 23's burdens fall largely on Black and Latino voters because they are less likely than white voters to have ID and the underlying documents necessary to obtain ID, and less likely to have the resources and education necessary to navigate the bureaucracies they must to obtain an ID.

*Second*, Act 23 unduly burdens voting rights of particular classes of voters, and thus, as applied to them, violates the Fourteenth Amendment. This includes voters who face substantial legal and practical barriers to obtaining ID (Claim 1) and voters who must incur substantial financial burdens in order to obtain ID (Claim 2). It includes technical college students (Claim 4) and veterans (Claim 6), whose photo IDs are essentially indistinguishable from allowable ID, but which Act 23 arbitrarily obstructs or prevents from being used.

*Third*, Act 23 violates the Twenty-Fourth and Fourteenth Amendments' prohibitions on poll taxes (Claims 3 and 5) by requiring voters to pay for documents like birth certificates to get ID, and by forcing legal Wisconsin voters to surrender out-of-state licenses to get "free" ID.

*Fourth*, Act 23 violates the Fourteenth Amendment's guarantee of equal protection (Claim 7) by giving secret discretion to DMV, resulting in arbitrary treatment of voters.

*Fifth*, Act 23 violates the Fourteenth Amendment's guarantee of substantive due process (Claim 8). Act 23's unreasonable and arbitrary requirements and exceptions, combined with pervasive and systemic failures of voter assistance, notice, training, and uniform implementation have rendered the electoral system fundamentally unfair.

Against all the evidence of the very real burdens that Act 23 imposes on identifiable voters – and tens of thousands more like them – the State's unsupported conjectures that Act 23 will deter voter fraud or improve confidence or election integrity are woefully insufficient. If the State is to impose burdens on our most fundamental right – in a manner that replicates Wisconsin's profound patterns of racial discrimination – it must, at a minimum, meaningfully substantiate its proffered justifications. It has utterly failed to do so here. Plaintiffs respectfully request that judgment be entered in their favor on all counts, and that Act 23 be permanently enjoined.

## I.      FACTS

### A.      Wisconsin Voters are Affected by Act 23

Plaintiff Brown, a Black Milwaukee resident born at home by a midwife in Louisiana in the 1930s, has voted regularly in Wisconsin elections since 1976. (Trial Transcript ("Tr.") 205:15-206:3, 206:10-13, 212:3-12.) Plaintiff Holloway, a Black Milwaukee resident, voted in the 2012 presidential election. (Tr. 42:8-43:5.) Plaintiff Frank, a lifelong Brokaw resident and

village board member, has voted in virtually every election since 1948. (Frank Plaintiffs' Exhibit "Fr. Ex." 606 at 4:21-5:17, 6:2-24.) Deceased Plaintiff Nancy Lea Wilde, a Schofield resident, voted regularly from 1957 (Fr. Ex. 607 at 8:08-9:06) until her death in 2013. If Act 23's voter ID requirement had been in place in 2012, these Plaintiffs would have been unable to vote because they did not and do not have accepted ID. (Tr. 207:21-209:1, 51:15-52:1, Fr. Ex. 606 at 7:18-22, Fr. Ex. 607 at 7:17-8:7.)

Similarly, Weddle, a Black Milwaukee resident who has voted since 1976 (Tr. 34:11-18, 38:7-39:7); Davis and Newcomb, military veterans and Black Milwaukee residents who voted in 2008 and 2012 (Tr. 84:13-22, 89:3-9, 840:13-14, 841:17-22, 842:20-843:5); Robertson, a lifelong Black Milwaukee resident who votes regularly (Tr. 418:20-419:20, 421:2-8); and Thompson, a Black Milwaukee resident who has voted here since 1975 (Tr. 700:16-701:1, 705:17-706:2) would have been unable to vote in 2012 and would still be unable to vote because they do not have ID. (Tr. 36:2-25, 86:20-87:12, 843:21-844:24, 420:6-24, 701:12-702:17.)

Some voters were or would have been disfranchised in other 2012 elections. For example, Plaintiff Matthew Dearing, a Black student who attended Lawrence University, could not vote in February 2012 due to his lack of ID and thought he could not vote in June 2012 for that reason. (Tr. 971:11-12, 972:2-18, 975:3-976:14.) Plaintiff Domonique Whitehurst, a Black Milwaukee Area Technical College student who voted in the June 2012 recall election, had only his MATC ID and might have been challenged if he had needed to use it to vote. (Tr. 388:25-389:15, 390:13-14, 391:7-10, 1957:23-1958:7.)

Act 23 affected many other Plaintiffs and witnesses, who went through significant burdens to obtain photo ID. All are voters, including Plaintiff DeWayne Smith, a Black Milwaukee resident since the 1960s who voted in the 2012 presidential election (Tr. 854:19-22,

4

855:9-11); Lorene Hutchins, an elderly Black woman who has lived and voted in Milwaukee for 60 years (Tr. 949:4-7, 949:25-950:6, 953:22-954:3, 955:13-20); Genevieve Winslow, who has lived in Wisconsin since 1948 and voted since she was 21 (Tr. 96:16-21, 101:12-19); deceased LULAC Plaintiff Bettye Jones, a Black voter who came to Wisconsin in 2011 (Tr. 56:13-21, 59:7-16, 60:12-22, 78:24-79:9); Andrew Trokan, a now-deceased lifelong Milwaukee voter (Tr. 1612:1-6, 1612:23-1613:2); Shirley Simon, a now-deceased lifelong voter who came to Milwaukee in 2010 and whose nursing home said she needed ID to vote (Tr. 114:9-116:4, 125:9-13); and Plaintiff Carl Ellis, a homeless Black Milwaukee veteran who wants to vote in the future (Tr. 557:17-20, 558:19-24, 560:6-11).

**B.    Act 23**

Under Act 23, Wisconsin voters must present one form of photo identification from a limited statutory list in order to cast a ballot. Wis. Stat. §§ 5.02(6m); 6.79(2)(a). Act 23 provides *no* exceptions to the photo ID requirement for in-person voting, except for voters with confidential status due to domestic violence, sexual assault, or stalking, Wis. Stat. § 6.79(6) – not even for indigent voters. (Tr. 868:11-22, 1652:19-21.) Absentee voters, even mail-in absentees, must obtain photo ID and, at least once, submit a copy of that ID unless they are among the few voters who live overseas, are in the military, have confidential status, or are elderly, infirm or disabled *and* indefinitely confined to their homes or living in certain care facilities. Wis. Stat. §§ 6.87; 6.875(6)(c); (Tr. 1656:10-13.) A voter lacking ID on Election Day must cast a provisional ballot that counts only if the voter obtains and presents an accepted form of ID to a local clerk, during the clerks' limited office hours, by 4 p.m. on the Friday after the election. Wis. Stat. §§ 6.79(3)(b); 6.97.

### 1. Accepted Photo IDs

Under Act 23, accepted ID is limited to drivers' licenses or ID cards issued by DMV; U.S. passports; naturalization certificates; uniformed services IDs; tribal IDs; or student IDs meeting additional requirements. The evidence establishes that at least 63,085 eligible voters in Milwaukee County alone do not have any of these forms of ID. (Fr. Ex. 600 at 16.) Defendants' expert acknowledged that at least 167,351 registered voters statewide do not have either licenses or ID cards. (Defendants' Exhibit ("Def. Ex.") 1001 at 10, Tr. 1427:22-1428:5, 1431:6-9.)

### a. Wisconsin drivers licenses and state ID cards

The primary forms of photo ID are unexpired state drivers' licenses or photo ID cards, or ones that expired since the last general election.[1] Wis. Stat. §§ 5.02(6m)(a)1,2. Voters can only get licenses and IDs from DMV, so obtaining them requires voters to get to and interact with DMV and subjects them to DMV requirements. (Sec. I.C.) A license normally costs $34 and is typically valid for 8 years. Wis. Stat. §§ 343.20(1)(a); 343.21(1)(am),(n). An ID card can be obtained for free if needed for voting and is also typically valid for 8 years, but can be renewed once online or by mail without a new photograph and thus could have a 16 year old photograph. (Tr. 1850:11-22), Wis. Stat. § 343.50(5)(a)3. Wisconsin voters with out-of-state driver's licenses cannot obtain a state ID card, even for voting, without giving up the out-of-state licenses. (Tr. 1113:7-16; 1890:5-16), Wis. Stat. § 343.50(1)(b).

---

[1] A voter may also vote using the receipt DMV issues to license and ID card applicants, which is valid for 60 days, Wis. Stat. §§ 5.02(6m)(c); 343.11(3), or in some cases using an original copy of a citation given when police confiscate a license. Wis. Stat. § 6.79(7).

### b.        Passports

A voter may use a current U.S. passport, or one that expired since the last general election, to vote. Wis. Stat. § 5.02(6m)(a)(4). An original passport costs at least $55 and is generally valid for 10 years. 22 C.F.R. §§ 22.1; 51.4(b)(1).

### c.        Naturalization certificates

A voter may use a naturalization certificate issued "not earlier than two years" before Election Day to vote. Wis. Stat. § 5.02(6m)(b).

### d.        Military ID cards

A voter may use an unexpired uniformed services ID card, or one that has expired since the last general election, to vote. Wis. Stat. § 5.02(6m)(a)(3). This includes military ID cards that do not contain expiration dates and those with "indefinite" expiration dates. (Tr. 1965:11-18.)

### e.        Tribal ID cards

A voter may use an ID card from a federally recognized Indian tribe in Wisconsin. Wis. Stat. § 5.02(6m)(e). That card does not need to contain any expiration date. (Tr. 1965:5-10.)

### f.        Student ID cards

To be valid for voting, a student photo ID must be issued by a Wisconsin university or college accredited as defined in Wis. Stat. § 39.30(1)(d) and contain the student's photograph, full name, signature, an issuance date, and an expiration date not later than 2 years after the date of issuance, even for four year colleges. Wis. Stat. § 5.02(6m)(f). Students using school ID cards to vote must *also* produce a document proving enrollment in the college or university. *Id.*

Act 23 required many colleges to change their ID cards if students were to use them to vote. (Tr. 876:10-20.) While some did so, GAB has no authority to order colleges to make ID cards compliant, and at least one, St. Norbert College, has declined to do so. (Def. Ex. 1047, Tr.

876:10-23, 1967:10-13.) GAB has no information on the ID cards of more than 20 Wisconsin colleges, including Lawrence University. (Tr. 1967:14-16, Def. Ex. 1047 at 2.)

Some schools, including Alverno, Beloit, Carthage, Edgewood, and Viterbo Colleges, and possibly Marian University, chose to try to satisfy Act 23 by putting stickers with required information on student ID cards. (Tr. 694:19-695:2, Carthage, which Plaintiff Samantha Meszaros attends, put expiration date sticker on back of ID); (Tr. 1966:5-1967:7, Def. Ex. 1047.) Wisconsin also has about 16 technical colleges serving "under 100,000" students. (Tr. 879:20-880:3.) Colleges such as MATC, which Whitehurst and more than a thousand other students attend, redesigned ID cards to satisfy Act 23's student ID requirements. (Tr. 389:8-390:7.)

GAB approved using stickers to make student ID cards compliant and in November 2011 informed the legislature that it did not believe it was necessary to engage in rulemaking. (Fr. Ex. 5 at 4-5.) Similarly, the GAB determined that technical colleges were accredited under state law and approved allowing the use of technical college IDs for voting as long as they otherwise complied with Act 23's student ID requirements. (Tr. 879:12-16, Fr. Ex. 5 at 2-4.) The Joint Committee for the Review of Administrative Rules (JCRAR) nevertheless voted to require GAB to promulgate administrative rules on both these issues. (Tr. 879:5-11, Tr. 880:4-9.) Neither set of rules is final, and the legislature or governor could still block them. (Fr. Ex. 372, Tr. 882:8-883:14.) As a result, college students using ID cards with stickers and technical college students could be challenged at the polls. (Tr. 1968:2-13.) In fact, although the GAB opined that in the February 2012 election, while the rules were pending, students could use technical college IDs for voting (Tr. 1957:23-1958:4), some officials, including Milwaukee Election Commissioner Robert Spindell, claimed those IDs were *not* valid for voting. (Def. Ex. 1109 at 1.)

## 2.     Identification Recommendations Not Accepted

Before Act 23 passed, GAB's Executive Director, Defendant Kevin Kennedy, made numerous recommendations to try to ease anticipated burdens on elections officials and voters. Kennedy was concerned that that there would be voters with difficulty obtaining photo ID and sought to ensure an alternative to enable those voters to vote. (Tr. 892:7-893:19.) He therefore urged that voters without ID be allowed to sign an affidavit of identity at the polls, a procedure he said was used in "many" states and much less burdensome for voters and elections workers than provisional ballots. (Tr. 892:7-22, 894:3-9, Fr. Exs. 1 at 6, 2 at 7-8.) GAB also explored whether an affidavit of identity could be used in conjunction with cameras at polling sites to photograph voters without ID (Tr. 896:3-897:13, Fr. Ex. 330 at 8), a procedure that would have been much less costly than the photo ID implementation plan that was adopted. (Fr. Ex. 13 at 2, Tr. 897:7-13.) None of these suggestions was accepted. (Tr. 894:23-25, 897:14-17.)

Kennedy also recommended that U.S. Veterans Administration photo ID ("VA ID") be accepted, noting that Indiana had originally failed to include this form of secure ID, but later amended its law to do so. (Fr. Exs. 1 at 2, 2 at 3, Tr. 871:10-22.) GAB knew that many veterans were homeless or marginally housed. (Tr. 1637:1-7.) Veterans such as Davis and Newcomb have VA ID, but no other photo ID, and Ellis, a homeless veteran, until recently had only a VA ID which he used to get health care. (Tr. 86:15-87:12, 557:25-558:18, 558:23-24, 840:23-841:16, 843:21-844:24.) Yet the legislature did not include VA ID as accepted ID. (Tr. 871:23-25.)

Kennedy also urged inclusion of regular student ID cards. (Tr. 872:8-873:2.) "These cards are used to access many benefits limited to students associated with the college or university. The college or university has a vested interest in issuing secure forms of

identification." (Fr. Ex. 1 at 2; *see also* Fr. Ex. 2 at 3). The legislature nevertheless imposed numerous requirements and restrictions on student ID cards. (Sec. I.B.1.f.)

Kennedy also urged the legislature not to require ID for mail-in absentee ballots, noting that no other state had that requirement, that it would be ineffective due to inability to match the photograph to the voter, and that Act 23's absentee voting provisions were extremely complex and confusing. (Tr. 884:10-885:1, Fr. Exs. 1 at 3-5, 2 at 2, 4-6; *see also* Tr. 1643:23-1644:7, Fr. Exs. 73, 74.) Photo ID was nevertheless required for many mail-in absentee voters. (Sec. I.B.)

## C.    Facts Regarding DMV Requirements

DMV must issue IDs for free if the applicant is a U.S. citizen, will be at least 18 years old by the next election, and asks that the card be provided free for voting. Wis. Stat. § 343.50(5)(a)(3).

### 1.    DMV Access

To obtain ID, voters must get to DMV offices. As GAB's former elections division administrator explained, that created a significant burden for many eligible voters: "Getting to and from the DMV office is a regularly recurring piece of information that comes to my attention . . . [t]hat an elector will have to either cab it or bus it. And many times that's expensive, particularly if it's a location where you don't have adequate city transportation like a bus system or it's not readily on their route. And a cab . . . can cost anywhere from $10 to $20 one way, depending on where you are and how far the DMV office is from where they live." (Fr. Ex. 635 at 32:23-33:11, Tr. 892:23-893:15 (Kennedy aware of transportation problems); *see also* Fr. Ex. 635 at 50:7-11 (transportation problems in inner city); *id.* at 59:3-9 (transportation to DMV a "major barrier" for people with disabilities); Tr. 132:13-19 (Latinos rely on transit and DMV may not be on bus line); Tr. 139:5-14 (many poor Racine and Kenosha residents have no cars);

Tr. 151:19-25, 430:23-431:6 (Racine and Kenosha transportation problems); Tr. 211:15-19 (Brown paid $6 to "driver from Medicare" to get to and from DMV); Tr. 748:12-20 (Grigsby's constituents had to take multiple buses); Tr. 845:9-18 (buses Newcomb used took 45 minutes to one DMV and an hour to another); Tr. 1211:2-6 (deficiencies in Milwaukee public transit); Tr. 1302:3-8 (Milwaukee Blacks and Latinos more likely to use transit or walk); Tr. 1655:9-20 (transportation issues for voters with disabilities); Tr. 1848:21-22 (no transit in Waupaca).) Many voters cannot afford those costs. (*See, e.g.*, Tr. 151:24-152:13 (Racine and Kenosha voters without bus money); Tr. 562:6-11 (Ellis walked 40 minutes one-way to DMV); Tr. 854:23-855:6, 858:12-15, 859:8-9 (Smith is unemployed but had to pay for bus when couldn't get ride).)

DMV hours and long lines during the limited hours offices are open are also a problem, as Defendants know. (Tr. 893:8-9 (Kennedy), Fr. Ex. 155 at 6.) "The DMV is viewed as a challenging location at which to get a free state ID card. Some feel it is difficult to get to a location that is open during hours convenient to them, while others voiced concern over long wait times and unfriendly staff." (Fr. Ex. 155 at 6, Tr. 904:16-22.) There are only 81 permanent Customer Service Centers ("CSCs") and 11 travel locations in the state. (Tr. 1117:3-5.) Only 32 of the 92 DMVs are open 5 days a week (Tr. 1083:20-22), most close at 4:45 p.m. (Tr. 1084:5-6), and only two are open until 6:00 or 6:30 p.m. (Tr. 1083:25-1084:4; *see also* Tr. 433:2-5 (Racine DMV not open evenings or weekends).) Of the 92 DMVs, only one – on Odana Rd. in Madison – is open on weekends, and it does not issue original licenses or ID cards. (Tr. 1084:7-12.) Despite the "strong feelings" of voters in GAB's focus group that more convenient locations, such as libraries, schools, post offices and city halls, be used to issue IDs (Fr. Ex. 155 at 6-7), DMV will not issue IDs anywhere other than its CSCs. (Fr. Ex. 351, Tr. 1117:8-10.)

DMV does not deploy mobile units (Tr. 1656:4-25), and neither DMV nor GAB transport voters to DMV. (Tr. 1655:9-16, 1657:1-19, 1792:18-22, Fr. Ex. 39.)

If voters make it to DMV, they often confront long wait times. (Fr. Ex. 155 at 6, Tr. 151:25-152:6, 160:19-21 (long waits in Kenosha, not just at peak hours.) The "length of time for transportation and the delays at the DMV discourage people from trying to get their IDs." (Tr. 152:7-9.) Some voters cannot leave work to go to DMV (Tr. 358:9-17, 432:16-25), while others would have to take unpaid time off. (Tr. 132:15-17, 132:23-25 (losing pay is a "big deal" for Latino community); Tr. 841:25-842:6, 845:18-21, 846:11-25 (Newcomb, a housekeeper, did not get paid time off and also has to care for his children, injured in a serious accident, and for grandchildren).) Even Defendants' witness Diane Hermann-Brown, the Sun Prairie clerk who was able to drive her mother to DMV during business hours because her "time is flexed," admitted that the process was "a pain." (Tr. 1795:8-11, 1800:9-13.)

### 2. DMV Documentation Requirements

Voters who have never held a Wisconsin license or ID card, and those who have not had one in more than 8 years, must produce at least three separate documents to establish: (1) name and date of birth, (2) citizenship or legal presence, (3) identity, and (4) Wisconsin residency. Wis. Admin. Code § Trans. 102.15(2)-(5).[2] Voters replacing lost or stolen IDs or renewing IDs still must prove identity and, if they have moved, residency. *Id.* §§ 102.15(2)(b), (4m). While DMV supervisors may occasionally adjust the rules, adjustments are not guided by formal, consistent or publicly disclosed rules or policies (Tr. 825:22-826:6, 1120:25-1123:24, 1891:11-

---

[2]These stringent regulations, especially the proof of citizenship requirement, were crafted not to facilitate voting, but rather to implement "REAL ID" requirements. *See* Tr. 1849:6-13; 2005 Wis. Act 126 § 2; 2007 Wis. Act 20 §§ 3245, 3257, 3379. In contrast, the Indiana photo ID law affirmed in *Crawford v. Marion County Election Board*, 553 U.S. 181, 198 n.17 (2008) ("Indiana law") required the production of just *one* primary document.

1892:5), and front line staff are told to accept only items listed on the BDS 316, a customer handout describing acceptable documents. (Tr. 1891:3-10, Def. Ex. 1077.)

### a.     Proof of name and date of birth, and citizenship

A birth certificate is by far the most common document to prove name and date of birth, and citizenship. (Tr. 460:18-461:6, 1819:9-11, 1819:22-24), Wis. Stat. § 343.14(2)(es), Wis. Adm. Code §§ Trans. 102.15(2)(a),(3)(a), (3m). In Milwaukee County alone, more than 20,000 voters who lack ID also lack proof of citizenship. (Fr. Ex. 600 at 37 (Table 8); *see also* Tr. 1161:5-8 (lack of birth certificate a "common question" for GAB callers); Tr. 150:20-151:6 (many Racine and Kenosha voters lack birth certificates); Tr. 170:12-171:1 (Puerto Ricans lacking birth certificates).) Although many Wisconsin voters have difficulty obtaining birth certificates or lack accurate birth certificates, if a birth certificate exists, DMV requires a voter to obtain it. (Tr. 1118:21-1119:23).[3] DMV's public position is that there are no exceptions to the requirements to prove legal presence and name and date of birth.[4] (Tr. 1851:24-1852:2.)

---

[3]If the voter cannot prove name and date of birth because a document is "unavailable," she may ask DMV to consider alternative documents. Wis. Adm. Code § Trans. 102.15(3)(b). "Unavailable" documents do not include ones the voter lacks or has trouble obtaining, ones with errors, or lost or destroyed documents if a replacement may be obtained. *Id.* § 102.15(1). In contrast, the Indiana law in *Crawford* let voters use Medicaid and Medicare cards, Social Security printouts, and other reasonable alternative documents in lieu of birth certificates. 553 U.S. at 199 n.18. *See also, e.g.*, *Common Cause / Georgia v. Billups,* 554 F.3d 1340, 1346 (11th Cir. 2009) (Georgia photo ID issued with evidence of voter registration and affidavit that voter has no other accepted photo ID); Miss. Code Ann. § 23-15-7(6) and Code Miss. R. 1-16-3.4(b) (proposed 12/12/12) (requiring production of one document to obtain Mississippi voter ID, which can include, *inter alia*, Social Security, Medicare or Medicaid card, utility bill, pay check or government check). In the past even DMV "easily" allowed use of documents like hospital birth certificates and baptismal certificates instead of birth certificates. (Tr. 1848:25-1849:5.)

[4]Involving high-level officials may get DMV to bend the rules. After Jennifer Platt complained to the governor's office about difficulty getting a license, DMV told her she could get it *without* a birth certificate. (Fr. Ex. 467, Tr. 1124:24-1128:24.)

Getting a birth certificate can take weeks, if not longer. (Tr. 1114:18-22, 1660:22-1661:7, Fr. Ex. 468 (6-8 weeks for N.Y. birth certificate); Fr. Ex. 526 at 3 (a month for birth certificate by mail).) DMV does not provide birth certificate applications (Tr. 464:23-465:1), and many voters are unable to navigate the application process. (*See, e.g.*, Tr. 77:1-11 (Jones did not use computer so needed daughter to get birth certificate); Tr. 88:1-25, 92:12-94:8 (Davis was told that to get birth certificate he had to go through a city in Tennessee where he had never been); Tr. 372:1-9, 373:1-24 (congregants born in south did not have or know how to get birth certificates); Tr. 399:17-400:15 (same for many elderly African-Americans); Tr. 532:6-11, 533:8-534:7, 539:9-25, 542:14-543:4 (for more than seven years Ray Ciszewski has helped get birth certificates for poor and homeless persons; in "hopeless cases" does not even start paperwork and in other cases is unable to obtain birth certificates 22-23% of the time); Tr. 541:11-19 (voters who moved a lot or were in foster care may not know where they were born); Tr. 565:23-566:8 (Ellis needed case manager to apply for birth certificate); Tr. 793:16-22 (seniors and voters from other states have harder time getting birth certificates); Tr. 131:9-25, 168:11-15, 812:1-2 (difficulties with birth certificates for Puerto Ricans); 952:21-953:2 (Hutchins needed daughter's time and money to get birth certificate).)

Getting a birth certificate usually requires ID, a "catch-22" or "vicious circle" for voters without ID. (Tr. 538:1-9, 1163:2-9, 1629:9-24, Fr. Ex. 13.) Voters like Brown and Hutchins could not apply for their own birth certificates because they lacked photo ID. (Fr. Ex. 591, Tr. 214:15-215:9, 963:23-967:23.) Wisconsin's vital records office requires a voter to provide a copy of a driver's license or state ID card, or two items from a limited list that many low-income and marginalized voters lack. (Tr. 1663:15-18, Fr. Ex. 138.) Most states, the District of Columbia and New York City also require photo ID for birth certificates. (Tr. 538:1-6.) While

some states allow use of other documents, rules are not consistently applied and alternatives, like bank or credit card statements, pay stubs and car titles, are often ones that low income people lack. (Tr. 538:10-539:2.) Some states, like Illinois, are particularly strict. (Tr. 540:4-17.) Newcomb had trouble getting his Illinois birth certificate and sent for his military discharge papers – which take months to arrive – to try to get it. (Tr. 846:1-10, 851:5-6, 852:6-20.)

Moreover, birth certificates usually cost money.[5] (Tr. 537:7-25, 898:24-899:5, 1111:12-14, 1627:16-18, 1659:14-18, 1665:1-3, Fr. Exs. 133, 138.) In Milwaukee County, 55% of eligible voters without ID earning less than $20,000 lack proof of citizenship. (Fr. Ex. 600 at 31, 43 (Table 21).) There is no indigency exception to DMV's birth certificate requirement (Tr. 465:9-466:4, 1852:22-1853:3) and DMV does not pay for birth certificates (Tr. 466:5-7) even for voters receiving government benefits like Holloway and Brown, who are on disability, and Weddle, on social security, Medicare and Medicaid (Tr. 51:2-5, 207:2-9, 40:16-21), retirees like Wilde and Thompson (Fr. Ex 607 at 7:14-16, Tr. 705:13-16), unemployed like Davis (Tr. 86:13-14), homeless like Ellis (Tr. 563:4-8), low wage workers, or low income (Tr. 747:24-748:11; *see also,* Fr. Ex. 578 at 12-15, 23-25, Tr. 1203:21-24 (nature and extent of poverty).) Spindell "absolutely" knows that "there are people who simply don't have $20 to pay for a document that they might need [to get ID]." (Tr. 2004:8-11.) For others, even the $5 birth certificate copayment that St. Ben's requires is beyond their reach. (Tr. 534:21-535:17.) (*See also,* Tr. 131:9-25 (all Puerto Rican birth certificates invalidated in 2010; to get new one voter must travel to Puerto Rico or pay "hefty charge" online); Tr. 563:4-13, 565:6-22 (Ellis lacked $15 for birth certificate; Dryhootch gave him money for it only after he donated time); Tr. 705:1-12 (even $3 is a lot of money for Thompson, who has already paid $30 and was told to pay $25 more to try to get birth

---

[5]Although Dane and Milwaukee counties were waiving some birth certificate fees, the programs were only for voters born in those two counties. (Tr. 535:25-536:13, 1793:7-9.)

certificate); Fr. Ex. 468, Tr. 1855:7-25 (unemployed voter would have to pay $52 for N.Y. birth certificate online or $30 by mail); Fr. Ex. 635 at 26:1-27:1, 50:2-51:1, 59:3-23 (costs to homeless, minority and disabled voters).) Thus Defendants' lack of cost-free document alternatives forces many low-income persons to expend their limited funds to pay for birth certificates or lose their right to vote.[6]

### i. Voters with erroneous birth certificates

DMV requires even voters with erroneous birth certificates to obtain them. (Tr. 467:9-15.) However, if errors exist, a not uncommon problem (Tr. 468:16-20, 1104:1-20, 1857:6-13, 1865:17-21), DMV tells voters that the name on the birth certificate must match the name on the ID and that if the birth certificate is incorrect they must amend it. (Fr. Ex. 54, Tr. 466:22-467:14, 1675:2-1676:2; Tr. 43:18-47:1 (Plaintiff Eddie Lee Holloway Jr., whose birth certificate said Eddie Junior Holloway, was told he had two identities and had to amend birth certificate); Tr. 94:17-96:15, 104:22-107:5 (DMV told Genevieve (Kujawski) Winslow, whose birth certificate read Ganava Kujansky, to amend Indiana birth certificate or renew passport); Tr. 116:10-119:8 (DMV told Shirley (Mendel) Simon, whose birth certificate read Genevieve Shirley Mendel, to change Illinois birth certificate); Tr. 1614:6-1616:18 (DMV told William Trokan to get new birth certificate for his father, whose birth certificate read "Andro" instead of "Andrew"); Tr. 966:20-967:14 (Hutchins' birth certificate lacked first name and had to be amended).) Amending a birth certificate is not free (*see, e.g.*, Fr. Ex. 603 and Tr. 965:21-23, 967:6-7 ($30 to amend Wisconsin and Mississippi birth certificates, respectively),) and costs and burdens can be significant. Tr. 46:23-51:1 (Holloway was told amending birth certificate could cost $400-600 and spent $180

---

[6]Voters who have changed their names, for example through marriage, must provide additional documents such as marriage certificates. (Tr. 1668:7-13, 1669:8-14, Fr. Ex. 524 at 3.) These also cost money. *See, e.g*., Wis. Stat. § 69.22 (1)(a); (Tr. 121:2-16).

for bus fare to Illinois in unsuccessful effort to do so); Tr. 562:25-571:19 (Rev. Brisco's grandmother travelled 210 miles to correct his birth certificate); Tr. 959:4-963:1 (Katherine Clark spent more than $2000 to amend Mississippi birth certificate).) Frank, who never in her life had her birth certificate, went to DMV with a baptismal certificate that she had been able to use to travel to Canada, was denied ID and told to get her birth certificate, was first told the birth certificate did not exist and then that it was replete with errors that would cost up to $200 to correct. (Fr. Exs. 603, 604, 606 at 7:9-10:11, 11:12-12:1, 20:2-21:15, Tr. 1898:8-1899:22.) Moreover, while Defendants now assert she "probably" could get ID with the incorrect birth certificate, there is no fee waiver for it and Frank "wasn't interested in obtaining [the birth certificate] if it was going to cost [her] money, because [she] felt that she had a right to vote without producing a birth certificate . . ." (Tr. 1900:3-11, Fr. Ex. 606 at 25:5-17.)

Although DMV claims to have flexibility in addressing the situations of voters whose birth certificates have errors, that information is kept secret and not included on its website, driver's license manual, customer handout, or list of documents used by front line workers. (Def. Exs. 1077, 1080, 1082, Tr. 1123:3-5, 1859:10-1860:3, 1861:16-22.) DMV knows its staff may reject cases with name discrepancies without escalating to supervisors (Tr. 1892:6-10), and even voters who ask for supervisors may find no help. (*See, e.g.*, Tr. 107:6-109:20, 1615:20-1616:18.)

Yet for some voters who know how to complain to the right person – usually to legislators, the governor, or high agency officials – DMV may bend the rules. Thus DMV issued IDs to Winslow, Simon, Trokan, Leo Navulis and a 103 year old Merrill woman in the names they used rather than the names on their birth certificates, after they or their children complained

to legislators or the governor about DMV's initial rejection of their applications.[7] (Tr. 107:6-112:8, 119:21-123:2, 1616:23-1618:24, 1862:2-1863:8, Fr. Exs. 425, 428, 429, 463.)

### ii. Voters without birth records

Some voters, though fewer than those with birth certificate errors, were never issued birth certificates or they were lost or destroyed in fires or natural disasters such as Hurricane Katrina. (Tr. 466:8-21, 1103:15-25, 1161:12-17, 1856:14-1857:3.) This includes older Blacks born in the South (Tr. 372:1-9), like Weddle (Tr. 37:5-38:6), Jones (LULAC Ex. 393 at 1, Tr. 56:25-57:13, 63:6-12), Brown (Tr. 205:15-206:3, 209:2-5), Thompson (Tr. 700:1-15), and many Racine voters (Tr. 431:7-12); Latinos born in places like Texas (Tr. 185:21-186:21); Mennonite and Amish voters (1856:25-1857:3), and voters like Robertson, from Milwaukee (Tr. 401:2-15), Marcella Althof, from Iowa (Fr. Ex. 450 at 8), and Wilde, from Marathon County (Fr. Ex. 607 at 10:1-8).

DMV has an MV3002 form for voters to ask vital records to verify that no birth record exists. (Tr. 470:16-471:11, 818:16-21.) DMV might accept a signed MV3002 with additional "strong evidence" to issue ID (Tr. 1872:1-17), but a voter will have to go to DMV at least twice and speak to a supervisor, and approval is not guaranteed.[8] (Fr. Ex. 526 at 2, Tr. 1881:3-7.)

---

[7]Defendants argue that Frank and Holloway could get ID. (Tr. 2132:11-14, 2132:25-2133:1.) DMV's actual testimony was that Frank could "probably" get ID and that there was a "possibility" that Holloway could get ID. (Tr. 1840:3-1841:5, 1843:11-1844:9.) Moreover, these cases fall in the category of responding only to voters who persistently or publicly complain.

[8]There has been dispute within DMV about whether the MV3002 can even be used to prove "legal presence" or only "name and date of birth." The form says it is for name and birth date (Fr. Ex. 38, Tr. 1861:12-15), DMV's manual does not say the MV3002 can be used to prove legal presence (Tr. 1861:3-11, 1865:3-12, Fr. Ex. 107.), and some DMV officials, including Jim Miller, have stated that anyone born in the U.S. has to provide a "certified Birth Certificate or Passport." (Fr. Ex. 450 at 5.) Although on 11/28/11 DMV issued an update saying the MV3002 and supporting evidence could be used to prove legal presence (Fr. Ex. 47), on 12/1/11 DMV's Deputy Administrator told a reporter that "[e]very applicant . . . must provide a birth certificate, a U.S. Passport, or naturalization papers for U.S. citizens." (Fr. Ex. 27 at 1).

Moreover, DMV keeps this process largely secret. The form is not available to the general public, not posted on DMV's website or at its offices, not kept at DMV offices, and not mentioned in the BDS 316. (Tr. 474:6-10, 819:7-22, 1123:11-14, 1872:18-20, 1877:21 -1878:4.) DMV told GAB to inform voters they need birth certificates and to only disclose the MV3002 if the voter volunteers more information about lacking a birth certificate. (Tr. 1880:20-1881:2.) DMV knows staff regularly turn away voters without birth certificates, such as Jones,[9] Brown, and Althof, without telling them of the MV3002. (Tr. 74:2-22, 214:8-12, Fr. Ex. 450, Tr. 1870:7-10.) Voters who are not told of the MV3002 may pay fees to search for documents that do not exist. (Tr. 37:9-38:6 (Weddle); 215:10-216:11 (Brown); 700:2-15 (Thompson).) If a voter somehow learns of the MV3002, she must pay vital records fees to have it completed with no guarantee that it will be accepted. (Tr. 471:19-472:12, Fr. Ex. 38.) Those fees can be burdensome for lower income voters like Wilde, for whom $20 was a lot of money. (*See, e.g.*, Fr. Ex. 607 at 38:12-39:8.) Even in Wisconsin – and certainly outside the state – vital records offices may not know the form exists or may not agree to sign it, and DMV cannot require them to do so. (Fr. Ex. 631, Tr. 1871:2-13, 1873:11-18.) Indeed, Wilde sent an MV3002 to vital records, which declined to complete it and told her to file a delayed birth registration instead.[10] (Fr. Exs. 121, 607 at 19:19-22:21; *see also* Tr. 401:7-18 (Robertson told to obtain delayed birth registration).)

---

[9]As in the case of non-matching documents, DMV officials may make arbitrary exceptions. Thus the Waukesha DMV twice denied Jones' application and a DOT employee said she doubted there was any exception for lacking a birth certificate, but Milwaukee DMV approved her, *without* an MV3002, after her daughter complained. (Tr. 61:13-62:22, 73:6-75:23.)

[10]Obtaining a delayed birth registration also costs money and requires proof that voters may be unable to obtain. (*See e.g.*, Fr. Exs. 121, 607 at 26:11-27:13, Tr. 67:2-72:22, 401:16-25.)

### b.    Proof of identity

DMV requires a document to prove identity, most commonly a social security card for voters without licenses or IDs. (Tr. 467:16-19, 1098:11-14, 1819:14-17); *see also* Wis. Admin. Code § Trans. 102.15(4)(a). Just in Milwaukee County, 1640 eligible voters without ID lack proof of identity. (Fr. Ex. 600 at 37.) The Social Security Administration ("SSA") usually requires photo ID to issue social security cards. For example, DMV told Smith he could not get ID without a social security card, but SSA would not give him a card without photo ID.[11] (Tr. 858:4-859:7; *see also* Tr. 467:20-468:8 (DMV team leader would not accept SSA printout); 1682:15-1683:5, Fr. Ex. 131 (DMV rejected printout that SSA gave voter who could not get social security card without photo ID).) DMV knows this, but sends voters to SSA without even providing social security applications or instructions. (Tr. 1884:22-1886:8.)

Further, if social security records contain even minor errors, DMV's social security matching database will place a "hold" on the application. (Tr. 1884:3-16.) DMV would not issue an ID to Hermann-Brown's mother until Social Security records were corrected, because they had the middle name "Loise" instead of "Lois." (Tr. 1795:17-1796:20; *see also* Fr. Ex. 496 (SSA matching problem for voter whose social security card used nickname).)

DMV has publicly stated that it cannot waive and has not changed its proof of identity requirements, even for homeless voters. (Fr. Ex. 46, Tr. 1652:1-18, 1675:16-19.) It claims some flexibility to accept other documents (Tr. 1830:11-21), but its website, manual and customer handout convey no such information and DMV does not think alternatives should be publicly

---

[11]While SSA may allow the use of other documents to get a social security card, some cost money and many require an applicant to travel to other offices or agencies. 20 C.F.R. § 422.107. Although Smith ultimately learned he could get a social security card with medical records, he was not even able to get his own medical records without ID and obtained them only because his sister – who had ID – requested them for him. (Tr. 856:12-857:16.)

disclosed. (Tr. 1893:14-25, Def. Ex. 1077, Def. Ex. 1082 at 7-8.) Thus DMV rejected Newcomb's VA ID and told him to get his discharge papers (Tr. 845:22-846:3), even though Miller believes VA ID "should" be on the proof of identity list. (Tr. 1888:17-25.)

### c.      Proof of residency

DMV also requires applicants for a license or ID card to provide proof of "a current acceptable Wisconsin residence street address," not a P.O. Box or commercial mail-receiving agency. Wis. Adm. Code §§ Trans. 102.15(2)(c); 102.15(4m). Not all voters have such proof. (*See, e.g.*, Tr. 430:5-22 (in Racine minority households, all bills may be in one person's name so others lack proof of residency); Tr. 470:9-16 (in just one CSC, applicants come several times a week lacking proof of residency.) Although DMV has somewhat more flexibility on proof of residency, that is not communicated to the public. (Tr. 1893:14-25.) Furthermore, all IDs are mailed, so voters lacking mailing addresses, including unsheltered homeless individuals unaffiliated with social service agencies, simply cannot get ID. (Tr. 1889:3-12.) In fact, as of 2012, hundreds of licenses and ID cards that were mailed had been returned as undeliverable, and cards continue to be returned.[12] (Tr. 1889:13-1890:4.)

### 3.      Multiple Trips to Agencies

As a result of DMV's requirements, many voters are forced to make multiple, in person trips in their often futile quests to get ID. For example, Davis (Tr. 88:1-11), Winslow (Tr. 99:3-9, 100:25-101:4), Simon (Tr. 116:15-24, 122:4-123:2), Brown (Tr. 210:20 -211:25), Newcomb (Tr. 844:25-846:3), Hutchins (Tr. 952:3-16, 967:24-968:10), Trokan (Tr. 1614:9-16, 1618:13-24), Smith (Tr. 858:21-859:11), and Hermann-Brown's mother (Tr. 1794:21-1795:11, 1796:19-20) all had to go to DMV twice; Jones (Tr. 60:25-61:18, 62:10-22, 75:5-11) and Ellis (Tr. 561:17-

---

[12]Voters who do not receive their cards will not be able to vote, as the DMV receipt is only valid for 60 days. Wis. Stat. § 343.11(3).

564:11, 564:24-565:1, 567:6-10) went to DMV three times; and Thompson (Tr. 704:2-20) went to DMV four or five times. Voters also must often go in person to multiple locations to get documents that DMV requires. For example, Holloway went to DMV, downtown to another agency, to various agencies in Illinois twice, and to SSA (Tr. 45:2-15, 46:1-14, 47:15-51:1); Ellis went to a church, Dryhootch and Vets Place Central for birth certificate help, and to SSA (Tr. 564:12-18, 565:18-566:16); Smith went to SSA 3 or 4 times and to Froedert Hospital to get medical records to get a social security card (Tr. 857:2-16, 858:4-11); Jones made multiple trips to notaries (Tr. 69:5-6), and Hermann-Brown's mother had to go to SSA. (Tr. 1795:17-1796:18.)

### 4. Surrender of Out-of-State License

DMV prohibits any person with an out-of-state license or ID card from obtaining a Wisconsin photo ID. (Tr. 828:14-18, 1113:7-16.) Having a Wisconsin license is not a voter qualification, and having an out-of-state license does not preclude someone with intent to reside in Wisconsin from voting. *See, e.g.*, Wis. Stat. §§ 6.02, 6.03; (Tr. 873:3-24, Fr. Ex. 1 at 3 ("Wisconsin law permits out-of-state students to vote in Wisconsin elections if they have established a 10-day [now 28-day] physical presence and intend the presence to be their residence for voting purposes. This means they cannot vote in another state . . . . These students may want to keep their out-of-state license because they may return to their home state for vacations or summer employment."); Fr. Ex. 635 at 121:8-123:6.) Thus lawful Wisconsin voters such as Meszaros, who is concerned about Wisconsin issues, but has an Illinois license that she primarily uses when visiting her parents (Tr. 693:8-694:7), Dearing, who did not have a car and seldom drove in Wisconsin, wants to return to school in Wisconsin, but has a New York license tied to his financial information (Tr. 972:15-18, 973:6-7, 974:4-13, 980:25-981:2), many Carthage students from out of state (Tr. 692:12-20), and Dearing's former classmates with out-

of-state licenses (Tr. 977:22-978:19, 983:15-984:7), would all have to surrender those licenses to get ID from DMV. Similarly, "snowbirds" or other voters who live part year in Wisconsin and part in other states and vote only in Wisconsin cannot get IDs without giving up the out-of-state licenses. (*See, e.g.*, Fr. Ex. 43, Tr. 1687:14-1688:21 (GAB's Ross Hein aware of at least 10 snowbirds with this problem, in addition to students at colleges without compliant IDs).)

## D.    Facts Relating to Election Administration

### 1.    GAB Has Limited Authority Over Election Administration

The GAB administers Wisconsin elections laws. Wis. Stat. §§ 5.05, 15.60, 15.603. However, while GAB has general oversight, Wisconsin operates the most decentralized electoral system in the country. About one of every six officials who run elections nationwide is in Wisconsin. (Tr. 888:18-24.) The actual operation of elections is in the hands of 1,852 municipal clerks, 62% of whom work part-time – at times a few hours a week – and are not "professional" elections workers. (Tr. 888:3-17, 889:16-890:5, Fr. Ex. 13 at 4, Fr. Ex. 635 at 83:5-16.) Clerk turnover is 20-25% per year, posing major training challenges in what is "never an easy process." (Tr. 890:6-21.) This decentralized structure also makes it difficult to ensure uniform implementation of election laws. (Tr. 1697:22-1698:9.) The facts that local elections officials – including one of Defendants' witnesses, Clerk Sue Ertmer – continued to put out information that photo ID was required for months after state courts enjoined Act 23, and that Racine poll workers still requested ID after the injunction, underscore the lack of uniformity and accuracy. (Tr. 439:13-440:6, 1702:24-1705:24, 1754:12-1755:2, Fr. Exs. 543, 556, 557, 558.)

The clerks supervise approximately 2700 to 5000 chief election inspectors ("chiefs") and 15,000 to 30,000 elections inspectors ("poll workers"). Wis. Stat. § 7.15(1); (Fr. Exs. 109 at ii; 635 at 82:2-18.) The state requires that *new* clerks and chiefs undergo only three hours of "core"

training and three more total hours of training every two years, regardless of the nature or extent of election law changes; other clerks and chiefs only have to undergo a total of six hours of training every two years and cannot be required to attend training on any specific topic. (Tr. 1150:17-1151:8, 1934:6-19.) Poll workers, many of whom are volunteers, are trained by municipal clerks, not the GAB (Fr. Ex. 635 at 73:21-25, 81:11-18), and election law changes can be confusing to them. (Tr. 911:23-912:4.) The increasing administrative burdens have made some poll workers decide they do not want to do the job anymore, and understaffed polling places can be a problem for voters and the system. (Tr. 1638:1-12.) Adding administrative tasks, or having overworked poll workers, also can insert errors into the process. (Tr. 1637:14-22.)

GAB, however, has limited ability to enforce compliance. It can try persuasion, but has no inherent enforcement authority or direct disciplinary tools over clerks, chiefs or poll workers, and some clerks ignore its orders. (Fr. Ex. 635 at 91:6-92:13, 95:12-96:9.)

### 2. GAB Does Not Meaningfully Assist Voters Who Lack Act 23 Compliant ID

GAB has only very limited ability to assist voters who lack compliant ID. Although Act 23 requires GAB "to engage in outreach to identify and contact groups of electors who may need assistance in obtaining or renewing statutory ID and provide assistance in obtaining and renewing statutory ID" (Fr. Ex. 1 at 8), GAB lacks the capacity to "work[] with individual voters other than to respond to inquiries." (Fr. Exs. 1 at 8; 2 at 11.) Instead, GAB provides primarily an information and referral service. (Tr.1667:21-1668:1, 1937:1-6.) Its media campaign also focused on telling voters to bring ID when they came to vote, and on providing bare bones information on the documents voters should use to get ID (Def. Ex. 1055, Tr. 1936:13-25), some of which actually disseminated inaccurate or incomplete information (*see, e.g*., Def. Exs. 1056 at 1, 1060 at 2 (indicating *any* college ID can be used as voter ID); Ex. 1056 at 2, Tr. 1934:25-

1935:12 (phone script incorrectly stating out-of-state license can be used for proof of name and date of birth).) In addition, not all outreach materials were provided in Spanish. (Tr. 1649:7-16.)

Many voters, especially in minority communities, are extremely confused by Act 23. (*See, e.g.*, Tr. 130:1-15, 185:1-14, 371:12-20, 399:9-16, 396:13-21, 399:9-16.) GAB is aware of particular difficulties in ensuring that minority, low-income, elderly, disabled, and rural voters understand the law. (Fr. Ex. 635 at 39:3-40:22, 45:16-46:3, 54:11-56:22, 57:14-58:16.) While GAB's outreach plan includes contacting some groups that work with voters, its efforts are limited by its budget, it has no funding to support those voter assistance efforts, many groups are completely unaware of that outreach, and GAB knows it is not reaching all voters statewide. (Fr. Ex. 13 at 4, Tr. 130:20-23, 153:19-21, 176:4-9, 901:2-25, 922:15-25, Fr. Ex. 635 at 62:10-21.)

Even though GAB knows that birth certificates usually cost money (Tr. 1659:14-23, 1665:1-3), GAB has no funding, or authority to provide funding, to pay for documents voters need to obtain a photo ID, even for indigent voters. (Tr. 899:25-900:3.) It cannot help voters fill out forms, amend birth certificates or other underlying documents, or help voters get documents they need to get ID. (Tr. 900:12-18, 1667:15-20, 1676:3-18.) Similarly, while the lack of transportation is a well-known barrier (Sec. I.C.1), GAB cannot transport voters to DMV.[13] (Tr. 900:19-23, 1655:15-16.) It cannot require clerks to take such steps. (Tr. 1792:18-1793:21.)

If voters contact GAB with problems with DMV, GAB's practice is to refer the voter back to DMV. (Tr. 1670:11-18, 1672:22-1673:1.) Wilde, for example, told GAB she could not get ID due to lack of a birth certificate and was referred back to DMV. (Fr. Ex. 25, Tr. 1670:19-1671:19.) Similarly, GAB's practice is to refer voters needing birth record help to their birth

---

[13]GAB looked into, but did not get, such transportation funding. (Tr. 1655:21-1656:3.)

state's vital records office. (Tr. 1664:5-8, 1673:2-6.) There is no follow up to ensure that voters are actually able to surmount barriers and obtain ID. (Tr. 1686:12-1687:7.)

Further, although the names and addresses of all registered voters are in its Statewide Voter Registration System (SVRS), GAB did not send individual notice to voters about Act 23 or procedures to obtain ID or require municipal clerks to do so. (Tr. 913:10-22.) It did not notify or require clerks to notify nursing homes, group homes, adult care facilities, or indefinitely confined voters such as Ruth Ann Obermeyer that they did *not* need photo ID, causing some to believe they could not continue to vote without ID. (Tr. 913:23-914:8, Fr. Ex. 608 at 14:7-15:4 Fr. Ex. 635 at 40:12-41:23, *see also* Tr. 125:9-13 (nursing home told Simon that mother needed ID to vote).) GAB did not even send notices to the 167,000 registered voters that its own expert identified as lacking ID (Sec. I.E.1.) to tell them about Act 23 or offer any help in getting ID. (Tr. 915:5-22.)

Nor does GAB have any oversight or legal authority over other agencies with which voters must interact to obtain ID. It cannot require DMV to comply with suggestions that might facilitate ID issuance, such as allowing homeless voters to get ID by affidavit instead of birth certificate (Fr. Ex. 46, 1652:1-24), issuing ID cards to voters with out-of-state licenses (Tr. 1688:22-25), or altering any other DMV rules or procedures. (Tr. 900:4-11, 1655:5-8.) It cannot require DMV to post information to inform voters of alternative policies. (Tr. 1681:7-1682:1.) It cannot require DMV to transport voters, set up mobile sites or issue ID cards in locations closer to, and preferred by, voters, such as libraries, schools, city halls, and post offices. (Fr. Exs. 39, 155 at 6-7, Tr. 905:3-906:15, 1656:4-1657:19.)

GAB also lacks authority over vital records and cannot change documentation policies, even if they keep voters from getting birth certificates and thereby keep them from getting ID.

26

(Tr. 1662:4-1664:4.) GAB has less of a relationship with Wisconsin vital records than with DMV

(Tr. 1673:7-11), and no relationship with out-of-state vital records offices. (Tr. 1673:16-21.)

### 3.     Registration and Voting Process

Since 2006, all Wisconsin voters have had to register to vote. A voter who registers by

the third Wednesday before Election Day (20 days before the election), Wis. Stat. § 6.28(1),

completes a form with:

> name; date; residence location; location of previous residence immediately before
> moving to current residence location; citizenship; date of birth; age; the number of a
> current and valid operator's license issued to the elector under ch. 343 or the last 4 digits
> of the elector's social security account number; whether the applicant has resided within
> the ward or election district for at least 28 consecutive days; whether the applicant has
> been convicted of a felony for which he or she has not been pardoned, and if so, whether
> the applicant is incarcerated, or on parole, probation, or extended supervision; whether
> the applicant is disqualified on any other ground from voting; and whether the applicant
> is currently registered to vote at any other location. The form shall include a space for the
> applicant's signature. Below the space for the signature, the form shall state "Falsification
> of information on this form is punishable under Wisconsin law as a Class I felony."

*Id.* § 6.33(1); (Tr. 1690:1-16.) A voter who registers after that date and by the Friday before

Election Day must do so in person at the clerk's office, and must produce a document from a

specified list with her complete name and address. Wis. Stat. §§ 6.29(2), 6.34(3). A voter who

registers at the polls on Election Day also must provide documentary proof of residence. Wis.

Stat. §§ 6.34(3), 6.55; (Tr. 2010:11-25.) First time voters who register by mail must provide

proof of residence from an even more limited list of documents. Wis. Stat. § 6.34(2).

Each voter's registration information is entered into the SVRS database, which began in

2006 and is designed to ensure accurate, complete, and high-quality voter data statewide. (Tr.

1689:18-25, 1690:17-19.) SVRS crosschecks voter information against sources including DMV,

SSA, Department of Corrections and Department of Health databases. (Tr. 1691:6-11, 1693:23-

1694:4, 1694:22-1695:1.) Felons and deceased voters are removed from poll lists. (Tr. 1694:1-

12, 1695:7-14.) SVRS also verifies and merges data for voters who move and register at new addresses so there is only one entry per voter (Tr. 1691:12-1692:17, 1693:6-9), and has been used forensically to identify voters who vote more than once in an election. (Tr. 1692:18-25.) There are formal procedures for removing from poll lists those who have not voted in four years. (Tr. 1695:16-1696:2.) All these steps have improved voter list quality. (Tr. 1696:3-10.) The processes were set up to balance voters' rights and the integrity of the system. (Tr. 1696:11-13.)

At the polling place, voters must announce their names and voting addresses to the poll workers. Wis. Stat. § 6.79(2)(a); (Tr. 2008:11-14.) Voters must state their name and address loudly enough for any election observers to hear them, or poll workers may repeat names and addresses so observers can hear them. (Tr. 1775:1-13.) Poll workers mark the serial numbers of ballots in the poll book. Wis. Stat. § 6.79(2)(b). Unless unable to do so due to disability, voters must also sign the poll book before receiving their ballots. Wis. Stat. §§ 6.36(2); 6.79(2)(a),(am).

### 4.      Act 23 Implementation Issues

Act 23 is a complicated law that was difficult for even professional elections workers to learn. (Tr. 1641:20-1643:5, Fr. Exs. 70, 348.) It adds numerous steps to the voting process,[14] and election officials are not prepared to uniformly and properly implement it. (Tr. 906:24-907:10, 1153:6-9, Fr. Ex. 364 (based on reports about how the "soft implementation of the new Photo ID law was being interpreted and implemented by local election officials, there seems to be a lot of misunderstanding 'out-there'"), Fr. Ex. 394 ("I am concerned that some clerks and their poll workers . . . are already off on the wrong path by NOT understanding critical aspects of the new

---

[14]Under Act 23, before issuing a ballot the poll worker must take added steps to verify that 1) the photo ID is one of the allowable forms of identification; 2) that it is unexpired or expired within Act 23's time limits; 3) that the photograph on the identification "reasonably resembles" the voter; and 4) that the name on the identification "conforms" to the name in the poll book. (Def. Ex. 1092 at 6-7, Def. Ex. 1094 at 15-18); Wis. Stat. § 6.79(2)(a).

Photo ID Law. They are making stuff up as they think how it should be."); GAB cannot even confirm that all clerks, chiefs, and poll workers were trained on Act 23. (Tr. 1151:9-18.)

By adding complexity, Act 23 increases the risk of error. (Tr. 906:17-23.) Other than knowing that voters must show ID, many elections workers – who will determine whether voters, even those *with* proper ID, are able to cast ballots – do not understand even basic aspects of the law. (Fr. Ex. 635 at 73:13-19, 81:20-23.) GAB's former Elections Division head recognized the problem: "This is a new sweeping law with a lot of nuances, and for poll workers who do not do this as a matter of their daily jobs . . . the facts that should be known, the basic facts, in fact, are many times not known. And it does adversely affect the voter . . . ." (Fr. Ex. 635 at 74:1-8.)

Some elections workers incorrectly require the name on the photo ID to be identical to the name on the voting list, which led to the improper denial of ballots to possibly more than five voters in just the low-turnout February 2012 election. (Fr. Ex. 635 at 74:9-75:21, 77:3-24, 80:18-20; *see also* Tr. 1152:17-21 (election workers confused about name conformity).) There is also a widespread misperception that the voter's current address must be on the photo ID, leading to poll workers wrongly trying to verify addresses and to between 10 and 50 instances of election officials improperly ordering voters to re-register and vote using outdated addresses on their licenses or ID cards. (Tr. 402:20-403:7, 1699:4-1700:6.) Other voters may have been denied the ability to vote due to improper address matching. (Fr. Ex. 635 at 87:9-22.) GAB is also concerned about local officials' improperly requiring a photo on the ID, which can often be more than a decade old, to exactly resemble the voter. (Fr. Ex. 635 at 79:25-80:12, Tr. 1152:13-16.) Elections workers were also confused about whether the signature on the ID had to match the signature in the poll book. (Tr. 1153:1-5.) Voters subjected to improper name, address, photo or signature matching by elections officials may well believe that the poll workers are the experts

(Fr. Ex. 635 at 87:6-21), become discouraged and give up on voting. In the context of photo ID, such errors can deprive eligible voters of their voting rights. (Tr. 1706:7-16.)

Other voters will simply not have compliant ID. In just the low turnout Feb. 2012 election, 28 Madison voters lacked ID and left without voting at all. (Tr. 2063:8-11, 2063:21-23.) Sixteen other voters without ID went through the time-consuming and complicated process of filling out a provisional ballot. (Tr. 2062:18-2063:11.) Only six provisional voters returned by the Friday after election day with compliant ID (Tr. 2063:12-23), and one of those votes still was not counted due to poll worker error in completing the provisional ballot. (Tr. 2064:25-2065:3.)

Act 23 will also increase the time needed to vote. (Tr. 907:11-13, 1700:13-14, Def. Ex. 1109 at 4.) Although some locations may not have had problems during "soft implementation" in 2011 or in the low-turnout February 2012 primary, at other sites delays at polling places occurred even when photo ID was voluntary. (Fr. Ex. 401 (longer lines and wait times in Kenosha and Arbor Vitae), Tr. 1700:13-1702:5, Fr. Ex. 393 (in DePere, 45 minute wait times, which would have been two hours, had there not been enough poll workers to "split" poll books); Tr. 1789:23-1790:5 (Sun Prairie budgeted for more poll workers due to voter ID).) During a 2011 special election in Madison when photo ID was voluntary, workers timed the voting process with stop watches and found it two and one-half times as long. (Tr. 2063:24-2064:12.) Adding one-half to one minute per voter (Tr. 2066:21-25) can cumulatively be a problem at polling sites with up to 1300 voters. (Tr. 2067:7-11.) Longer lines can make people give up on voting. (Tr. 1702:9-12; *see also* Tr. 1221:10-20 (lines at polling places impose a "cost" on voting that can decrease participation).) The provisional voting process, for voters who lack ID, is even longer and more complicated. (Def. Ex. 1068 at 25-32, Tr. 2064:13-22, 2065:10-13.)

E. **Facts Relating to Eligible Wisconsin Voters Without Acceptable Forms of ID and Racial Disparities in ID Possession Rates**

1. **More than 150,000 Registered Voters Lack Accepted Photo ID**

The undisputed evidence shows that there are more than 150,000 registered voters, and likely several hundred thousand eligible voters, in the state of Wisconsin who do not have an accepted form of photo ID required to vote under Act 23. Frank Plaintiffs' expert, Prof. Matthew Barreto, conducted a survey of eligible voters in Milwaukee County and found that 63,085 *eligible* voters lacked any form of acceptable ID (Fr. Ex. 600 at 16.) Of the 63,085 eligible voters without accepted photo ID, 21,512 lacked at least one of the three documents needed to get even a free ID for voting. (*Id.* at 37 (Table 8).)

Significantly, Defendants' expert, Prof. Melvin Hood, acknowledged that Barreto is a well-regarded social scientist, that surveys are widely used in the social sciences (Tr. 1491:1-13), and that Barreto's survey was "conducted in a professional manner using commonly accepted survey research practices."[15] (Def. Ex. 1003 at 11 ¶ 20.) Indeed, Hood acknowledged that

_____

[15]Hood criticizes Barreto's survey design for failing to "validate" the survey responses by comparing them to government records. As the sole basis for that criticism, Hood pointed to academic studies (based on data from the 1970s (Tr. 1525:9-25)), arguing that survey respondents may inaccurately report whether they are registered or turned out to vote. (Tr. 1520:12-1521:3, Def. Ex. 1003 at 12-13 ¶ 24.) But he admitted that there is no academic literature indicating that survey respondents misreport whether they are eligible to vote or possess ID and/or underlying documents (Tr. 1521:9-1522:20, 1523:19-24, 1524:21-1525:8), which was the focus of Barreto's survey. (Tr. 1524:12-1525:8.) Validation was therefore unnecessary here. Further, as Barreto explained, recent academic work has shown that comparing the survey results to government records is inappropriate because of inaccuracies in government records. (Tr. 293:5-294:7, 329:19-330:2, 1526:1-1527:11.) Hood was aware of this recent academic literature but chose not to bring it to the court's attention (Tr. 1526:18-1527:25), and admitted that he had published two peer-reviewed academic articles concerning voting behavior that, like Barreto's work, *relied on un-validated survey data*. (Tr. 1528:1-1529:14, 1530:22-1531:11.) In any event, validation was impossible because Barreto did not have access to the names of survey respondents. (Tr. 292:9-16, 323:8-16.) Under industry guidelines, which prohibit respondents' identifying information from being used without consent (Tr. 292:17-21), validation would have been possible only if the survey had advised and obtained consent from

Barreto's survey was in several ways superior to prior analyses performed by other experts – including Hood's own analysis – because it enabled Barreto to estimate the number and racial breakdown of *eligible* voters who do not have *any* of the accepted forms of ID, as well as which of those persons lacked the underlying documents necessary to obtain an ID, rather than being limited to *registered* voters and possession of a drivers' license or state ID card. (Def. Ex. 1003 at 22 ¶ 41, Tr. 1492:4-21, 1496:4-8.) Moreover, unlike the databases Hood used, which could only determine whether a person has been *issued* a state ID card, the survey asked whether respondents *currently possess* ID or documents needed to get it, accounting for instances where ID or documents were lost, stolen, or destroyed. (Fr. Ex. 600 at 3-5, 44-50.)[16] In any event, even Hood's methodology found that between 38,661 and 51,724 registered voters in Milwaukee County, and *between 167,351 and 285,425 registered voters statewide*, do not have a license or state ID. (Def. Ex. 1001 at 10; Tr. 1427:22-1428:5, 1431:6-9.)[17] Hood conceded that his

---

[16]This is not an infrequent phenomenon. (*See, e.g.*, Tr. 44:1-5 (Holloway's Illinois ID expired); 84:25-84:5 (Davis' birth certificate lost in fire); 118:1-6 (Simon's passport expired and lost); 390:25-391:6 (Whitehurst's ID stolen); 510:11-13 (Jayme Montgomery Baker's driver's license lost); 701:16-702:3 (Thompson's license expired in 1980); 857:17-23 (Smith's social security card lost); 950:23-951:1 (Hutchins' license expired); 405:19-25 ("As I knock doors, I found out people didn't have IDs for various reasons . . . . [T]hey were like, my drivers license expired and I don't have the money. . . . Some just lost their ID."); 479:11-18 (Turja encountering those with lost birth certificates every week); 1103:18-25 (birth certificates lost in Hurricane Katrina); 536:25-537:6 ("the homeless element, the people really don't have much of a way of securing their documents . . .").

[17]LULAC Plaintiffs' expert, Leland Beatty, also performed a matching analysis and found that 317,735 registered voters lacked driver's licenses or IDs. (LULAC Ex. 817 at ¶ 6.) The difference between Beatty's analysis and Hood's analysis essentially boils down to two assumptions Hood made that likely *overestimated* the number of registered voters with ID. First, he assumed that people with the same state ID number on the voter list and DMV list were the same person without checking that their *names* matched, a step he conceded could have easily been taken. (Tr. 1545:2-1546:14.) Second, he simply assumed that the 77,209 to 83,399

calculations even under-estimated the number of voters affected by the photo ID law because he considered only *registered* voters, not all *eligible* voters without ID. (Tr. 1513:11-1514:3.) This omission is significant because many voters use same-day registration.[18] (Tr. 285:11-14, Tr. 911:5-21 (15-16% of voters in November 2012 same-day registered).)

Hood tried to further reduce his estimate by arguing that some of the at least 167,351 registered voters without driver's licenses or state ID have other forms of Act 23 compliant ID. (Def. Ex. 1001 at 13.) But, unlike his recent work in South Carolina, he made no attempt to quantify how many such individuals exist in Wisconsin. (Def. Ex. 1001 at 14-15, Tr. 1437:4-14, 1440:7-25, 1510:11-23.) And he did not dispute Barreto's finding that just *0.3%* of eligible voters who did not have a license or state ID possessed one of the other forms of ID. (Tr. 300:7-13, 1493:5-1494:1.) When multiplied by Wisconsin's eligible voter population of approximately 4.3 million (Def. Ex. 1003 at 11 (Table 3)), approximately 13,000 people fall into that category, which when subtracted from Hood's 167,351 estimate still produces an estimate of more than *150,000 registered voters* without any acceptable ID. (Tr. 1510:24-1512:15.)

---

individuals with a state ID number in the voter database had a DMV-issued driver's license or ID, *even when the voter's ID number was not listed in the DMV database*. (Def. Exs. 1001 at 6, 1003 at 5 ¶ 12, Tr. 1536:2-16.) The only step he took to verify this assumption was to give DMV 20 names to purportedly confirm that most had changed their names and had ID. (Def. Ex. 1001 at 6, Tr. 1537:3-16.) Hood admitted that no social scientist would reasonably draw conclusions about a population of 77,000 based on a sample size of 20. (Tr. 1537:17-1540:1.) Hood also simply assumed that people with the same first and last names, middle initials, and date of birth on both lists were the same person but did not check whether fields like zip code or middle name also matched, a step he conceded he could have easily taken. (Tr. 1543:3-1545:1.)

[18]For example, Dearing was an *eligible* voter who wanted to vote in the February 2012 election but did not register because he lacked accepted ID. (Tr. 975:3-976:3.) He was eligible but not registered for the June 2012 recall election because he thought Act 23 was still in place and that he could not vote. (Tr. 974:4-14.) It was not until November 2012, when he realized he could vote, that he registered and voted on Election Day. (Tr. 981:24-982:4.)

## 2.   There are Significant Racial Disparities in ID Possession

In addition to the sheer number of Wisconsin voters who do not have accepted forms of photo ID as well those who lacked one or more underlying documents, Barreto's survey found significant racial disparities among eligible voters in the rate of non-possession of ID and, for eligible voters without ID, in the lack of documents needed to get ID:

- Non-possession of valid Act 23 ID. 13.2% of eligible African-American voters and 14.9% of eligible Latino voters lack accepted ID, compared to 7.3% of eligible white voters. (Fr. Ex. 600 at 18-19, 34, Tr. 304:5-11.) Among registered voters, 15.3% of registered African-American voters and 11.3% of registered Latino voters lack accepted forms of ID, compared to 6.0% of registered white voters. (Fr. Ex. 600 at 19-20, 36, Tr. 306:19-307:6.) These disparities are statistically significant, at either the 95% or 99% level. (Tr. 304:5-307:6.)[19]

- Non-possession of underlying documents. 14.1% of eligible African-American voters and 18.9% of eligible Latino voters lack documentary proof of citizenship, compared to 11.2% of eligible white voters (Fr. Ex. 600 at 21, 35), with the Latino-white difference statistically significant at the 99% confidence level. Moreover, 38.4% of eligible Puerto Rican-born voters[20] lack birth certificates, compared to 12.9% of eligible white voters. (*Id.* at 20-21, 25-35.)[21]

---

[19]Hood suggests that the survey revealed no significant disparity between whites and African Americans with respect to those who have *never* possessed ID (while admitting a disparity between whites and Latinos). (Def. Ex. 1003 at 13-14 ¶ 27 (Table 6), Tr. 1496:4-17.) But that is irrelevant. As Hood conceded, individuals with lost or long-expired IDs would not be able to vote under Act 23 (Tr. 1495:9-1496:1), and even if it is possible for some of them to obtain ID, the process of doing so necessarily entails a cost. (Tr. 1473:19-1474:11.)

[20]Puerto Ricans are U.S. Citizens (Tr. 468:25-469:3), and 16.7% of Milwaukee Latinos, such as Nicole Collazo-Santiago, were born there. (Fr. Ex. 600 at 25, Tr. 131:7-8.) The survey also found that eligible Black (48.9%) and Latino (71.7%) voters are far more likely than eligible white voters (18.9%) to have been born out of state. (Fr. Ex. 600 at 24-26, Tr. 303:1-10, 372:1-9, 537:22-25.) It can be harder for voters born elsewhere to get birth certificates. (Sec. I.C.2.a.)

[21]Hood argues that there are no significant Black/white disparities in possession of proof of citizenship or identity documents *out of the subset of those who lack ID*. (Def. Ex. 1003 at 14-15 ¶ 29 (Table 7), Tr. 1456:12-1457:8, Def. Ex. 1003 at 16-17 ¶ 31 (Table 9), Tr. 1457:25-1458:16).) But he ignores the fact that minority voters are *much more likely to lack ID* than whites. For example, if 30% of Black voters and 10% of white voters lack ID, and among those who lack ID, 50% lack birth certificates, then out of 100 Black voters 15 (.30 x .50 x 100) would lack birth certificates, while only 5 out of 100 white voters would lack them (.10 x .50 x 100). Hood also suggests that there are no racial disparities among the total population for those lacking proof of identity (Def. Ex. 1003 at 17-18 ¶ 32 (Table 10), Tr. 1458:21-1459:13), but as

- Non-possession of both ID *and* underlying documents. 4.5% of African-American eligible voters and 5.9% of Latino eligible voters lack acceptable ID *and* one or more of the documents required to obtain ID, compared to only 2.4% of white eligible voters (Fr. Ex. 600 at 23, Tr. 307:14-308:7.) These findings are statistically significant at the 95% and 99% confidence levels, respectively. *Id.*[22]

The survey's findings compel the conclusion that there are and continue to be significant racial disparities in possession rates of ID and underlying documents in Milwaukee County. Indeed, Hood conceded that there was a statistically significant difference in ID non-possession rates between Blacks and whites, and Latinos and whites (Tr. 1494:2-20, 1497:20-1498:22), and did not dispute the other racial disparities the survey found. Hood also conceded that his analysis did not undermine Barreto's results because his analysis *did not even account for race*, and therefore could not determine the racial breakdown of those without ID. (Tr. 1512:16-1513:10.)

Moreover, the credible evidence and natural inferences to be drawn from the survey establish that racial disparities exist throughout Wisconsin, not just in Milwaukee. "Oftentimes when you do a survey or a study in just one county within a state you do tend to find similar patterns or similar rates. . . [A]bsent some specific information that minorities in Milwaukee County are somehow more uninformed or disadvantaged against possession of ID . . . these results [should] be consistent statewide and that would be consistent with other work I've done." (Tr. 336:21-337:3; *see also* 337:16-20 (isolating large county in Indiana and Pennsylvania tended to produce same results as statewide sample).) Defendants did not refute this principle and offered nothing to suggest that minorities in Milwaukee County would be less likely to possess

---

he conceded, ID cannot be obtained with just proof of identity alone (Tr. 1501:8-17), and most individuals without ID who lack a document lack proof of citizenship. (Tr. 1504:20-25.)

[22]Hood suggests that the survey revealed relatively few individuals out of the total population of those who lack ID *and* proof of citizenship (Def. Ex. 1003 at 15-16 ¶ 30 (Table 8), Tr. 1457:12-22), but conceded that "the difference between whites and Blacks or Hispanics is statistically significant." (Tr. 1503:3-1504:2, 1507:15-25.)

ID than minorities in other parts of the state. Moreover, because such large percentages of Wisconsin minorities reside in Milwaukee County, observations about Milwaukee will by mathematical necessity be probative of statewide trends (Tr. 1190:3-15, 1263:10-23), as Hood conceded. (Tr. 1519:12-1520:5.) As Barreto concluded, it is precisely this large concentration of minorities that renders Milwaukee a "very appropriate" area in which to study racial disparities in Wisconsin. (Tr. 284:20-285:3, 337:5-15, Fr. Ex. 600 at 8.)

The survey's findings are consistent with every other study that has examined statewide racial disparities in ID possession in Wisconsin. In addition to Beatty's analysis finding racially disparate rates of ID possession statewide (LULAC Ex. 2 at 2, LULAC Ex. 817 at 1), a "widely cited" 2005 study by UW-Milwaukee's John Pawasarat found that while 83% of Wisconsin whites held a valid driver's license, slightly fewer than half of Blacks and Latinos did. (Fr. Ex. 578 at 26, LULAC Ex. 58, Tr. 1332:14-1334:18.) Knowledge of these racial disparities is so well-established even GAB leadership recognized them. (Tr. 903:5-8, Fr. Ex. 635 at 45:19-22.) These disparities are consistent with the first-hand experiences of DMV staff such as Janet Turja, whose experience was that Latinos are more likely than whites to lack proof of citizenship. (Tr. 469:12-19.) Hood even conceded that "academic studies, including [his] own, also have found rates of government-issued IDs vary by race and ethnicity." (Defs. Ex. 1003 at 9 ¶ 18.)

There is likewise no merit to Defendants' suggestion that Barreto's survey is too old to be relied on. The survey was conducted in 2012, and its results remain valid. As he explained, a properly conducted survey like this one "should always be able to capture a snapshot in time that a short two years later should still be a very accurate picture of what the electorate looks like." (Tr. 309:3-5; *see also id.* 308:8-309:5.) Absent some significant factor such as an unusual demographic shift, there is no reason to suspect that its estimates no longer hold true.

Demographic analyses generally remain valid for several years, and courts routinely find racial discrimination and voting rights violations based on data – including surveys – that are several years old.[23] The most recent DMV data confirmed that the relative percentages of whites and minorities with licenses and ID cards had not changed since the time of the survey. (Tr. 311:17-312:4, 325:14-19.) There is thus no indication of any disproportionate surge in licenses and ID cards being issued to minorities in the last two years that might undermine the substantial racial disparities in ID possession rates found by the survey.[24] (Tr. 309:15-22.)

Hood's attack on the continued validity of Barreto's survey is principally based on the supposed mitigating effect of the availability of free IDs under Act 23, which were disproportionately issued to Blacks and Latinos. But Barreto's survey was completed six months after the free ID program began (Tr. 318:25-319:4), and therefore already took the impact of the program, if any, into account. Moreover, Hood failed to demonstrate that the free ID program changed the possession *rates* of ID or the racial breakdown of such rates.[25] Indeed, when asked if

----

[23]*See, e.g.*, *United States v. Balistrieri*, 981 F.2d 916 (7th Cir. 1992) (upholding findings based on 1989 study of race discrimination in Milwaukee; *see also* Br. for United States, 1991 WL 11010286, at *2 (trial held in Jan. and Feb. 1991)); *Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1253-54 (N.D. Miss. 1987) (judgment for plaintiffs following 1987 bench trial, citing research and academic papers from 1981-1985), *aff'd* 932 F.2d 400 (5th Cir. 1991); *cf. Stewart v. Blackwell*, 444 F.3d 843, 848-49 (6th Cir. 2006), *superseded by* 473 F.3d 692 (6th Cir. 2007) (2006 decision reversing district court conclusion that plaintiffs did not state VRA claim, citing surveys and exit polls between 1980 and 1996 and 2001 academic work).

[24]Defendants suggested that the 2012 elections might have shifted ID possession rates after the survey. (Tr. 318:15-21.) However, the February 2012 primary election had very low turnout (Tr. 908:2-9), and the voter ID law was enjoined in March 2012, removing any incentive for voters to obtain ID to participate in other 2012 elections.

[25]Calculating a possession rate requires a numerator (number of people with acceptable ID) and a denominator (number of eligible voters), and the mere number of free IDs issued does not account for increases to the denominator – *i.e.*, the growth of the eligible voter population (e.g., people who turn 18, become citizens, or move into Wisconsin). Nor does it account for other factors relevant to the numerator, such as voters whose IDs have lapsed, or IDs that have been lost or stolen. (Tr. 308:18-309:1, 328:18-329:2.) Hood also did not account for any changes

he was "offering an opinion that the free ID program has resulted in a change to the variation in rates of ID possession among minorities compared to whites," Hood admitted, "I can't make that determination from just that data, no." (Tr. 1561:18-22.)

Hood also argues in his supplemental report that GAB's "launch of an educational campaign" would mitigate racial disparities in ID ownership. (Def. Ex. 1001 at 20, Tr. 1471:22-1472:3.) Hood's assertion, however, was based purely on statutory language and unsubstantiated assumptions about how this program would be implemented. (Tr. 1516:7-19.) There is no question that the educational campaign involved only the dissemination of general information, and not individual voter assistance. (Tr. 1936:17-1937:6, Sec. I.D.2.)[26]

---

in possession of *other* types of ID like licenses (Tr. 1554:5-18, 1557:3-1558:11, 1561:5-7), or for whether free IDs were simply issued as renewals or duplicates to people who already had ID. (Tr. 1553:4-22, 1560:25-1561:4.) Race would also have to be accounted for in all these numbers.

[26]The Court observed Hood's testimony and demeanor for the better part of a trial day and will make its own credibility determinations. Plaintiffs respectfully submit that on any disputed issue, Hood's analysis, opinion and testimony was not credible, as other federal courts have found in rejecting or excluding his opinions. *See, e.g.*, *Florida v. United States*, 885 F. Supp. 2d 299, 324 (D.D.C. 2012) ("the analysis underlying [Hood's] conclusions suffers from a number of methodological flaws"); *id.* at 326 (describing Hood's methods as "distorting," "misleading[]," and "unpersuasive"); Order for Judgment at 10 n.11, *NAACP v. Walker*, No. 11 CV 5492 (Dane Cnty. Cir. Ct. July 17, 2012) ("reports and the testimony of Professor Mayer were substantially more credible and more helpful to the court than those of Professor Hood.") *at:* http://moritzlaw.osu.edu/electionlaw/litigation/documents/PermanentInjunction.pdf; *Common Cause / Georgia v. Billups*, No. 4:05-CV-0201-HLM, 2007 WL 7600409, at *14 (N.D. Ga. Sept. 6, 2007) (excluding Hood's opinions as "either unreliable or not relevant"). In fact, the only court of which Plaintiffs are aware to have credited Hood's testimony is in *South Carolina v. United States*, 898 F. Supp. 2d 30 (D.D.C. 2012), where he admitted that there was a significant racial disparity in the possession of photo ID in South Carolina. *See id.* at 40 (noting "undisputed racial disparity" in photo ID possession rates). (Tr. 1576:14-1578:3.)

**F.      Facts Relating to Social and Historical Factors that Affect Minorities' Ability to Participate in the Political Process**

**1.      Blacks and Latinos Bear the Effects of Discrimination, Which Hinders Their Ability to Participate Effectively in the Political Process (Senate Factor 5)**

The Blacks and Latinos who will disproportionately shoulder the burdens imposed by Act 23 already face heightened burdens on their political participation in Wisconsin. Frank Plaintiffs' expert, Prof. Marc Levine, a professor of history, urban studies, and economic development at the UW-Milwaukee for 29 years (Tr. 1179:23-1181:18) who has authored or co-authored four books and about 40 journal articles and chapters in peer-reviewed anthologies (Tr. 1183:19-1184:12) and whose credentials went unchallenged by Defendants, evaluated a broad range of socioeconomic indicators, finding that for Blacks and Latinos those indicators "are demonstrably worse almost across the board in Milwaukee compared to other regions." (Tr. 1195:4-9; *see also* LULAC Ex. 811 at 5-11, Tr. 1298:9-1314:12, Def. Ex. 1003 at 9 ¶ 18 ("accept[ing] Professor Levine's findings concerning the socio-economic status of minorities within Wisconsin").) There is an "absolute consensus in the political science literature that socioeconomic disparities play a major role in hindering full participation in the political process." (Tr. 1218:25-1219:3; *see also* Tr. 771:23-772:4, 779:7-14, 1219:20-1220:9, 1312:19-1314:12, Fr. Ex. 578 at 23.)

Levine's testimony and report are replete with examples of the profound racial disparities in income and poverty measures in the Milwaukee metro area. (*See, e.g.*, Tr. 1193:18-25, 1195:15-18, Fr. Ex. 578 at 12-13 (Black median household income 42% that of whites, ranking 39th out of 40 largest metropolitan areas); Tr. 1193:18-25, 1195:19-1196:4, Fr. Ex. 578 at 12-13 (Hispanic median household income 56% of that of whites; ranking 27th out of 36 largest metropolitan areas); Tr. 1196:8-1197:6, Fr. Ex. 578 at 22 (Black poverty rate 39%, Hispanic poverty rate 30%, white poverty rate of 8%, disparity worst for Blacks and 30th out of 36 for

Latinos); *see generally* (Fr. Ex. 578 at 12-15.) The poverty rate for Blacks in metropolitan Milwaukee is 39.2%, and 38.8% throughout the state of Wisconsin. (Tr. 1263:24-1264:2.)

Residential segregation and housing discrimination are major causes of these poverty and income disparities. Milwaukee ranks the worst out of the 102 largest metro areas in Black/white segregation based on the dissimilarity index and 9th worst in Hispanic/white segregation. (Tr. 1201:3-1202:20, Fr. Ex. 578 at 22; *see generally* Fr. Ex. 578 at 5-11.) Black suburbanization is the lowest among even the most segregated metropolitan areas in the U.S. (Fr. Ex. 578 at 9.) The extreme residential segregation that still plagues Milwaukee is the "cornerstone from which all of these other socioeconomic disparities flow." (Tr. 1202:24-1203:1; *see also* 120421-1205:9.) It helps keep largely Black and Latino populations in central Milwaukee from accessing suburban labor markets. (Tr. 1203:1-8.) There is a "fairly robust correlation between metropolitan areas that have high levels of segregation . . . [and] low levels of Black male employment." (Tr. 1208:3-6.) Segregation also limits access to schools with lower concentrations of poverty. (Fr. Ex. 578 at 8.)

Contemporary segregation can be traced in part to Milwaukee's ugly history of housing discrimination, which includes "amply documented discrimination in housing markets . . . in the use of . . . public policy, zoning practices to exclude minorities from areas in the region, the lack of affordable housing built in areas, [and] the segregated construction of public housing back in the 1940s and the 1950s." (Tr. 1204:21-1205:2.) And housing discrimination persists. For example, more than 98% of home purchase loans in Milwaukee suburbs in the 1990's went to white applicants. (Fr. Ex. 578 at 10.) The "disparity in black and white mortgage denials was greater in Milwaukee than in any metropolitan area in the country," which a study "replicated and found to persist" in the 2000s. (Tr. 1205:19-1206:2, Fr. Ex. 578 at 9.) The discrimination is

so rampant that *affluent* minorities face higher loan denial rates than *lower-income* whites. (Fr. Ex. 578 at 10, Tr. 1206:21-1207:3.) Federal court decisions and filings confirm the ongoing persistence of housing discrimination.[27]

Extreme racial disparities likewise persist in employment. Overall Black male employment rates in Milwaukee are abysmal. (Tr. 1209:11-14.) There is a 32.4% Black/white male and a 20.4% Black/white female employment gap, the worst out of 40 metro areas in the country. (Fr. Ex. 578 at 16-20.) Hispanic/white male and Hispanic/white female employment disparities rank near the lowest third of 38 metro areas. (Tr. 1210:5-10, Fr. Ex. 578 at 17-18.) Black business ownership ranks 48th out of 50, and Latino business ownership is the lowest of 36 metro areas. (Tr. 1214-12-14, Fr. Ex. 578 at 23.) And as noted above, segregation severely restricts minority access to suburban jobs, which, combined with the lack of public transit, "plays a rather prominent role in the employment crisis." (Tr. 1211:2-8; *see also* Fr. Ex. 578 at 17.)

Hiring discrimination also persists. An early 2000s study of the Milwaukee labor market sent pairs of Black and white testers, with identical qualifications other than race and whether they had prison records, to apply for certain jobs. White applicants were called back for interviews more than twice as frequently as Black candidates, and white applicants *with criminal records* were called back at a higher rate than Black applicants *without* criminal records. (Fr. Ex.

---

[27]*See, e.g.*, *United States v. City of New Berlin*, No. 11-CV-608 (E.D. Wis. filed April 19, 2012), ECF No. 70 (consent decree enjoining New Berlin from housing discrimination and requiring provision of fair and affordable housing); *State Financial Bank et al v. South Milwaukee*, No. 00-C-1530, ECF No. 363 (3/25/2009) (denying summary judgment on race discrimination claim against Milwaukee suburb opposing affordable housing; verdict for plaintiffs finding race discrimination at ECF 508 (7/29/2009)); *United States v. Security Management Co.,* 96 F.3d 260 (7th Cir. 1996) (insurance coverage dispute arising out of race discrimination claims in Wisconsin, including Milwaukee County, which had been resolved by consent order); *United States v. Balistrieri*, 981 F.2d 916 (evidence sufficient to support finding of pattern of race discrimination by owners of Milwaukee apartment complex); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992) (claim of racially discriminatory insurance redlining in Milwaukee area).

578 at 18, Tr. 1212:4-1213:3, LULAC Ex. 811 at 9, Tr. 1306:24-1307:18.) Court decisions confirm the persistence of discriminatory employment practices.[28] Defendants did not dispute that these disparities are related to continuing discrimination.

Racial disparities in education are profound and a legacy of historical discrimination.[29] Wisconsin has the nation's lowest test scores for Black eighth-graders and the worst racial disparities on those tests. (Tr. 1215:5-11.) The Black-white test score gap in Milwaukee is second-highest, and the Latino/white gap is 14th highest, of the 100 largest metro areas. (Tr. 1214:19-1215:4, Fr. Ex. 578 at 23.) These disparities are especially troublesome because education correlates with employment and so can be key to escaping poverty. (Tr. 1208:9-13.)

Educational disparities are also largely related to segregation. "[C]oncentrated poverty, most researchers agree, is a crucial element in explaining the racial disparities that exist in educational achievement in urban school systems" (Tr. 1216:7-9), and Black and Latino Milwaukee students are far more likely than whites to attend schools with concentrated poverty. (Tr. 1216:12-14, Fr. Ex. 578 at 23 (78% of students are poor in schools attended by average

---

[28] *See, e.g.*, *Kimble v. Wis. Dep't of Workforce Development*, 690 F. Supp. 2d 765 (E.D. Wis. 2010) (state agency discriminated against supervisor on basis of race and gender); *Davis v. Wis. Dep't of Corrections*, 445 F.3d 971 (7th Cir. 2006) (evidence sufficient to support jury verdict of intentional racial discrimination by state agency); *United States v. City of Milwaukee*, 441 F. Supp. 1377 (E.D. Wis. 1977) (denying motions to vacate consent decrees integrating Milwaukee police force).

[29] *See, e.g.*, *Sch. Dist. of Shorewood v. Wausau Ins. Companies*, 170 Wis.2d 347 (1992), *overruled on other grounds by Johnson Controls, Inc. v. Emp'rs Ins. of Wausau*, 264 Wis.2d 60 (2003) (insurance coverage dispute noting settlement in underlying action for racial integration of schools and housing)**;** *Armstrong v. O'Connell*, 451 F. Supp. 817 (E.D.Wis. 1978) (defendants intentionally segregated Black students); *Amos v. Bd. of Sch. Directors*, 408 F. Supp. 765, 818 (E.D. Wis. 1976) ("[S]chool authorities engaged in practices with the intent and for the purpose of creating and maintaining a segregated school system, and that such practices had the effect of causing" segregation in the Milwaukee public schools).

Black student, 70.5% of students are poor in schools attended by average Latino student; 24.2% of students are poor in schools attended by average white student).)

## 2. The Political Process is Tainted by Other Factors Hindering Blacks' and Latinos' Ability to Participate Effectively

Blacks and Latinos face additional barriers to full participation in Wisconsin political life.

### a. Racial appeals (Senate Factor 6)

A "racial appeal" is an issue targeted at "segments of the population that would be influenced by a particular racial attitude . . . raising certain issues, either overtly about a particular racial group or through more subtle means to evoke certain ideas about a racial group." (Tr. 1223:17-22.) There have been racial appeals in Wisconsin political campaigns for decades. The history of overt racial appeals stretches back to smearing Frank Zeidler during his mayoral campaign in the 1950s (Tr. 1224:14-21) and the success of the segregationist Wallace presidential campaign in the 1960s. (Tr. 1225:12-1226:6, Fr. Ex. 578 at 30.)

As overt appeals to race became less acceptable, political campaigns sought to achieve the same impact with coded language about issues like crime, welfare, busing, and cutting taxes. (Fr. Ex. 578 at 29.) There can be a "degree of racial coding even in . . . seemingly race-neutral issues." (Tr. 1227:16-17.) While not every voter who favors these positions is a "racist" (Tr. 1230:17-23), the use of coded language around such issues often functions as a "dog whistle" for negative racial attitudes. (Tr. 1229:22-1230:4, 1227:3-12.) For example, in the 1970s, a Nazi ran as the "white people's candidate" for mayor, emphasizing "runaway crime," "unsafe streets," "welfare handouts," forced busing," and "integrated jungles." (Fr. Ex. 578 at 31.) In the 1980s, gubernatorial candidates debating welfare reform traded accusations of wanting to make Wisconsin like Mississippi. (Fr. Ex. 578 at 32, Tr. 1229:10-21.)

The most notorious recent example was a 2008 campaign ad against Wisconsin's only

African-American Supreme Court Justice, Louis Butler, that played on racial stereotypes in a

"reprise of the 1988 Willie Horton gambit."[30] The ad portrays images of Justice Butler alongside

a convicted rapist who Justice Butler had represented during his days as a public defender and

used menacing music and racial images to suggest that as a Black jurist Butler would choose to

let violent criminals go free. The ad concludes with the question "Can Wisconsin families feel

safe with Louis Butler on the Supreme Court?" (Tr. 265:8-21, Fr. Exs. 578 at 35, 587.) After the

ad ran, Butler's chambers were flooded with angry and racist calls, such as one from a person

who said she didn't know there was a Black Supreme Court Justice and that that was

"disgusting." (Tr. 267:3-25.) Butler became the first Wisconsin Supreme Court incumbent to be

defeated since 1967 (LULAC Ex. 811 at 12), which left the Court exclusively white. There have

been many other examples of racial coding in Wisconsin political campaigns in recent years.[31]

Indeed, the earliest legislative efforts to enact voter ID (Def. Ex. 1036) occurred at around the

same time that the specter of "voter fraud" in "urban areas" was being raised,[32] and culminated

---

[30]The "Willie Horton gambit" refers to an ad that used the actions of a Black criminal to attack a candidate. (Tr. 1228:12-14.) Its creator, Lee Atwater, admitted it was an attempt to appeal to racial fears without using overt racial language. (Tr. 1228:15-18; *see also* Fr. Ex. 578 at 29.)

[31](*See* Fr. Ex. 578 at 33 (1989 Milwaukee aldermanic candidate accused of wanting to open white areas of district to minorities); *id.* at 34 (1996 Milwaukee judicial incumbent linked to "Black militant"); *Milwaukee Branch of the NAACP v. Thompson*, 935 F. Supp. 1419, 1433 (E.D. Wis. 1996) (campaign "appear[ed] to have involved racial appeals."); Fr. Ex. 578 at 35 (1997 Waukesha County Board supervisor "upset" when he sees "people who can't speak English" having their "hands out for welfare."); *id.* at 34 (2000 Milwaukee mayoral candidate opposed light rail because "urban criminals could use the trains to prey on suburbanites"); *id.* at 35-36 (2006 Attorney General candidate emphasized plan to "deal with illegal immigrants who commit crimes"); *id.* at 36 (2006 gubernatorial campaign referenced "illegal aliens stream[ing] in" to take spots in Wisconsin's university system); *see also* LULAC Ex. 811 at 12-13.)

[32](*See, e.g.*, Fr. Ex. 578 at 36 (2001 article referred to unsubstantiated "voter irregularities" in "urban areas"); *id.* at 37 (comments from radio host referred to "wetback[s] and

in Act 23's enactment just a few years after unprecedented Black turnout helped elect the nation's first Black president. (LULAC Ex. 811 at 3.)

### b. Non-responsiveness to minority communities (Senate Factor 8)

Wisconsin elected officials have not been responsive to the particularized needs of minority group members in recent years. The history of Act 23 itself illustrates this lack of responsiveness. Numerous witnesses presented evidence to the legislature that minorities were less likely than whites to have ID and implored the legislature to consider this impact. (Fr. Exs. 333, 589, Tr. 746:6-747:1, 784:14-785:23, 787:25-788:5, 1325:22:-1339:2.) Yet the legislature did not even seek to confirm or study the racial disparity statistics (Tr. 747:2-8), and rejected proposals that might have mitigated the burdens the law imposed on those voters, such as providing mobile DMVs (Tr. 790:20-792:12) or free birth certificates. (Tr. 792:20-794:10.)

The same legislature that refused to consider the racial effects of Act 23 also repealed a law that had required law enforcement to collect data on the race and ethnicity of individuals who were being pulled over (Tr. 750:13-751:15); ignored concerns that Black men were the primary victims of "stand your ground" laws and passed a "castle doctrine" law, which was invoked a few weeks later when a white suburban homeowner shot and killed a young Black man (Tr. 752:19-754:25); turned down federal funds to extend unemployment benefits despite stratospheric unemployment in the Black community (Tr. 755:1-13); and ignored the fact that Milwaukee had the second-highest teen pregnancy rate for Black girls and one of the highest

---

every other non-citizen out there voting" in 2004); *id.* (in 2008, political operative sought people "willing to volunteer . . . at inner city . . . polling places" to intimidate voters and try to catch supposed voter fraud); *id.* at 37-39 (in 2010 and 2012, dozens of billboards were placed primarily in Milwaukee's Black and Latino neighborhoods warning people about "voter fraud"); *see also* Tr. 1231:10-18; 758:16-760:5 (describing billboards, which inner city residents interpreted as trying to intimidate them from voting); Tr. 1233:25-1235:12 (support for voter ID law correlates with racial resentment and increases as racial resentment increases.)

HIV/AIDS infection rates among young Blacks in repealing a law requiring schools to provide medically accurate pregnancy prevention and safe sex information. (Tr. 755:14-756:13.) Prior legislatures ignored transportation needs of minority communities, who are much less likely than whites to drive, by blocking establishment of a regional transit authority to ensure transit funding. (Tr. 757:5-758:2.) Representative Grigsby, among others, was "very, very vocal" about the racial impact of these laws, yet her concerns were ignored. (Tr. 756:14-24, 758:3-9.)

### c. Other Senate Factors

Act 23 will interact with other factors to cause further inequalities in the political process. Wisconsin has a history of official voting-related discrimination that has marginalized minority voters (Senate Factors 1 and 3). (LULAC Ex. 811 at 3-6, Tr. 1283:24-1287:11, 1292:6-1298:4.) In 2011, soon after passing Act 23, the legislature passed a redistricting plan that violated the Voting Rights Act. *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 854-58 (E.D. Wis. 2012). Wisconsin voting has also been marked by "racial polarization" (Senate Factor 2), *id.* at 855-56; (*see also* LULAC Ex. 811 at 4, 1288:16-1292:5), which means "simply that the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races . . . vote in blocs for different candidates." *Thornburg v. Gingles*, 478 U.S. 30, 62 (1986). Few minority candidates have been successful in statewide campaigns (Senate Factor 7): in Wisconsin's history only one Black candidate has been elected to statewide office and only one Black has been elected to Congress. There are no Latinos in the state senate, and only two of 99 Assembly members are Latino. Milwaukee, a majority-minority city, has never elected a minority mayor. (LULAC Ex. 811 at 14, Tr. 1322:13-1323:18.) Defendants produced no evidence disputing these factors.

### 3. Given the Presence of These Factors, the Burdens Associated with Act 23 Weigh More Heavily on African-Americans and Latinos

Against this backdrop, the burdens of Act 23 weigh much more heavily on Blacks and Latinos. Defendants did not dispute that a "'great deal of research shows that voter turnout declines as the costs of voting increase, and that even small increases in cost may make a real difference in turnout rates.'" (Fr. Ex. 578 at 24 (citation omitted).) These "costs" are not limited to money, but also include time and energy to navigate bureaucracies, wages lost from taking time off work, and physically getting from one place to another. (*See* Tr. 396:25-397:8 (in African-American community "one little thing" can stop people from going to vote); 1221:3-18; Sec. I.C.) Hood admitted that his own work in other states found that photo ID laws suppress voter turnout, and that Georgia's far less onerous law had the effect of suppressing turnout by 0.4%, or 20,000 voters. (Tr. 1473:8-18, 1475:2-24.) Hood conceded that even if ID is technically "free," Act 23 clearly imposes such costs on voters without ID (Tr. 1473:19-1474:11), and admitted that Act 23 would similarly suppress turnout in Wisconsin. (Tr. 1475:25-1477:22.)

All available evidence confirms that Act 23's burdens will affect low socioeconomic status voters – who are disproportionately minority – more severely. (Tr. 1240:14-21.) As Levine explained, costs are not felt equally by people of different socioeconomic statuses. (Tr. 1221:21-1222:2.) For example, poor voters have more difficulty taking time from work – often unpaid – or obtaining child care to do so. (Tr. 1222:11-14, Sec. I.C.1.) Thus, it is unsurprising that a growing body of social science research suggests minority voters will disproportionately feel Act 23's suppressive effects. (Tr. 1240:14-21.) For instance, one 2012 study found that the lack of photo ID deterred three times as many Black young adults as white young adults from voting in 2012, and a working paper from 2013 indicates a racially disparate impact of about two percentage points. (Tr. 1239:23-1240:1.) Other studies cited in Levine's report support the

47

conclusion that minority voters are disproportionately less likely to vote after voter ID laws are implemented. (Fr. Ex. 578 at 25-28.)[33]

### G.    There is No Evidence of Voter Fraud that Act 23 Would Deter and No Evidence It Would Improve Voter Confidence

Defendants argue that this case involves "the state's legitimate and important interests in protecting the integrity of elections, promoting citizen confidence in the election process, and detecting, deterring, and preventing voter fraud." (Tr. 2126:17-20.) Defendants, however, produced no expert or credible evidence to support a claim that Act 23 accomplishes these goals.

As Prof. Barry Burden made clear, voter ID can prevent only one type of unlawful behavior: in-person voter impersonation (Tr. 1340:10-14), defined as a voter voting in person at the polls and representing herself as someone she is not. (Tr. 1013:16-25.) A nationwide study by Prof. Lorraine Minnite found zero federal indictments for such fraud. (Tr. 1014:1-4.) Even looking at the expanded pie of all voter fraud cases, any kind of fraud is exceedingly rare (Tr. 1013:1-2), a statistical zero (Tr. 1013:6-15), and less likely than being struck by lightning. (Tr. 513:21-514:1). As Minnite's research showed, there is no reason to believe that in-person voter impersonation is occurring but going undetected. (Tr. 1014:14-1016:8.)

With respect to Wisconsin, there are just 31 cases in which voter fraud charges were filed between 2008 and 2013, only 21 of which involved unlawful voting.[34] (Tr. 1035:6-1037:12.)

---

[33]Hood used his research and one other study (Def. Ex. 1003 at 9 ¶ 18) to argue that ID laws do not have a racially disparate effect on turnout. (Def. Ex. 1003 at 22-24 ¶¶ 41-45.) His Georgia study is of limited utility given differences in state laws. Unlike Wisconsin, in Georgia anyone can vote absentee by mail without photo ID (Tr. 1567:18-25), mitigating the law's effect on turnout, and Blacks in Georgia were more likely to cite voter ID as a reason for voting absentee. (Tr. 1568:4-1570:11.) It is also harder to obtain ID in Wisconsin than Georgia. (Tr. 1566:7-1567:17.) Further, both studies only arrive at their conclusions after controlling for income (Tr. 1570:15-1571:16), which obscures voter ID's disproportionate effect on Blacks and Latinos, who are overrepresented among lower income voters. (Fr. Ex. 578 at 23-24.)

[34]The others involve such issues as improper registration or signature collection, with no

Thirteen involved felons voting, but felons can obtain photo ID and thus a photo ID requirements would not stop such unlawful voting. (Tr. 1037:13-1038:7, 1633:7-1634:5.) Three cases involved double voting (Tr. 1038:8-10), which photo ID would not prevent because voters may use licenses to register and double vote. (*See, e.g.*, Def. Ex. 1028 at 2.) Four cases involved voters voting in the wrong jurisdiction or ward, another situation that would not be prevented by photo ID. (Tr. 1040:22-1041:12.) Only one case potentially implicated voter ID – a case where an individual obtained and voted an absentee ballot in the name of his recently deceased wife. (Tr. 1041:13-16.) Even in that case it is likely the man had a copy of his wife's photo ID, which he could have included when mailing the absentee ballot application in her name, so Act 23 would not have prevented that case either. (Tr. 1041:17-1042:12.)

Although Defendants repeatedly suggested that impersonation *could* happen, they provided no evidence it *does* happen. Despite years of intensive scrutiny of Wisconsin elections, there was no evidence produced of a single charge or conviction for in-person voter impersonation. (*See, e.g.*, Tr. 1031:12-14, 1343:1-1344:6.) GAB counsel Shane Falk concluded that there is no voter fraud "of the type that is specifically the basis for doing Act 23" (Tr. 1635:11-12), and that those who allege voter fraud "are never able to back it up." (Tr. 1635:13-15.) As Defendants' witnesses admitted, virtually all impersonation complaints turn out to be based on mistakes, such as a poll worker putting a voter number on the wrong line or a voter with a common name going to an incorrect polling site. (Tr. 2057:7-19.) Former police officer Michael Sandvick, called as a witness by Defendants, admitted that *every* impersonation complaint he investigated turned out to be poll worker error. (Tr. 2039:10-2040:2.)[35] Similarly,

evidence whatsoever that they implicated any illegal voting. (Tr. 1036:12-1037:8.)

[35]Sandvick – who joined the Republican Party in 2011 to advocate for voter ID – claimed the kind of fraud that is hard to find is voting at an *improper address*. (Tr. 2036:9-16, 2037:24-

Bruce Landgraf, a Milwaukee County Assistant District Attorney Defendants called, has *never* prosecuted a case of in-person impersonation fraud. (Tr.2039:17-2040:11.) Landgraf asserted that there may be one or two unexplained impersonation allegations per major election, but produced evidence of only two such complaints, neither of which was prosecuted or appears to constitute impersonation.[36] (Tr. 2056:16-2057:25). The absence of any actual evidence of impersonation fraud is consistent with GAB's findings in its 2009-2014 Election Administration Plan that "empirical evidence made available to the Board has not documented any widespread, organized, or systemic cases of voting by ineligible individuals or of double voting in Wisconsin." (Fr. Ex. 109 at 4.)

This is not surprising. Committing in person voter fraud is difficult (Tr. 1340:22-23) and extremely risky, punishable with $10,000 fine and 3 years in jail. (Tr. 1342:3-4.)

> If I wanted to commit voter fraud in that way, I would have to know that a person who is not me is registered at a particular polling place, their name is on the poll book, I have to know the person's address, and I have to know that they have not yet voted that day. I then walk into the polling place, give that person's name fraudulently, and address, sign the poll book, and hope that that voter doesn't walk in while I'm doing it. I'm also doing that under the watchful eye of poll workers from both parties, election observers who are traditionally there from both campaigns, other voters who are in line behind me, trained poll workers who are likely to know the voters who come through their polling place, and media and others who may be in the polling place.

(Tr. 1341:6-19; *see also* 2007:15-2011:5 (same points from Defendants' witness Spindell).)

Defendants also failed to present any credible evidence that voter ID increases public confidence. Moreover, the question of whether or how voter ID laws affect public confidence in

---

2038:10.) A few such cases have in fact been prosecuted. (Tr. 1040:22-1041:12.) Further, Act 23 does not require a correct (or any) address on the ID, so it would have no effect on such fraud.

[36](Def. Exs. 1033 (allegation that someone voted in Artie Gaines' name; poll worker could not specifically remember person); 1034 (unexplained case of elderly disabled man with trouble hearing and communicating; poll worker "believed that the man was stating his name was 'Milan Malich'" so had him sign that line in poll book; voter believes it was a mix up).)

the electoral process can only be answered through expert research (Tr. 1384:23-1385:1), not based on the purported popularity of voter ID in public opinion polls (Tr. 1265:12-23) or lay opinion, and a recent multivariate statistical analysis found that voter ID laws had no effect on public confidence or trust. (Tr. 1385:17-25.) Another method of measuring public confidence would be to see whether turnout increases with voter ID (Tr. 1265:24-1266:16), but the persuasive trend in research actually finds a suppressive effect on turnout. (Tr. 1265:12-1267:11.) Defendants produced no contrary evidence.

Moreover, factors such as fairness, the ability of eligible voters to vote regardless of race, and the perception that a law is applied in a racially fair manner are also important to public confidence in elections. (Tr. 1386:2-15.) So is confidence that a voter will be able to cast a vote and have that vote counted. (Tr. 1386:16-20.) Because impersonation fraud is not a problem in Wisconsin (Tr. 1389:24-1390:2), public officials who justify legislation based on preventing such fraud are making unsubstantiated allegations, unnecessarily undermining public confidence in elections. (Tr. 1388:3-16.)

## II.    ARGUMENT

### A.    Act 23 Violates Section 2 of the Voting Rights Act (Claims 9 & 10)

#### 1.    The Section 2 Legal Standard

Section 2 of the Voting Rights Act prohibits any State from imposing or applying a "voting qualification or prerequisite to voting or standard, practice, or procedure . . . *in a manner which results in* a denial or abridgement of the right of any citizen of the United States to vote on account of race[,] color, [or language minority status]." 42 U.S.C. § 1973(a) (emphasis added). Evidence of discriminatory intent is unnecessary, as "Congress [has] made clear that a violation of § 2 c[an] be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991). This "results test" is set forth in Section 2(b), which provides:

> A violation of [Section 2] is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b). The inquiry requires a court to "assess the impact of the contested structure or practice on minority electoral opportunities" on the basis of objective factors, rather than on the subjective intent of the legislature. *Thornburg v. Gingles*, 478 U.S. 30, 35-36, 44 (1986).

The "essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Id*. at 47. In the context of laws imposing barriers to the ballot box, a Section 2 violation occurs where the law: (i) imposes burdens on voting; (ii) that are disproportionately felt by minority voters; and (iii) the law interacts with historical and social conditions to cause an inequality in the ability of minorities to participate in the political process. *See, e.g.*, *Spirit Lake Tribe v. Benson Cnty*., No. 2:10-cv-095, 2010 WL 4226614, at *3-*4 (D.N.D. Oct. 21, 2010) (closure of polling places on Native American reservation, in light of "entrenched problems of poverty, alcoholism, illiteracy, and homelessness," likely violated Section 2); *Operation Push v. Allain*, 674 F. Supp. 1245, 1262-68 (N.D. Miss. 1987) (dual registration system and prohibition on satellite registration resulted in lower Black registration rate, which, coupled with "vast socio-economic disparities between Blacks and whites" and other factors, violated Section 2); *Roberts v. Wamser*, 679 F. Supp. 1513, 1523-32 (E.D. Mo. 1987), *rev'd on other grounds*, 883 F.2d 617 (8th Cir. 1989) (failure to manually review erroneously-marked ballots, which were primarily from Black voters, in conjunction with socioeconomic disparities and other factors, violated Section 2); *Harris v. Graddick*, 593 F. Supp. 128, 132-33 (M.D. Ala. 1984) (due to history of white intimidation at

polls, underrepresentation of Blacks as poll workers depressed Black registration and turnout and likely violated Section 2).

The social and historical conditions relevant to Section 2 liability, set out in the Senate Report accompanying the 1982 VRA amendments and known as the "Senate Factors," include:

(1) the history of voting-related discrimination in the State or political subdivision;

(2) the extent to which voting in the elections of the State or political subdivision is racially polarized;

(3) the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group;

(4) the exclusion of members of the minority group from candidate slating processes;

(5) the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(6) the use of overt or subtle racial appeals in political campaigns;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction;

(8) whether elected officials are unresponsive to the particularized needs of the members of the minority group; and

(9) whether the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous.

*Gingles*, 478 U.S. at 44-45 (citing S. Rep. No. 97-417, at 28-29 (1982)). This list of factors "is neither comprehensive nor exclusive," and "'there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.'" *Id.* at 45 (quoting S. Rep. No. 97-417, at 29). Depending on the nature of the challenged practice, some factors may be more relevant than others, and the "question whether the political processes are equally open

depends upon a searching practical evaluation of the past and present reality, and on a functional view of the political process." *Id.* (quotations and citations omitted).[37]

### 2. Act 23's Burdens Fall Disproportionately on Black and Latino Voters

The evidence presented at trial clearly shows that Act 23 causes burdens on voting to be imposed disproportionately upon minority voters. There is no dispute that even obtaining a "free" ID is a burden and has a suppressive effect on voting. (Secs. I.C, I.F.3.) Separate from Act 23's ultimate effect on turnout, its burdens clearly fall more heavily on minority voters. The evidence, including the report and testimony of Plaintiffs' expert, Barreto, and admissions of Defendants' expert, Hood, convincingly established that Blacks and Latinos are less likely to have photo ID than whites, are less likely to have the documents needed to obtain ID, and are more likely to be from out of state, compounding the difficulty of acquiring requisite documents (Secs. I.C.2.a, I.E.2), and that the racial disparities exist statewide. (Sec. I.E.2.) Thus, minorities in Wisconsin are more likely to face obstacles to voting as a result of Act 23. *See also*, *Spirit Lake Tribe*, 2010 WL 4226614, at *3 (survey showed that "closure of the voting places on the reservation will have a disparate impact on members of the Spirit Lake Tribe"). This is the

_____

[37]Defendants have sought to frame Plaintiffs' Section 2 claim as exclusively a "vote denial" claim, not a "vote dilution" claim. (*See* Dkt. 85 at 37.) In general, "vote denial" refers to practices that make it harder for minorities to vote or have their votes counted, while "vote dilution" refers to practices that diminish minorities' political influence. *See* D.P. Tokaji, *The New Vote Denial: Where Election Reform Meets the Voting Rights Act*, 57 S.C. L. Rev. 689, 691 (2006). Act 23 both disproportionately makes it harder for minorities to vote and diminishes their political influence, and courts have characterized such challenges to voting barriers as vote dilution. *See, e.g.*, *Black v. McGuffage*, 209 F. Supp. 2d 889, 895 (N.D. Ill. 2002) (framing use of punch-card voting systems resulting in greater uncounted minority votes as vote dilution claim); *Gonzalez v. Arizona*, 677 F.3d 383, 406 (9th Cir. 2012) (en banc) (adopting plaintiffs' characterization of voter ID challenge as vote dilution claim). Plaintiffs pled both here. (Dkt. 31 at 72-76.) In any event, whether Plaintiffs' claims are framed as "vote denial," "vote dilution," or both, *see, e.g.*, *Operation Push*, 674 F. Supp. at 1268 (finding that dual registration system violated Section 2, without adopting either characterization), Plaintiffs clearly established all elements of their Section 2 claims.

critical evidence that the Ninth Circuit believed was lacking in *Gonzalez v. Arizona*, 677 F.3d 383, 405 (9th Cir. 2012) (en banc), a case on which Defendants rely. (Dkt. 85 at 35-40).

But even without evidence of disparate rates of ID possession – and certainly when layered over that evidence – Plaintiffs established that Act 23 disproportionately burdens African-Americans and Latinos because of its interaction with poverty and pervasive socioeconomic disparities. The record clearly shows that among voters who lack ID, the burdens of Act 23 fall more harshly on those of lower socioeconomic status. Poor voters are less likely to have the money, time, education, and resources – such as transportation – to be able to navigate the complex bureaucratic processes necessary to obtain ID. (Secs. I.C, I.F.1,3.) It is undisputed that Wisconsin's poor and less educated are disproportionately comprised of Blacks and Latinos. (Sec. I.F.1.) It therefore follows that, regardless of whether there are disparities in ID possession rates, Act 23's burdens disproportionately fall on minorities. *See, e.g.*, *Operation Push*, 674 F. Supp. at 1256 ("limited hours for registration, was and is particularly onerous on poor persons [and] . . . a disproportionate number of the poor persons in Mississippi are black"); *cf. Texas v. Holder*, 888 F. Supp. 2d 113, 138-141 (D.D.C. 2012), *vacated and remanded on other grounds by Texas v. Holder*, 133 S. Ct. 2886 (June 27, 2013) (in Section 5 case, finding racially disparate impact of voter ID law, even without evidence of ID possession rates among racial groups, because burdens disproportionately fell on poor voters who are predominantly minority).

Notwithstanding Defendants' suggestions to the contrary (Dkt. 85 at 40; Tr. 2134:15-17), Plaintiffs do not have to show that Act 23 makes voting disproportionately *impossible* for minorities, only that it makes voting disproportionately more *burdensome*. Section 2 prohibits the "denial *or abridgement*"[38] of the right to vote, and a violation exists when "the political

---

[38] Black's Law Dictionary (9th ed. 2009) defines "abridge" as "To reduce or diminish."

processes leading to nomination or election in the State . . . *are not equally open to participation by* [racial minorities] . . . in that its members have *less opportunity* . . . to participate in the political process . . . ." 42 U.S.C. § 1973 (emphases added). As Justice Scalia explained, "[i]f . . . a county permitted voter registration for only three hours one day a week, and that made it *more difficult* for blacks to register than whites, blacks would have less opportunity 'to participate in the political process' than whites." *Chisom*, 501 U.S. at 408 (Scalia, J., dissenting) (emphasis shifted). When exercising the right to vote is more burdensome for Blacks and Latinos than it is for whites, voting is obviously no longer "equally open to participation" by minorities.

Thus under Section 2 courts routinely examine whether a challenged voting practice has made it more *burdensome* for minorities to vote, not whether a practice has made voting *impossible*. For example, in *Spirit Lake Tribe*, 2010 WL 4226614, the court enjoined the closure of polling locations on a reservation because it would have been *more difficult* for many reservation residents to travel to the remaining polling place, *see id.* at *3 (noting among other factors the lack of sufficient buses). The court rejected the government's claim that it was still *possible* for reservation residents to vote by mail because "poverty and transience on the Reservation *makes mail balloting more difficult for tribal members*." *Id.* (emphasis added). Similarly, in *Operation Push* the court found that Mississippi's ban on satellite registration, which would have made voter registration available only at the county courthouse, violated Section 2 because a disproportionate number of Blacks lacked automobiles, making it more difficult for them to register at that location. *Id.*, 674 F. Supp. at 1253; *see also id.* at 1252-53 ("the unavailability of telephones to some 30 percent of black households in Mississippi *makes it more difficult for blacks* to obtain information about procedures for registering to vote" (emphasis added).) The court also found that Mississippi's dual registration system violated

Section 2 because such requirements "*were harder to overcome* for persons of lower socio-economic status and persons of lower educational attainment, a group that is disproportionately black," *id.* at 1256 (emphasis added), not because the system made registration *impossible*. Other courts have similarly found Section 2 violations because of disproportionate *burdens*, not because of *impossibility*.[39] Accordingly, the racially disproportionate burdens imposed by Act 23 are sufficient to give rise to liability under Section 2.

### 3. Act 23 Interacts with Historical and Social Conditions (Senate Factors) to Cause Inequality in Minorities' Ability to Participate in Political Process

Plaintiffs also established that Act 23's disproportionate burdens interact with social and historical factors to limit the ability of minorities to participate in the political process and elect candidates of their choice. The undisputed evidence demonstrated that each Senate Factor except Factor 4 is present here. *See Gingles*, 478 U.S. at 45 (no requirement that all factors be proved because relevancy of each factor depends on context). (Secs. I.F, I.G.) Although Defendants assert that these factors are irrelevant in non-redistricting cases (Dkt. 85 at 41-42), Section 2 does not set forth different standards for cases involving barriers to voting, nor does the Senate Report provide that the Senate factors are irrelevant in such contexts. Indeed, courts in voting barrier cases have routinely relied on Senate factors in finding Section 2 liability. *See, e.g.*, *Spirit Lake*, 2010 WL 4226614, at *3 (liability based in part on Factors 1 and 3); *Roberts*, 679 F. Supp. at 1530 (liability based on Factor 2: "City's black population is politically cohesive and subject to white bloc voting"); *United States v. Berks Cnty.*, 277 F. Supp. 2d 570, 581 (E.D. Pa. 2003)

---

[39] *See, e.g.*, *Brown v. Dean*, 555 F. Supp. 502, 504-05 (D.R.I. 1982) (change in polling location "would make it *considerably more difficult* for the [Black] class members to vote" and "would be a substantial deterrent to voting by the members of the plaintiff class" and "may well *abridge* the [Black] class members' free exercise of the right to vote" (emphases added)); *Brooks v. Gant*, No. Civ. 12-5003-KES, 2012 WL 4482984, at *7 (D.S.D. Sept. 27, 2012) (denying motion to dismiss where plaintiffs claimed that six-day limit on early voting for predominantly Native American county provided less opportunity to participate in political process).

(liability based on Factor 5); *Roberts*, 679 F. Supp. at 1531 (liability based on Factor 6: "political campaigns in the City are the subject of racial appeals"); *Operation Push*, 674 F. Supp. at 1265 (liability based on Factor 7: only three Black officials elected from white majority districts).

Evidence of Senate Factors illustrates that there are built-in headwinds against equal participation by minorities in the political process. For example, the undisputed evidence showed that Wisconsin's Blacks and Latinos are far more likely than whites to be of lower socioeconomic status, rendering them less likely to have the time and resources necessary to participate in the political process (Factor 5). (Sec. I.F.1.3.) *Cf. Spirit Lake*, 2010 WL 4226614 at *3 ("Native American citizens in Benson County continue to bear the effects of this past discrimination, reflected in their markedly lower socioeconomic status compared to the white population. These factors hinder Native Americans' present-day ability to participate effectively in the political process."); *Berks Cnty.*, 277 F. Supp. 2d at 581 ("Hispanics in Reading suffer from significant socioeconomic inequality, which is ordinarily linked to lower literacy rates, unequal educational opportunities, and depressed participation in the political process.").

These severe, widespread, and interlinked socioeconomic disparities, which are the result, in part, of decades of continuing discrimination across a wide range of areas by state and non-state actors in Wisconsin (Sec. I.F.1), magnify Act 23's exclusionary effects, explaining how Act 23 directly *causes* a discriminatory result. Blacks and Latinos are less likely to have transportation, paid time off, or child care to get to DMV. They are less likely than whites to have the money to pay for birth certificates and transportation costs, and more likely to experience difficulties getting documents at all because they are more likely to have been born outside of Wisconsin. They often have less education and, in the case of Latinos, may have language barriers, leading them to be less likely to understand Act 23's intricacies and how to

comply with its requirements. In sum, Black and Latino voters have lower rates of ID possession precisely because discrimination has left them less likely to have the resources to be able to pass the bureaucracy navigation test to obtain ID. They will thus have more difficulty voting *because* of Act 23. *Cf. Roberts*, 679 F. Supp. at 1531 ("Black community in St. Louis City presently bears the effects of past discrimination in such areas as education, employment, housing, and health."); *Spirit Lake*, 2010 WL 4226614 at *3.

This causal link to continuing patterns of discrimination and racial inequality distinguishes this case from those on which Defendants rely, in which mere statistical disparities alone were deemed inadequate for Section 2 liability.[40] In contrast, Act 23 will cause discriminatory inequalities in minorities' socioeconomic circumstances to directly impede their ability to vote. And Act 23's racially disparate effects are not statistical accidents, but are intimately connected to past and present discrimination in the socioeconomic sphere. Courts have found liability where, as here, a barrier to voting interacts with existing socioeconomic disparities to cause minority voters to have less ability to participate in the political process. *See, e.g.*, *Operation Push*, 674 F. Supp. at 1255 (registration restrictions "have a disparate impact on the opportunities of black citizens in Mississippi to register to vote *because* of their socio-economic and occupational status") (emphasis added); *Brown v. Dean*, 555 F. Supp. 502, 504-05 (D.R.I. 1982) ("[m]any of the class members are elderly, and-or without automobiles" making it "considerably more difficult" for them to vote because of polling place change); *see also Stewart v. Blackwell*, 444 F.3d 843, 879 (6th Cir. 2006), *superseded by* 473 F.3d 692 (6th Cir. 2007)

---

[40](Dkt. 85 at 35-40, citing, *inter alia*, *Smith v. Salt River Proj. Agric. Improvement and Power Dist.*, 109 F.3d 586 (9th Cir. 1997); *Ortiz v. City of Philadelphia*, 28 F.3d 306 (3d Cir. 1994); *Salas v. Sw. Tex. Junior Coll. Dist.*, 964 F.2d 1542 (5th Cir. 1992); *Irby v. Va. State Bd. of Elections*, 889 F.2d 1352 (4th Cir. 1989); *Wesley v. Collins*, 791 F.2d 1255 (6th Cir. 1986).)

(rejecting argument that disparate impact was only attributable to socioeconomic conditions as distinct from race, when socioeconomic status correlated "strong[ly]" with race).

Similarly, factors directly related to the electoral process, such as official discrimination in voting (Factors 1 and 3); racially polarized voting (Factor 2); racial appeals (Factor 6); the absence of minority candidate success (Factor 7); and the non-responsiveness of elected officials to the minority community (Factor 8) (Sec.I.F.2), marginalize minority voters and perpetuate a cycle of exclusion from the democratic process. Racially polarized voting, for example, "allows those elected to ignore [minority] interests without fear of political consequences." *Rogers v. Lodge*, 458 U.S. 613, 623 (1982).[41] Racial appeals, such as those used in the 2008 campaign that ousted Justice Butler, the only Black Justice on the Wisconsin Supreme Court, play on racial fears and lead to a reduction in minority candidate electoral success. The dearth of successful minority candidates in Wisconsin, in turn, "is a relevant fact in the totality of circumstances to be analyzed when determining whether members of a minority group have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994) (quoting 42 U.S.C. § 1973). Where, as here, many preexisting conditions already inhibit minority participation, Act 23 is equivalent to kicking minority voters after they are already down.

Evidence of the Senate Factors also shows that although Act 23 is facially race-neutral, it cannot be divorced from the racially-charged context in which it was enacted. Although the legislature was repeatedly warned by witnesses of the likely racial effects of Act 23 due to

---

[41]*See also Shelby Cnty. v. Holder*, 133 S. Ct. 2612, 2643 (2013) (Ginsburg, J., dissenting) ("[R]acial polarization means that racial minorities are at risk of being systematically outvoted and having their interests underrepresented in legislatures," and "when political preferences fall along racial lines, the natural inclinations of incumbents and ruling parties to entrench themselves . . . translate into race-specific disadvantages." (citation omitted)).

racially disparate socioeconomic conditions (Factor 5), it rejected ameliorative amendment after amendment, highlighting its non-responsiveness to the particularized needs of minority communities (Factor 8). (Secs. I.B.2, I.F.2.b.) *Cf. Operation Push*, 674 F. Supp. at 1265 (finding a "significant lack of responsiveness on the part of elected officials" with respect to the satellite registration at issue in the case); *Conn. Cit. Action Gr. v. Pugliese*, Civil No. N 84-431, 1984 U.S. Dist. LEXIS 24869, at *12 (D. Conn. Sept. 27, 1984) (finding widespread "unresponsiveness" in changing voter registration procedures which were the subject of lawsuit). The law also was enacted within the context of racially polarized voting in Wisconsin (Factor 2) (Sec.I.F.2.c), which "bear[s] heavily on the issue of purposeful discrimination [because v]oting along racial lines allows those elected to ignore Black interests without fear of political consequences." *Rogers*, 458 U.S at 623.[42] Moreover, the earliest legislative efforts to enact voter ID occurred at about the same time claims of "voter fraud" in "urban areas" were being raised. Racial overtones related to voter fraud permeated the debate surrounding the years-long effort to enact voter ID in Wisconsin. It tapped into a rich polemical vein that has for decades been laced with racial appeals (Factor 6) used to frighten certain portions of the electorate into believing their votes will be "stolen" (a term Defendants and their witnesses used in this very trial, (*see, e.g.*, Tr. 2056:16-21, 2128:16)) by people from "urban areas" and "wetbacks," and culminated in

---

[42]Although intent is not a required element of liability here, the Senate Factors are in some sense *probative* of intent, because, "[i]n practice, . . . this 'results test,' as applied in section 2 cases, requires consideration of factors very similar to those used to establish discriminatory intent based on circumstantial evidence." *Shelby Cnty. v. Holder*, 679 F.3d 848, 868 (D.C. Cir. 2012) *rev'd on other grounds*, 133 S. Ct. 2612 (2013). The Supreme Court has recognized the Senate Factors as circumstantial evidence of discriminatory intent. *See Rogers,* 458 U.S. at 613, 619-20 n.8, 623-24 (finding the "unresponsiveness of elected officials to minority interests [Factor 8], a tenuous state policy underlying the [challenged practice] [Factor 9], and the existence of past discrimination [Factor 1]," along with racially polarized voting [Factor 2], to be "relevant to the issue of intentional discrimination"). The presence of these factors here indicates a racially-charged context that is relevant to this court's evaluation of Act 23.

Act 23's enactment just a few years after unprecedented Black turnout helped elect the nation's first Black president. (Sec. I.F.2.a.) In this context, Act 23's discriminatory results simply cannot be ignored.

### 4. The Policy Justifications for Act 23 Are "Tenuous" at Best (Senate Factor 9)

Defendants cannot adequately justify the disproportionate burdens that Act 23 places on minorities and the ways in which it interacts with social and historical conditions to further exclude minorities from the political process (Factor 9). The two prime justifications the State provided are the prevention of "voter fraud" and vague beliefs about "voter confidence" or "election integrity." But Defendants offer a ghost story about voter fraud. Despite extensive investigation of Wisconsin elections for more than a decade, few election law violations at all – and no in-person impersonation violations – have been found. (*See generally* Sec.I.G.)

The only evidence about the incidence of voter fraud confirmed that it is exceedingly rare and that the only type of fraud that voter ID might affect – in-person voter impersonation – is essentially non-existent.[43] Defendants' witnesses confirmed that there have been no prosecutions for voter impersonation and that the handful of impersonation allegations that arise during busy elections almost always turn out to be due to innocent poll-worker error. In closing arguments, Defendants even conceded that "voter fraud does not appear to be rampant in Wisconsin." (Tr. 2128:1-2.) They had little choice, given the dearth of evidence of the existence of such fraud.

Although the Defendants repeatedly tried to suggest that voter impersonation *could* happen, they did not provide any evidence that it *does* happen or even that it would be easy for it to happen. As Defendants' own witnesses conceded, to "steal" another person's vote, a would-be perpetrator would need to know the voter's name, address, polling location, and whether the

---

[43]To the extent Defendants presented evidence of the existence of other forms of election violations, the evidence is clear that photo ID does not prevent such crimes. (Sec. I.G.)

voter has already voted; would have to be able to forge the voter's signature in the poll book; and would have to hope that poll workers, who are often from the voter's own neighborhood, observers, and others at the polling place would not recognize the voter or be able to identify the perpetrator. Also the would-be perpetrator would have to be willing to risk a felony prosecution – for the questionable "gain" of casting a single illegal vote that, statistically, is highly unlikely to affect the outcome of an election. (Sec. I.G.)

As for Defendants' theory that voter ID laws advance voter or public confidence in elections, it relies on citations to public opinion polls on the popularity of voter ID, rather than on any empirical or expert testimony about whether voter ID laws actually improve voter confidence. (Sec. I.G.) Nor did Defendants account for the costs to "confidence" exacted when voters are unable to vote because they do not have ID, or due to the diminished voter turnout their expert conceded results from voter ID. (Sec. I.F.3.) And the trial revealed that, if anything, any reduction in confidence is primarily attributable to the very public officials and political activists who spread ghost stories about voter fraud.

Defendants' shibboleths – "voter fraud," "voter confidence," and "election integrity," unsubstantiated with actual evidence – are not sufficient. If the state is to burden the most fundamental right in our democracy – in a manner that replicates and exacerbates Wisconsin's ugly patterns of racial discrimination – it must offer more than urban myths. *See, e.g.*, *Operation Push*, 674 F. Supp. at 1266-68 (on factual record, justifications for dual registration system, failure to deputize municipal clerks, and prohibition on satellite registration tenuous for lack of any "legitimate or "compelling" basis); *Brown*, 555 F. Supp. at 504 ("no evidence" connecting "considerations of security" to moving polling location); *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1045 (5th Cir. 1984) (justification for at-large elections "tenuous" on factual record); *cf.*

*United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984) (a "tenuous

explanation . . . 'is circumstantial evidence that the device has a discriminatory result.'").

Given the many ways in which Act 23 interacts with social and historical conditions to

limit the ability of minorities to participate in the political process and to elect candidates of their

choice, Act 23 leads to a discriminatory effect that violates Section 2 of the Voting Rights Act.

**B.  Act 23 Violates the Constitution by Imposing Excessive Burdens on Many Eligible Voters without Accepted ID (Claims/Classes 1 and 2)**

The evidence shows that Act 23 imposes severe burdens on voters without ID who face

logistical or financial obstacles to obtaining it, and that those burdens are excessive in relation to

the State's purported interests. (*See generally* Secs. I.C., I.G.) The Constitution protects the right

to vote. *See Crawford v. Marion County Election Bd.*, 472 F.3d 949, 950 (7th Cir. 2007), *aff'd*,

553 U.S. 181 (2008) (citing *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S.

173, 184 (1979)). Voting is a fundamental constitutional right in our system, such that "[o]ther

rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*,

376 U.S. 1, 17 (1964). While some regulation, which "inevitably affects [voting rights] to some

degree," may be acceptable to ensure fair and orderly elections, *Anderson v. Celebrezze*, 460

U.S. 780, 788 (1983), it does not mean that every regulation is permissible. To resolve

challenges to state election procedures that burden voting rights, a court:

> must first consider the character and magnitude of the asserted injury to the rights
> protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It
> then must identify and evaluate the precise interests put forward by the State as
> justifications for the burden imposed by its rule.

*Id.* at 789; *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

An election law that imposes voting restrictions that "are unrelated to voter

qualifications" – such as a poll tax or literacy test – is inherently "invidious," and therefore

unconstitutional, even if the restrictions are otherwise rational. *Crawford v. Marion Cnty.*
*Election Bd.*, 553 U.S. 181, 189 (2008). Similarly, a "severe restriction" on voting may be
justified only by "a narrowly drawn state interest of compelling importance." *Id.* at 190 (citing
*Norman v. Reed*, 502 U.S. 279, 288-89 (1992)), 205 (Scalia, J., concurring) (strict scrutiny
appropriate "if the burden is severe"); *see also Burdick*, 504 U.S. at 434. While a burden that is
"merely inconvenient" may not be severe, *Crawford*, 553 U.S. at 205 (Scalia, J., concurring),
successful plaintiffs do "not need to show that they [are] legally prohibited from voting, but only
that 'burdened voters have few alternate means of access to the ballot.'" *Obama for America v.*
*Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (citation omitted).

Even when the burden is not severe, "a court must identify and evaluate the interests put
forward by the State as justifications for the burden imposed by its rule, and then make the 'hard
judgment' that our adversary system demands." *Crawford*, 553 U.S. at 190. Making this hard
judgment in cases where the burden is less than severe requires a court to apply the "flexible"
balancing test set out in *Anderson* and *Burdick*. *See Northeast Ohio Coalition for the Homeless v.*
*Husted*, 696 F.3d 580, 592 (6th Cir. 2012). As explained in *Anderson*:

> [T]he Court must not only determine the legitimacy and strength of each of those
> interests; it also must consider the extent to which those interests make it necessary to
> burden the plaintiff's rights. Only after weighing all these factors is the reviewing court
> in a position to decide whether the challenged provision is unconstitutional.

460 U.S. at 789; *see also Burdick*, 504 U.S. at 434.

In *Crawford*, a majority of the Court applied the *Anderson-Burdick* approach to a facial
challenge to a voter photo ID law. 553 U.S. at 189-91 (Stevens, J., joined by Roberts, C.J. &
Kennedy, J., announcing judgment); 204 (Scalia, J., joined by Alito & Thomas, JJ., concurring in
judgment) (applying *Burdick*), 210-211 (Souter, J., joined by Ginsburg, J., dissenting) (applying
*Anderson-Burdick* test). *Crawford* confirmed that there is no "litmus test for measuring the

severity of a burden that a state law imposes on . . . an individual voter, or a discrete class of voters. However slight that burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" 553 U.S at 191 (citations omitted).

Unlike the litigants bringing *Crawford's* facial challenge – who were unable to find "a single plaintiff . . . whom the law will deter from voting," *Crawford*, 472 F.3d at 951-52, Frank, Brown, Holloway, Wilde, Weddle, Davis, Newcomb, Robertson, and Thompson, would not only be *deterred* from voting, they would have been absolutely *prevented* from voting in elections in which they actually *did* vote[44] had Act 23 been in effect. (Sec. I.A.) Act 23, unlike the Indiana law in *Crawford*, imposes a *total* deprivation of the right to vote on these voters. None of the Plaintiffs or class members fit within the limited exemptions from the ID requirement, and there is no fail-safe procedure for voters who are simply unable to obtain accepted photo ID.[45]

Even voters who managed to obtain ID by trial, such as Jones, Winslow, Simon, Smith, Ellis, Hutchins, and Trokan, described a Kafkaesque ordeal of bureaucratic hurdles and financial obstacles that were overcome only with the help of persistent family members, the intervention of politicians, or the grace of private charity. (Sec. I.C.) Defendants did nothing to help these eligible voters get ID. This is the predictable result of the state's unnecessary decision to make the DMV – a bureaucracy whose burdensome restrictions and requirements were designed for very different purposes – a gatekeeper to the ballot box for voters who do not already have ID. Weighed against these undeniable burdens, Defendants offer a myth about voter fraud. Election

---

[44]In contrast, in *Crawford,* there were some plaintiffs "who have no photo ID but have not said they would vote if they did and so who also are, as far as we can tell, unaffected by the law." 472 F.2d at 952.

[45]Unlike Act 23, other state voter ID laws do not require mail-in absentee voters to produce photo ID. (*See, e.g.,* Sec. I.E.3 at n. 33 (Georgia); *Crawford*, 553 U.S. at 185-186 (Indiana).) Moreover, the ballots of in-person Indiana voters without ID are counted if they sign an affidavit of indigency within 10 days of the election. 553 U.S. at 185-86.

fraud of any kind is extremely rare, and the one type of fraud that voter ID might affect – in-person voter impersonation – is essentially non-existent. (Sec. I.G.)

1.      The Severity of the Burdens

The Supreme Court recognized in *Crawford* that, although Indiana's photo ID law, which is significantly less restrictive than Act 23, was not unconstitutional on its face, a law that imposed "excessively burdensome requirements" would be subject to an as-applied challenge on behalf of especially burdened individuals or classes. *See* 553 U.S. at 199-202, 204. The Court acknowledged that a "heavier burden" may apply, for instance, to "elderly persons born out of state, who may have difficulty obtaining a birth certificate[,] persons who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification[, and] homeless persons." *Id*. at 198-99. Those are the voters in Classes 1 and 2 in this case.

a.      Act 23 imposes severe burdens on voters without ID who face legal or practical systemic barriers to obtaining ID (Claim 1/Class 1)

Act 23 imposes severe burdens on the many eligible voters who do not possess photo ID and thus must obtain an ID card from DMV to vote but face substantial obstacles to satisfying DMV's strict documentation requirements. (Secs. I.C.1-3, I.E.) "Ordinary and widespread burdens, such as those requiring nominal effort of everyone, are not severe. Burdens are severe if they go beyond the merely inconvenient." *Crawford,* 553 U.S. at 205 (Scalia, J., concurring) (internal citations and quotation marks omitted). The combined effects of the burdens imposed by the photo ID requirement on members of Class I go far beyond "merely inconvenient."

By making a DMV-issued ID the photo ID of last resort, Act 23 makes the process of getting ID for voting far more difficult than necessary to achieve its purported ends. Act 23 forces voters to physically access DMV, often on multiple occasions, and to interact with DMV

and other bureaucracies to obtain documents needed to secure that ID. (Sec. I.C.) These systemic burdens are the direct consequence of inserting the process of acquiring a state ID card between a voter and the ballot. While the burdens DMV imposes may be appropriate for licensing drivers, they are not acceptable when interposed as a barrier to the fundamental right to vote. These burdens are not, as Defendants argue (Tr. 2133:7-10), "extraordinary" or "bizarre" but systemically imposed on voters without ID who lack one or more of the documents DMV requires.

Many voters, such as Smith, Ellis, Newcomb, and Davis, have barriers to timely obtaining the documents DMV demands, if they can get them at all. Just figuring out where and how to get those documents can stymie them. (Sec. I.C.2.a.) Many voters without ID also lack birth certificates or social security cards, which take weeks or longer to get and are often difficult to obtain because vital records and SSA offices usually require photo ID or items from a restrictive list to issue these documents, a catch-22 that routinely results in voters obtaining neither the documents nor ID. (Secs. I.C.2.a,b.) Voters also may lack – and have difficulty obtaining – one of the limited number of other documents that DMV requests, such as discharge papers (Sec. I.C.2.b) or proof of residency. (Sec. I.C.2.c.) These common difficulties are magnified by DMV's routine failure to inform voters of alternatives not on public lists and by the fact that, other than referring voters to other bureaucracies, neither GAB nor DMV provide any assistance to voters in obtaining the required documents. (Secs. I.C.2.a,b; I.D.2.) Thus voters without ID and without documents or with non-standard documents inevitably have to make multiple trips to multiple bureaucracies before they can get ID (Sec. I.C.3) – if they are able to get ID at all.

DMV also imposes unreasonable burdens on voters whose documents do not accurately reflect their names, a problem DMV knows is relatively common. Although DMV theoretically might accept birth certificates with names that vary from those on other documents, DMV in practice insists voters amend birth certificates before it will issue ID, does not inform them that supervisors may have discretion to accept documents with name disparities at all or when issuing non-REAL ID products, and does not mention this purported discretion even in "internal" documents such as its manual and BFS 14. Thus DMV told many voters, including Holloway, Winslow, Simon, Trokan, and Navulis, to amend their birth certificates to get ID.[46] Vital records, to whom DMV referred Frank, similarly told her to amend her birth certificate. (Sec. I.C.2.a.i.)

For other voters – like Brown, Weddle, Robertson, Thompson, Jones, Wilde and Althof, many other Black and Latino voters, Amish and Mennonite voters, and others – no official government record of their birth exists. DMV's purported alternative for those voters requires them to send an MV3002 form to vital records to certify that no birth record exists – a form and process that DMV keeps secret. DMV has not coordinated with vital records, and even in Wisconsin those offices are unfamiliar with the form. Some – including Wisconsin's – decline to complete it, and DMV has no authority to require them to do so. Even if voters learn of the form and surmount the burdens of getting a vital records office to complete it, they also must present additional documents that they may not possess or have any realistic way to obtain and that may or may not satisfy the DMV officials reviewing their applications. (Sec. I.C.2.a.ii.)

These burdens are "severe," in that they go far beyond the "merely inconvenient," *Crawford*, 553 U.S. at 205 (Scalia, J. concurring), and "represent a significant increase over the usual burdens of voting," *id.* at 198, especially for citizens who have voted for years without ID

---

[46]The voters who nevertheless obtained ID were those who figured out how to persistently complain to the "right" officials. (Secs. I.C.2.a, I.C.2.a.i.)

or the underlying documents needed to obtain one. (*See, e.g.*, Sec. I.A., I.C.2.a.i.) Even if this Court finds that the burden of interacting with DMV and other bureaucracies is not "severe" for all class members, under the *Anderson* balancing test the burden is still excessive in relation to the purported state interests and thus unconstitutional.

<strong>b.    Act 23 imposes severe burdens on eligible voters who lack ID and lack<br>the financial resources needed to obtain it (Claim 2/Class 2)</strong>

The testimony made clear that obtaining photo ID also imposes financial hardships on many voters. As Defendants know and the evidence showed, indigent, homeless, disabled and minority voters experience significant financial burdens even getting to DMV (Sec. I.C.1), and low-income voters are also much less likely to have ID and the birth certificates needed to obtain ID than higher-income voters. (Sec. I.C.2.a.) *Contrast Crawford*, 553 U.S. at 201, 202 n.20 (no evidence of "difficulties faced by [] indigent voters," including how many lacked birth certificates). Yet there is no indigency exception to Act 23 or to DMV's birth certificate requirement. (Secs. I.B, I.C.2.a.) Defendants do not even make exceptions for voters like Holloway, who they demand go through a costly birth certificate amendment process, or for voters like Brown, Thompson and Weddle, who have paid to request records that do not exist. (Secs. I.C.2.a.i, ii.)

While for some voters these costs may not be burdensome, for voters who are subsisting on government benefits like Holloway, Brown and Weddle, unemployed like Davis, homeless like Ellis, low-wage workers like Newcomb, retirees like Wilde and Thompson, or mired in poverty like many Wisconsin voters (Sec. I.C.2.a), the burden is at least excessive, and usually severe. In contrast, Indiana allows the use of free documents like Social Security benefit statements and Medicare and Medicaid cards instead of birth certificates, and also allows

indigent voters without ID to sign affidavits that they are "unable to obtain proof of identification without payment of a fee." *Crawford*, 553 U.S. at 216 n.19, 185-86.

### 2.    The Asserted Government Interests Are Conjectural

These severe logistical and financial burdens on members of Classes 1 and 2 must be weighed against the state's rationales for requiring photo identification. Defendants claim that photo ID is necessary to prevent fraud and increase public confidence in election integrity.

The same lack of evidence that voter ID would positively affect public confidence or that impersonation fraud exists that makes Defendants' claims tenuous for purposes of the VRA, (Secs. I.G, II.A.4), also makes them inadequate and conjectural for purposes of the Constitution. Citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-5 (1986), Defendants argue that the state may seek to prevent voter fraud before it has evidence it occurs. (Tr. 2127:15-25.) However, as *Munro* makes clear, the government may seek to address speculative electoral problems only if the chosen regulations are reasonable and do not "significantly impinge" on the constitutionally protected right to vote. *Id.* at 195-196. As discussed above, Act 23 does impose burdens than directly and "significantly impinge" on the right to vote.[47]

### 3.    Balancing Interests: The State's Interests Do Not Justify the Burdens on these Plaintiffs and Class Members

The evidence shows that Act 23 substantially impinges on the right to vote of members of Classes 1 and 2, so the Defendants must present something beyond mere conjecture to justify the burdens. Where, as here, an election regulation imposes a "severe" burden on the rights of a class

---

[47]In addition, *Munro* involved minor party ballot access rather than a direct restriction on voting. Ballot access laws have only a "theoretical, correlative effect on voters," so "it is essential to examine in a realistic light the extent and nature of their impact on voters." *Bullock v. Carter*, 405 U.S. 134, 143 (1972). In contrast, the effect on voters in Classes 1 and 2 is real and direct, not theoretical and correlative: without ID, Brown, Holloway, Frank, Weddle, Davis, Newcomb, Robertson, and Thompson cannot cast a ballot for *any* candidate.

71

of voters, the regulation must satisfy strict scrutiny. That is, the regulation must be "'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (citation omitted). Defendants' evidence simply fails to satisfy this exacting level of scrutiny. *Crawford* does not foreclose evaluation of the burdens faced by class members and weighing them against the State's justifications. The State's purported interests must be balanced, not against the law's application to the majority of voters who have ID and thus are not burdened by the photo ID requirement, but to Plaintiffs and other class members who were or are concretely and specifically burdened by the need to obtain photo ID. *Crawford*, 553 U.S. at 198. Even if the Court determines that the burdens on some voters without ID in Classes 1 and 2 is less than severe, the burdens are clearly excessive in relation to the purported state interests and do not satisfy the "hard judgment" standard for less than severe burdens. *Id*. at 190; *Anderson,* 460 U.S. at 789-90.

The State produced no credible evidence linking voter ID to increased confidence, and there is in fact credible evidence that ID laws have no effect on public confidence or trust. (Secs. I.G, II.A.4.) Its claims that committing impersonation fraud occurs or might occur and that such fraud is difficult to detect also are not supported by evidence (*id.*), undermining the "legitimacy and strength" of the state interests and thus failing to satisfy the balancing test required by *Anderson, Burdick* and *Crawford. See Northeast Ohio Coalition*, 696 F.3d at 597 ("[P]laintiffs have shown a likely equal protection violation" where, as here, "the State does not show how [its asserted] interests support the specific restriction challenged.") In trying to claim that impersonation fraud would be easy, the State "pil[es] conjecture upon conjecture"[48] (*see*, Secs. I.G., II.A.4), something it may not do even under the most lenient forms of constitutional

---

[48]*Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988).

scrutiny. *Reed*, 842 F.2d at 962-63 (applying extremely deferential "reasonably related to legitimate penological interests" test); *cf. Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (under intermediate scrutiny government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."); *Bernal v. Fainter*, 467 U.S. 216, 228 (1984) (under strict scrutiny, "[w]ithout a factual underpinning, the State's asserted interest lacks the weight we have required of interests properly denominated as compelling.").

Even if the state has a legitimate interest, a law imposing significant burdens on the right to vote is not "necessary" if the state's interest could be achieved in a less restrictive way. *Anderson*, 460 U.S. at 789. Since 2005 there have been vast improvements in the quality of voter lists, voter registration forms, databases and record keeping that help ensure that only one record exists for each eligible voter and that only eligible voters exercise the right to vote, improvements that have in fact been used forensically to help identify voters who voted unlawfully. (Sec.I.D.3.) These election administration procedures are a less restrictive means of fraud prevention than requiring photo ID from voters who encounter obstacles to obtaining it.

Moreover, the State could have enacted a much less restrictive law, but rejected its chief election official's numerous recommendations for diminishing the burdens of a photo ID requirement, such as not requiring ID for mail-in absentee voters, accepting VA and existing college and university ID, and creating an affidavit of identity for voters unable to secure ID. (Sec. I.B.2.) It could have complied with a consultant's recommendation to make ID available closer to where voters live. It could have brought mobile DMVs to voters or transported voters to DMV. It could have created ID without DMV's stringent documentation requirements, as other states have done. (Secs. I.C.2, I.D.2.) It chose to do none of these. That decision cannot stand.

73

**C.    Act 23 Arbitrarily and Unreasonably Burdens Voting Rights of Veterans and Technical College Students (Claims/Classes 4 and 6)**

Voters are entitled to be free of arbitrary state action, and burdens imposed on the right to vote must be balanced against the asserted state interests.  It is well-settled that arbitrary and therefore "'invidious' distinctions cannot be enacted without a violation of the Equal Protection Clause." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

The burden imposed by Act 23 on veterans and technical college students is simply not "necessary," *Anderson*, 460 U.S. at 789, or justified by any "important regulatory interest[]," *Burdick*, 504 U.S. at 434. The state has articulated no rational basis, much less a necessary or important interest, for refusing to accept secure photo ID issued by the U.S. Department of Veterans Affairs when it accepts ID issued by the U.S. military, when both are federal documents with voters' names and photographs, and when both may lack expiration dates. Similarly, no interest was proffered for seeking to block the use of photo ID from Wisconsin's two year technical colleges, when those IDs have identical indicia of reliability (name, photo, expiration date within two years from date of issuance) to IDs from other Wisconsin colleges.

**1.    Act 23 Arbitrarily Excludes the Use of VA ID for Voting (Claim/Class 6)**

After leaving the military, many veterans receive secure VA IDs, with the veterans' names and photographs, that are used for matters such as obtaining health care from this federal agency. For years Ellis had only VA ID, and Davis and Newcomb still have only VA ID. States like Indiana allow voters to use VA ID, and Kennedy recommended that Act 23 include VA ID, but the law does not do so. (Sec. I.B.2.)

Act 23's exclusion of VA ID places severe burdens on veterans who have only VA ID, many of whom, Defendants know, are homeless or marginally housed. (*Id.*) This includes Ellis, who struggled to get a DMV-issued ID for nearly two years, making numerous trips to multiple

agencies to get his birth certificate, and ID. (Sec. I.C.3.) Davis, who is unemployed, and Newcomb, a housekeeper also caring for his children who were involved in a serious accident, have tried but not succeeded in getting DMV-issued ID. (Secs. I.A, I.C.1, I.C.2.a.)

At trial, Defendants articulated no state interest, let alone an "important" one, in refusing to accept this form of secure federal ID. Nor did the State articulate *any* interest in forcing these veterans to expend time and money obtaining a different photo ID to vote, much less a sufficient interest to justify this burden. *See Burdick*, 504 U.S. at 434 (citing *Anderson*, 460 U.S. at 788). In prior briefs, the State hypothesized that the lack of an expiration date on VA ID might justify the exclusion. (Dkt. 38 at 21.) But Act 23 authorizes the use of other forms of photo ID without expiration dates, including some military and tribal ID cards. (Secs. I.B.1.d,e.) It also allows the use of DMV-issued ID with 16-year-old photos. (Sec. I.B.1.a.) Thus the exclusion of VA ID has no evident or articulated purpose other than imposing an unnecessary burden on some veterans, or keeping them from voting. Defendants therefore have violated the Equal Protection Clause.

## 2. Act 23 Arbitrarily Obstructs Use of Technical College IDs (Claim/Class 4)

Under Act 23, a college student ID may be used for voting purposes if the school is accredited and if the ID meets criteria including having a signature, issuance date and expiration date not later than two years after the date of issuance. (Sec. I.B.1.f.) Many of Wisconsin's technical colleges, which serve tens of thousands of students, modified their IDs to comply with Act 23's student ID requirements. (*Id*.) This was less difficult than the ID changes imposed on four-year colleges, since the Wisconsin Technical College System is designed to issue two-year degrees. Wis. Stat. §§ 38.001(1m) (technical colleges "responsible for . . . programs . . . below the baccalaureate level, including associate degrees . . ."); 38.01(1) ("'Associate degree program' means a 2-year, post-high school program . . .").

Although GAB determined that technical colleges are "accredited" under state law and that technical college IDs that otherwise comply with Act 23 should be valid for voting, the legislature has required GAB to go through rulemaking. (Sec. I.B.1.f.) While Defendants appear to suggest that students such as Whitehurst can use technical college ID to vote (Tr. 2131:5-7), the rules are not final, the governor or legislature could still block them, and students who wish to use technical college ID to vote could be challenged at the polls. (Sec. I.B.1.f.)

The State's efforts to obstruct, and potentially prevent, students from using otherwise compliant technical college IDs to vote are clearly arbitrary. Defendants have articulated no state interest, let alone an "important" one, in refusing to accept ID from its own technical colleges when those IDs have features identical to allowable ID issued by its four year colleges. Nor did the State articulate any interest in forcing these students to expend time and money to obtain a different ID to vote. *See Burdick*, 504 U.S. at 434 (citing *Anderson*, 460 U.S. at 788). Because they have not justified this burden with *any* state interest, it violates the Equal Protection Clause.

**D.     Act 23 Unconstitutionally Imposes a Poll Tax or other Material Burden on Voters (Claims/Classes 3 and 5)**

The Twenty-Fourth Amendment provides that the "right of citizens of the United States to vote in any primary or other election for" federal offices "shall be not be denied or abridged by . . . any State by reason of failure to pay any poll tax or other tax." It prohibits states from conditioning the right to vote in federal elections on the payment of a tax or fee, or imposing any additional condition that would not apply if they paid. *Harman v. Forssenius*, 380 U.S. 528, 538-39 (1965). The Fourteenth Amendment similarly prohibits poll taxes in state and local elections. *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 670 (1966). "[F]ee paying has . . . no relation to voting qualifications; the right to vote is too precious, too fundamental to be so burdened or

conditioned." *Id.* at 670. *Crawford* – which never squarely addressed the poll tax issue – does not foreclose Plaintiffs' claim.

The Constitution prohibits not only poll taxes as such, but also "nullifies sophisticated as well as simple-minded modes of impairing the right guaranteed." *Harman,* 380 U.S. at 540-41. The amount of the fee or severity of the "material requirement" is irrelevant; any amount is impermissible. *See Common Cause / Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) ("The inability of a voter to pay a poll tax, for example, is not required to challenge a statute that imposes a tax on voting . . . ."). This is true "whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it." *Harper,* 383 U.S. at 668. If photo ID is required to vote, and if obtaining acceptable ID either requires payment of a fee or imposes a "material requirement" in lieu of paying the fee, the law constitutes a poll tax. *See Common Cause / Georgia v. Billups*, 406 F.Supp.2d 1326, 1366-70 (N.D. Ga. 2005).

### 1. Requiring Voters to Pay for Documents to Get ID is a Poll Tax (Claim/Class 5)

A "requirement of fee paying" as a "condition of obtaining a ballot" embraces fees that are necessary to comply with a voting restriction to cast a ballot, as well as fees that must be paid prior to arriving at the polling place and obtaining a ballot. *Harper*, 383 U.S. at 666. By requiring voters in Class 5 who do not have ID and must pay money to obtain documents such as birth certificates to get "free" ID for voting, Act 23 makes the "payment of any fee an electoral standard" as applied to those voters. *See Harper*, 383 U.S. at 666. The Missouri Supreme Court has squarely held that forcing voters to pay for documents to obtain ID is an unconstitutional fee imposed on the right to vote. *Weinschenk v. Missouri*, 203 S.W.3d 201, 213-15 (Mo. 2006).

To the extent that *Crawford* implied that requiring documents might not necessarily be a poll tax, it is critical to note that the Court only evaluated Indiana's law in the context of "the

statute's broad application to all Indiana voters." 553 U.S. at 202-03. Here, Plaintiffs challenge the requirements imposed by Act 23 *as applied* to voters who lack birth certificates or other DMV-mandated documents, like marriage certificates, that carry a cost. Moreover, the Court found that Indiana's harms and burdens were mitigated by the ability of some voters to use free documents to get ID, by an affidavit of indigency for voters without ID, and by some voters' ability to vote absentee without ID. *Id.* at 199, n. 18 & 201. None of those alternatives exist here.

The *Crawford* court also acknowledged that photo ID may place a "heavier burden" on voters including elderly persons born out of state, "persons who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification," and homeless voters. *Id.* at 199. While the *Crawford* plaintiffs presented no evidence of the "difficulties faced by . . . indigent voters," including how many voters lacked birth certificates, *id.* at 201, 202 n.20, Plaintiffs here presented ample evidence of voters who lack both ID and birth certificates and who therefore must pay fees to obtain documents they need to secure ID to vote.

As a result of Act 23, voters such as Frank, who has voted since 1948, gone her whole life without ID and without a birth certificate, and does not believe that she should have to pay in order to vote, will at a minimum be forced to obtain – and pay for – that birth certificate to get ID. (Secs. I.A, I.C.2.a.i.) Holloway was told he must incur substantial costs to amend his birth certificate to get ID. (*Id.*) Brown has also voted and lived for decades without ID or a birth certificate, but her son had to pay $15 on her behalf in a futile effort to get the birth certificate DMV said she must have. (Secs. I.A., I.C.2.a.ii.) Wilde, who had no ID or birth certificate and had voted since 1957, did not want to pay for trying to get an MV3002 completed. (*Id.*) Thompson has already sent $30, is being asked for $25 more and still lacks her birth certificate.

(Sec. I.C.2.a.) Ellis obtained an ID only after donating time to get $15 for his Illinois birth certificate. (*Id.*) *See Weinschenk*, 203 S.W.3d at 213 (waiving costs for ID does not make it "'free' if Missourians without certified copies of birth certificates or passports must still expend sums of money to obtain the" ID).

These fees are not beyond the State's control. The State made photo ID a voting requirement, designated the types of ID that would be accepted, and required voters without ID to follow DMV laws, rules, and policies to obtain it. The State could have chosen to issue or allow IDs that do not require such documentation. *Contrast Common Cause*, 554 F.3d at 1346 (ID issued with evidence of registration and affidavit that voter has no other accepted photo ID); Miss. Code Ann. § 23-15-7(6)(2013), Code Miss. R. 1-16-3.4(B),(C) (proposed 12/12/12) (free documents, like Medicaid and social security cards, paychecks and utility bills, can be used to get voter ID, and entity issuing ID can electronically verify birth registration data). Other states also allow voters to sign affidavits in lieu of incurring ID-related expenses. *Crawford*, 553 U.S. at 199; *South Carolina v. United States*, 898 F. Supp. 2d 30, 34 (D.D.C. 2012). Act 23 therefore impermissibly "burden[s] or condition[s]" the right to vote upon "wealth or fee paying." *Harper* 383 U.S. at 670.

### 2. Requiring Voters to Surrender Out-of-State Licenses to Obtain "Free" ID is a Poll Tax or "Material Requirement" (Claim/Class 3)

Act 23 also violates the Twenty-Fourth Amendment by imposing a "material requirement" on members of Class 3, who are Wisconsin residents for voting purposes but have out of state driver's licenses. State law prohibits these voters from obtaining DMV-issued ID unless they surrender their out-of-state driver's licenses (Sec. I.C.4), and courts have held that imposing such a "material requirement" in order to vote is unconstitutional. *See, e.g.*, *Harman*, 380 U.S. at 530 (requiring certificate of residence); *Common Cause*, 406 F.Supp.2d at 1370

(requiring execution of indigency affidavit); *Gray v. Johnson*, 234 F. Supp. 743, 746 (S.D. Miss. 1964) (requiring voters to obtain document from sheriff). In each of these cases, the state charged a fee for voting and the "material requirement" was imposed upon those who sought a fee waiver, forcing the voter to choose between the material requirement, paying the fee, or not voting. Similarly here, voters must surrender their licenses and thus their driving privileges to get "free" ID, pay for Wisconsin licenses (or other forms of ID, such as passports), or not vote.

No "material requirement" may be imposed upon voting even if there is "some remote administrative benefit to the State." *Harman*, 380 U.S. at 542. Defendants cannot justify forcing eligible voters to give up out-of-state licenses to vote since, as GAB made clear, residency for driving purposes is *not* the same as residency for voting purposes. (Sec. I.C.4); Wis. Stat. § 6.10(1). GAB acknowledged that voters such as snowbirds who live part of the year in Wisconsin and part in other states may have out-of-state licenses while still satisfying Wisconsin's intent requirements for voting, and knows there are voters in this situation. (Sec. I.C.4.) *Cf. Ramey v. Rockefeller*, 348 F. Supp.780 (E.D.N.Y. 1972) (only constitutionally permissible test involves voter's present intention). Students can similarly satisfy Wisconsin's residency requirements for voting even if they have out-of-state licenses. Meszaros and Dearing moved to Wisconsin and, like many of their classmates, sought to vote here. *See* Wis. Stat. §§ 6.10(4), (12); *Shivelhood v. Davis*, 336 F.Supp. 1111, 1115 (D. Vt. 1971) (living in dormitory and being supported by parents does not preclude establishing voting residence at school); *Scolaro v. D.C. Bd. of Elections*, 691 A.2d 77, 93 & n.19 (D.C. 1997) (becoming concerned about local issues while in school supports "decid[ing] to become a voting resident . . .").

Under Act 23, however, voters such as Meszaros, Dearing, and many of their classmates, are forced to surrender drivers' licenses issued in the states in which they actually drive so that

they can obtain an ID from the DMV to vote. Act 23 thus denies these voters equal protection under the Fourteenth Amendment and charges a poll tax or material requirement in violation of the Twenty-Fourth Amendment. Dearing was already injured by being unable to vote in February 2012 (Sec. I.A.), and these voters continue to be injured whether or not they pay the poll tax and whether or not they find an alternative way to obtain accepted ID. (Sec. II.I.2.)

E.  **Act 23 Confers Unconstrained Discretion Which Results In Inconsistent and Arbitrary Treatment of Voters in Violation of Equal Protection (Claim/Class 7)**

"A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution . . . ." *Baker v. Carr*, 369 U.S. 186, 208 (1962). Thus literacy, constitutional understanding, and similar "tests" were struck down because they gave election workers unfettered discretion to judge whether a voter was qualified to vote. *See, e.g.*, *Davis v. Schnell*, 81 F. Supp. 872, 878 (S.D. Ala. 1949), *judgment aff'd*, 336 U.S. 933 (1949). In *Louisiana v. United States*, 380 U.S. 145, 153 (1965), the Court affirmed that voting rights "cannot be obliterated by the use of laws . . . which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar. Many of our cases have pointed out the invalidity of laws so completely devoid of standards and restraints." *Bush v. Gore*, 531 U.S. 98 (2000), descends from this line of precedent, and reaffirmed that under the Equal Protection Clause, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-05. This extends beyond "the initial allocation of the franchise" to "the manner of its exercise." *Id.* at 104. Only "specific standards" and "uniform rules" provide "sufficient guarantees of equal treatment." *Id.* at 106-07. Non-uniform or arbitrary treatment is constitutionally impermissible.

In *Black v. McGuffage*, 209 F. Supp. 2d 889, 899 (N.D. Ill. 2002), the court rejected a motion to dismiss an equal protection claim challenging the use of ballot-counting equipment that led to the differential treatment of voters depending on where they lived.

> [The election system] leaves the choice of voting system up to local authorities. But that choice necessarily means that some authorities will choose a system with less accuracy than others. As a result, voters in some counties are statistically less likely to have their votes counted than voters in other counties in the same state in the same election for the same office. Similarly situated persons are treated differently in an arbitrary manner.

*See also Northeast Ohio Coalition,* 696 F.3d at 583, 598 (equal protection violated by counting certain provisional ballots of voters who used last four digits of SSN for identification, but not of voters using other forms of ID); *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 234-36 (6th Cir. 2011) (counting some provisional ballots cast in wrong precinct due to poll worker error, while not considering evidence of same errors for similarly situated ballots, violates equal protection); *Obama for Am.*, 697 F.3d at 435 (holding unconstitutional statute giving some voters, but not others, more early voting opportunities, because "[w]ith respect to in-person early voting . . . there is no relevant distinction between the two groups"); *Stewart*, 444 F.3d at 846 (allowing equal protection claim against error-prone punch card machines to proceed); *Pierce v. Allegheny Cnty. Bd. of Elections*, 324 F.Supp.2d 684, 690 (W.D. Pa. 2003) (allowing third party delivery of absentee ballots only in some counties violates Fourteenth Amendment and could dilute votes in county where delivery not allowed). "The Supreme Court has held in cases since *Snowden v. Hughes,* 321 U.S. 1, 8 (1944)] that the Equal Protection Clause protects the right to vote from invidious and arbitrary discrimination" and "a showing of intentional discrimination has not been required in these cases." *Hunter*, 635 F.3d at 234 n.13 (*citing Bush*, 531 U.S. at 104-05; *Williams v. Rhodes*, 393 U.S. 23, 30, 34 (1968)).

To obtain photo ID, voters must produce multiple documents. For most voters, those documents must comply with DMV's strict, publicly disclosed rules and policies. However, DMV also has a collection of secret documentation rules and exceptions that sometimes allow applicants to satisfy its requirements with alternative documents or get exceptions based on policies or practices that are concealed from the public, not reduced to writing, contradictory, arbitrary, and not well-known to or consistently applied by DMV staff.

Thus DMV's public materials explicitly require specific documents for DMV to issue ID, with no exceptions listed, and DMV does not believe that the public should know that alternatives exist. (Sec.I.C.2.) It demands fully accurate and matching documents from voters with document errors such as Holloway and Hutchins, and demands birth certificates from voters for whom they do not exist, such as Brown, Weddle and Robertson. (Secs. I.C.2.a.i,ii.) Similarly, DMV insists that voters like Newcomb obtain and produce military discharge papers instead of VA photo ID to prove identity. (Sec. I.C.2.b.)

Defendants argue that their rules are not burdensome because, they claim, DMV has flexibility. But DMV has no rules or policies to govern any exercise of discretion and is well aware that its staff and supervisors treat similarly situated voters differently. (Sec. I.C.2.) Thus Jones, lacking a birth certificate and denied ID in Waukesha twice, obtained it in Milwaukee, *without* the MV3002 DMV claims is required, but only after her daughter complained to supervisors. (Sec. I.C.2.a.ii.) DMV also has a pattern of exercising, or offering to exercise, any discretion that may exist only when voters (such as Winslow, Simon, Trokan, Navulis, Platt, and the 103-year-old Merrill woman) complain to legislators or the governor. (Secs. I.C.2.a, I.C.2.a.i.) These secret alternatives, not publicly disclosed and not employed according to any

consistent rules or standards, lead to arbitrary and disparate treatment of similarly situated voters based largely on the voter's ability to complain. In doing so, they violate Equal Protection.

**F.     Act 23 Has Rendered the Electoral System Fundamentally Unfair (Claim 8)**

"[A]n election is more than just a sum total of votes. It is also about the *act* of voting – an individual's ability to express his or her political preferences at the ballot box." *Kozuszek v. Brewer*, 546 F.3d 485, 490 (7th Cir. 2008). Although a plaintiff must show more than isolated or negligent actions by election officials, an electoral system marked by fundamental unfairness violates the Fourteenth Amendment's due process guarantees. *See, e.g.*, *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 468-70, 477-78 (6th Cir. 2008) (structural electoral dysfunction based on a lack of uniform rules, standards and procedures for such election administration matters as registration lists, polling places, absentee and provisional ballots, and assistance for disabled voters, combined with inadequate poll worker training, could lead to widespread disfranchisement and state a substantive due process claim.) "[S]ubstantial changes to state election procedures and/or the implementation of non-uniform standards run afoul of due process if they 'result in significant disenfranchisement and vote dilution.'" *Northeast Ohio Coalition*, 696 F.3d at 597 (internal citations omitted). The Seventh Circuit has also found a due process violation where the government failed to issue specific rules or policies setting standards for nominating petition signatures, failed to publicize standards to be used in reviewing petitions, and then applied standards arbitrarily and using stringent interpretations of law to disqualify some petition signers. *Briscoe v. Kusper*, 435 F.2d 1046, 1052-56 (7th Cir. 1970); *see also Griffin v. Burns*, 570 F.2d 1065, 1078-79 (1st Cir. 1978); *Black*, 209 F. Supp. 2d at 901. "[L]ack of intent to violate the plaintiffs' constitutional rights would 'not necessarily be a defense if the

defendants should have known that their conduct would have that effect.'" *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975) (*quoting Wood v. Strickland*, 420 U.S. 308, 322 (1975)).

Act 23 violates substantive due process requirements by creating an electoral scheme that is fundamentally unfair and that inevitably and predictably disfranchises voters.

First, Act 23's arbitrary requirements and exclusions add extreme levels of complexity and confusion to the system that are unnecessary if the point of photo ID is to prove voters are who they say they are. Allowing the use of drivers' licenses up to 8 years old, ID cards with photos up to 16 years old, passports up to 10 years old,[49] tribal IDs with no expiration dates, and "indefinite" military IDs, while excluding VA ID, restricting naturalization certificates to those less than two years old, forcing four year colleges with secure student photo IDs to reissue them every two years but obstructing the use of two year technical college IDs, and requiring some – but not all – mail-in absentee voters to provide ID despite a complete inability to match the voter to the photograph on the ID (Secs. I.B, I.D.4), is not only confusing for voters, clerks and poll workers, but has no evident purpose other than burdening the right to vote.

Second, Act 23 unreasonably subjects voters to the burdens and barriers that permeate the process of obtaining ID at DMV, under rules never designed to regulate voting and over which GAB has no authority. (Secs.I.C.2, I.D.2.) Yet no meaningful individual assistance is provided to voters trying to navigate these complicated systems. Voters who encounter problems obtaining ID and figure out how to contact GAB are typically just re-routed back to DMV or vital records offices. Neither the GAB nor the DMV have procedures or protocols to ensure that eligible voters are actually able to obtain the ID they need to vote. As a result, voters must fend for themselves, figure out if their cases are being mishandled, complain, and be lucky enough to

---

[49]In fact, photos could be up to two years older because Act 23 allows the use of these forms of ID if they expired up to two years previously.

locate the rare individual at GAB or DMV who can and will provide meaningful assistance. If an applicant does not escalate a problem to a supervisor, a legislator or the governor − a process about which the voter is never notified − that voter may well be disfranchised. (Sec. I.D.2.)

Third, there is no individualized notice to voters of Act 23's requirements or exceptions. The record clearly shows that election officials have difficulty understanding these complex laws (Sec. I.D.4), and the lack of knowledge and confusion is inevitably greater for voters. GAB is aware of particular and persistent difficulties in ensuring that low-income, elderly, disabled, rural, and minority voters understand Act 23. (Sec. I.D.2.) GAB's public outreach efforts, which focus on telling voters to bring ID to vote and give bare bones, and sometimes incorrect, information on how to get ID, fail to reach many voters and are wholly inadequate to communicate complex election laws to millions of voters statewide. (Sec. I.D.2.) Providing individual notice could perhaps have lessened anticipated problems. Yet, despite having the names and addresses of all registered voters in its SVRS database, GAB sent no notice to inform voters of Act 23's existence, requirements and exceptions or how to obtain ID, nor has it required the municipal clerks who run elections to do so.[50] It did not notify, or require clerks to notify, nursing homes, group homes, adult family homes, and indefinitely confined voters like Obermeyer, that they were exempt from the law. It did not even notify, much less offer to assist, the 167,000 voters that its own expert found lack licenses and ID cards. (Sec. I.D.2, I.E.1.)

Fourth, Act 23's incredibly complex requirements are being imposed on a profoundly decentralized system with 1852 municipal clerks, and tens of thousands of chief inspectors and poll workers, many of whom, as the GAB knows, simply do not understand the details of Act 23

---

[50]The state may not have wanted to pay for such notice, but "[c]osts of administration" and "administrative convenience" generally cannot justify infringing constitutional rights. *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217-18 (1986).

other than to know that ID is required. (Sec.I.D.1, I.D.4.) Local elections officials even failed to

consistently inform voters that ID was not required after the 2012 injunction. (Sec. I.D.1.) GAB

knows that those officials are not prepared to uniformly and properly implement the law.[51] (Sec.

I.D.4.) Clear examples of disfranchisement, including of voters who lacked compliant ID and so

did not vote, and due to poll workers' improper name, address, photo, and signature matching,

have already occurred and will continue under Act 23. (Sec. I.D.4.) An intentional due process

violation can be shown by, as here, the State's decision to enforce strict rules despite knowledge

of poll worker error. *Northeast Ohio Coalition*, 696 F.3d at 597. Moreover, voters subject to

even *improper* requirements will often assume the poll workers are the experts, and may well

become discouraged and give up on voting. *See, e.g.*, *Hoblock v. Albany Cnty. Bd. of Elections*,

487 F. Supp. 2d 90 (N.D.N.Y. 2006) (voters reasonably relied on election officials' erroneous

issuance of absentee ballots and were deprived of their voting rights when officials refused to

count their votes). Voters caught in the increasingly long lines that Act 23 will cause, especially

in communities that lack the ability to obtain or budgets to hire additional poll workers, will also

give up. (Sec. I.D.4.) Yet the State provides GAB with little authority over training, discipline, or

local election administration. (Sec. I.D.1.)

These cumulative burdens and failings are not incidental or inadvertent. They are,

instead, the result of deliberate decisions made by the State and the inescapable result of trying to

implement Act 23 by unreasonably restricting the forms of ID that can be used, forcing voters

without ID into a DMV system – with its stringent policies, secret exceptions, and lack of

accountability to elections officials – not designed to protect their rights, providing virtually no

notice, individual assistance or meaningful outreach, and failing to provide adequate education,

---

[51]The failure to ensure uniform standards may also constitute an Equal Protection
violation. *See, e.g., Bush*, 531 U.S. 98.

oversight and resources to a profoundly decentralized election administration system. These combined actions *already* have deterred and prevented voters from voting, and had the ID requirement been in effect for a high-turnout election, the number of voters harmed undoubtedly would have been far greater. "Injunctions issue to curtail palpable risks of future injury; it is not essential to establish that the worst has come to pass." *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006).

**G.    Remedy**

**1.    Plaintiffs Are Entitled to a Permanent Injunction**

Having established Defendants' liability on each of Plaintiffs' claims, Plaintiffs are entitled to a permanent injunction. *See Plummer v. Am. Inst. of Certificate Pub. Accountants*, 97 F.3d 220, 229 (7th Cir. 1996). "According to well-established principles of equity, a plaintiff seeking a permanent injunction must . . . demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). These four factors are readily met here. Restrictions on the fundamental right to vote constitute irreparable injury that is not compensable by monetary damages, *Obama for Am.*, 697 F.3d at 436, and the significant burden imposed on the class members outweighs any corresponding burden on Defendants, who have been able to administer elections without a photo ID requirement for decades. *See id.* Lastly, while states have a "strong interest in their ability to enforce state election law requirements, the public has a strong interest in exercising the fundamental political right to vote," *Obama for Am.*, 697 F.3d at 436 (quoting *Hunter,*

*Hunter*, 635 F.3d at 244), and the "public interest . . . favors permitting as many qualified voters to vote as possible." *Id.* at 436-37. The next question, therefore, is what qualifies as an appropriate remedy in this case.

> **2.      Enjoining the Photo ID Provisions is Necessary Because They Violate Section 2 of the Voting Rights Act (Claims 9 and 10)**

Plaintiffs demonstrated that the photo ID provisions of Act 23 violate Section 2 of the Voting Rights Act by imposing barriers to voting that disproportionately impact minorities throughout Wisconsin. The only appropriate response is to remove such barriers by permanently enjoining those provisions statewide. Although the Seventh Circuit has indicated that "wherever practicable" a jurisdiction should be afforded first opportunity to remedy the violation, *Harper v. City of Chicago Heights*, 223 F.3d 593, 599 (7th Cir. 2000) (citation omitted), *Harper* involved an illegal at-large election system where the remedy would have required a districting plan, and the citations supporting that holding trace back to the principle in *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978), that "redistricting and reapportioning . . . is a legislative task which the federal courts should make every effort not to preempt." When curing a VRA violation *does not* involve that uniquely legislative task, courts have permanently enjoined the unlawful voting procedures in the first instance. *See, e.g.*, *Berks Cnty.,* 277 F. Supp. 2d at 582; *Marks v. Stinson*, No. CIV. A. 93-6157, 1994 WL 146113, at *33-*37 (E.D. Penn. Apr. 26, 1994); *Roberts v. Wamser*, 679 F. Supp. 1513, 1532-33 (E.D. Mo. 1987); *Goodloe v. Madison Cnty. Bd. of Elec. Comm'rs*, 610 F. Supp. 240, 243 (S.D. Miss. 1985).[52] The legislature remains free to enact an alternative voting

---

[52]In *Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991), the Fifth Circuit acknowledged that the rule allowing defendants to first propose a remedy to a Section 2 violation is usually limited to reapportionment cases, but nevertheless applied it to a voter registration procedure. *Id.* at 406. Permanently enjoining Mississippi's existing registration system would have affirmatively wrought significant and complex changes to a status quo that had been in

procedure that would comply with Section 2. *Cf. e.g.*, *Bell v. Keating*, 697 F.3d 445, 464 (7th Cir. 2012); *Lux v. Judd*, 842 F. Supp. 2d 895, 905-06 (E.D. Va. 2012).

### 3. Enjoining the Photo ID Provisions is Necessary Because They Cannot Be Implemented in a Constitutionally Fair or Consistent Manner (Claims 7 and 8)

Enjoining the law is also the most reasonable way of remedying Defendants' constitutional violations in Claims 7 and 8. Generally, "[i]njunctions are based in equity and thus courts must remain flexible in weighing the appropriate relief." *Starsurgical, Inc. v. Aperta, LLC*, 832 F. Supp. 2d 1000, 1006 (E.D. Wis. 2011) (citations omitted). Here, it is not possible to rectify the chaotic, inconsistent, and unfair manner in which the 92 DMV offices and 1,852 municipal clerks implement Act 23's photo ID provisions without permanently enjoining those provisions entirely. *See Hunter*, 850 F. Supp. 2d at 835-41, 847; *Griffin v. Burns*, 570 F.2d at 1076-80. Otherwise, the Court would have to essentially rewrite the statutes and rules governing ID issuance and election administration. *Cf. e.g.*, *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479 (1995) (invalidating statute rather than rewriting it).

### 4. Act 23's Unconstitutional Applications Should be Remedied by Allowing Voting Without ID or by a Simple Affidavit Option (Claims 1-6)

Should the Court decline to enjoin the entire law, in light of Act 23's many unconstitutional applications to the Plaintiff classes (Claims 1-6), the Court should order Defendants to allow an eligible voter without ID to vote at the polling place without ID, or by signing an affidavit affirming her identity and lack of ID.[53]

---

place for 40 years. *Id.* at 402. By contrast here, enjoining photo ID would simply maintain the same voting system that has long been in place, so it does not implicate the same concerns.

[53]The Court also could enjoin application of the law to Classes 3, 4, and 6 by permitting eligible voters to use out-of-state drivers' licenses, technical college IDs, and VA IDs, for voting.

Should the Court determine that an affidavit is an appropriate remedy, given the substantial evidence of efforts to intimidate voters with fraud assertions and the low educational and socioeconomic status of many voters without ID, it is critical that the affidavit be a simple one. Because confusion already exists about Act 23's requirements, the Court should also order Defendants to ensure that clerks, poll workers and voters are trained and clearly informed about any such option, and to prohibit officials from suggesting that *all* voters must show ID in order to vote. Lastly, the Court should ensure that the ballots of voters who use it are not treated differently than other ballots and that the State is not targeting voters who sign affidavits for special investigation. *Cf. South Carolina*, 898 F. Supp. 2d at 41 (no Section 5 violation because votes cast by affidavit will not be treated differently from other votes).

During trial, Defendants referred to a pending bill,[54] which the Court rightly recognized was irrelevant to the merits of this case. (Tr. 1468:13-1469:9.) To the extent Defendants attempt to proffer this bill as a remedy, the Court should reject it. First, the bill provides that eligible voters without ID may use an affidavit only if they swear that they are "indigent" or "cannot obtain the document" needed to get ID, but leaves those terms undefined, which will create confusion over what they mean and will suppress voting by raising fears that voters who sign it could be prosecuted if their assertions are inaccurate.[55] Second, those categories do not

---

[54] *See* http://docs.legis.wisconsin.gov/2013/proposals/ab493.

[55] *Cf. South Carolina*, 898 F. Supp. 2d at 40 ("the process of filling out the form must not become a trap for the unwary, or a tool for intimidation or disenfranchisement of qualified voters."); *LWV v. Browning*, 863 F. Supp. 2d 1155, 1164 (N.D. Fla. 2012) (requiring voter registration agent to sign statement threatening felony conviction for submitting false information when agent "does not know or have reason to believe the information is false" "could have no purpose other than to discourage voluntary participation in legitimate, indeed constitutionally protected, activities"); *Jones v. Bates*, 127 F.3d 839, 855-63 (9th Cir. 1997) (invaliding law whose ambiguous wording failed to give adequate notice to "average voters" that it would "severely . . . burden their most fundamental right, the right to vote"); *Starsurgical, Inc.*,

encompass the circumstances of many voters lacking ID. (*See, e.g.*, Secs. I.C.1,3,4); *contrast South Carolina*, 898 F. Supp. 2d at 41 (categories include "religious objection," "lack of transportation," "disability or illness," "lack of birth certificate," "work schedule," "family responsibilities," and "other reasonable impediment"); *id.* at 36 ("reasonable" defined by voter). Third, the bill requires voters to *orally* swear they cannot afford ID, which is humiliating and will deter voting.[56] Fourth, while challenges are normally only for cause, Wis. Stat. §§ 6.92-6.95, the bill improperly treats all votes cast by affidavit as "challenged ballots," which means they will be marked and subject to heightened scrutiny. *See, e.g.*, *South Carolina*, 898 F. Supp. 2d at 41; *Northeast Ohio Coalition*, 696 F.3d at 598 (treating votes of those voting by affidavit differently raises Equal Protection problems).[57] Lastly, the bill allows elections officials to investigate – for any reason, including mere use of the affidavit – the "qualifications" of any voter who signs it, which may be designed to, and will certainly have the effect of, intimidating voters and deterring them from using this option. *See, South Carolina*, 898 F. Supp. 2d at 40.

## H.     The Court Should Certify the Proposed Classes

On April 23, 2012, Plaintiffs moved to certify seven plaintiff classes. That motion remains pending. (Dkt. 63.) The Court should now grant the motion.

---

832 F. Supp. 2d at 1006 (disclaimers would "likely be ineffective in dispelling consumer confusion," so enjoining use of mark was more appropriate).

[56]*Cf. Common Cause*, 406 F. Supp. 2d at 1370 ("many voters simply may be too embarrassed over their inability to afford a photo ID card to request and complete an Affidavit for a free card"); *Boustani v. Blackwell*, 460 F. Supp. 2d 822, 827 (N.D. Ohio 2006) ("It is offensive to single out a voter in the public polling place, thereby subjecting him or her to embarrassment or ridicule while attempting to exercise a citizenship privilege."); *Harris v. Siegelman*, 695 F. Supp. 517, 525-26 (M.D. Ala. 1988) (provision requiring that voter swear to inspectors that she is unable to write English contributes to atmosphere of humiliation).

[57]*Cf. Boustani*, 460 F. Supp. 2d at 825 (permanently enjoining statute that would allow "unbridled discretion to challenge any voter's citizenship without any guidelines").

**1.     Class-Wide Treatment of Claims and Remedies in this Case is Far Superior to the Alternative of *Ad Seriatim* Litigation of Individual Claims**

A class action provides many benefits in cases like this where a law infringes the rights of many similarly situated persons in common ways. Benefits include preventing a multiplicity of actions; preventing inconsistent adjudication of similar claims; avoiding incompatible injunctions; and preserving the availability of relief for the class when claims of individual plaintiffs are inherently transitory. *See generally,* Herbert Newberg et al., Newberg on Class Actions, §§ 1:8.4, 1:9, 1:10 (5th ed. 2011) ("Newberg"). In addition, class actions enable plaintiffs with limited financial means to vindicate their rights by relieving them of often prohibitive costs of maintaining individual suits. *See Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 895 (7th Cir. 1981) ("Except for the class [action] approach many might never receive any redress for the wrong done to them."); Newberg § 1:10.2. This last benefit is particularly important in this case where, absent class wide treatment of claims and remedies, many affected voters, especially low-income voters most severely burdened by Act 23, would not receive *any* redress.

Concerns about employing the class action device typically arise when there is a risk of a lack of procedural fairness to absent class members or that parties may misuse the class action device to obtain leverage in damages actions. None of these concerns apply here. In opposing class certification, Defendants argued only that "management of a class action in this [case] would be untenable." (Dkt. 83 at 8.) The trial, however, demonstrated that Defendants were wrong. Class-wide treatment of claims is manageable and offers numerous advantages over *ad seriatim* litigation of absent class members' claims if class certification is denied.

At trial, the Court heard testimony from numerous Wisconsin voters about the burdens they faced in trying to get ID acceptable for voting. Contrary to Defendants' characterization of

these voters' experiences as "unique" or "one of a kind," these witnesses told substantially similar stories about how difficult, costly, and time consuming it is to obtain ID. Organizational witnesses, state employees and even Defendants' witnesses confirmed that the same barriers described by the testifying voters were commonplace. Thus the evidence is not so "radically different" as to make class-wide treatment of claims unmanageable. Indeed, it is difficult to imagine how repeating this trial for each absent class member would be anything other than duplicative and wasteful. Each subsequent trial would involve the same state-employee witnesses, the same documentary evidence, the same defense, and only cumulative testimony from voters about their personal experience facing the very same barriers. Moreover, such trials could number in the thousands, as expert witnesses for all parties showed that there are at least tens, if not hundreds, of thousands, of similarly situated voters, and could pose the risk of inconsistent decisions or incompatible injunctions. *See* Fed. R. Civ. P. 23(b)(1)(A).

The legal questions can also be answered on the basis of Defendants' rules and policies, which are common to all voters, and which infringe the rights of class members in common ways. As Defendants admit "there are no individualized claims which would not be adequately addressed in this case even without this being a class action." (Dkt. 83 at 8.) The remedies are likewise manageable on a class-wide basis. The Court does not need to provide voter-specific remedies, but can fashion practical and administrable remedies sufficient to redress harm to all class members. As even Defendants admit "[i]f there is relief granted by this Court at all, it can be fashioned to cover all of these putative class members." *Id*. In short, the classes should be certified because there are tremendous efficiencies to be achieved and there are no concerns in this case about procedural unfairness.

2.      **Each of Plaintiffs' Proposed Classes Satisfies the Requirements for Certification under Rule 23 and is Ascertainable**

Under Rule 23(a), the Court should certify a class where, as here, a plaintiff shows: (1) numerosity – that the class is so numerous that joinder of all members is impracticable; (2) commonality – that there are questions of law or fact common to the class; (3) typicality – that the named plaintiffs' claims or defenses are typical of the class; and (4) adequacy of representation – that the named plaintiffs fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Under Rule 23(b), the Court should certify a class if (1) prosecuting separate actions would create a risk of inconsistent adjudications establishing incompatible standards of conduct for Defendants; or (2) Defendants have acted or refused to act on grounds that apply generally to the class so that injunctive relief is appropriate.

Civil rights cases like this one are particularly appropriate for class certification. *See* Advisory Comm. Notes, Fed. R. Civ. P. 23(b)(2) ("Illustrative of [cases appropriate for class certification under 23(b)(2)] are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration."). Federal courts must "construe liberally the requirements for class actions in civil rights cases" because such actions often seek to end violations that specifically affect certain classes of citizens. *Long v. Thornton Twp. High Sch. Dist. 205*, 82 F.R.D. 186, 189 (D.C. Ill. 1979) (citing *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 719 (7th Cir. 1967)).

a.      **All classes satisfy the requirements of Rule 23(b)(1)-(2)**

Each class and claim challenges the legality of Defendants' unduly restrictive designation of photo ID acceptable for voting under Act 23 and/or the unduly restrictive documentary proof requirements for obtaining such ID, which are common to all voters, and impose barriers or poll taxes on certain classes of voters in common ways. Thus, Defendants have "acted . . . on grounds

95

that apply generally to the class, so that final injunctive relief [and] corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Absent class-wide treatment of claims, there is a risk that Defendants will be subjected to incompatible injunctions. Certification is thus also warranted pursuant to Fed. R. Civ. P. 23(b)(1).

### b. All classes satisfy the requirements of Rule 23(a)(1)-(3)

#### i. Class 1 satisfies the requirements of Rule 23(a)

Class 1 includes "all eligible Wisconsin voters who lack accepted photo ID, lack one or more of the documents DMV accepts to obtain a Wisconsin ID card for voting purposes, and face legal or systemic practical barriers to completing the process of obtaining an ID." (Dkt. 31 ¶ 106.) The trial demonstrated that these barriers are pervasive and are the product of DMV's stringent and burdensome documentation requirements. (Sec. I.C.) The pervasive legal and systemic practical barriers exist where:

> 1) Voters cannot obtain the documents required by DMV without obtaining other documents needed to obtain those documents.. For example, Smith had to get medical records to get a social security card to get ID, and Newcomb had to send for discharge papers to get his birth certificate to get ID. (Secs. I.C.2.a, b, I.C.3);
>
> 2) Voters are caught in a "vicious circle" of needing photo ID to obtain the documents that DMV requires for photo ID. Smith was told he needed photo ID to get his social security card and also that he needed photo ID to get the medical records to get his social security card, and Brown and Hutchins could not apply for their own birth certificates without photo ID, a common problem of which state employees and other witnesses were well aware. (Secs. I.C.2.a,b);
>
> 3) Voters have documents with name mismatches. For example, Holloway's birth certificate said Eddie Junior Holloway, while other documents said Eddie Lee Holloway Jr.; the birth certificates for Frank, Winslow, Trokan, and Simon all contained errors; and Hermann's social security records did not match her name. These problems cannot be solved without the voter having to amend documents and thus interact with more agencies (Barrier 1), or by DMV applying a secret exception (Sec. I.C.2.a.i);
>
> 4) Voters cannot produce the documents DMV requires because the documents do not exist. For example, Brown, Weddle, Thompson, Robertson and Wilde were never issued birth certificates, and even if the voter is notified of DMV's secret

96

exception process, getting that exception requires obtaining additional documents that are often not available (Sec. I.C.2.a.ii); and

5) Voters must deal with out-of-state agencies, multiple agencies, or delays exceeding one month to get documents DMV requires. For example, Holloway travelled to multiple cities in Illinois to try to amend his birth certificate; Brown had to see if Louisiana even had a birth certificate and was sent her sister's birth certificate instead; Ellis had to deal with multiple agencies to get his birth certificate, with SSA, and with DMV; and Davis was told that to get a birth certificate he had to go through a city in Tennessee where he had never been. (Secs. I.C.2.a, I.C.3.)

The members of Class 1 are so numerous that joinder is impracticable. There are more than 21,000 eligible voters in Milwaukee County alone who lack any form of accepted photo ID *and* lack one or more documents DMV requires. (Fr. Ex. 600 at 37 (Table 8).) In addition to this data, the testimony of numerous witnesses – Plaintiffs, voters, organizations, legislators, and state employees – confirmed that these systemic barriers were pervasive and affected many other voters. (Sec. I.C.) Given this evidence, there can be no doubt that the members of Class 1 are sufficiently numerous that joinder is impracticable. *See Eggleston*, 657 F.2d at 895.

There are also questions of law and fact common to the members of Class 1. The "commonality" element of Rule 23 is satisfied if the class members' "claims . . . depend upon a common contention" that "is capable of class-wide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," and that certifying the class will permit the litigation to "generate common *answers* apt to drive the resolution of the litigation." *Id.* at 2551 (citation omitted; emphasis in original). "[E]ven a single common question will do." *Id.* at 2556 (quotation marks, alterations, and citations omitted). There are multiple common questions with respect to Class 1. Among these are the nature of the State's interest in Act 23, the extent to which Act 23 advances those purported interests, and whether Act 23 and the DMV's

requirements for obtaining photo ID impose severe or excessive burdens on the right to vote when applied to the members of Class 1, who lack accepted photo ID, lack the necessary documentation to obtain photo ID, and face the systemic barriers described above.

These issues can all be decided on a class-wide basis because the questions center on the structure and reasonableness of Defendants' rules and policies. *See Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 909 (7th Cir. 2012) (commonality satisfied when common question about defendant's policies was apt to drive resolution of the litigation), *cert. granted, judgment vacated*, 133 S. Ct. 1722 (2013); *Edmonson v. Simon*, 86 F.R.D. 375, 380 (N.D. Ill. 1980) (when "across-the-board or permeating policy . . . is alleged in a class action, the requirement under Rule 23(a)(2) of commonality is satisfied."). Unlike *Dukes*, where each class member's injury was specific to individualized decisions made by managers, here the injury is the result of a common DMV rule. *Compare Dukes*, 131 S.Ct. at 2552 (finding no "glue holding toegther the alleged reasons for [the managers'] decisions") *with McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 490 (7th Cir. 2012) (distinguishing *Dukes* on the basis that the injuries alleged in *McReynolds* were the result of a company-wide policy); *N.B. ex rel. Buchanan v. Hamos*, No. 11 C 6866, 2012 WL 1953146, at *9 (N.D. Ill. May 30, 2012) ("[A]s the Seventh Circuit has recognized, the holding in *Dukes* does not apply where discrimination results from a defendant's standardized conduct toward proposed class members.").

The questions apt to drive resolution of the claims of the Class 1 members can be decided with reference to those common policies. Although there may be various types of systemic barriers experienced by members of Class 1, there is no need to address the details of each barrier separately, as the burdens, and thus the merits of the analysis, do not change materially from one barrier to the next. *See, e.g., Floyd v. City of New York*, 283 F.R.D. 153, 172-75

(S.D.N.Y. 2012) (differences in how each police stop and frisk was conducted did not defeat commonality because each stop was made according to centralized policies); *Gray v. Golden Gate Nat'l Recreational Area*, 279 F.R.D. 501, 514, 516 (N.D. Cal. 2011) (although park's violations of obligations to provide access to disabled citizens varied based on types of barriers and types of disabilities, court did not need to undertake a "barrier-by-barrier, accommodation-by-accommodation evaluation" because the class members "have all been denied access to the [park] on the basis of [defendant's] common failure of policies and practices").[58] Moreover, none of these burdens are justified by the state's proffered interests in Act 23.

Typicality is also established for Class 1. "[A] 'plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'" *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), *cert. denied*, 506 U.S. 1051 (1993) (quoting *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). The named Plaintiffs representing Class 1 are Brown, Frank, Holloway and Smith. The systemic barriers these voters encountered are materially indistinguishable from the testimony of other class members, organizational plaintiffs, legislators, and even GAB and DMV employees, who testified at trial.

### ii.    Class 2 satisfies the requirements of Rule 23(a)

Class 2 includes "all eligible Wisconsin voters who lack accepted photo ID and for whom the costs incurred in obtaining a Wisconsin ID card, including but not limited to the cost of obtaining certified and accurate copies of birth certificates or any other documentary proof accepted by the Wisconsin DMV or the cost of traveling to the nearest Wisconsin DMV office,

---

[58]If, however, the Court finds it necessary to weigh separately the burdens of each specific barrier against the State's interest, the five barriers discussed above are sufficiently standardized to permit the Court to certify certain sub-classes to resolve the questions separately for each systemic barrier. *See* Fed. R. Civ. P. 23(c)(5).

would constitute a financial burden." (Dkt. 31 ¶ 110.) The trial revealed that voters with incomes below $20,000 are much more likely to lack ID and documents needed to get ID, and confirmed that the costs were a financial burden for many eligible Wisconsin voters who are on government assistance, unemployed, retirees, homeless, low wage workers, or otherwise in poverty, such as Plaintiffs Holloway, Brown, and Ellis, and class members Davis, Weddle, Newcomb, and Thompson. (Secs. I.C.1, I.C.2.a.) Organizational witnesses, experts, legislators, state employees, and Defendants' own witnesses confirmed that the costs of getting documents like birth certificates to get ID was a financial burden for numerous low income, indigent and homeless voters. (Secs. I.C.1, I.C.2.a.) This testimony establishes that Act 23 imposes financial burdens, including for costs of documents DMV requires and for transportation, and that Plaintiffs Holloway, Brown and Ellis, who have been forced, and may continue to be forced, to expend limited resources to try to obtain compliant ID, are typical of the claims of the many other Class 2 members. Typicality and numerosity are thus established for Class 2.

Commonality is also established for Class 2. Again, the common questions are the nature of the State's interest in Act 23, the extent to which Act 23 advances those purported interests, and whether Act 23 and the DMV's requirements for obtaining photo ID impose excessive monetary burdens on the right to vote when applied to the members of Class 2, who have difficulty affording the document fees, transportation costs, and lost wages associated with obtaining ID. The answers to these questions do not require a voter-by-voter analysis. Rather, they can be decided with reference to the objective poverty status of the voter.[59]

---

[59]Plaintiffs submit that the Court can answer this question by determining whether the financial costs of obtaining ID impose excessive burdens for any voter who is homeless, eligible for means-tested public benefits, or has income at or below $20,000 per year. This income, level is below 2013 federal poverty guidelines for a family of 4, of which the court may take judicial notice. 78 Fed. Reg. 5182-83 (1/24/13). The link to burdens is clear in that Barreto's survey

### iii. Class 3 satisfies the requirements of Rule 23(a)

Claim 3 is a poll tax claim based on the requirement that voters must surrender an out-of-state driver's license in order to obtain a "free" ID for voting in Wisconsin. Class 3 thus includes "all Wisconsin voters who are residents of Wisconsin for voting purposes, who lack any accepted photo ID, and who would be forced to surrender an out-of-state driver's license in order to obtain a free Wisconsin ID card for voting purposes." (Dkt. 31 ¶ 115.) This claim encompasses voters such as "snowbirds," (*i.e.,* voters who live part of the year in Wisconsin and part in other states) and students who legally vote in Wisconsin but retain out-of-state licenses.

Plaintiffs Meszaros and Dearing, both consider themselves to be Wisconsin residents for voting purposes but seldom drive in Wisconsin and retain their out-of-state licenses in the state where they do drive. They testified that there are more than 100 out of state students at Carthage College (Tr. 692:12-18) and 40 or 50 at Lawrence University (Tr. 978:7-15, 983:15-984:7), many of whom would therefore also be unable to vote under Act 23.[60] A single GAB employee is also specifically aware of more than 10 "snowbirds" in the same situation (Sec. I.C.4), which, especially when combined with out-of-state student voters clearly is sufficient for numerosity requirements.[61] The common question for Class 3 is whether the requirement to surrender out-of-state drivers' licenses in order to obtain state ID for voting purposes constitutes a poll tax or

---

found that 54.8% of voters who lacked ID and had incomes below $20,000 per year *also* lacked proof of citizenship, a statistically significant finding. (Fr. Ex. 600 at 43 (Table 21).)

[60]Defendants argued that Meszaros can also use her college ID to vote. (Tr. 2131:4-5.) However, that ID uses a sticker to try to satisfy Act 23, a process that could subject the user to challenge and could be eliminated if the legislature or governor blocks the rules. (Sec. I.B.1.f.)

[61]*See, e.g., Rosario v. Cook Co.*, 101 F.R.D. 659, 661 (N.D. Ill. 1983) (certifying class of 20 seeking injunctive relief because "[r]egardless of their number, the joinder of future alleged discriminatees is inherently impracticable."); *Swanson v. Am. Consumer Indus.*, 415 F.2d 1326, 1333 (7th Cir. 1969) (40 sufficient); *Riordon v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (10-29 sufficient); *Allen v. Isaac*, 99 F.R.D. 45 (N.D. Ill. 1983) (17 sufficient).

material requirement. Because this question is the same for Meszaros, Dearing, and every other member of the class, typicality and commonality are satisfied.

### iv. Class 4 satisfies the requirements of Rule 23(a)

Class 4 is comprised of "all enrolled students at accredited Wisconsin technical colleges who lack any form of accepted photo ID other than technical college ID cards." (Dkt. 31 ¶ 120.) Although GAB has sought to allow the use of these ID cards under Act 23, there is no final rule establishing that technical college IDs are acceptable under Act 23, any rule could be blocked by the legislature or governor, and students using those IDs could be challenged at the polls. (Sec. I.B.1.f.) As the testimony of Defendant Kennedy and of Plaintiff Whitehurst, a voter with MATC ID, confirmed, there are at least tens of thousands of students attending technical colleges in Wisconsin. (Sec. I.B.1.f.) None of these students could use technical college IDs to vote without risk of being challenged, or risk that proposed rules allowing its use would be reversed. Numerosity is thus established for Class 4.

Whitehurst's claims and those of every other Class 4 member revolve around the Defendants' arbitrary refusal to accept technical college IDs. The common question apt to resolve each of these claims is whether there is any meaningful difference between technical college IDs and the forms of photo ID acceptable for voting, including IDs from all other colleges and universities, or whether the Defendants' rejection of technical college ID cards is arbitrary and unreasonable. Commonality and typicality are thus established for Class 4.

### v. Class 5 satisfies the requirements of Rule 23(a)

Claim 5 asserts that requiring voters to pay fees to obtain documents to get ID to vote constitutes a poll tax, in violation of the Fourteenth and Twenty-Fourth Amendments. Class 5 thus includes "all eligible Wisconsin voters who lack accepted photo ID, must obtain one or

more primary documents that DMV accepts to obtain a Wisconsin state ID card, including but not limited to certified and accurate copies of birth, marriage, and name change certificates or records of the non-existence thereof, and will be required to pay one or more fees to obtain these documents." (Dkt. 31 ¶ 123.)

As the testimony of Plaintiffs, other voters, organizations, state employees, and Defendants' witnesses made clear, voters without ID must produce specific documents to get ID, and if voters do not have those documents most will have to pay for them. Plaintiffs Frank, Brown, Holloway, and Ellis have paid or will have to pay money to get original or amended birth certificates, or proof that birth certificates do not exist, before they can get ID. As shown in the discussion of Class 2 (Sec. II.H.2.b.ii), having to pay such fees is indisputably a widespread and common situation. Therefore, just as typicality and numerosity are established for Class 2, typicality and numerosity are established for Class 5. Commonality is also established for Class 5. The common question apt to drive resolution of the class members' claims is whether the fees voters must pay to obtain documents DMV requires constitute a poll tax or material requirement.

### vi.     Class 6 satisfies the requirements of Rule 23(a)

Class 6 is comprised of "all veterans of a uniformed service of the United States who are eligible Wisconsin voters, lack accepted photo ID, and possess a Veterans Identification Card ("VA ID") issued by the U.S. Department of Veterans Affairs." (Dkt. 31 ¶ 126.) VA IDs are not accepted for voting despite the fact that they contain the same characteristics as other acceptable forms of ID. (Secs. I.B.1.d,e, II.C.1.) Plaintiff Ellis and voters Davis and Newcomb all have VA ID and their claims involve Defendants' arbitrary refusal to accept VA IDs for voting. GAB is also aware that many veterans are homeless or marginally housed and may lack ID other than VA ID (Sec. I.B.1.f), and during the time he lived at Vet Place Central, a homeless shelter, Ellis

alone knew at least 15 or 20 other veterans who did not have DMV-issued ID. (Tr. 567:20-568:6.) But whether a veteran has or does not have a form of accepted ID is irrelevant to the merits of Claim 6, which depends only on whether there is any meaningful difference between VA IDs and the forms of photo ID accepted for voting, or whether Defendants' rejection of VA IDs is arbitrary and unreasonable. As this is the common question for Ellis and all other eligible Wisconsin voters with VA ID, commonality, typicality and numerosity are satisfied for Class 6.

### vii.    Class 7 satisfies the requirements of Rule 23(a)

Class 7 is defined as "all eligible African-American and Hispanic/Latino voters in the State of Wisconsin who lack accepted photo ID." (Dkt. 31 ¶ 129.) The class is sufficiently numerous such that joinder is impracticable. There are almost 21,000 eligible Black voters and more than 7,400 eligible Latino voters in Milwaukee County alone who lack accepted photo ID. (Fr. Ex. 600 at 34 (Table 2).) Of those eligible voters, more than 7,000 Black voters and nearly 3,000 Latino voters also lack the underlying documents needed to obtain ID. (*Id.* at 37 (Table 8).) Numerosity is thus satisfied.

Violation of Section 2 of the VRA is by its very nature a class-wide harm that features a central question common to all members of the class: "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles,* 478 U.S. at 47. Commonality is thus satisfied for Class 7. Plaintiffs Brown and Holloway's claims are also typical as they are African American voters living in Milwaukee County who lack accepted photo ID under Act 23. (Sec. I.A.)

### c.  All Classes Satisfy the Requirements of Rule 23(a)(4)

There are two prongs to the test for adequacy of representation under Rule 23(a)(1): (1) "the adequacy of the named plaintiff's counsel;" and (2) the absence of "antagonistic or conflicting interests" between the class members and the named plaintiffs. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (internal quotation marks omitted); *Sec. of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986).

There are no antagonistic interests between the representatives of any class and the remaining class members, and the trial demonstrated that the class members' interests are adequately protected by Plaintiffs' counsel. Further, to the extent that some of the proposed class representatives, including Plaintiffs Smith, Ellis, Meszaros, Dearing and Whitehurst, may have obtained ID between the date, timely and long before trial, that Plaintiffs moved for class certification and the trial, their active participation at trial made clear that they have no conflicts with absent class members and will vigorously pursue those claims and seek to vindicate the rights of similarly situated voters. Moreover, whether a voter has overcome the barrier imposed by Act 23 is irrelevant to standing in an equal protection claim. (Sec. II.I.2.)

The Court should therefore certify Class 1 and appoint Plaintiffs Brown, Frank, Holloway, Smith and Ellis as class representatives; Class 2, and appoint Plaintiffs Brown, Holloway, and Ellis as class representatives; Class 3, and appoint Plaintiffs Meszaros and Dearing as class representatives; Class 4, and appoint Plaintiff Whitehurst as class representative; Class 5 and appoint Plaintiffs Brown, Frank, and Holloway as class representatives; and Class 6 and appoint Plaintiff Ellis as class representative.[62] The Court should

---

[62]Class representatives who obtained ID well after Plaintiffs diligently moved for class certification continue to have standing to raise claims that they have been, and continue to be, denied equal protection in violation of the Fourteenth Amendment. The controversy between

further approve Plaintiffs' counsel from the American Civil Liberties Union of Wisconsin Foundation; American Civil Liberties Union Foundation; National Law Center on Homelessness & Poverty; and Dechert LLP as class counsel for each class.

### d.    Each of Plaintiffs' Classes is Ascertainable

In opposing Plaintiffs' motion for class certification, Defendants argued that Plaintiffs' class definitions are not sufficiently ascertainable. Ascertainability is not explicitly required by Rule 23, and to the extent that some courts require it, it normally is in damages actions where the Court is required to direct notice to the class members, including providing individual notice to all members who can be identified through reasonable effort and informing them of their ability to opt out. *See* Fed. R. Civ. P. 23(c)(2)(B). Courts, however, are not required to direct notice to class members when, as here, the proposed classes seek only injunctive or declaratory relief under Rule 23(b)(1) or Rule 23(b)(2), *see* Fed. R. Civ. P. 23(c)(2)(A), making ascertainability a less important consideration. *See Haynes v. Dart*, No. 08 C 4834, 2009 WL 2355393, at *4 (N.D. Ill., July 29, 2009) ("The ascertainability requirement can be applied more flexibly in situations where individual notice to class members is not required, such as suits for equitable relief.") Moreover, if the Court does not entirely enjoin the law, the proposed affidavit remedy will enable class members to self-identify when they appear at the polls, thus making a remedy easy to administer. *See Westefer v. Snyder*, Nos. 00-162-GPM, 00-708-GPM, 2006 WL 2639972, at *10 (N.D. Ill. Sept. 12, 2006) ("[The] precise definition of the class is not as important as it may

---

*unnamed* class members and Defendants is also very much live. (Sec. II.I.2.) However, if the Court is inclined to find that Plaintiff Ellis is not an adequate class representative for any reason, even though he struggled for nearly two years to obtain ID and has clearly demonstrated his dedication to this case, Plaintiffs respectfully request that Newcomb, who has VA ID but no other accepted ID, permissively intervene as the class representative for Class 6 pursuant to Rule 24(b). Newberg § 16:8.

be under other class certification rules, given that relief sought is predominantly equitable relief against a defendant's allegedly unlawful conduct directed to the class as a whole.").

In any event, all of Plaintiffs' classes are sufficiently ascertainable. A class is ascertainable if it is defined by objective criteria. *See* Newberg § 3:3 ("All courts essentially focus on the question of whether the class can be ascertained by objective criteria."). For Class 1 the criteria are whether the voter lacks ID (objective), lacks the underlying documentation (objective), and faces any of the following five systemic burdens, all of which can be objectively determined: 1) the voter cannot obtain the documents required by the DMV without first obtaining yet other documents needed to obtain those documents; 2) the voter faces a "catch 22" scenario; 3) the voter has a name mismatch; 4) the voter's birth certificate or other required document does not exist; 5) the voter must deal with out of state agencies, multiple agencies, or long lead times exceeding one month to get the documents required by the DMV.

The remaining classes are likewise ascertainable based on objective criteria. Membership in Class 2 is established based on objective criteria of whether the voter is homeless, eligible for means-tested public benefits, or has income at or below $20,000 per year. Membership in Class 3 is established by the objective criterion of whether a voter has an out-of-state driver's license. Membership in Class 4 is established by the objective criterion of whether a voter has a technical college ID. Membership in Class 5 is established by the objective criterion of whether a voter has paid or must pay for the documents required by the DMV. Membership in Class 6 is established based on the objective criterion of whether a voter has a VA ID. Membership in Class 7 is established based on the objective criteria of whether a voter is African-American or Latino and lacks accepted photo ID. All proposed remedies for these classes are administrable. (Sec. II.G.)

# I. Defendants' Rule 52(c) Motion Should Be Denied

Defendants moved on the last day of trial for judgment dismissing the claims of certain Plaintiffs on the grounds that some of these Plaintiffs did not testify at trial and that others who testified had obtained ID prior to trial. (Dkt. 167.) Defendants' motion fails to recognize the representative nature of a class action[63] and the nature of the injury and standing in equal protection claims. All the named Plaintiffs have live claims, except Nancy Lea Wilde, who is deceased. The Court should deny the motion as to all Plaintiffs except Ms. Wilde.

## 1. The Claims of Plaintiffs Who Did Not Testify At Trial Were Represented by the Plaintiffs Who Did Testify

Defendants asked the Court to dismiss the claims of 16 Plaintiffs because they did not testify at trial.[64] A class action, however, is a representative form of litigation in which the claims of many similarly situated persons are advanced through evidence put forth by class representatives. Since all plaintiffs are similarly situated, there is no need for every class member or every named plaintiff to separately prove his or her individual case. Indeed, such a requirement would undermine the very efficiency that a class action is designed to achieve.

Each of the 16 Plaintiffs named by the Defendants has a live claim that was represented at trial by the class representatives identified in this brief. So long as the Court certifies the proposed classes, those 16 Plaintiffs' claims should not be dismissed. Defendants' motion should thus be denied as to these 16 Plaintiffs.

---

[63]Neither of the cases Defendants cited, *Pinkston v. Madry*, 440 F.3d 879 (7th Cir. 2006) and *Collins v. Ralston Purina Co.*, 147 F.3d 592 (7th Cir. 1998), was a class action.

[64]Defendants identify these Plaintiffs as: Mariannis Ginorio, Frank Ybarra, Sam Bulmer, Pamela Dukes, Rickie Lamont Harmon, Dartric Davis, Barbara Oden, Sandra Jashinski, Justin Luft, Anna Shea, Max Kligman, Steven Kvasnicka, Sarah Lahti, Edward Hogan, Anthony Judd, and Anthony Sharp. (Dkt 167 at 2.)

108

### 2. Obtaining Accepted Photo ID Does Not Moot a Plaintiff's Claims

Defendants argue that Plaintiffs Carl Ellis, DeWayne Smith, Samantha Meszaros, Matthew Dearing, and Domonique Whitehurst have no claim for relief because, long *after* this suit was filed, and well after Plaintiffs promptly moved for class certification, these Plaintiffs obtained accepted photo ID. According to Defendants, these Plaintiffs thus "cannot be injured by Act 23's photo identification requirement." (Dkt. 167 at 2.) Defendants argument misunderstands the nature of the injury in an equal protection claim.

Claims 1-7 assert constitutional violations that sound in equal protection. The injury in such a case is caused by the existence of the law and is therefore not eliminated simply because a voter managed to compensate for the barrier imposed by the law. As discussed in *Common Cause / Georgia v. Billups*, a case challenging Georgia's photo ID law, "For purposes of standing, a denial of equal treatment is an actual injury even when the complainant is able to overcome the challenged barrier . . . . The 'injury in fact' in an equal protection claim of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." 554 F.3d 1340, 1351 (11th Cir. 2009) (citing *NE Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla*., 508 U.S. 656 (1993)). The Court thus held that "[e]ven if [plaintiffs] possessed an acceptable form of photo identification, they would still have standing to challenge the statute," and "the lack of acceptable photo identification is not necessary to challenge a statute that requires photo identification."

Claims 1-7 are thus not moot for Ellis, Smith, Meszaros, Dearing or Whitehurst, because they continue to suffer from a denial of equal protection so long as Act 23 remains in place. Ellis still cannot use VA ID to vote due to the arbitrary nature of Act 23. Whitehurst still cannot use

technical college ID to vote due to the arbitrary nature of Act 23. Meszaros and Dearing still cannot obtain a state ID without surrendering their out-of-state driver's licenses. The fact that these Plaintiffs have managed to obtain a compliant ID they otherwise would not have needed but for Act 23, at their own expense, does not moot their claims.

In addition, even voters who have obtained photo ID can have it lost or stolen in an instant, as Whitehurst already has and as other voters' experiences demonstrate. Homeless voters have a particularly hard time retaining documents. (Sec. I.E.1.) Acceptable forms of ID will also eventually expire. Thus, there is a very real risk that even voters who have obtained ID will be subjected to Act 23's barriers again in the future. The claims are thus susceptible to repetition.

### 3.     There is a Live Controversy for Every Claim in this Case

Despite Defendants' suggestion, there is a live controversy between at least one live Plaintiff who is still without ID and the Defendants for Claim 1 (Brown, Holloway, Frank), Claim 2 (Brown, Holloway), Claim 5 (Brown, Frank, Holloway), Claims 7-8 (Brown, Holloway, Frank), and Claims 9-10 (Brown, Holloway). For the reasons discussed in Sec. II.I.2, there also continues to be a live controversy between a named plaintiff who subsequently obtained photo ID and Defendants Claim 1 (Ellis, Smith), Claim 2 (Ellis, Smith), Claim 3 (Meszaros, Dearing), Claim 4 (Whitehurst), Claim 5 (Meszaros, Dearing, Ellis, Smith), Claim 6 (Ellis), and Claim 7 (Ellis, Smith, Whitehurst, Meszaros, Dearing).

Moreover, there continues to be a live controversy between the absent class members and Defendants for Claims 1-6 and 9-10 for which class certification has been requested. These controversies are very much alive and ripe for decision. Thus, another reason the Court should certify the classes is to preserve relief for these class members in case any named plaintiffs' claims do become moot in the future. *See Sosna v. Iowa*, 419 U.S. 393, 401-402 (1975) (holding

that even if a named plaintiff's claim becomes moot, a live controversy continues to exist between the defendant and members of the class); *Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544 (7th Cir. 2003) ("[T]he mooting of the named plaintiff's claim in a class action by the defendant's satisfying the claim does not moot the action so long as the case has been certified as a class action . . . or, as in this case, so long as a motion for class certification has been made and not ruled on, unless . . . the movant has been dilatory.")

## CONCLUSION

For the reasons set forth above, Plaintiffs request that this Court certify proposed Classes 1-7, approve Plaintiffs' undersigned counsel as class counsel, certify certain named plaintiffs as class representatives as detailed above, enter judgment in favor of Plaintiffs, permanently enjoin the photo ID provisions of Act 23, and grant other such relief as may be just and proper.

Dated this 16th day of January, 2014.          Respectfully submitted,

/s/ Karyn L. Rotker
KARYN L. ROTKER
State Bar No. 1007719
LAURENCE J. DUPUIS
State Bar No. 1029261
American Civil Liberties Union of Wisconsin
Foundation
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
Phone: (414) 272-4032
Fax: (414) 272-0182 (fax)
krotker@aclu-wi.org
ldupuis@aclu-wi.org

DALE E. HO
SEAN YOUNG
American Civil Liberties Union Foundation,
Inc.
125 Broad St.
New York, NY 10004
Phone: (212) 549-2693
Fax: (212) 549-2651

111

dale.ho@aclu.orgs
young@aclu.org

LAUGHLIN MCDONALD
American Civil Liberties Union Foundation,
Inc.
230 Peachtree Street, Suite 1440
Atlanta, GA 30303
Phone: (404) 523-2721
Fax: (404) 653-0331
lmcdonald@aclu.org

JEREMY ROSEN
National Law Center on Homelessness &
Poverty
2000 M Street NW, Ste. 210
Washington, DC 20036
Phone: (202) 347-3124
Fax: (202) 628-2737
jrosen@nlchp.org

NEIL STEINER
DIANE PRINC
Dechert LLP
1095 Avenue of the Americas New
York, NY 10036-6797
Phone: (212) 698-3822
Fax: (212) 698-3599
neil.steiner@dechert.comdiane
.princ@dechert.com

CRAIG FALLS
Dechert LLP 1900 K St. NW
Washington, DC 20006
Phone: (202) 261-3373
Fax: (202) 261-3333
craig.falls@dechert.com

ANGELA LIU
Dechert LLP
77 West Wacker Drive Suite 3200
Chicago, IL 60601
Phone: (312) 646-5816
Fax: (312) 646-5858
angela.liu@dechert.com

Attorneys for Plaintiffs.