# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**RUTHELLE FRANK, et al.,**
        Plaintiffs,

   v.                                 Case No. 11-C-01128

**SCOTT WALKER, et al.,**
        Defendants.

---

## DECISION AND ORDER

When the plaintiffs commenced this suit, they alleged that Wisconsin's law requiring voters to present photo identification at the polls, 2011 Wis. Act 23 ("Act 23"), violated the Constitution and Section 2 of the Voting Rights Act. Following a trial on the claims alleged in this and a companion case, I concluded that Act 23 placed an unjustified burden on the plaintiffs' voting rights and therefore violated the Fourteenth Amendment. I also concluded that Act 23 violated Section 2 of the Voting Rights Act. Having found these violations, I entered an injunction prohibiting the defendants from enforcing the photo ID requirement. Frank v. Walker, 17 F. Supp. 3d 837 (E.D. Wis. 2014). The defendants appealed, and the Seventh Circuit reversed. Frank v. Walker, 768 F.3d 744 (7th Cir. 2014).

In my prior decision, I noted that I was leaving certain of the plaintiffs' constitutional claims unresolved. Frank, 17 F. Supp. 3d at 842–43. Those claims involved Act 23's failure to include certain forms of photo ID, such as veteran's ID cards, on the list of acceptable IDs, and its allegedly placing a poll tax on persons who would be required to surrender their out-of-state driver's licenses in order to obtain free ID cards to use for

voting.  The plaintiffs now move for class certification and for relief on these unresolved claims.  I address those claims below.

However, before I turn to the unresolved claims, I discuss the plaintiffs' request for class certification and for relief on behalf of persons they describe as "Class 1 voters," i.e., those voters "who lack photo ID and face systemic practical barriers to obtaining an ID." See Pls.' Br. at 16, ECF No. 223.  The relief they seek in connection with this claim is an injunction allowing persons to vote at their polling place without presenting an ID but instead by signing an affidavit attesting to their identity and to the difficulties they would face in obtaining ID.  Id. at 18.  This "Class 1" claim is not a claim I left unresolved in my prior decision.  It is the constitutional claim on which I granted relief: I found that Act 23 imposed unjustified burdens on voters who currently lack photo ID and will face heightened barriers to obtaining ID.  Frank, 17 F. Supp. 3d at 862–63.  I specifically considered the plaintiffs' proposed affidavit procedure and determined that an injunction against the law's enforcement was a more appropriate remedy for the violation of the plaintiffs' rights.  Id.  The Seventh Circuit reversed my decision and did not remand for further proceedings in connection with this claim.  It did not, for example, vacate the injunction and remand with instructions to consider granting some other remedy, such as the plaintiffs' proposed affidavit procedure.  Rather, it held that the plaintiffs' claim was no different than the claim the Supreme Court considered and rejected in Crawford v. Marion County Election Board, 553 U.S. 181 (2008).  Frank, 768 F.3d at 751.  I am not free to disregard this holding on remand.  See, e.g., Kovacs v. United States, 739 F.3d 1020, 1024 (7th Cir. 2014) ("The lower court is bound, through the mandate rule, to the resolution of any points that the higher court has addressed.").

2

For two reasons, the plaintiffs contend that the Class 1 claim they are now pursuing is different than the claim the Seventh Circuit considered and rejected: (1) they seek relief on behalf of a narrower class of voters,[1] and (2) they seek relief that is somewhat narrower than the relief I previously granted.[2] But these facts do not change the claim such that it falls outside the Seventh Circuit's holding on appeal. The Seventh Circuit characterized the plaintiffs' claim as a "facial" challenge that was indistinguishable from the claim in Crawford because it was based on "predictions about the effects of requiring photo ID" rather than on "results." Frank, 768 F.3d at 747. The court implied that a constitutional claim that is not foreclosed by Crawford would be one based on proof that "substantial numbers of persons eligible to vote have tried to get a photo ID but been unable to do so," id. at 746, or on proof that the law has in fact significantly reduced voter turnout, id. at 747, 751. As I read the Seventh Circuit's opinion, it holds that Crawford disposes of any constitutional claim based on a "prediction" that barriers to obtaining photo ID will prevent

---

[1] In their reply brief, the plaintiffs contend that the members of Class 1 are limited to individuals who will face one of three barriers to obtaining ID: (1) having to deal with name mismatches or other errors in an underlying document needed to obtain ID; (2) having to obtain an underlying document from an agency other than the DMV; and (3) the person's underlying document does not exist. Pls.' Reply Br. at 10, ECF No. 237.

[2] I say "somewhat" narrower because the relief is not limited to identified members of the class. Under the plaintiffs' proposed affidavit procedure, any person who appeared at the polls would be allowed to vote without showing ID so long as he or she signed an affidavit in the required form. Thus, a person willing to commit voter-impersonation fraud could submit a false affidavit and then vote in someone else's name. Since that would undermine the law's purpose, which is to assure the public that voter-impersonation fraud will not occur, the proposed affidavit procedure seems little better than enjoining the law in its entirety. Of course, in-person voter-impersonation fraud is virtually nonexistent, but I am bound by the Seventh Circuit's interpretation of Crawford, under which photo-ID laws are deemed to confer "substantial benefits" because they promote "confidence in electoral integrity." Frank, 768 F.3d at 751.

3

Case 2:11-cv-01128-LA   Filed 10/19/15   Page 3 of 20   Document 250

a group of persons from voting. The plaintiffs' reformulated Class 1 claim fits this description. It seeks relief on behalf of a group of voters who have not yet tried to obtain ID,[3] based on the prediction that it will be hard for them to obtain ID, and that therefore they "are likely to be deterred from voting in future elections." Pls.' Br. at 18. This is precisely the claim that I previously resolved in the plaintiffs' favor and was reversed on. I continue to believe that my decision was correct and that the plaintiffs' claim is not foreclosed by Crawford, but the Seventh Circuit disagreed and I am bound by its decision. Therefore, I cannot reconsider the "Class 1" claim.

## I. TECHNICAL COLLEGE ID

Plaintiff Domonique Whitehurst seeks to represent a class of "Wisconsin technical college students who have photo ID otherwise acceptable under the student ID provisions of Act 23." Pls.' Br. at 10, ECF No. 223. Under the student ID provisions of Act 23, such an ID may be used for voting if it is issued by a university or college in Wisconsin that is "accredited" (as defined by Wis. Stat. § 39.90(1)(d)), and meets certain other requirements. See Wis. Stat. § 5.02(6m)(f). The plaintiff contends that any refusal to accept technical college IDs as acceptable forms of ID for complying with Act 23 would violate the Equal Protection Clause, and she seeks an injunction requiring the defendants to accept such

---

[3] To be sure, some members of the class, including class representatives Ruthelle Frank and Eddie Lee Holloway, Jr., have tried and failed to obtain ID. However, the class definition is not limited to those who have tried and failed to obtain ID. Nor is the proposed relief tailored to those who have tried and failed to obtain ID. As noted, the plaintiffs' proposed affidavit procedure would be available to any person who shows up at the polls and is willing to sign an affidavit stating that it would be hard for him or her to obtain ID. A true "as applied" remedy for a person who has made a reasonable effort to obtain ID but been unable to do so would be an injunction requiring the state to issue that person an ID.

IDs so long as they are otherwise indistinguishable from the types of student ID already accepted under Act 23.

Act 23 does not expressly state that technical college IDs may not be used for voting, and since November 2011, the Government Accountability Board (which is the state agency charged with implementing Act 23) has interpreted Act 23 to mean that technical college IDs are acceptable. However, when in September 2011 the GAB first considered whether technical college IDs are acceptable, it concluded that the legislature "did not intend for technical college ID cards to be treated as equivalent to those issued by other universities and colleges." Defs.' Ex. 1049 at p. 2. It reached this conclusion after noting that the legislature had rejected amendments to Act 23 that would have explicitly included technical college IDs in the list of acceptable IDs. Id. But then the GAB reconsidered this conclusion at its meeting on November 9, 2011, and it decided "to allow technical college ID cards for voting purposes." Defs.' Ex. 1050, fifth page. At the November meeting, the GAB determined that the ordinary meaning of the word "college," as used in the statute, included technical colleges. Id.

A few days after the GAB interpreted Act 23 to allow the use of technical college IDs, the Wisconsin Legislature's Joint Committee for the Review of Administrative Rules directed the GAB to embody its interpretation of Act 23 in an emergency administrative rule. See Defs.' Ex. 1050, seventh page; Wis. Stat. § 227.26(2)(b). The GAB then created an emergency rule allowing the use of technical college IDs for voting. Shortly thereafter, the state courts enjoined the implementation of Act 23, and the GAB suspended its administrative rulemaking. See Decl. of Kevin Kennedy ¶ 8–9, ECF No. 230. In May 2015, following the reversal of the state-court injunctions and the injunction I issued in this case,

5

Case 2:11-cv-01128-LA   Filed 10/19/15   Page 5 of 20   Document 250

the GAB reissued the emergency rule, and Governor Scott Walker approved it. See ECF No. 235. The emergency rule has been in force ever since, and the GAB has taken steps to make that rule permanent. Kennedy Decl. ¶¶ 13–23. However, as of the date of this opinion, the permanent rule has not replaced the emergency rule.

The defendants contend that the GAB's interpretation of Act 23 and its rulemaking have rendered the plaintiff's equal-protection claim moot. However, although I agree that the plaintiff's claim is not justiciable at this time, I do so on the basis of ripeness rather than mootness. Mootness comes into play when it is too late to grant relief to the plaintiff; ripeness comes into play when it is too early to do so. See Capeheart v. Terrell, 695 F.3d 681, 648 (7th Cir. 2012). By the time the plaintiffs filed this suit, the GAB had interpreted Act 23 to allow the use of technical college IDs for voting. The plaintiffs nonetheless included a claim on behalf of technical college students in their complaint because they feared that at some point in the future either the GAB, the governor, or the state legislature would take some action to prevent the use of technical college IDs for voting. See Am. Compl. ¶¶ 47–48, ECF No. 31. The plaintiff's claim thus relates to future events that may or may not occur, which raises a question of ripeness rather than mootness. See Wis. Right to Life v. Barland, 664 F.3d 139, 148 (7th Cir. 2011) ("Ripeness concerns may arise when a case involves uncertain or contingent events that may not occur as anticipated, or not occur at all.").

Here, the plaintiff's claim is not ripe because too many contingent and unlikely events must occur before she and the proposed class members would be precluded from using technical college IDs at the polls. For nearly four years, the GAB has interpreted Act 23's student-ID provision as including technical college IDs, and it has issued both

6

Case 2:11-cv-01128-LA   Filed 10/19/15   Page 6 of 20   Document 250

emergency and proposed permanent rules that embody its interpretation. To date, neither the governor nor the legislature has disagreed with the GAB's interpretation, and these branches of state government have taken no action to block the GAB's rules. Even if the GAB's rules do not become permanent, the GAB could continue to interpret Act 23 the way it has and continue to instruct local election officials to accept technical college IDs at the polls. See Defs.' Ex. 1050 at 7–8 (noting that GAB instructed local election officials to accept technical college IDs even before the emergency rules went into effect). The plaintiff suggests that the legislature could enact a new statute explicitly forbidding the use of technical college IDs for voting, Am. Compl. ¶ 48, and at oral argument her lawyer pointed out that the legislature is considering a bill to eliminate the GAB altogether, which might result in the creation of a new agency responsible for administering the election laws, which agency, in turn, might interpret Act 23 as excluding technical college IDs, see Tr. of Oral Argument at 7. But these are highly speculative future events, and the chance that they will occur is too small to justify constitutional adjudication. See Bauer v. Shepard, 620 F.3d 704, 708–09 (7th Cir. 2010) (claim is unripe when it depends on the occurrence of "too many unlikely steps").

Moreover, should the events the plaintiff fears come to pass, she (or another technical college student) may commence a new suit at that time and seek a preliminary injunction. The suit would present a relatively straightforward legal question that could be resolved quickly, and if the plaintiff's claim has merit an injunction could likely be issued between the time the defendants announce their decision to exclude technical college IDs and the date of an election. Thus, withholding judicial review until after that decision has been made would not impose a hardship on the plaintiff or the proposed class members.

7

Case 2:11-cv-01128-LA   Filed 10/19/15   Page 7 of 20   Document 250

See Wis. Right to Life, 664 F.3d at 148 (explaining that case is unripe when plaintiff cannot show that delaying judicial review until feared events occur will cause hardship).

For these reasons, the plaintiff's motion for relief on behalf of technical college students will be denied, and her claim will be dismissed as unripe.

## II. OUT-OF-STATE DRIVER'S LICENSES

Plaintiffs Samantha Meszaros and Matthew Dearing seek to represent a class of "all Wisconsin voters who are residents of Wisconsin for voting purposes, who lack any accepted photo ID, and who would be forced to surrender an out-of-state driver's license in order to obtain a free Wisconsin ID card for voting purposes." ECF No. 194 at 101. These plaintiffs contend that the photo ID requirement, as applied to members of the proposed class, amounts to a poll tax that violates both the 24th Amendment to the Constitution and the Equal Protection Clause of the Fourteenth Amendment. Their argument is that persons who possess an out-of-state license are faced with an impermissible choice: they must either pay a fee to obtain another form of Act 23-compliant ID (such as a passport) or surrender their driving privileges to obtain a free Wisconsin state ID card.[4] See Harper v. Va. Bd. of Elections, 383 U.S. 663 (1966); Harman v. Forssenius, 380 U.S. 528 (1965).

An initial problem is that the claims of the class representatives are moot. Both Meszaros and Dearing testified at trial that they have obtained U.S. passports and that they did so for reasons other than to vote in Wisconsin. Tr. at 696, 977. Thus, assuming that

---

[4]Under Wisconsin law, a person may be issued a state ID card only if he or she surrenders any driver's license issued to that person by another jurisdiction. See Wis. Stat. § 343.50(1)(b); Wis. Admin. Code § Trans 102.14(2).

8

they are otherwise qualified Wisconsin voters,[5] Meszaros and Dearing may now vote in Wisconsin without obtaining a free Wisconsin state ID or surrendering their out-of-state driver's licenses. They therefore are no longer subject to the claimed poll tax, and their individual claims must be dismissed as moot.[6] It follows that I cannot certify a class in which Meszaros and Dearing are the class representatives. Weismueller v. Kosobocki, 513 F.3d 784, 786 (7th Cir. 2008) ("If . . . the named plaintiff's claim becomes moot before the class is certified, the suit must be dismissed because no one besides the plaintiff has a legally protected interest in the litigation.").

The plaintiffs contend that even if Meszaros and Dearing's claims are moot, another person, Brittney Frederick, is willing to serve as the class representative. Frederick filed a declaration stating that she is a student at Carthage College and does not currently possess any form of Act 23-compliant ID. See ECF No. 238-1. She does possess a student photo ID card issued by Carthage, but she is not sure whether that ID is acceptable for voting purposes. Frederick has an unexpired driver's license issued by Illinois, which is where she grew up and where her parents live. She states that she does not want to either pay for a Wisconsin driver's license or to surrender her Illinois driver's license.

---

[5]At the time of trial, Dearing was not a Wisconsin resident and for that reason was not eligible to vote in Wisconsin. Tr. at 980. However, he stated that he hoped to return to Wisconsin. Id.

[6]Meszaros and Dearing contend that their claims are not moot because they are still prohibited from using their out-of-state driver's licenses to comply with Act 23. Reply Br. at 17–18, ECF No. 237. However, the plaintiffs' injuries were caused not by their inability to use their out-of-state licenses at the polls, but by their inability to obtain Act 23-compliant ID without choosing between either paying fees or surrendering their out-of-state driver's licenses. Now that the plaintiffs have obtained Act 23-compliant ID, they no longer face this allegedly impermissible choice. Thus, their claims are moot.

9

Frederick is not identified in the plaintiffs' most recent complaint, did not participate in discovery, and did not testify at the trial. The defendants have not conceded that the facts as alleged in her declaration are true.[7] Thus, before Frederick could represent a class, the plaintiffs would have to file a complaint identifying her as a plaintiff. The defendants would then be entitled to take discovery with respect to her claim, and a second trial might be required.

Moreover, the plaintiffs have not convinced me that there are a large number of persons in Wisconsin who do not possess Act 23-qualifying ID and who could not obtain such an ID without having to surrender an out-of-state driver's license. See Fed. R. Civ. P. 23(a)(1) (class may not be certified unless "the class is so numerous that joinder of all members is impractical"). In moving for class certification, the plaintiffs identified college students and "snowbirds"—individuals who live in Wisconsin during warmer months and who live in other states during the winter—as the types of individuals who will likely possess an out-of-state driver's license yet be eligible to vote in Wisconsin. However, most college students will possess student photo ID cards issued by their colleges, and the evidence presented does not convince me that student ID cards issued by colleges or universities in Wisconsin will fail to meet Act 23's requirements. Thus, at this point, I have no reason to think that college students in Wisconsin must surrender any out-of-state IDs in their possession in order to vote. As for snowbirds, none testified at trial. The only evidence in the record pertaining to them is the testimony of a GAB employee who stated

---

[7]The defendants have moved to strike Frederick's declaration on the ground that it was filed with the plaintiffs' reply brief. See ECF No. 240. Although I will not strike the declaration, neither will I assume that Frederick's statements are true.

10

that he had heard from approximately ten individuals who complained about having to surrender their out-of-state driver's licenses to obtain Wisconsin ID cards. Tr. at 1687–88. This testimony does not demonstrate that the number of individuals who cannot vote without surrendering an out-of-state driver's license is "so numerous that joinder of all the members is impractical." Fed. R. Civ. P. 23(a)(1). No details with respect to these ten individuals were offered at trial, and it is possible that they possess some form of qualifying ID. Even assuming that these individuals lack Act 23-qualifying ID and could not obtain such ID without surrendering an out-of-state driver's license, it is not impractical to join ten individuals to a suit.

More generally, I doubt that there are a large number of qualified Wisconsin voters who may legally drive in Wisconsin without possessing a valid Wisconsin driver's license. To vote in Wisconsin, a person must reside in Wisconsin. Wis. Stat. § 6.02(1). "Residence" is defined as "the place where the person's habitation is fixed, without any present intent to move, and to which, when absent, the person intends to return." Wis. Stat. § 6.10(1).[8] It is illegal for a Wisconsin resident to operate a motor vehicle in this state unless that person possesses a valid operator's license issued by the Wisconsin Department of Transportation. Wis. Stat. § 343.05(3)(a). Nonresidents, however, may operate a motor vehicle in Wisconsin so long as they are at least 16 years old and have a valid license issued by the person's home jurisdiction. Wis. Stat. § 343.05(4)(b)1. Under the motor-vehicle code, a "resident" is defined as "an adult whose one home and

---

[8]Other subsections of Wis. Stat. § 6.02 provide additional standards for determining residence, but those standards do not alter the basic requirement that residence is the place where the person's habitation is fixed, without any present intent to move, and to which, when absent, the person intends to return.

11

customary and principal residence, to which the person has the intention of returning whenever he or she is absent, is in this state." Wis. Stat. § 343.01(2)(g). This definition has the same meaning as "residence" under the voting laws—both definitions define residence as meaning, essentially, a person's "domicile." See Black's Law Dictionary (10th ed. 2014) (defining "domicile" as "[t]he place at which a person has been physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere."). It is thus difficult to envision a scenario in which an adult could be a resident of Wisconsin for purposes of the voting laws and not also be a resident of Wisconsin for purposes of the motor-vehicle code, such that the person could legally drive in Wisconsin without surrendering his or her out-of-state license. The plaintiffs have not offered an interpretation of these statutes that would permit such a result.

If a person who is qualified to vote in Wisconsin must be a resident of Wisconsin for driving purposes, then the only persons who could claim that having to surrender an out-of-state driver's license is a poll tax are persons who (a) are qualified to vote in Wisconsin, (b) never drive in Wisconsin, (c) possess a driver's license issued by another state, (d) occasionally drive in that other state, and (e) do not already possess a form of Act 23-qualifying ID. All other persons who are qualified to vote in Wisconsin and who wish to retain their driving privileges would be required to obtain a Wisconsin driver's license and surrender their out-of-state driver's license regardless of whether they intended to vote in Wisconsin. I doubt that there are many persons who would fit criteria (a) through (e), and the plaintiffs have not submitted evidence indicating that such persons exist. The students who testified at the trial admitted to driving in Wisconsin, and thus if they are residents for

12

voting purposes they are required to have Wisconsin driver's licenses regardless of whether they wish to vote. Tr. at 698, 980–81. As noted, no snowbirds testified at trial, but in any event I doubt that a person who lives in Wisconsin during its warmer months never drives while in Wisconsin but drives in the state in which that person lives for the remainder of the year. Thus, the plaintiffs have not demonstrated that their proposed class satisfies the numerosity requirement of Rule 23(a)(1).

For these reasons, the claims of the named class members, Meszaros and Dearing, will be dismissed as moot, and the plaintiffs' motion to certify a class in connection with their poll-tax claim will be denied.

### III. VETERAN'S ID

Plaintiffs Sam Bulmer, Carl Ellis, and Rickie Lamont Harmon seek to represent a class of veterans who possess photo identification cards issued by U.S. Department of Veterans Affairs.[9] The specific ID card at issue is the Veteran Health Identification Card, which veterans use to obtain treatment at VA health facilities. See Young Decl. Ex. 17, ECF No. 238-14. Act 23 does not include such ID cards among the kinds of photo ID cards that may be used for voting. See Wis. Stat. § 5.02(6m). The plaintiffs contend that the exclusion of veteran's ID from the list of acceptable kinds of photo ID is arbitrary and therefore violates the Equal Protection Clause as applied to any person who possesses a veteran's ID.

---

[9]When the plaintiffs originally moved for class certification, they defined the class in a way that limited it to persons who possessed veteran's ID and no form of Act 23-qualifying ID. See ECF No. 64 at 21. However, they have since expanded the proposed class definition to include all persons who possess veteran's ID, regardless of whether they also possess Act 23-qualifying ID. See ECF No. 223 at 9; ECF No. 237 at 17–18.

13

The defendants argue that the claims of the proposed class representatives are moot because, during the pendency of this case, all of them were able to obtain a form of photo ID that is already accepted under Act 23. However, the injury for which the plaintiffs seek redress is their inability to use their veteran's ID for voting purposes. The plaintiffs' having obtained other IDs that they can use for voting purposes does not redress that injury. Although the inability to use a veteran's ID for voting purposes may seem like a minor injury in light of the plaintiffs' possession of another form of ID, it nonetheless is sufficient to give the plaintiffs "a direct stake in the outcome of the litigation." See United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n.14 (1973). The plaintiffs wish to use their veteran's ID for voting purposes, but the defendants will not allow them to. An injunction requiring the defendants to accept the plaintiffs' veteran's IDs would redress their injuries. Thus, the named plaintiffs continue to have standing, and their claims are not moot.[10]

The defendants next argue that I may not certify the proposed class of veterans because the class would not satisfy the numerosity requirement of Rule 23(a)(1), because the claims of the named plaintiffs are not typical of the claims of the class, see Rule

---

[10]My conclusion that the claims of veterans who possess acceptable ID are not moot is consistent with my conclusion that the claims of those who possess both out-of-state ID and Act 23-qualifying ID are moot. This is because the claims of those with out-of-state ID relate to the process of obtaining acceptable ID—they claim they are injured because they cannot obtain Act 23-qualifying ID without paying a poll tax. If the plaintiffs have obtained Act 23-qualifying ID without paying a poll tax, then they are no longer suffering the claimed injury. In contrast, the veterans do not challenge the process of obtaining ID; they challenge what is, in their view, the arbitrary exclusion of veteran's ID from the list of Act 23-qualifying ID. Thus, the named plaintiffs who are veterans may challenge the continued refusal to accept veteran's ID even though they have obtained acceptable forms of photo ID.

14

23(a)(3), and because the named plaintiffs are not adequate class representatives, see Rule 23(a)(4). However, rather than addressing these issues, I will proceed to address the merits of the named plaintiffs' claims. I do this because, as I will discuss, those claims fail on the merits. Thus, certifying a class of veterans would not benefit the plaintiffs. Rather, it would benefit only the defendants by precluding unnamed veterans from bringing their own, separate claims. See Myrick v. WellPoint, Inc., 764 F.3d 662 (7th Cir. 2014). But the defendants oppose class certification and thus seem content to waive this benefit. Therefore, I will proceed to the merits. See Cowen v. Bank United of Tex., 70 F.3d 937, 941–42 (7th Cir. 1995).

The plaintiffs argue that it is arbitrary to exclude veteran's ID from the list of acceptable forms of ID when a veteran's ID is "just as secure" (i.e., just as likely to ensure that the person presenting it is who he or she claims to be) as other forms of Act 23-qualifying ID—namely, ID cards issued by a U.S. uniformed service ("military ID cards") and ID cards issued by federally recognized Indian tribes in Wisconsin ("tribal ID cards").[11] Wis. Stat. § 5.02(6m)(a)3 & (e). Therefore, argue the plaintiffs, Act 23 cannot survive rational-basis scrutiny.[12] Under such scrutiny, a statutory classification must be upheld "if

---

[11]The parties do not identify a comprehensive standard for judging the degree of "security" offered by a given form of ID. However, some forms of military and tribal ID cards apparently do not bear expiration dates. Tr. at 1965. At the time Act 23 was passed, veteran's ID cards did not bear expiration dates. See Def. Post-trial Br. at 123, ECF No. 176. (However, newly issued cards have expiration dates. See Young Decl. Exs. 4 & 8.) It is apparently the lack of expiration dates that makes some military ID cards, tribal ID cards, and veteran's ID cards "less secure" than other forms of ID, such as driver's licenses and passports.

[12]In a footnote, the plaintiffs suggest that the Anderson/Burdick balancing test, see Burdick v. Takushi, 504 U.S. 428 (1992); Anderson v. Celebrezze, 460 U.S. 780 (1983), rather than rational-basis scrutiny, might apply to the question of whether the defendants

15

there is any reasonably conceivable state of facts that could provide a rational basis for the classification." FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993).

There is no dispute that veteran's ID is "just as secure" as some forms of military and tribal ID that are acceptable under Act 23. However, this does not make Wisconsin's decision to exclude veteran's ID arbitrary or irrational. The plaintiffs' argument implies that the state must accept all forms of photo ID that are "just as secure" as the least secure form of ID that is already on the list of accepted IDs. That would produce a very long list. The federal judiciary, for example, issues ID cards to its employees that contain the employee's name and photograph, as well as the date of issuance and an expiration date. Presumably, this card would be "just as secure" as a veteran's ID, tribal ID, or military ID. Moreover, many other federal, state, and local governmental agencies likely issue photo IDs to their employees that could be deemed "just as secure" as military IDs or tribal IDs. Under the plaintiffs' argument, those IDs would have to be accepted as well. Undoubtedly, many other forms of photo ID could be identified that are "just as secure" as the forms of ID already accepted under Act 23.

It is rational for Wisconsin to limit the number of acceptable IDs to a manageable amount, while at the same time accepting enough forms of ID to make it likely that most voters will already possess one of the accepted forms. If the state could not limit the number of IDs to a manageable amount, state officials would be required to compile a list

---

may exclude veteran's ID. See Reply Br. at 3 n.2, ECF No. 237. However, the plaintiffs do not develop this argument, and it was raised for the first time in their reply brief. For these reasons, I will not consider the argument. See Bank of America, N.A. v. Veluchamy, 643 F.3d 185, 189–90 (7th Cir. 2011) (court is not required to consider undeveloped arguments); Gonzales v. Mize, 565 F.3d 373, 382 (7th Cir. 2009) (argument raised for the first time in a reply brief is waived).

16

of all forms of accepted ID that a Wisconsin voter might possess, make sure that the list was updated regularly, and identify all the forms of ID that are "just as secure" as the least secure form of ID that is already on the list of acceptable IDs. Act 23 would need to be periodically amended to include any new forms of ID that are "just as secure" as the IDs that are already accepted. And poll workers would need frequent training on which IDs are acceptable. All of this would make it harder for the state to administer the law, and it is rational for the state to want to minimize this burden.

To be sure, Wisconsin probably could have included veteran's ID on the list of Act 23-qualifying ID without significantly increasing its administrative burden. However, for the reasons just discussed, the state had to draw the line between acceptable and unacceptable forms of ID somewhere. Drawing such a line "inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." Beach Communications, 508 U.S. at 315–16 (internal quotation marks omitted). Thus, Wisconsin's decision to exclude veteran's ID from the list of acceptable forms of ID is "virtually unreviewable." Id. at 316.

Moreover, one can conceive of reasons for wanting to expand the list of acceptable forms of ID to include military ID and tribal ID, even if they may be deemed "less secure" than some of the other forms of acceptable ID, but not expand the list to include veteran's ID. Military ID cards are issued to active-duty personnel and their family members (among others). These individuals tend to relocate more frequently than voters generally and for that reason may not reside in Wisconsin for long enough to find themselves in need of a

17

Wisconsin driver's license or state ID card. Thus, the state could rationally conclude that military voters should be able to use their military ID cards at the polls, even though they may be "less secure" than other forms of ID.[13] The same rationale would not apply to veterans, who are no more likely to relocate frequently than voters generally. Thus, the state had a rational basis for expanding the list of acceptable ID to include military ID but not veteran's ID.

As for tribal ID cards, they are issued by quasi-sovereign Indian tribes to their members. The state could rationally conclude that tribal ID cards hold the same status within the tribal community as Wisconsin state ID cards hold outside of it, and that therefore they should be treated the same as Wisconsin state ID cards for voting purposes, even if they could be deemed somewhat "less secure" than Wisconsin state ID cards because they do not have expiration dates. This rationale would not apply to veteran's ID cards, as obviously veterans do not comprise a quasi-sovereign community that issues its own form of citizen ID. Thus, the state had a rational basis for expanding the list of acceptable ID to include tribal ID cards but not veteran's ID cards.

---

[13] The plaintiffs note that military ID cards are issued not just to active-duty personnel, but also to retirees and others who might not relocate as frequently as active-duty personnel. Although that may be true, it does not render the state's decision to accept military ID cards irrational. The plaintiffs have not shown that there is a form of military ID that is possessed only by active-duty personnel who are likely to relocate, such that the state could have limited its acceptance of military IDs to that form. But more importantly, under rational-basis scrutiny, the state is not required to draw its lines with precision. See Wis. Educ. Ass'n Council v. Walker, 705 F.3d 640, 655–56 (7th Cir. 2013). Thus, even if the state could have limited its acceptance of military IDs to a form that it possessed only by active-duty personnel, the Equal Protection Clause would not have required it to do so. Id. at 656 (noting that court will not interfere with legislative line-drawing even when the lines drawn are overinclusive or underinclusive).

18

In their briefs and at oral argument, the plaintiffs relied heavily on Center for Inquiry, Inc. v. Marion Circuit Court Clerk, 758 F.3d 869 (7th Cir 2014). In that case, a group of secular humanists alleged that Indiana's marriage-solemnization statute violated the Religion Clauses of the First Amendment because it allowed solemnization by religious officials of certain religious groups but disallowed solemnization by equivalent officials of secular groups. The Seventh Circuit held that the statute violated the First Amendment by favoring religious groups over secular groups. But it also stated that the statute violated the Equal Protection Clause because it made irrational and absurd distinctions. Id. at 874–75. The plaintiffs contend that this case stands for the proposition that a state's desire for a finite list does not justify its exclusion of items from that list that otherwise could have been included. But that's not what the case says. Indiana did not defend its exclusion of secular humanists from its list of approved marriage celebrants on the ground that including them would open the door to an unmanageably long list. Indiana gave other reasons for excluding them. See id. at 874. Moreover, the reason the exclusion of humanists was irrational was that the statute "discriminated arbitrarily among religious and ethical beliefs." Id. at 875. The statute, for example, permitted officials of the Church of Satan, "whose high priestess avows that her powers derive from having sex with Satan," to solemnize marriages, yet precluded Buddhists, "who emphasize love an peace," from doing so. Id. As explained above, nothing like that is going on here. Wisconsin had a rational basis for including tribal and military IDs on the list of acceptable IDs yet excluding veteran's IDs.

19

Accordingly, the named plaintiffs are not entitled to an injunction requiring the state to accept veteran's ID cards for voting purposes. Their claims will be dismissed on the merits.

### IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the plaintiffs' motion for permanent injunction, class certification, and judgment on remaining as-applied claims is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion to strike portions of the plaintiffs' reply brief and supporting materials is **DENIED**.

**IT IS FURTHER ORDERED** that the claim of Domonique Whitehurst is dismissed as unripe.

**IT IS FURTHER ORDERED** that the claims of Samantha Meszaros and Matthew Dearing are dismissed as moot.

**IT IS FURTHER ORDERED** that the claims of Sam Bulmer, Carl Ellis, and Rickie Lamont Harmon are dismissed on the merits.

Dated at Milwaukee, Wisconsin, this 19th day of October 2015.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge