# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

**RUTHELLE FRANK, et al., on behalf of**
**themselves and all others similarly situated,**
       **Plaintiffs,**

      **v.**                        **Case No. 11-C-1128**

**SCOTT WALKER, in his official capacity as**
**Governor of the State of Wisconsin, et al.,**
       **Defendants.**
_____

## DECISION AND ORDER

The plaintiffs, a number of individuals who are eligible to vote in Wisconsin, filed this suit in 2011, alleging that Wisconsin's law requiring them to present photo identification at the polls, 2011 Wis. Act 23 ("Act 23"), violates the Constitution and Section 2 of the Voting Rights Act. Following a trial on the claims alleged in this and a companion case, I concluded that Act 23 placed an undue burden on the plaintiffs' voting rights and therefore violated the Fourteenth Amendment. I also concluded that Act 23 violated Section 2 of the Voting Rights Act. Having found these violations, I entered an injunction prohibiting the defendants from enforcing the photo ID requirement. *Frank v. Walker*, 17 F. Supp. 3d 837 (E.D. Wis. 2014). The defendants appealed, and the Seventh Circuit reversed. *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) ("*Frank I*").

On remand, the plaintiffs sought relief in connection with certain claims that I did not resolve in my first decision. I issued a decision denying relief on those claims on October 19, 2015. The plaintiffs appealed, challenging two aspects of my decision. First, the plaintiffs challenged my conclusion that *Frank I* precluded me from considering

the plaintiffs' claim for relief on behalf of persons who cannot obtain Act 23-qualifying ID with reasonable effort. Second, the plaintiffs challenged my conclusion that Act 23's exclusion of veterans' ID cards from the list of IDs that may be used for voting did not violate the Equal Protection Clause.

While the plaintiffs' appeal was pending, Wisconsin amended Act 23 to require election officials to accept veterans' IDs. *See* 2015 Wis. Act 261, § 2. Because the parties agreed that this rendered the plaintiffs' claim regarding the refusal to accept such IDs moot, the Seventh Circuit vacated my decision on that claim and remanded with instructions to dismiss it as moot. *See Frank v. Walker*, 819 F.3d 384, 385 (7th Cir. 2016) ("*Frank II*"). In accordance with that instruction, I will in this order dismiss that claim as moot.

As to the plaintiffs' other argument, the Seventh Circuit held that its decision in the first appeal did not preclude me from considering the plaintiffs' claim for relief on behalf of those who cannot obtain ID with reasonable effort. It therefore vacated my dismissal of that claim and remanded the case for further proceedings. *Id.* at 385–88.

Now that the case has been remanded a second time, the plaintiffs have filed a motion to supplement their complaint, *see* Fed. R. Civ. P. 15(d), a motion to certify a class, *see* Fed. R. Civ. P. 23, and a motion for a preliminary injunction, *see* Fed. R. Civ. P. 65(a). The motion for a preliminary injunction seeks an order requiring the defendants to offer voters who do not possess an ID and who cannot obtain one with reasonable effort the option of receiving a ballot by executing an affidavit to that effect.[1]

_____

[1] Throughout this opinion, I refer to the relief the plaintiffs seek as an "affidavit" option. However, in legal jargon, "affidavit" usually refers to a statement that is sworn before an officer, such as a notary. The affidavit that the plaintiffs request will not be notarized or sworn, and thus it might be more accurate to refer to the affidavit as a "declaration,"

The plaintiffs also seek an order requiring the defendants to publicize this affidavit option by sending individualized notice to all registered voters who, according to DMV records, might not possess qualifying ID.

I will grant the plaintiffs' motion for a preliminary injunction and will order the defendants to implement an affidavit option in time for the general election on November 8, 2016. As explained in more detail below, although most voters in Wisconsin either possess qualifying ID or can easily obtain one, a safety net is needed for those voters who cannot obtain qualifying ID with reasonable effort. The plaintiffs' proposed affidavit option is a sensible approach that will both prevent the disenfranchisement of some voters during the pendency of this litigation and preserve Wisconsin's interests in protecting the integrity of its elections. I will also grant the plaintiffs' motion to file a supplemental complaint and their motion for class certification. However, I will not require the defendants to mail individualized notice of the affidavit option to certain voters.

**I.**

I begin with the plaintiffs' motion to file a supplemental complaint. The sole purpose of this pleading is to add three named plaintiffs and potential class representatives to the case: Melvin Robertson, Leroy Switlick, and James Green. The proposed supplemental complaint alleges that these individuals do not possess Act 23-qualifying ID, that they face significant barriers to obtaining ID, and that the requirement to present ID at the polls prevented them from voting in Wisconsin elections during 2016. *See* Decl. of Sean J. Young Ex. 1, ECF No. 280-1.

---

which is a statement made under penalty of perjury that is not notarized or sworn to. However, because the parties use the term "affidavit," I will as well.

3

The defendants contend that I should not allow these individuals to be added as plaintiffs because their claims will be addressed as part of a separate lawsuit that is pending in the Western District of Wisconsin, *One Wisconsin Institute, Inc., et al. v. Judge Gerald C. Nichol, et al.*, W.D. Wis. Case No. 15-C-0324. The defendants contend that adding the new plaintiffs to this case would be duplicative and inefficient. However, Robertson, Switlick and Green are not parties to the *One Wisconsin* case. It is true that they may benefit from any relief granted in *One Wisconsin*, but that is also true of the individuals who are already named as plaintiffs in this case. If I were to deny Robertson, Switlick and Green leave to join this case, they would still have a right to file their own, separate suit, and thus not allowing them to become parties in this case would only increase the risk of duplicative litigation. It is better to have their claims and the claims of the existing plaintiffs, all of which are virtually identical, litigated as part of a single action. For that reason, I will grant the plaintiffs' motion to file a supplemental complaint.

## II.

I next address the defendants' argument that no plaintiff has standing to seek an affidavit option on behalf of persons who lack ID and cannot obtain ID with reasonable effort. To have standing, a plaintiff must show that he has suffered an injury in fact that is fairly traceable to the defendants' conduct and that is likely to be redressed by a favorable judicial decision. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

The plaintiffs have put forth the following individuals as plaintiffs with standing to pursue an affidavit option: Ruthelle Frank, Shirley Brown, DeWayne Smith, Melvin Robertson, Leroy Switlick, and James Green. Pls.' Br. at 24, ECF No. 279. So long as

one of these individuals has standing, the claim may proceed rather than be dismissed for lack of standing. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 189 n.7 (2008).

The defendants point out that two of these plaintiffs, Brown and Smith, have obtained ID, and contend that therefore their claims are moot. A claim becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party. *Knox v. Serv. Employees Int'l Union, Local 1000*, __ U.S. __, 132 S. Ct. 2277, 2287 (2012). Here, because Brown and Smith have obtained ID, they would not benefit from the relief that the plaintiffs currently seek, *i.e.,* an order requiring the defendants to allow those who lack ID to obtain a ballot by signing an affidavit stating that they have been unable to obtain ID with reasonable effort. Thus, such an order would not be effectual relief for them. However, these plaintiffs still have a sufficient stake in this case to remain plaintiffs. That is because the plaintiffs intend to argue on appeal that *Frank I* was wrongly decided and that Act 23 should be enjoined in its entirety. *See* Pls.' Br. at 6 n.4, ECF No. 279. As I noted in my original decision, those who possess IDs have standing to seek an injunction that prevents them from having to show their IDs at the polls to receive a ballot. *Frank*, 17 F. Supp. 3d at 866. But, for purposes of this order, I will assume that Brown and Smith do not have standing to seek an affidavit option and examine whether any of the other plaintiffs do.

The defendants contend that the claim of Ruthelle Frank, who does not possess an ID, is moot because she was able to vote by absentee mail in this year's elections without having to show ID under Act 23's "indefinitely confined" exception. That exception provides that a person "who is indefinitely confined because of age, physical illness or infirmity or is disabled for an indefinite period may by signing a statement to

5

that effect" vote by absentee ballot without presenting ID. Wis. Stat. §§ 6.86(2)(a), 6.87(4)(b)2. However, Frank prefers to vote in person and has voted absentee only because she lacks ID and therefore cannot vote in person. *See* Frank Dep. at 12–13, ECF No. 280-4. Thus, Frank continues to suffer an injury in fact, *i.e.*, the inability to vote in person, that is caused by the photo-ID requirement, and that would be redressed by the creation of an affidavit option. She therefore continues to have standing to seek the requested injunctive relief.

The remaining plaintiffs, Robertson, Switlick and Green, also have standing to seek an order creating an affidavit option. These plaintiffs do not currently possess IDs, have been unable to vote in recent elections, and allege that they cannot with reasonable effort obtain IDs. The defendants contend that these plaintiffs do not have standing because they have not shown that they tried to obtain IDs under the Wisconsin DMV's most recent procedures. However, while the plaintiffs' failure to apply for IDs under the current procedures may be relevant to the merits of their claims, it does not deprive them of standing to seek an affidavit option, which if granted would prevent them from having to apply for IDs at all. Moreover, Leroy Switlick did attempt to obtain an ID as recently as April 2016 but was unsuccessful. Decl. of Leroy Switlick ¶¶ 8–10, ECF No. 280-6. This would have been after the DMV instituted most of its new procedures but before a recent emergency rule (discussed below) went into effect in May 2016. Having to reapply for an ID every time the DMV changes its procedures would itself require more than reasonable effort, and thus Switlick undoubtedly has standing to seek an affidavit remedy. This reasoning also applies to Melvin Robertson, who attempted to obtain an ID before 2014. Decl. of Melvin Robertson ¶ 7, ECF No.

280-5.  Accordingly, I conclude that Robertson, Switlick and Green have standing to seek an order creating an affidavit option.

III.

Next, I address the plaintiffs' motion for class certification.  The plaintiffs propose to certify a class defined as eligible Wisconsin voters without acceptable forms of identification for voting and who have one or more of the following barriers to obtaining ID: (1) name mismatches or other errors in a document needed to obtain ID; (2) a need to obtain an underlying document from an agency other than the DMV in order to obtain ID; and/or (3) one or more underlying documents necessary to obtain ID cannot be found.  *See* Pls. Prop. Order at 1–2, ECF No. 278-1.  However, the affidavit remedy the plaintiffs seek on behalf of this class would apply to a broader class of persons, namely, to all those who face a "reasonable impediment" to obtaining acceptable ID.  The order they seek would direct the defendants to:

> Create an affidavit in simple language that would allow voters without acceptable identification for voting to cast a regular ballot at the polling place or an absentee ballot, by affirming that they face a "reasonable impediment" to obtaining acceptable identification.  The form should have boxes that a voter may check for "lack of transportation," "disability or illness," "lack of birth certificate," "work schedule," "family responsibilities," and "other reasonable impediment."

*See id.* at 2.  To bring the class definition in line with the proposed remedy, I will define the proposed class as all those eligible to vote in Wisconsin who cannot with reasonable effort obtain a qualifying photo ID.  Most of the members of this class will also fit into one of the plaintiffs' three categories, since individuals in those categories are the ones most likely to encounter reasonable impediments.  *See Frank II*, 819 F.3d at 386 (describing the members of the plaintiffs' three categories as those who cannot "obtain a qualifying photo ID with reasonable effort").

7

Having defined the proposed class, I turn to whether it may be certified under Federal Rule of Civil Procedure 23. A district court may certify a class of plaintiffs if the proposed class satisfies all four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and any one of the conditions of Rule 23(b). *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). For the reasons explained below, I conclude that these elements are satisfied.

**A.**

I first address the four Rule 23(a) requirements.

*Numerosity.* Under Rule 23(a)(1), a class may be certified only if "the class is so numerous that joinder of all members is impracticable." I find that the proposed class satisfies this requirement. Although it is true that the vast majority of Wisconsin voters already possess qualifying ID, and although it may be true that many voters who do not already possess qualifying ID can obtain one with ease, there can be no doubt that some voters in Wisconsin still face high hurdels to obtaining ID. As explained in more detail below, the DMV has already denied IDs to more than 50 applicants who sought IDs under the DMV's current rules, and it is likely that many others will be unable to obtain ID with reasonable effort. Moreover, it is clearly impracticable to join all such individuals as plaintiffs. There is no way to identify every person in the state who currently faces high hurdles to obtaining ID. Indeed, many individuals likely will not even realize that they fall within the class definition until they attempt to obtain ID and discover the hurdles that affect them. For example, a person might believe that it will be easy to obtain an ID only to discover, upon getting to the DMV, that his or her documentation is not acceptable. This person will benefit from the relief sought by the class but could not have been joined as a named plaintiff. A related point is that new

8

class members will be created while the case is pending, as people turn eighteen, move to Wisconsin, or otherwise become eligible to vote here and discover that they cannot obtain ID with reasonable effort. It is not possible to identify all of these individuals in advance and join them as named plaintiffs. Accordingly, Rule 23(a)(1) is satisfied.

*Commonality.* Rule 23(a)(2) provides that a class may be certified only if "there are questions of law or fact common to the class." This requires the plaintiff to demonstrate that the class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). This, in turn, requires the plaintiff to show that the class's claims "depend upon a common contention" that is central to the validity of every class member's claim and which can be resolved on a classwide basis, *i.e.*, in one stroke. *Id.* at 350. Here, I conclude that plaintiffs have satisfied this standard. One common question is this: Does Act 23, as applied to those who cannot with reasonable effort obtain qualifying ID, violate the Constitution as it was understood in decisions such as *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)? If the answer to this common question is yes, then another common question arises: Is the proper remedy for this violation of the class members' rights an injunction requiring the creation of an affidavit option in the form that the plaintiffs have sought?

*Typicality.* Rule 23(a)(3), in pertinent part, requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." The Seventh Circuit has interpreted this requirement to mean that the named representatives' claims must "have the same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983); *accord Munro v.*

9

*Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009). The court has stated that "[a] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente*, 713 F.2d at 232 (quoting H. Newberg, *Class Actions* § 1115(b) at 185 (1977)); *accord Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006). The court has also stated that "[t]he typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *De La Fuente*, 713 F.2d at 232; *accord Oshana*, 472 F.3d at 514.

In the present case, I conclude that the claims of class representatives Frank, Robertson, Switlick and Green are typical of the claims of the class. The named plaintiffs' claims share the same essential characteristics as the claims of the class at large. Those characteristics are (1) the lack of a qualifying ID, and (2) the existence of a high hurdle to obtaining such ID. The class representatives' claims are also based on the same legal theory as the class's claims, *i.e.*, violation of the Constitution as understood in *Anderson* and *Burdick*.

*Adequacy of representation.* Rule 23(a)(4) requires the representative parties to demonstrate that they will "fairly and adequately protect the interests of the class." This requirement focuses on matters such as whether the class representatives have retained appropriate counsel and whether the representatives have interests that conflict with the interests of the class. *See, e.g., Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993). In the present case, the defendants do not dispute that Frank, Robertson, Switlick and Green are adequate class representatives,

and it appears to me that they and their counsel will fairly and adequately protect the interests of the class. Therefore, I conclude that Rule 23(a)(4) is satisfied.

**B.**

I next examine whether one of the conditions in Rule 23(b) is satisfied. Here, the plaintiffs seek certification under either Rule 23(b)(1) or Rule 23(b)(2). I conclude that certification is proper under Rule 23(b)(2) and for that reason will not discuss Rule 23(b)(1).

Rule 23(b)(2) permits class certification if "the party opposing the class has acted or refuses to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2); *Chicago Teachers Union, Local No. 1 v. Bd. of Educ.*, 797 F.3d 426, 441 (7th Cir. 2015). "Colloquially, 23(b)(2) is the appropriate rule to enlist when the plaintiffs' primary goal is not monetary relief, but rather to require the defendant to do or not do something that would benefit the whole class." *Chicago Teachers Union*, 797 F.3d at 441. Rule 23(b)(2) is generally considered to be the appropriate procedural vehicle for certifying civil-rights claims seeking injunctive relief. *Id.*

Here, the defendants have acted or failed to act on grounds that apply generally to the class, in that Act 23 applies to all of those who cannot with reasonable effort obtain qualifying ID. Moreover, the general requirements for obtaining qualifying ID are the same for all class members. Although the class members do not all face the same high hurdles to obtaining ID, the plaintiffs have not asked the court to fashion different remedies for each hurdle. Rather, the plaintiffs seek an injunction requiring the defendants to allow all class members to vote by presenting an affidavit in lieu of photo ID. This would be an adequate remedy for the entire class, and thus final injunctive

11

relief would operate in favor of the class as a whole. Certification is therefore appropriate under Rule 23(b)(2).

**C.**

The defendants also contend that class certification should be denied because the proposed class is vague or indefinite, *i.e.,* that it is not "ascertainable." *See Alliance to End Repression v. Rochford*, 565 F.2d 975, 977–78 (7th Cir. 1977). I disagree. The class is defined as all eligible Wisconsin voters who cannot with reasonable effort obtain qualifying ID. Although one may contend that the term "reasonable effort" is indefinite, as applied to the facts of this case it is definite enough. The essential point is that the class includes anyone who does not currently possess qualifying ID and who, to obtain one, would have to do more than retrieve a birth certificate and related documents from his or her desk drawer and make a single trip to the DMV. The class would also include those who cannot, without going to unreasonable lengths, make a single trip to the DMV, such as those with health problems who find travel difficult and those who cannot afford the costs of transportation to the DMV.

To administer this case, it is not necessary to define the class with greater precision. Because the class is being certified under Rule 23(b)(2), there will be no need to identify specific class members so that they may receive notice and an opportunity to opt out. *See* Fed. R. Civ. P. 23(c)(2); 1 William B. Rubenstein, et al., *Newberg on Class Actions* § 3:7 (5th ed. 2011) (explaining that definiteness is less important in Rule 23(b)(2) cases, where class members do not have notice and opt-out rights); 5 James Wm. Moore, *Moore's Federal Practice–Civil* § 23.21[5] (3d ed. 2016) (same). Moreover, the lack of greater definiteness will not impede the adjudication of the class's claims or the implementation of the affidavit remedy. It is not necessary to

12

identify all class members who cannot with reasonable effort obtain ID in order to determine whether any person who cannot is entitled to relief. Likewise, the defendants do not need to identify any class members in advance to implement the affidavit procedure. Rather, the defendants merely need to make the affidavit forms available to all voters and allow those who complete them to receive a ballot without producing an ID. Thus, the class is definite enough to make all aspects of this case administrable. *See* Moore, *supra*, § 23.21[5] ("Because [in a Rule 23(b)(2) class] the defendant is obligated to comply with any orders granting injunctive or declaratory relief and the representative plaintiffs may enforce compliance, the court may not need to identify each individual who might be entitled to relief.").

## IV.

Having certified a class, I turn to the plaintiffs' request for a preliminary injunction. To obtain a preliminary injunction, the plaintiffs must make an initial showing that (1) they will suffer irreparable harm in the period before the final resolution of their claim; (2) traditional legal remedies are inadequate; and (3) the claim has some likelihood of success on the merits. *BBL, Inc. v. City of Angola*, 809 F.3d 317, 323–24 (7th Cir. 2015). If the plaintiffs make this showing, the court weighs the factors against one another, assessing whether the balance of harms favors the plaintiffs or whether the harm to the defendants or the public is sufficiently weighty that the injunction should be denied. *Id.*

In the present case, the first two factors of the initial showing are clearly satisfied. Those who cannot with reasonable effort obtain qualifying ID will be unable to vote in any elections that occur between now and when their claims are finally resolved. At least two elections will occur during that period: the partisan primary on August 9, 2016,

and the general election on November 8, 2016.  However, additional elections are likely to occur before the plaintiffs' claims are finally resolved, including a statewide election on February 21, 2017.  *See* Decl. of Michael Haas ¶ 44, ECF No. 286.  If the plaintiffs were unable to vote in these elections, traditional legal remedies, such as monetary damages, would be inadequate.  Thus, whether the plaintiffs are entitled to a preliminary injunction turns on their likelihood of success on the merits and whether the balance of harms favors the issuance of an injunction.  I consider these issues below.[2]

### A.

Under the framework set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), a voting regulation will violate the constitutional rights of a plaintiff where the regulation imposes an undue burden on the plaintiff's voting rights.  To determine whether a regulation imposes an undue burden, the court balances the burdens faced by the plaintiff against the state's interests in the regulation, "taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"  *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

In the present case, the defendants contend that Act 23 furthers its interests in detecting and deterring voter-impersonation fraud and in promoting public confidence in the integrity of elections.  These interests have been recognized as important enough to

---

[2] The defendants have filed a motion to strike some of the evidence that the plaintiffs have filed in support of their motion for a preliminary injunction.  *See* ECF No. 290.  That evidence consists largely of declarations and discovery materials that were gathered during the course of the *One Wisconsin* case in the Western District of Wisconsin.  The defendants have not cited any Federal Rule of Civil Procedure, local rule of this court, or other legal authority that supports their motion.  Nor am I aware of any rule or authority that would support striking this evidence.  Accordingly, the motion to strike will be denied.

justify the burdens that Act 23 places on the vast majority of Wisconsin's voters, who either already possess qualifying ID or can obtain qualifying ID with reasonable effort. *See Frank I*, 768 F.3d at 749–51.  The question presented at this stage of the case is whether the state's interests are sufficient to require some voters to expend more than reasonable effort to obtain qualifying ID, and to disenfranchise those voters who cannot obtain ID not matter how hard they try.  *See Frank II*, 819 F.3d at 386–87.

### 1.

The defendants do not contend that the Constitution permits Wisconsin to deny access to a ballot to those who cannot with reasonable effort obtain qualifying ID. Rather, they contend that all eligible voters in the state who employ reasonable effort will obtain qualifying ID—specifically, a Wisconsin state ID card issued by the Wisconsin Department of Transportation's Division of Motor Vehicles ("DMV").  I thus begin by discussing the evidence in the record that pertains to the DMV's procedures for issuing these IDs to voters who need them.  I then address whether those procedures ensure that all voters who employ reasonable effort will obtain qualifying ID.  As the discussion below indicates, while the DMV's latest procedures may make it easy for the majority of applicants to obtain a state ID card, there will still be some who will be unable to obtain ID with reasonable effort.  A safety net, such as the plaintiffs' affidavit option, is necessary to protect the voting rights of these individuals.

### a.

The basic requirements for obtaining a free state ID card for voting purposes are set out in a Wisconsin administrative regulation, Trans 102.15.  *See* Wis. Admin. Code § Trans 102.15.  This regulation requires applicants to present proof of six items: (1)

name, (2) date of birth, (3) United States citizenship,[3] (4) identity, (5) Wisconsin residency, and (6) social security number. *See* § Trans 102.15(3), (3m), (4), (4m) & (5). To prove name, date of birth and United States citizenship, most applicants will need to produce a birth certificate. §§ Trans 102.15(3)(a)1–2, (3m)(a)1; *Frank*, 17 F. Supp. 3d at 856. To prove identity, most applicants will need to produce a social security card. § Trans 102.15(4)(a)13; *Frank*, 17 F. Supp. 3d at 856–57. To prove Wisconsin residency, an applicant must produce a document that lists the applicant's address, such as a utility bill or paystub. § Trans 102.15(4m). To prove social security number, the person generally needs no documentation but must provide the number to the DMV. § Trans 102.15(5).

In my original opinion in this case, which I issued in April 2014, I made extensive findings about the burdens a person may encounter when trying to prove the six items required by Trans 102.15. *See Frank*, 17 F. Supp. 3d at 855–62. However, since the date of that opinion, Wisconsin has made several changes to this rule in an attempt to make the process of obtaining ID easier. The DMV has also adopted various informal practices that have not been codified in the rule but which are designed to further reduce the burdens associated with obtaining ID for voting purposes.

Under the current system, to obtain a free state ID card, a person begins by gathering whatever documentation he or she has and bringing them to a DMV customer service center. There are 92 service centers, or field offices, in the state. Each county

_____

[3] To receive a state ID card, a person does not have to be a United States citizen. Rather, a person who is not a citizen may receive a state ID card if he or she is a legal permanent resident or is otherwise legally present in the United States. *See* Wis. Admin. Code § Trans 102.15(3m). However, to be qualified to vote, a person must be a United States citizen. *See* Wis. Stat. § 6.02. Thus, if a person applies for a free state ID card to use for voting purposes, the person must prove U.S. citizenship.

16

has a service center that is open at least 20 hours per week. If a person arrives at a service center, completes an application for a free state ID card, and produces all of the necessary documentation to prove the six items required by Trans 102.15, the DMV will issue the person an ID. Decl. of Kristina Boardman ¶ 9, ECF No. 287.[4] If, however, the person arrives at the DMV and is either missing a required document or the documents are not in order (such as because the person's name is different or spelled differently on a supporting document), the person will have to rely on one of the DMV's procedures for handling these problems.

One of the DMV's procedures is known as the ID Petition Process, or "IDPP." This process is used when the ID applicant does not have a birth certificate or other document needed to prove name, date of birth, and/or United States citizenship. The authority for the DMV to use this process is found in § Trans 102.15(5m), which was recently amended by way of an emergency rule promulgated by the Department of Transportation and approved by Wisconsin's governor. *See* Emergency Rule 1618, §§ 6–9 (effective May 13, 2016).[5] However, the DMV has been applying this procedure since September 2014. Boardman Decl. ¶ 12.

To use the ID petition process, an individual must go to a DMV service center, fill out an application for a free state ID card, and also complete a petition (known as "Form MV3012") to be issued an ID without producing documents that prove name, date of birth, and citizenship. The person must also present documents to prove identity and Wisconsin residency. Boardman Decl. ¶ 13. Once this happens, an employee at the

---

[4] Kristina Boardman is the Administrator of the DMV.

[5] The emergency rule can be found on the Internet by entering "Emergency Rule 1618" into a search engine. Copies of the rule have been filed with the court. *See* ECF No. 280-24.

17

DMV service center scans any documents that the applicant brought to the DMV and transmits them to the DMV's central office in Madison. The central office will then attempt to verify the applicant's name, date of birth, and U.S. citizenship by contacting various federal, state, and local agencies. The DMV does not charge the applicant a fee for using the petition process, and the goal of the process is to verify the applicant's qualifications without requiring the applicant to make trips to other agencies or to pay a fee to obtain documents like a birth certificate.

The ID petition process is performed in stages. In the first stage, DMV's central office attempts to quickly verify the applicant's qualifications by finding his or her birth certificate through contact with public agencies. If the central office is successful, it will mail an ID card to the applicant's address. However, if the central office is unsuccessful, the petition enters the second stage, where it is referred to the DMV's Compliance, Audit and Fraud Unit, which goes by the acronym "CAFU." Boardman Decl. ¶ 20. Once the petition reaches CAFU, an investigator is assigned to the case. The investigator then employs "investigatory skills developed in other aspects of CAFU's work" to verify the applicant's name, date of birth, and citizenship. *Id.* ¶ 23. These investigators are not restricted in the information they can consider and will often talk to family members, hospitals, and school districts to verify the applicant's qualifications. An investor may also contact the applicant and ask him or her to provide additional information. CAFU's primary goal is to locate the applicant's birth certificate. But if it cannot find one, CAFU will try to find one of the documents that may be accepted as a birth-certificate substitute under the DMV's "extraordinary proof" process. *See* Wis. Admin. Code § Trans 102.15(5m)(b)3. These documents include: a baptismal certificate, a hospital birth certificate, a delayed birth certificate, a census record, an

18

early school record, a family bible, and a doctor's record of post-natal care. *Id.* After CAFU concludes its investigation, it makes a recommendation to the Director of the DMV's Bureau of Field Service (currently Jim Miller). The Director then makes the final decision on the petition. Boardman Decl. ¶ 29. The administrative rule, as amended by Emergency Rule 1618, states that a petition must be granted if the Director "concludes, on the basis of secondary documentation or other corroborating information, that it is more likely than not that the name, date of birth or U.S. citizenship provided by the applicant is correct." Emergency Rule 1618, § 8. If the Director denies the petition, the applicant does not receive an ID.

The May 2016 emergency rule also created a process under which the DMV must issue a temporary identification card "receipt" to any person who applies for a state ID card to use for voting purposes and who needs to use the ID petition process. *See* Emergency Rule 1618, § 10 (creating § Trans 102.15(6m)). The receipt is a sheet of paper that contains the person's name, signature, photograph, and other information (such as the date of issuance and an expiration date). *See* Ex. 1020, ECF No. 287-8. An unexpired identification card receipt is a form of qualifying ID under Act 23 and thus can be used for voting. *See* Wis. Stat. § 5.02(6m)(d). The emergency rule provides that the DMV must issue the receipt "not later than the sixth working day after the applicant" files the petition to use the ID petition process (i.e., Form MV3012), and that the receipt must be issued by first-class mail. Emergency Rule 1618, § 10. Thus, if a person applies for a state ID card for voting purposes, also submits Form MV3012, and also supplies sufficient proof of identity and Wisconsin residency, the DMV will mail the person a temporary ID receipt within approximately six days. The person may then use the ID for voting purposes while he or she is waiting for the DMV's central office and/or

19

CAFU to verify his or her name, date of birth, and U.S. citizenship. The DMV also has an internal policy under which, during the week of an election, it will mail a temporary ID receipt to an applicant on the same day that the application is made. Boardman Decl. ¶ 44. The purpose of this internal policy is to get a temporary ID receipt into the hands of a voter who did not have qualifying ID on election day in time to allow the voter to validate his or her provisional ballot by 4 p.m. on the Friday after the election.[6] *Id.*

A temporary ID receipt expires after 60 days. Wis. Stat. § 343.50(1)(c). However, the Emergency Rule requires the DMV to mail a new receipt to an applicant 10 days before the receipt expires. Emergency Rule 1618, § 10. The DMV states that it will generally send two renewals to an applicant, such that all applicants will have a valid ID receipt for a total of 180 days. Boardman Decl. ¶ 41. Moreover, a person will continue getting additional renewal ID receipts so long as the person's ID petition is under review. *Id.* The DMV will stop issuing renewal receipts only if it determines that the applicant committed fraud, it determines that the person is not eligible for a permanent ID, the applicant does not respond to DMV requests for further information related to the investigation, or the person requests that the DMV cancel the ID petition process. *Id.*

In addition to the ID petition process, the DMV has adopted two new procedures for processing ID applications in which there is a discrepancy between the name on a birth record or other underlying document and the name the applicant uses. First, the DMV will disregard a single-letter discrepancy in the applicant's first, middle, or last

_____

[6] Under Wisconsin law, if a person does not have qualifying ID on election day, he or she may cast a provisional ballot. Wis. Stat. § 6.79(3)(b). The ballot will not be counted unless the person presents qualifying ID to the municipal clerk or board of election commissioners by 4 p.m. on the Friday following the election. Wis. Stat. § 6.97(3)(b).

name.  *See* Boardman Decl. ¶ 36.  Thus, if the person uses the first name "Shaun" but an underlying document lists his first name as "Shawn," the person will still be issued an ID without having to use any formal exception process.  (The DMV's policy of disregarding single-letter discrepancies is not codified in the Administrative Code.) Second, if an individual has a different name, or a name that is significantly different from the name on his or her birth record, then a person can fill out a document that the DMV keeps on hand entitled "Affidavit of Common Law Name Change."  This procedure, which was recently codified as part of the May 2016 emergency rule, *see* Emergency Rule 1618 §§ 1–3, is designed for cases in which a person has used a name that is different from the one that appears on his or her birth certificate for many years but has not had the name officially changed by a court order or other formal means.  Under Wisconsin common law, if the person has consistently and continuously used the name, then the name is considered to have been legally changed even though no formal procedure was used.  *See State v. Hansford*, 219 Wis. 2d 226, 245–46 (1998). The DMV's affidavit procedure allows the applicant to make this fact known to the DMV.  The DMV's form affidavit contains a space for a notary signature, but according to the defendants, a DMV employee may notarize the form for free. Boardman Decl. ¶ 38; *but see* Young Decl. Ex. 41(applicant tells CAFU agent that he cannot get name-change affidavit notarized and agent does not advise applicant that notary services are available at the DMV).  After the person submits the affidavit, the DMV will do "research" and then either approve or deny the name-change request.  *See* Boardman Decl. Ex. 1018 at 2 (internal DMV document stating that "approval process may take up to 2 weeks while research is completed" and that DMV will "send the customer a letter approving or denying the request to change their name").

21

Presumably, if the name change is approved, the DMV will also send the person an ID card. However, I have been unable to locate anything in the record that explains when an ID will be issued after a person submits an Affidavit of Common Law Name Change.

**b.**

Having explained the DMV's current procedures for issuing state ID cards, I next consider whether they result in all voters who employ reasonable effort obtaining qualifying ID. I conclude that although many individuals who need qualifying ID will be able to obtain one with reasonable effort under these procedures, there will still be some who will not. Indeed, because there are likely thousands of eligible voters in Wisconsin who lack qualifying ID, *see Frank*, 17 F. Supp. 3d at 854, it is virtually self-evident that *some* of them will either need to exercise extraordinary effort to obtain qualifying ID or be unable to obtain ID no matter how hard they try. However, as explained below, the evidence produced so far also supports this conclusion.

The record contains evidence about the results of the DMV's ID petition process, which, as explained above, is used when an applicant for an ID cannot produce a birth certificate or other record that proves name, date of birth, and citizenship. According to the defendants, between September 15, 2014 and May 12, 2016, applicants filed 1,389 petitions. Boardman Decl. ¶ 32. Of those, 1,132 petitions were granted. Of the remaining 257 petitions, 67 remain "pending." *Id.* Ex. 1017. This leaves 190 petitions that were resolved without issuing an ID to the applicant. Of these, 98 are listed as "cancelled by the customer," 40 were suspended based on the lack of response from the applicant, and 52 were flat denials. *Id.* The defendants state that one petition was denied because it was determined that the person was not a U.S. citizen. Boardman

22

Decl. ¶ 33.  No evidence in the record suggests that the remaining denials involved applications by individuals who are not eligible to vote in Wisconsin.

From the evidence in the record pertaining to the denied ID petitions, I find that it will be impossible or nearly impossible for some class members to obtain a free state ID card.  The record contains reports and other internal DMV documents reflecting that several ID petitions were denied because the applicant was unable to provide, and CAFU was unable to locate, satisfactory information proving name, date of birth, and/or citizenship.  For example, one report pertains to a woman was born in Cook County, Illinois, and who did not have a copy of her birth certificate.  Young Decl., Ex. 59.  The DMV was unable to locate her birth records, and when a CAFU investigator contacted Cook County Hospital, he was told that the hospital would not release information over the phone and would only release information to the applicant for a fee.  The CAFU investigator then contacted the applicant and asked her to provide one of the other documents accepted as a birth-certificate substitute, such as a baptismal certificate. The applicant informed the investigator that she did not have any of those documents and had no way to obtain them.  The investigator told her that he would keep trying.  A few months later, the applicant called the DMV and expressed frustration that it had not verified her qualifications and issued her an ID.  Eventually, the DMV denied the petition because it could not verify the applicant's qualifications and the applicant could not provide the DMV with any further leads.  Reports and internal DMV emails pertaining to other applicants indicate that other petitions were denied for similar reasons.  *See* Young Decl. Ex. 60 (petition denied because CAFU could not find birth record and applicant did not have access to documents accepted as birth-certificate substitute); *id.* Ex. 56 (same); *id.* Ex. 45 (petition denied because CAFU could not find birth record and

applicant did not respond to request to produce birth-certificate substitute); *id.* Ex. 44 (same).

Other reports suggest that individuals will be unable to obtain ID without going to unreasonable lengths. In one case, CAFU could not find a birth certificate for a person who was born in Tennessee, but it could find a birth certificate and social security number that seemed to match the individual but which contained a different last name than the one she currently used. The CAFU investigator eventually determined that, most likely, the name discrepancy stemmed from the fact that the applicant had been adopted and her original birth certificate had been voided. The investigator determined that the only solution to the problem was for the applicant to find court documents or adoption papers from Tennessee that supported her current name. The investigator informed the applicant of this fact and gave her the number for a Tennessee post-adoption service. When the applicant did not contact CAFU with further information, her application for a state ID card was denied. *See* Young Decl. Exs. 39 & 61. In this case, it appears that it may have been possible for the applicant to obtain an ID. However, to obtain the ID, the applicant would have had to exert unreasonable effort in tracking down adoption papers and court records from Tennessee.

In another case involving a name mismatch, the applicant's name was spelled differently on his Mississippi birth certificate than it was on his social security card. *Id.* Ex. 42. The applicant considered the name on the birth certificate to be a misspelling. When the applicant's daughter brought the birth certificate to the DMV, the employees at the counter informed her that she would have to return to Mississippi to get the name corrected. The daughter informed CAFU that the people at the counter "were very nasty to her." However, the CAFU investigator asked her to return to the DMV and

24

have the employees at the counter scan the birth certificate so it could be sent to the investigator. The daughter did this but experienced additional problems with staff at her local DMV. (The daughter told the investigator that the process "has been the biggest headache.") About a month after the petition was submitted, the investigator informed the applicant's daughter that the applicant would need to either request a name correction through the Social Security Administration or initiate court proceedings to legally change his name. When the daughter informed the investigator that the applicant was not willing to do either of these things, the investigator recommended that the DMV send the applicant a denial letter. However, someone at the DMV then advised the investigator that the applicant could use the common law name-change affidavit. The investigator relayed this information to the daughter. The daughter then submitted the affidavit, but the DMV rejected it because the applicant's "old name" (which he had not used for 74 years) was misspelled on the affidavit and because the daughter had signed the affidavit rather than the applicant. The daughter advised the DMV that she had power of attorney for her father, who recently had a stroke and could not write. The DMV then sent the daughter a copy of the affidavit with the old name correctly spelled and advised her to sign and return the affidavit along with proof that she had power of attorney for her father. When the DMV received no further response from the applicant or his daughter, it denied the petition. By this time, the daughter had been trying for five months to obtain an ID for her father.

In this case, the applicant may have eventually been able to obtain ID. However, doing so would have involved an unreasonable amount of effort. The applicant's daughter made numerous contacts with the DMV over a five-month period, including two in-person trips that the daughter found unpleasant, and sending in a name-change

affidavit that the DMV rejected. Although the daughter did not respond after the DMV mailed her a second name-change affidavit and requested proof that she had power of attorney for her father, by that point the daughter had already exerted more than reasonable effort on her father's behalf.

Next, I find that errors made by DMV staff will result in applicants being unable to obtain ID with reasonable effort. It is virtually self-evident that in a large bureaucracy like the DMV—which has 92 separate locations and between 350 and 370 employees at those locations, *see* Boardman Decl. ¶ 7—errors will be made. Some of these errors will prevent applicants from obtaining ID with reasonable effort. One error that seems to happen frequently is counter staff's failure to inform an ID applicant who lacks a birth certificate that he or she can use the ID petition process. *See* Young Decl. Exs. 20, 57. If an applicant who lacks a birth certificate is not informed of the petition process, he is likely to conclude that he cannot obtain an ID and may give up, even if he might have been able to obtain an ID easily if he had been told about the petition process. A related error that has occurred is CAFU's failing to inform applicants with name mismatches that they could use the common law name-change affidavit and obtain notary services for free at the DMV. *See* Young Decl. Exs. 41 at p.2 (applicant informs CAFU investigator that he cannot get affidavit notarized and investigator does not advise him that notary services are available at DMV) & 42 (CAFU recommends denying ID to applicant with name mismatch without realizing that applicant could use name-change affidavit). Other errors may result in an applicant having to make a second trip to the DMV to complete the application process. *See id.* Exs. 65 & 72; Boardman Decl. ¶ 34 (noting that DMV staff members sometimes fail to scan or copy an applicant's documents, and that when this happens the applicant must return to the

26

DMV to supply the necessary information a second time).  This second trip would involve more than reasonable effort for many voters, especially those with limited time and limited access to transportation.

Another burden for those who use the ID petition process is keeping in touch with the CAFU investigator over the period of weeks or months that it takes the investigator to verify the applicant's qualifications.  In some cases, this will be a substantial burden. For example, one CAFU report documents a case in which an applicant had to stay in touch with an investigator over a three-month period.  *See* Young Decl. Ex. 41.  During that time, the applicant spoke on the phone with the investigator nine times, made two in-person visits to his local DMV, made calls to other agencies in an effort to track down documents, and asked his nephew to scan and email documents to the DMV. Eventually, the applicant was issued an ID, but only after exerting more than reasonable effort.  If this applicant had been homeless, he would almost certainly have failed to obtain an ID.  Although the DMV states that it is able to mail documents to a homeless person though a shelter, food pantry, or social-services agency, *see* Boardman Decl. ¶ 31, it would be nearly impossible for a homeless person to make nine phone calls to a CAFU investigator over a three-month period.  The DMV has acknowledged that is difficult for CAFU to keep in touch with applicants.  *See* Dep. of Susan Schilz at 34:14–35:5 (attached as Ex. 37 to Young Decl.).

Another problem is that the DMV's new procedures do not relieve an applicant from having to produce a document that proves his or her identity.  *See* Wis. Admin. Code § Trans 102.15(4) (requiring proof of identity); Boardman Decl. ¶ 13 (person using

ID petition process must still provide proof of identity and Wisconsin residency).[7]  As I found during the trial on the plaintiffs' original claims, to satisfy this requirement, a person will generally need to produce a social security card.  *Frank*, 17 F. Supp. 3d at 856–57.  However, to obtain a social security card, a person generally must present photo ID to the Social Security Administration.  *Id.*  Obviously, a person applying for a free photo ID for voting will not already have a photo ID, and thus it will be nearly impossible for a person who needs a free photo ID and does not already possess his or her social security card to prove identity.[8]  *See Frank II*, 819 F.3d at 386.  The DMV does accept other documents as proof of identity, such as a valid state ID card or driver's license from another jurisdiction, military discharge papers, or a marriage certificate, *see* Wis. Admin. Code § Trans 102.15(4)(a), but many applicants who lack ID will also lack these documents.  Moreover, the DMV does not have any procedure in place that is analogous to the IDPP in which DMV employees will track down proof of

---

[7] Emergency Rule 1618, § 4 exempts a person applying for a free ID for voting purposes from having to provide his or her social security number, which would otherwise be required under Trans 102.15(5).  However, the Emergency Rule does not relieve the person from having to prove identity under Trans 102.15(4), which, as discussed in the text, generally requires an applicant to produce a social security card.

[8] The administrator of the DMV states that a temporary ID card receipt can be used to obtain "birth records and source documents from other jurisdictions that require a photo ID with an application."  Boardman Decl. ¶ 45.  However, under DMV rules, a person cannot obtain a temporary ID card receipt without proof of identity, and thus a person who must obtain a social security card to use as proof of identity will not be eligible for a temporary ID card receipt.  *See id.* ¶ 40 (temporary ID card receipt issued to those who enter IDPP) & ¶ 13 (to enter IDPP, a person must produce proof of identity and Wisconsin residency).  Moreover, even if a person without proof of identity could obtain a temporary ID card receipt, the evidence suggests that the Social Security Administration will not issue a social security card to those who present such a receipt as their only form of identification.  *See* Young Decl. Ex. 17 at p.6 (Social Security Administration flyer stating that "DMV receipt" cannot be used to obtain a replacement social security card).

28

identity on behalf of an applicant. Thus, I find that the proof-of-identity requirement will result in some eligible Wisconsin voters being unable to obtain ID with reasonable effort.

Another category of eligible voters who will be unable to obtain ID with reasonable effort is those who cannot reasonably make even a single trip to the DMV. *See Crawford*, 553 U.S. at 198 (implying that, for some voters, making even a single trip to the DMV is an undue burden on the right to vote). This category includes those who because of health reasons cannot travel easily, those without reasonable access to transportation to the DMV, and those who cannot afford to miss work for the time required to make a trip to the DMV. *See* Decl. of Rachel Fon, ECF No. 280-12 (explaining that health problems and poverty have made it impossible for her to obtain ID "without going through a great amount of effort"). The defendants point out that Wisconsin law allows those who are "indefinitely confined because of age, physical illness or infirmity," and those who are "disabled for an indefinite period," to vote by absentee ballot without proof of identification. *See* Wis. Stat. §§ 6.86(2)(a); 6.87(4)(b)2. However, assuming that this removes any undue burden on the voting rights of those who meet the definitions of "indefinitely confined" or "disabled for an indefinite period," it does nothing to help the other members of this category, including those whose health problems do not result in "confinement" or rise to the level of a disability, and those who simply cannot afford a trip to the DMV. Thus, transportation barriers will result in some eligible voters being unable to obtain ID with reasonable effort.

Finally, those who find themselves without qualifying ID on election day might be unable to obtain ID in time to have their ballots counted without going to unreasonable lengths. This category of eligible voters includes those who reasonably believe that they already possess qualifying ID, only to discover at the polls that their ID is

29

unacceptable.  *See* Decl. of Alexandra Kirschner ¶ 6, ECF No. 280-15 (arrived at polls believing that she could use out-of-state driver's license as proof of identification); Decl. of Miguel Angel Vega ¶ 6, ECF No. 280-21 (same); Decl. of Neil Albrecht ¶ 9, ECF No. 280-8 (executive director of the Milwaukee election commission described how he personally observed two voters attempt to vote using IDs that had expired outside the acceptable expiration range).  As I previously noted, under Wisconsin law, these voters may cast a provisional ballot, but they must validate the ballot by presenting qualifying ID to a municipal clerk or city election commission by 4 p.m. on the Friday following the election.  *See* Wis. Stat. §§ 6.79(3)(b); 6.97(3)(b).  Because elections are held on Tuesdays, these voters will have about three days to get to the DMV, obtain qualifying ID, and then get to the office of the municipal clerk or election commission.  Even voters who have in their possession everything they need to obtain an ID from the DMV may be unable, with reasonable effort, to jump through these hoops within three days.  However, those who need to use the ID petition process will face higher hurdles.  These voters will be able to validate their provisional ballots only after receiving temporary ID card receipts in the mail.  Thus, these voters must get to the DMV immediately, apply for an ID through the petition process, and then hope that the temporary ID card receipt arrives in the mail within a day or two.  If it does, then the voter must immediately get to the office of the municipal clerk or election commission to validate his or her provisional ballot.  Not all such voters will be able to complete this process in time. *See* Kirschner Decl. ¶ 6, ECF No. 280-15 (unable to validate provisional ballot in time); Vega Decl. ¶ 6, ECF No. 280-21 (same).

Before moving on, I note that the defendants contend that no voter will face undue burdens under the DMV's current procedures because, according to them,

"[a]nyone who goes to a Wisconsin DMV office and applies for a free state ID will be mailed, within six days, either an ID card or photo receipt that is valid for voting." Defs.' Br. at 1, ECF No. 285. The defendants then contend that, for this reason, no eligible voter who employs reasonable effort will fail to obtain qualifying ID. However, as discussed above, the record does not support the defendants' contention that anyone who goes to the DMV and applies for an ID will receive either an ID or a temporary ID card receipt. Those who do not supply sufficient proof of identity and proof of Wisconsin residency will not receive even a temporary ID card receipt. Boardman Decl. ¶ 40 (temporary ID card receipt issued to those who enter ID petition process) & ¶ 13 (to enter ID petition process, a person must produce proof of identity and Wisconsin residency). Moreover, the defendants' contention overlooks the possibility that DMV staff will err and fail to inform applicants who lack underlying documentation about the ID petition process and related procedures. These applicants will be turned away without receiving even a temporary ID card receipt. The defendants also overlook those who cannot with reasonable effort make even a single trip to the DMV to begin the ID petition process and be mailed a temporary ID card receipt, as well as those who do not realize they lack qualifying ID until election day and who cannot reasonably be expected to obtain a temporary ID card receipt and validate a provisional ballot within three days.

In any event, even if it were true that every eligible voter in Wisconsin who needs ID could with reasonable effort obtain a temporary ID card receipt in time for the next election, it would not follow that the plaintiffs are not entitled to relief. Obviously, a temporary ID card receipt will at some point expire and not be renewed. What every class member will eventually need is an actual ID card, not just an ID card receipt. As demonstrated above, some eligible voters who apply for an ID using the petition

31

process will eventually be denied an ID card because the DMV will be unable to verify their qualifications. When their temporary ID cards expire, these individuals will be unable to vote, potentially for the rest of their lives. Unquestionably, some mechanism needs to be in place to preserve the voting rights of these individuals.

The defendants contend that even if temporary ID card receipts are not permanent solutions, they at least make it unnecessary to grant a preliminary injunction, since every voter who goes to the DMV today and applies for an ID will receive a temporary ID card receipt that is likely to be valid for 180 days, a period that encompasses both the August primary and the November general election. Again, however, I stress that some voters will be unable to obtain even a temporary ID card receipt with reasonable effort. But even if all could, preliminary relief would still be needed to prevent irreparable harm to some voters. Although an ID card receipt issued today is likely to be valid for 180 days, it would expire before February 21, 2017, the date of the first statewide election scheduled to occur after the November general election. It is not likely that the plaintiffs' claims will be finally resolved before then. Preliminary relief is therefore needed to ensure that the plaintiffs' voting rights are not denied during that election and any other elections that may occur before this case is over.

**2.**

Having concluded that, even under the DMV's current procedures, many voters will be unable to obtain qualifying ID with reasonable effort, I turn to the question of whether the state's interests are sufficient to require some voters to employ more than reasonable effort to obtain an ID to vote. Here, the state's interests must be measured against the specific remedy that the plaintiffs seek, which is an injunction requiring the

32

defendants to implement an affidavit option. *See Crawford*, 553 U.S. at 199–200 (noting that, under the *Anderson/Burdick* framework, a court must take into account the specific relief sought by the plaintiffs).

As I previously noted, the state's interests in requiring photo ID are preventing voter-impersonation fraud and promoting voter confidence.[9] These interests have been found sufficient to require most voters to present photo ID. *Crawford*, 553 U.S. at 191–97; *Frank I*, 768 F.3d at 749–50. However, no court has found that these interests are sufficient to prevent a person who cannot obtain ID with reasonable effort, or who cannot obtain ID at all, from voting. And I find, for the reasons explained below, that these interests would not be undermined to any significant extent by allowing voters who cannot obtain ID with reasonable effort to present an affidavit in lieu of photo identification. Thus, I conclude that the state's interests do not outweigh the burdens placed on the plaintiffs' voting rights, and that the plaintiffs are entitled to an affidavit remedy. *See Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789).

In assigning weight to the state's interests under the *Anderson/Burdick* balancing test, I recognize that those interests are important and that Act 23 serves those interests to some extent. However, the interests do not justify disenfranchising voters who cannot with reasonable effort obtain ID. As I found in my original opinion in this case, there is virtually no voter-impersonation fraud in Wisconsin. *Frank*, 17 F. Supp. 3d at 847–50. And the defendants have produced no evidence suggesting that the public's confidence in the electoral process would be undermined by excusing those voters who

---

[9] The defendants also contend that Act 23 furthers the state's interests in promoting orderly election administration and accurate recordkeeping. However, the defendants have not identified any way in which Act 23's photo ID requirement serves these interests other than by detecting and preventing voter fraud. Thus, I do not separately discuss these interests.

cannot obtain ID with reasonable effort from presenting ID.[10]  Indeed, Wisconsin already allows some to vote without presenting photo ID—those who claim to be indefinitely confined or disabled.  *See* Wis. Stat. §§ 6.86(2)(a); 6.87(4)(b)2.  Moreover, many states that have voter photo-identification requirements allow those who lack IDs to vote by signing an affidavit or other statement to that effect rather than by presenting ID, and the defendants do not suggest that the laws of those states fail to prevent fraud and promote voter confidence.  *See* Idaho Code § 34-1114; Ind. Code § 3-11.7-5-2.5(c); La. Rev. Stat. § 18:562; Mich. Comp. Laws § 168.523(2); N.C. Gen. Stat. § 163-166.13(c)(2); S.C. Code § 7-13-710(D)(1)(b).  It is true that some of the states that accept affidavits or statements in lieu of photo ID require the use of provisional ballots and other procedures for challenging the ballots cast by those who do not present ID. However, some states do not.  *See* Idaho Code § 34-1114; La. Rev. Stat. § 18:562. The defendants here have not argued that the use of provisional ballots is necessary to protect the state's interests.

        The defendants do contend that allowing voters to use affidavits in lieu of IDs whenever they "subjectively" determine that they are unable to obtain ID with reasonable effort "without any process for verifying that reason" would undermine the integrity of Wisconsin elections.  Defs.' Br. at 21, 24, ECF No. 285.  However, the defendants produce no evidence that supports the notion that allowing a few voters to present an affidavit while the vast majority present a photo ID would undermine the integrity of Wisconsin elections, even if the voters who use affidavits are permitted to

_____

[10] The Supreme Court recently reiterated that where a state law burdens a constitutional right, the state must produce evidence supporting its claim that the burden is necessary to further the state's claimed interests.  *Whole Woman's Health v. Hellerstedt*, No. 15-274, slip op. at 19–21 (June 27, 2016).

34

determine for themselves what constitutes a reasonable impediment and there is no process for verifying that reason. And it seems to me that even if some voters who use affidavits give false reasons or reasons that do not qualify as reasonable impediments (such as "not wanting to pose for a photo") the state's interests would not be seriously undermined. Just about any voter who does not face a reasonable impediment to obtaining ID will prefer to get the ID rather than take the time to fill out a bogus affidavit every time he or she goes to the polls. Thus, the number of affidavits listing insufficient or false reasons should be very tiny. Also, someone who wishes to use the affidavit to commit fraud will likely list a legitimate reason on the affidavit rather than call attention to himself or herself by listing a clearly insufficient reason. So coming up with a finite list of recognized reasonable impediments is not likely to do anything to prevent fraud or to promote public confidence in elections. Finally, the states that already use "reasonable impediment" affidavits allow voters to subjectively determine what qualifies as a reasonable impediment and do not have procedures in place for challenging the sufficiency of the reasons given. *See North Carolina State Conference of the NAACP v. McCrory*, __ F. Supp. 3d __, 2016 WL 1650774, at *120 (M.D.N.C. April 25, 2016); *South Carolina v. U.S.*, 898 F. Supp. 2d 30, 34, 36–37 (D.D.C. 2012).[11] This strongly suggests that such procedures are not required to protect the states' interests in preventing fraud and promoting voter confidence. I also note that the defendants have not explained how they would go about investigating whether a reason given by a voter on the affidavit is true or whether it qualifies as a reasonable impediment. Nor have

---

[11] Under the laws of North and South Carolina, "state and county officials may not review the reasonableness of the voter's explanation"; rather, they may only review the explanation for falsity. *South Carolina*, 898 F. Supp. 2d at 34; *see McCrory*, 2016 WL 1650774, at *120 (explaining that North Carolina's reasonable-impediment procedure is virtually identical to South Carolina's).

they proposed that I incorporate any specific procedures into the affidavit option that would assist the defendants in verifying the reason given or in adjudicating whether it qualifies as a reasonable impediment.

The defendants point out that I previously determined that an affidavit remedy would be inappropriate because it would require me to re-write Act 23 and partially manage the state's election officials. *See Frank*, 17 F. Supp. 3d at 863. However, I made that determination in the context of choosing between enjoining Act 23 in its entirety and fashioning a different remedy. I reasoned that the difficulty of implementing an affidavit remedy weighed in favor of enjoining the law as to all voters. *Id.* However, now that such an injunction is off the table, I must create a safety net to prevent those who cannot obtain ID with reasonable effort from losing the right to vote.[12] The defendants have not proposed their own solution to this problem, and thus the only potential remedy is the plaintiffs' affidavit procedure. Even if that approach is not ideal, it is better than leaving the plaintiffs with no relief at all.

## B.

For the reasons stated above, I conclude that the plaintiffs are very likely to succeed on their claim that Act 23 is unconstitutional as applied to those who cannot obtain ID with reasonable effort, and that the appropriate remedy is to allow those voters to present an affidavit in lieu of photo identification. In the discussion above, I also implicitly addressed the public interest and the balance of harms and determined that those factors weigh in favor of preliminary relief, in that I determined that the state's

---

[12] In describing the affidavit option as a "safety net," I do not mean to imply that it is preferable to an injunction invalidating Act 23 in its entirety. I continue to believe, for the reasons expressed in my original opinion, that enjoining the photo ID requirement in its entirety is the proper remedy.

interests in requiring photo ID do not justify disenfranchising the plaintiffs while this litigation is pending. In this section, I address some remaining arguments made by the defendants regarding the public interest and the balance of harms.

First, the defendants contend that it would be difficult for the state's election-administration officials to implement an affidavit remedy in time for the August and November elections. As I explain in Part IV.C, I agree that it is not possible to implement the affidavit remedy in time for the election on August 9, and therefore I will not include that election within the scope of the injunction. However, the defendants have not shown that it would be difficult to implement the remedy in time for the general election on November 8. To implement the affidavit remedy, the defendants need only direct elections officials to print a stack of affidavits in the form that I will specify, make them available at the polls and to those who vote absentee, and accept properly completed affidavits from voters in lieu of photo ID. As discussed above, any reason the voter deems a reasonable impediment must be accepted, and thus election officials will not have to receive training on what constitutes a reasonable impediment. Rather, election officials must only make sure the voter signs his name and either checks a box on the form or writes something in the space for identifying other reasonable impediments. The municipal clerks of Wisconsin's largest municipalities have submitted declarations stating that it would be practical to accomplish these tasks in time for the November election. Decl. of Neil Albrecht ¶¶ 14–16 (municipal clerk for City of Milwaukee states that affidavit option could be implemented in time for November election); Decl. of Maribeth Witzel-Behl ¶¶ 16–17 (municipal clerk for City of Madison states that affidavit option could be implemented in time for November election).

One aspect of carrying out my order that will impose a more significant burden on the defendants is informing voters of the affidavit option. As explained in more detail in Part IV.D of this opinion, I will not grant the plaintiffs' request for an order requiring the defendants to send individualized notice of the affidavit option to voters who may lack qualifying ID. However, the defendants will still have to revise their publicity materials relating to the photo ID requirement to include information about the affidavit option and will also have to train election officials to inform voters at the polls about this option. This will require the election-administration defendants to exercise significant effort. *See* Decl. of Michael Haas ¶¶ 30–42. Still, I find that it is practical to complete these tasks in time for the November election. *Id.* ¶ 42 (indicating that it is likely possible to implement the affidavit option in time for November election). Moreover, I find that, under the balance of harms, requiring the defendants to put forth this effort prior to the final resolution of the plaintiffs' claims is justified by the plaintiffs' strong likelihood of success on the merits and the certainty that many of the plaintiffs would suffer significant irreparable harm (i.e., disenfranchisement) if preliminary relief were not granted.

The defendants also contend that preliminary relief is inappropriate because of the possibility of voter confusion. That is, the defendants contend that if I grant a preliminary injunction creating an affidavit option, and then the plaintiffs lose at trial and the injunction is dissolved, some voters will mistakenly think that they may still vote by presenting an affidavit rather than an ID. Voter confusion is of course a risk. However, as I have found, the plaintiffs have a strong likelihood of success on the merits, and thus the affidavit option is not likely to be dissolved after trial. Moreover, any confusion that arises will likely only affect those voters who would be unable to vote without the

affidavit option. Those who already have IDs will use them whether or not the affidavit option is available, as will those who can obtain ID with reasonable effort. Only those who cannot obtain ID with reasonable effort will suffer if they erroneously believe that the affidavit option is still available after trial. But disenfranchising those voters while this litigation is pending would be worse than causing them to be confused after trial, when they would likely be unable to vote anyway due to their inability to obtain ID with reasonable effort. So again, the balance of harms favors preliminary relief.

Finally, the defendants contend that I should not grant preliminary relief because they are unsure whether they have the power to implement an affidavit option. Defs.' Br. at 23, ECF No. 285. The defendants point out that Wisconsin's "municipal clerks," who are not defendants in this case, are the officials who have "charge and supervision" of the state's elections. Wis. Stat. § 7.15(1). The defendants then question whether they have authority under state law to require these clerks to accept affidavits from voters in lieu of photo ID.

Under Wisconsin election law, a "municipal clerk" is defined as "the city clerk, town clerk, village clerk and the executive director of the city election commission and their authorized representatives." Wis. Stat. § 5.02(10). There are approximately 1,900 such clerks in Wisconsin. *See* Trial Testimony of Kevin Kennedy at 888; Declaration of Michael Haas ¶ 12, ECF No. 286. Obviously, it would be impractical to join all of these clerks as defendants, and it is not necessary to do so. The defendants in this case include the Governor of the State of Wisconsin and the members of the state's Elections Commission, which, until recently, was known as the Government Accountability Board.

*See* 2015 Wis. Act 118; Haas Decl. ¶ 1 n.1.[13]   These defendants possess authority under Wisconsin law to require municipal clerks to implement the affidavit remedy. First, the governor, as the chief executive of the state, has the power to require municipal clerks, who are creatures of state law, to implement a court order issued under the U.S. Constitution and that concerns the state's election laws.   Indeed, the defendants submit no evidence and develop no legal argument indicating that the governor lacks this power.   Rather, the defendants merely question whether the Elections Commission has this power.  *See* Defs.' Br. at 23; *see generally* Haas Decl.

But the Elections Commission clearly has this power as well.  State law vests the commission with "the responsibility for the administration of [the Wisconsin Statutes governing elections] and other laws relating to elections."  Wis. Stat. § 5.05(1).  Carrying out a federal court's order concerning the state's election procedures would qualify as administering the state's election laws and "other laws relating to elections" (which includes federal laws relating to elections).   Municipal clerks, who lack the power to administer election laws but only have the power to conduct elections in accordance with those laws, *see* Wis. Stat. § 7.15(1), could not disobey the commission's directive to make affidavits available to voters and to accept them in lieu of photo ID.   The administrator of the Elections Commission points out that the commission might not have authority under state law to pass a formal administrative rule implementing the affidavit requirement.   Haas Decl. ¶¶ 15–17.   However, such a rule is unnecessary. Although the commission has rulemaking authority, *see* Wis. Stat. § 5.05(1)(f), that is

---

[13] The plaintiffs have not named the members of the new Elections Commission as defendants.  However, because those members are successors to the members of the Government Accountability Board, who have been named as defendants in their official capacities, they are automatically substituted as parties.  *See* Fed. R. Civ. P. 25(d).

Case 2:11-cv-01128-LA   Filed 07/19/16   Page 40 of 44   Document 294

just one manifestation of its general authority to administer election laws. Pursuant to its general authority, the commission may direct municipal clerks to implement a court order pertaining to the state's election procedures and federal law.

I also note that the defendants had no difficulty implementing the injunctive relief that I granted in 2014. If the defendants were able to direct municipal clerks to stop requiring voters to present photo ID at the polls in 2014, then they will be able to direct municipal clerks to allow voters to cast a ballot by presenting an affidavit in lieu of photo ID in 2016. Accordingly, I reject the defendants' suggestion that uncertainty over whether they have power to require municipal clerks to implement an affidavit remedy is a reason not to grant that remedy in the first place.

## C.

In this section, I explain why I will not require the defendants to implement the affidavit option for the August 9 primary. First, the plaintiffs have not argued that it would be practical to implement the option in time for this election, which is only a few weeks away. Second, the Administrator of the Elections Commission, who would have primary responsibility for implementing the affidavit option, states that it is not possible to implement that remedy by the date of the election. Haas Decl. ¶¶ 8–12, 41. Aside from the sheer administrative difficulty of implementing the affidavit option by August 9, there is the fact that, as a practical matter, the August election has already begun: municipal clerks began mailing absentee ballots to voters on June 10, 2016, and the deadline for mailing absentee ballots was June 23, 2016. Haas Decl. ¶¶ 9–10. Moreover, in-person early voting begins on July 25, 2016. *See* http://www.gab.wi.gov/voters/absentee (viewed July 19, 2016). Given these facts, the possibility of disrupting the administration of the August election is too great to require

41

the defendants to change the rules applicable to that election now. I realize that this will cause some class members irreparable harm because they will be unable to vote in the August primary, but under the balance of harms, the harm to the defendants and to the public that would be caused by requiring implementation by August 9 outweighs the harm to these class members. Accordingly, I will order the defendants to implement the affidavit option in time for the November general election.

**D.**

Next, I address the plaintiffs' request that the preliminary injunction require the defendants to "send an individualized mailing to all registered voters who do not appear in the DMV database as having acceptable photo ID, informing them about the voter ID law and the affidavit option." ECF No. 278-1 at 2. I am not convinced that individualized notice to voters is required to prevent irreparable harm. The Elections Commission is already planning an advertising campaign relating to the photo ID requirement, Haas Decl. ¶¶ 30–35, and that campaign will now have to include information about the affidavit option. The commission will also have to train elections officials to inform voters about the affidavit option. While it might also be useful to send individualized notice of the affidavit option to voters who might need it, I do not believe that this step is necessary. At this point, I will leave it to the Elections Commission to decide how best to publicize the affidavit option. Accordingly, the plaintiffs' request for an order requiring individualized notice will be denied.

**E.**

Finally, I must specify the form of the affidavit and other details concerning the implementation of the affidavit option. I have modeled the form of the affidavit on North

Carolina's "reasonable impediment declaration."  *See* Young Decl. Ex. 2, ECF No. 280-

2.  The affidavit must contain the following language:

> I declare under penalty of perjury that I am the individual identified below, and that I have been unable to obtain acceptable photo identification with reasonable effort.  This is due to the following reason(s):
>
> __ Lack of transportation
>
> __ Lack of birth certificate or other documents needed to obtain photo ID
>
> __ Work schedule
>
> __ Disability or illness
>
> __ Family responsibilities
>
> __ Other (please identify): _____

The affidavit shall have a space for the voter to print his or her name, a space for the voter's signature, and a space for a date.  The affidavit does not have to be notarized or sworn before any officer.  The Elections Commission may include spaces on the affidavit that are to be completed by election officials for administrative purposes, such as a space for identifying the polling location at which the affidavit was received.

The defendants shall ensure that copies of the affidavit are available at the polls and also to those who vote by absentee ballot.  Any voter who completes and submits an affidavit shall receive a regular ballot, even if that voter does not show acceptable photo identification.  No person may challenge the sufficiency of the reason given by the voter for failing to obtain ID.  Finally, the defendants shall include the affidavit option in any publicity materials related to the photo ID requirement, shall train poll workers to inform voters who arrive at the polls without qualifying ID about the affidavit option, and shall otherwise make reasonable efforts to ensure that voters are made aware of the affidavit option.

**V.**

For the reasons stated, **IT IS ORDERED** that the plaintiffs' motion for a preliminary injunction (ECF No. 278) is **GRANTED**. All defendants and their officers, agents, servants, employees, and attorneys, and all those acting in concert or participation with them, or having actual or implicit knowledge of this order by personal service or otherwise, are directed to implement the affidavit option, in the manner specified in this opinion, in time for the general election on November 8, 2016, and all elections that occur after that date, while this preliminary injunction is in force.

**IT IS FURTHER ORDERED** that the plaintiffs' motion to file a supplemental complaint (ECF No. 278) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiffs' motion for class certification (ECF No. 278) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiffs' claims involving veterans' ID cards are **DISMISSED** as **MOOT**.

**IT IS FURTHER ORDERED** that the defendants' motion to file confidential court records under seal (ECF No. 289) is **GRANTED**.

**IT IS FURTHER ORDERED** that the defendants' motion to strike (ECF No. 290) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 19th day of July, 2016.


<u>s/Lynn Adelman</u>
LYNN ADELMAN
District Judge